UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

<table>
<tr><td>

OPHNET, INC., A Massachusetts Corporation<br>
and JOHN A. HIRSCH and RONALD W. ZOLLA,<br>
Individually and as Shareholders of<br>
ZHL, INC., A Massachusetts Corporation, and<br>
KENNETH CRAM,<br>
<br>
               Plaintiffs,<br>
<br>
v.<br>
<br>
MICHAEL LAMENSDORF, Individually and<br>
as a Shareholder of ZHL, INC.;<br>
MICHAEL LAMENSDORF, M.D., P.C.,<br>
A Florida Professional Corporation;<br>
BAYOU JENNKAY, INC., a Florida Corporation;<br>
and KATHY LAMENSDORF, Individually and<br>
as an officer of Bayou JennKay, Inc.; and<br>
ZHL, INC., a Massachusetts Corporation,<br>
<br>
               Defendants.

</td><td>

Civil Action No.<br>
05-10970-DPW

</td></tr>
</table>

## MEMORANDUM IN SUPPORT OF MOTION TO REMAND

The defendants in this matter (collectively, "the Lamensdorfs") have, *for the second time,* removed this case to the federal court. The last time they removed, they claimed that the defendant ZHL, Inc. (a Massachusetts corporation that is non-diverse as to the Massachusetts plaintiffs) was being fraudulently joined as a party plaintiff. Judge Lindsay rejected the argument, permitted the amendment that named ZHL as a defendant, and remanded the case to state court.

They're back. Nearly three years after Judge Lindsay's decision, the Lamensdorfs claimed to have discovered through recently unearthed evidence that ZHL was fraudulently joined. That evidence appears to consist of a letter tendering the defense of the claim against

ZHL to Dr. Michael Lamensdorf ("Dr. Lamensdorf"), the minority shareholder responsible for

ZHL's breach of the contract. Unsurprisingly (at least to those who know the Lamensdorfs), the

latest removal took place less than three weeks before discovery was due to close and about two

months after the Massachusetts Superior Court set a firm trial date of October 2005.

The case must be remanded again for four reasons.

First, 28 U.S.C. § 1446 explicitly provides that a matter may not be removed based on

diversity more than one year after commencement of the action. This action commenced in

February 2002, so the Lamensdorfs missed the deadline by about 27 months. The language of §

1446(b) is absolute on its face and admits of no exceptions. Thus, even if all of the plaintiff's

rash charges about the fraudulent joinder of ZHL are taken as true, removal still will not lie.

Second, the removing party must act within 30 days after receipt of a pleading that

provides notice that the case has become removable. The Lamensdorfs cannot point to any such

pleading, and at any rate they had already asserted their fraudulent joinder allegations. Thus, the

30 day bar of § 1446(b) also requires remand.

Third, even if some exception to the one-year bar of § 1446(b) could be implied, the

Lamensdorfs presented their claim of fraudulent joinder to this Court nearly three years ago, and

Judge Lindsay rejected it. That order is now law of the case. Furthermore, the Lamensdorfs had

one full year to pursue the fraudulent joinder theory they articulated when opposing the original

amendment that added ZHL. The mere fact that more evidence of that theory emerged recently

(or so they say) cannot reasonably be the basis for a second removal. If it is, there is no

principled reason why the disappointed remover could not remove a case for a third or fourth

time based on alleged newly discovered evidence. Thus, even if it were possible in theory to

create an exception to the one-year rule (and there is no basis whatsoever for it), this case would not qualify.

Finally, even if this Court were to reach the merits of the Lamensdorfs' claims, it is clear that Judge Lindsay was correct ZHL was not fraudulently joined. ZHL is a party to a management contract with Ophnet. ZHL, acting by and through Dr. Lamensdorf, breached the contract by wrongfully terminating it. When Ophnet originally sued Dr. Lamensdorf for breach, it was <u>Dr. Lamensdorf himself</u> (through his attorneys) who pointed out that the plaintiffs had sued the wrong party and that he had <u>not</u> signed the management contract in his personal capacity. The breach of contract claim was therefore in the case from the very first day; only the defendant alleged to be liable changed. The claim that no discovery has been conducted into the claim is outrageously false; Dr. Lamensdorf was deposed for the better part of <u>two days</u> about the supposed mismanagement of the surgery center, about his reasons for terminating Ophnet, and about the circumstances of his doing so. Accordingly, there is no legal or factual basis to the Lamensdorfs' fraudulent removal claims.

## **FACTS**

### A. The Original Complaint

This case began on or about March 5, 2002 when the plaintiffs Ophnet, Inc. ("Ophnet"), John A. Hirsch ("Mr. Hirsch") and Ronald W. Zolla ("Mr. Zolla") filed suit against Dr. Michael Lamensdorf ("Dr. Lamensdorf") and his wife Kathy ("Mrs. Lamensdorf"), both individually and in their capacities as shareholders of ZHL. <u>See</u> "Complaint," March 4, 2002, attached (without exhibits) as <u>Exhibit 1</u> hereto.[1] Also named as a defendant was Dr. Lamensdorf's medical practice, Michael Lamensdorf, M.D., P.C. ("the practice"). The proofs of service filed with the

---

[1] The exhibits to the Complaint were voluminous and are therefore omitted, but can be provided to the Court on request.

Superior Court showed that the Sarasota County Sheriff effected service of the Complaint in hand on March 7, 2002. [2]

The Complaint recited essentially the following facts. Mr. Hirsch and Mr. Zolla are management consultants who for over 20 years have specialized exclusively in the management of ophthalmology practices. Ex. 1 at ¶ 9. In 1995, Ophnet, a company which Mr. Hirsch and Mr. Zolla own and operate, entered into a contract with Dr. Lamensdorf and the practice to provide management and strategic planning services. Id. at ¶ 10. Ophnet agreed to work for a reduced rate compared to its standard hourly charges, but under the management agreement with the practice would potentially earn bonus income based upon the practice's Net Income (a defined term). Id. at ¶ 11. The formula for determining bonus income was complex and precise, but in substance the Lamensdorfs kept the first $269,000 in profits and they split the rest with Ophnet 50/50. Id. Ophnet also was entitled to certain deferred income based upon increases in practice profits. Id. at ¶¶ 12-13.

With Ophnet's assistance, Dr. Lamensdorf's practice grew and prospered. Id. at ¶ 14. Cataract surgeries – by far the most profitable procedure for an ophthalmology practice – increased by approximately 400% between 1995 and 2002. Id. Accordingly, in 1998, the parties jointly agreed to build an ambulatory surgery center ("ASC") which would specialize in eye surgeries. Id. at ¶ 15. To that end, they formed ZHL, Inc., a Massachusetts corporation in which Dr. Lamensdorf, Mrs. Lamensdorf, Mr. Hirsch and Mr. Zolla were the shareholders. Id.

---

[2] It is expected that the Lamensdorfs will comply with L.R. 81.1 and file certified copies of the Essex Superior Court pleadings at about the time that this Motion to Remand is filed. Accordingly, the plaintiffs freely reference Superior Court pleadings without attaching them if they are of marginal significance. The plaintiffs will provide the Court with copies of any relevant documents which the Lamensdorfs do not in fact file at the Court's request.

Because Ophnet had experience in the construction and operation of ambulatory surgery centers, ZHL effective January 15, 1999 entered into a Management Agreement (hereafter, "the ZHL Management Agreement") with Ophnet whereby Ophnet would oversee the construction of and provide management services to the ASC. Ex. 1 at ¶ 16. A true and accurate copy of the ZHL Management Agreement which was Exhibit 5 to the complaint, is attached hereto as Exhibit 2. Ophnet was required to provide several different types of management services to the ASC. These included strategic management and marketing services, such as assistance in preparing non-medical policies and procedures. Ex. 2 at § 4 (c), pp. 9-10. Under § 4(d), captioned "Operational Phase," Ophnet was required, *inter alia*, to monitor the day-to-day operations of the ASC. Ex. 1 at ¶ 15; Ex. 2 at pgs. 9-11. Operational services under § 4(d) could be terminated by Dr. Lamensdorf upon 120 days' written notice to Ophnet of the perceived deficiencies plus a 30 day cure period. Ex. 1 at ¶ 17; Ex. 2 at § 11, p. 15. By contrast, Ophnet's duties under § 4(c) could be terminated only by majority vote of ZHL's shareholders. Ex. 1 at ¶ 17; Ex. 2 at § 11, p. 15.

During the construction phase of the ASC, Dr. and Mrs. Lamensdorf each falsely claimed that they did not have sufficient funds to make capital contributions to ZHL necessary for the construction and operation of the ASC. Ex. 1 at ¶ 18. Accordingly, Mr. Hirsch and Mr. Zolla each individually loaned ZHL $400,000 (a sum, parenthetically, that by 2005 had risen to well over $1.2 million). Id. The Complaint recited that although the ASC had opened for business, the Lamensdorfs were still not making their required capital contributions but that they were interfering with non-medical aspects of the management of the ASC. Id. at ¶ 19. On January 16, 2002, Dr. Lamensdorf purported to terminate Ophnet's management contracts both for the medical practice and for the ASC. Id. A true and accurate copy of the termination letters and

related correspondence was attached to the complaint at Exhibit 7, and are attached hereto as Exhibit 3.

The Complaint thereafter stated five counts relating to the medical practice, including the failure to pay bonus income and the failure to pay Ophnet's deferred income. Ex. 1 at ¶¶ 21-37. The other counts related to the ASC. Count VII stated a claim for fraudulent inducement against the Lamensdorfs relating to the loans which Mr. Hirsch and Mr. Zolla had provided to the ASC, and Count VIII stated claims for breach of fiduciary duty relating to the Lamensdorfs' actions as shareholders of ZHL. For present purposes, however, the critical count was Count VI, relating to breach of the ZHL Management Agreement, including allegations that Dr. Lamensdorf had purported to terminate the contract in bad faith and that he had failed to provide the required notice and cure period before doing so. Id. at ¶ 39.

B. The First Removal to Federal Court

On March 27, 2002, the defendants filed a "Notice of Removal." Concurrently, the defendants moved to compel arbitration based on certain alternative dispute resolution clauses in certain of the contracts.

Following removal, the defendants (after some procedural wrangling relating to the plaintiffs' compliance or lack of compliance with L.R. 15.1), moved to file a Second Amended Complaint.[3] The Second Amended Complaint included a somewhat expanded fact statement against Dr. Lamensdorf and his medical practice, including the allegations that Dr. Lamensdorf had systematically understated the practice's profits (and therefore Ophnet's bonus income) by

---

[3] On or about March 20, 2002, the complaint had been amended as a matter of right while it was still pending in the state court. The amendments added a new party plaintiff, Kenneth Cram, and added two additional counts relating to the business affairs of the Lamenscram Partnership, an entity in which Mr. Cram was a partner which had been formed to hold certain hard assets of the medical practice, and to seek a declaratory judgment on certain restraints on competition contained in the ZHL Shareholder Agreement. See "Amended Complaint", March 20, 2002 at ¶¶ 5, 50-58.

taking a salary more than $100,000 in excess of his contractually allotted $269,000 per year, and paying his wife's corporation, Bayou JenKay, Inc. exorbitant sums for clerical and "strategic consulting" services thereby further artificially depressing the practice's profits. See Exhibit 4.[4]

For present purposes, the amendment that mattered was the one that named ZHL as a party defendant. In the original complaint, Count VI stated a claim against Dr. Lamensdorf for breach of the ZHL Management Agreement due to his wrongful termination of Ophnet as manager of the ASC. Ex. 1 at ¶¶ 38-40. As the defendants themselves observed in their "Memorandum of Law in Support of Their Motion to Compel Arbitration," Exhibit 5 hereto, "Dr. Lamensdorf did not sign the ZHL Management Agreement personally, he signed it in his capacity as Chairman of the Board of ZHL." Id. at 10. The evident assertion was that as a party who signed on behalf of a disclosed principal, Dr. Lamensdorf could not be held liable for ZHL's breach of contract, and so the proper party to sue was ZHL itself. Ophnet therefore sought to leave to sue ZHL. Concurrently, the plaintiffs moved to remand, since ZHL's joinder would destroy diversity. See Exhibit 6, Renewed Motion for Remand for Lack of Subject Matter Jurisdiction, and Exhibit 7, Plaintiffs' Consolidated Memorandum of Law in Support of the motions, both dated May 22, 2002.[5]

The Lamensdorfs promptly filed an opposition to the motion to amend and the motion to remand. Exhibit 8. Among other things, the defendants argued that the "equities" weighed in favor of refusing to join ZHL as a party defendant because Mr. Hirsch and Mr. Zolla "as

---

[4] Exhibit 4 is the Amended and Corrected Motion to Amend with the corrected Second Amended Complaint that was eventually filed on May 22, 2002. It was this motion that Judge Lindsay ultimately granted, and the Second Amended Complaint attached to it (also reproduced without exhibits) is currently the operative one in this case.

[5] Exhibit A to the Consolidated Memorandum was the ZHL Management Agreement, attached hereto as Ex. 2.

controlling interest holders in ZHL will presumably be appointing counsel and making all of the

representation decision [sic] concerning the defense of ZHL." Ex. 8 at 5.[6] The Lamensdorfs'

Opposition also argued that ZHL had been fraudulently joined insofar as it was under Mr. Hirsch

and Mr. Zolla's control. Id. at 6-7.

On July 20, 2002, Judge Lindsay issued an order on the motion to amend and to remand.

Exhibit 9. He found that ZHL "appears to be an indispensable party. Accordingly, the motion to

amend that corporation as a defendant is allowed. Because the addition of ZHL destroys this

court's subject matter jurisdiction, this case is REMANDED to Essex Superior Court

(Massachusetts)." Id.

C. The Current Removal Petition

The defendants filed their current notice of removal on May 10, 2005. As of that date,

the Middlesex Superior Court on the plaintiffs' motion had scheduled a firm discovery cutoff of

May 30, 2005 and a firm trial date of October 13, 2005. See Exhibit 10. Between July 20, 2002

and May 2005, counsel's court file index showed over 150 motions, orders, pleadings, and other

discovery events. See Exhibit 11.

## ARGUMENT

**I.    THE DEFENDANTS FAILED TO REMOVE THIS CASE WITHIN ONE YEAR OF ITS FILING, AND IT CANNOT BE REMOVED NOW**

Even if this Court were to credit the Lamensdorfs' unsupported claim that ZHL was

fraudulently joined to defeat diversity, this case would still need to be remanded. 28 U.S.C.

§ 1446(b) provides, in pertinent part, that "a case may not be removed on the basis of jurisdiction

---

[6] The defendants added: "Defendants have never indicated that ZHL should be a party to this suit as Defendants recognized that all parties in interest are in fact already represented in this action. In their Motion to Compel Arbitration Defendants simply point out that Dr. Lamensdorf as an individual cannot be held liable for beach of a contract that he did not sign individually." Id. at 5.

conferred by § 1332 of this title more than one year after commencement of the action." In this district, it has been held based upon the plain language of the statute and its legislative history that § 1446(b) is "clear and unambiguous" and that the "one-year bar is absolute." Santiago v. Barre Nat., Inc., 795 F. Supp. 508, 510 (D. Mass. 1992). Since Santiago, the majority of the courts to have considered the issue agree that there are no exceptions to that rule. See, e.g., Foiles v. Merrill Nat.'l Laboratories, 730 F. Supp. 108 (N.D. Ill. 1989) ("plain language" of statute "reads as a blanket prohibition on removal of diversity case more than one year after commencement of the action"); Rezendez v. Dow Corning Corp., 717 F. Supp. 1435 (E.D. Cal. 1989) ("Congress has clearly expressed its intent in the plain language of [the statute] that a diversity case which has been before a state court for more than one year should stay there").

Neither the legislative history nor the language of § 1446(b) has changed since Santiago was decided. Indeed, if anything, the basis for its holding has become stronger since Caterpillar, Inc. v. Lewis, 519 U.S. 61 (1996). The issue presented in Caterpillar was whether the district court had jurisdiction to enter judgment where it had erroneously denied the plaintiff's motion to remand but where the non-diverse party settled out of the case, thereby restoring diversity at the time judgment entered. In its analysis, the Caterpillar court stated that *"[n]o case* may be removed from state to federal court based on diversity of citizenship 'more than one year after commencement of the action.'" 519 U.S. at 68-69 (quoting § 1446(b); emphasis supplied). Just as the language of § 1446(b) is absolute, "the Supreme Court's language in Caterpillar is absolute, allowing no exclusions." Barnett v. Sylacauga Autoplex, 973 F. Supp. 1358, 1362 (N.D. Ala. 1997). See also Lovern v. GMC, 121 F.3d 160, 163 (4th Cir. 1997) ("in diversity cases, the statute explicitly . . . erect[s] an absolute bar to a removal of cases in which jurisdiction is premised on 28 U.S.C. § 1332 more than one year after commencement of the action.")

The <u>Santiago</u> court's reading of § 1446(b)'s legislative history has also found wide

acceptance.  As the Eleventh Circuit has put it:

> the Commentary to the 1988 Revisions of 28 U.S.C. § 1446(b) shows that Congress knew
> when it passed the one year bar o removal that some plaintiffs would attempt to defeat
> diversity by fraudulently (and temporarily) joining a non-diverse party.  In that case, as
> long as there is some possibility that a non-diverse joined party could be liable in the
> action, there is no federal jurisdiction.  But, under section 1446(b), if, after one year, the
> plaintiff dismisses the non-diverse defendant, the defendant cannot remove.  So, a
> plaintiff could defeat jurisdiction by joining a non-diverse party and dismissing him after
> the deadline.  Congress has recognized and accepted that, in some circumstances,
> plaintiff can and will intentionally avoid federal jurisdiction.

<u>Burns v. Windsor Ins. Co.</u>, 31 F.3d 1092, 1097, n. 12 (11th Cir. 1994).  The great majority of the

courts to have considered the issues firmly agree:  there are no loopholes in § 1446(b).  <u>See, e.g.</u>,

<u>Beisel v. Aid Ass'n for Lutherans</u>, 843 F. Supp. 616 (C.D. Cal. 1994) (plaintiff added non-

diverse defendant to defeat removal; second removal following state court dismissal of non-

diverse defendant rejected as untimely under one-year rule); <u>Baylor v. District of Columbia</u>, 838

F. Supp. 7 (D.D.C. 1993) (no removal more than one year after commencement of action);

<u>Hedges v. Hedges Gauging Service, Inc.</u>, 837 F. Supp. 753 (M.D. La. 1993) (same, observing

that it is Congress' responsibility, not the court's, to rewrite the removal statute to eliminate

abuses or create exceptions); <u>Rashid v. Schenck Const. Co., Inc.</u>, 843 F. Supp. 1081, 1088 (S.D.

W.Va. 1993) (§ 1446(b) "serves the interest of comity between state and federal courts" and is

absolute); <u>Auto Transportes Gacela S.A. De C. V. v. Border Freight Distrib. & Warehouse, Inc.</u>,

792 F. Supp. 1471 (S.D. Tex. 1992) (§ 1446(b) barred removal by third-party defendant added

more than a year after the commencement of state court action).

The cases which permit equitable tolling or imply other exceptions to the absolute

language of § 1446(b) are singularly unpersuasive.  <u>See, e.g.</u>, <u>Tedford v. Warner-Lambert Co.</u>,

327 F.3d 423, 426 (5th Cir. 2003) (providing that parties' conduct, in limited instances, may

warrant equitable tolling of the one year limit); Hardy v. Ajax Magnathermic Corp., 122 F. Supp. 2d 757, 759-761 (W.D. Ky. 2000). The Hardy court, for example, did not discuss at all the many cases holding that § 1446(b) was an absolute bar to removal after a year. The Tedford court relied primarily on (i) its previous ruling that the time limits in § 1446(a) were subject to equitable tolling, and its reluctance to depart from that rule in connection with § 1446(b); and (ii) upon its reading the legislative history.

As to the latter point, Tedford's reading emphasized the statement in the House Report that Congress intended only to "reduce the opportunity for removal after substantial progress has been made in state court" such that the provision was intended to effect only "a modest curtailment in access to diversity jurisdiction." 327 F.3d at 426 n. 3, 427 & n. 9. Tedford, however, looks at the language of the legislative history from the wrong perspective. Few indeed will be the cases that the one year bar will apply to; the thirty day bar contained in § 1446(a) disposes of the great majority of the decided cases, as a glance at the annotations in the United States Code Service will confirm. The fact that Congress knew that the one-year bar of § 1446 would apply in a relatively small number of cases does not, however, mean that the bar was intended to be something other than absolute in those relatively few cases it reached.

The Tedford court also ignored the substantial differences between the language of § 1446(a) and that of § 1446(b). The language of the latter provision is absolute. See Jones Mgmt. Servs., LLC v. KES, Inc., 296 F. Supp. 2d 892, 894 (E.D. Tenn. 2003) ("The statute says what it says. Any attempt to read into the statute an 'equitable' exception amounts to judicial legerdemain."). The Tedford court also did not discuss or even cite to Caterpillar, a case that confirms the absolute nature of the one-year bar.[7]

---

[7] To the extent that the Fifth Circuit invoked policy considerations, it simply consulted the wrong policy. The statement that "Congress may have intended to limit diversity jurisdiction, but it did not intend to

In short, the cases since <u>Santiago</u> have correctly perceived that the one-year limit established by § 1446(b) is strict and unyielding.  The rule provides certainty to litigants, informs prospective removing defendants who believe that fraudulent joinder has taken place that they have 365 days in which to diligently pursue that claim, and ensures that cases (like this one) that have been in litigation for three years and have firm trial dates scheduled are not suddenly whisked away to federal court so that trial can be further delayed.  Accordingly, under the one-year absolute bar erected by § 1446(b), this case must be remanded to the state court.

## II.    THE DEFENDANTS CANNOT SHOW THAT THEY REMOVED THIS CASE IN THIRTY DAYS WITHIN THE RECEIPT OF A PAPER SHOWING THAT IT HAS BECOME REMOVABLE.

Even if the Defendants can surmount the one-year bar of § 1446(b), the provision contains a second requirement as well:  the notice of removal must be filed "within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable."  The 'paper' the defendants apparently rely on is a letter that Mr. Hirsch sent to Mr. Lamensdorf in early May, 2005 in which Mr. Hirsch states that as far as he is concerned ZHL has no valid defense to Ophnet's claims.  <u>See</u> Affidavit of Matthew E. Miller in Support of Defendants' Notice of Removal, May 10, 2005 at Ex. D.

---

allow plaintiffs to circumvent it altogether" is simply a non-sequitur.  <u>See</u> 327 F.3d at 427.  Nobody supposes that the intention was to allow plaintiffs to circumvent a federal forum *altogether*.  Rather, as the Eleventh Circuit recognized, the rule accepts that some arguably unjust results must be tolerated in the service of ease of application and clarity.  As a general matter, in the interest of comity and judicial efficiency the removal statutes are to be strictly construed.  <u>See</u> Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 108-09 (1941); American Home Assurance Co. v. Insular Underwriters Corp., 494 F.2d 317, 319 (1st Cir. 1974).  In light of the fact that federal removal jurisdiction is statutory in nature and to be strictly construed, if there is any doubt at all about whether equitable tolling was intended, the appropriate policy consideration is that all doubts should be resolved *against* diversity removal jurisdiction.  <u>See, e.g.</u>, Caudill v. Ford Motor Co., 271 F. Supp. 2d 1324, 1327 (N.D. Okla. 2003).

Under the 30 day rule, a removing defendant bears the burden of showing what "paper" alerted him to the possibility of removal. See Longden v. Phillip Morris, Inc., 2003 U.S. Dist. LEXIS 14427 (D. N.H. August 19, 2003) at *3-*5. Courts have recognized, however, that the "*other* paper" referenced in § 1446(b) is not necessarily *any* paper. See Mill-Bern Assocs. v. Dallas Semiconductor Corp. 69 F. Supp. 2d 240, 241 (D. Mass. 1999). Thus, the removing defendant "must show not only that the content of the [paper relied upon] made the case removable, but also that the [paper] was the kind of 'other paper' that may renew an otherwise expired right of removal." Id. at 241. If the May 5, 2005 Hirsch letter fails either prong of this test the case must be remanded, and it in fact fails both prongs.

First, there is nothing in the Hirsch letter which supports removal. Certainly there is nothing about a statement by an officer of a plaintiff that he regards the plaintiff's claims as meritorious that could serve to "inform" anyone of anything. Of course Ophnet thinks its claims are meritorious. Tendering (or retendering) ZHL's defense to Dr. Lamensdorf also belies rather than supports the Lamensdorfs' desired inference that the case Ophnet brought against ZHL was a sham. If the case were a sham, the last thing Mr. Hirsch would want would be for Dr. Lamensdorf to assume ZHL's defense. Thus, nothing about the paper supports the inference that the Lamensdorfs seek to draw, and their claim is mere pretext.

Second, there is little question that while the phrase "other paper" has at times been broadly read, a letter is not the sort of document that the statute contemplates. See Mill-Bern, at 242-243. "The words 'other paper' are part of the series: 'amended pleading, motion, order or other paper.' Following as they do three specific terms, the general words 'other paper' should be understood to describe something that shares some common characteristic or quality with the other terms in the series." Id. Hence, the better view of the language is that only legal pleadings,

perhaps in the extended sense of that term, constitute a 'paper' that can revive a lapsed right of removal. An affidavit qualifies as an 'other paper'; a deposition transcript might or might not; a letter certainly does not. See Mill-Bern at 243. Although there is contrary authority (as discussed in Judge O'Toole's opinion in Mill-Bern), it appears clear that in this district at least that those cases have correctly been rejected. Accordingly, this case must be remanded.

## III. EVEN IF EQUITABLE TOLLING EXISTS FOR § 1446(b)'S ABSOLUTE ONE-YEAR BAR, THIS CASE IS UNSUITABLE FOR APPLICATION OF ANY SUCH EXCEPTION

Even if this Court were to recognize as a theoretical matter the possibility of implying exceptions to the absolute one-year bar of § 1446(b), there is no basis for applying that exception to the case at hand.[8] Quite apart from the fact that there is no evidence of forum manipulation (a matter addressed in Part IV below), the fact is that the defendants asserted almost *three years ago* that ZHL's joinder was fraudulent. Between July 2002 and now, however, the Lamensdorfs apparently did *nothing* that they care to articulate to investigate that claim, and if they did do anything they certainly did not see fit to actually remove the case within the one year bar. Judge Lindsay's order permitting amendment and remand over the defendants' objections constitutes the law of the case. See Ellis v. United States, 313 F.3d 636, 647 (1st Cir. 2002) ("A party should be allowed his day in court, but going beyond that point deprives others of their days in court, squanders judicial resources, and breeds undue delay."). As such, the defendants bear the heavy burden to show that there are "special circumstances" that would justify revisiting that order. Id. at 646.

---

[8] It should be noted in passing that ZHL, a defendant in this matter, did not join in the petition for removal, and that alone is arguably fatal to its claim. See, e.g., Price v. Messer, 872 F. Supp. 317, 321 (S.D.W. Va. 1995). Since Dr. Lamensdorf has been tendered the defense of ZHL, he has every right to cause it to join in the petition, and the failure to do so, without more, requires that the case be remanded. But see Coughlin v. Nationwide Mut. Ins. Co., 776 F. Supp. 626, 629 n.4 (fraudulently joined defendant need not join in removal petition).

In determining whether newly discovered evidence may form the basis for an equitable tolling of § 1446(b)'s time limits, a defendant who has previously raised the fraudulent joinder issue should, by analogy to Fed. R. Civ. P. 59 and 60(b)(2), be held at least to an obligation of due diligence. See, e.g., Karak v. Bursaw Oil Corp., 288 F.3d 15, 18-20 (1st Cir. 2002). Having already argued to Judge Lindsay that the Court should not permit amendment because Mr. Hirsch and Mr. Zolla were in control of ZHL, the defendants are plainly are in no position now to say that newly discovered evidence informed them of that alleged fact.[9]

In short, as one court observed in invoking the absolute bar of § 1446(b), the Lamensdorfs "knew the one-year clock was ticking, yet [they] failed to take action. There is no good reason for a federal court to 'create' removal jurisdiction outside the one-year period when the issue could have been addressed before the deadline set by Congress." Caudill v. Ford Motor Co., 271 F. Supp. 2d 1324, 1328 (N.D. Ok. 2003). Accordingly, even if this Court were to find that a defendant may under appropriate circumstances invoke equitable tolling under § 1446(b), this case does not present an identifiable occasion for doing so.

## IV.    THE LAMENSDORFS CANNOT SHOW BY CLEAR AND CONVINCING EVIDENCE THAT ZHL WAS FRAUDULENTLY JOINED TO DEFEAT DIVERSITY.

Even if this Court were inclined to hold that equitable tolling is possible under § 1446(b) and even if it were inclined to revisit the ground that Judge Lindsay previously traversed, the Lamensdorfs cannot show fraudulent joinder. "A defendant who seeks to remove a case from the state court, asserting fraudulent joinder of a defendant, has the burden to prove by clear and

---

[9] In many of the cases that have recognized equitable tolling, the defining characteristic is the plaintiff's concealing from the defendant the true nature of the claim by joining a straw or otherwise misleading the defendants about their *bona fides* in naming certain defendants. See, e.g., Kite v. Richard Wolf Medical Instruments Corp., 761 F. Supp. 597, 600 (S.D. Ind. 1989), where the joining of the defendant was a sham and possibly a collusive sham. See also Longden v. Philip Morris, Inc., 2003 U.S. Dist. LEXIS 14427 at *10-11 (D.N.H. August 19, 2003) (listing cases). Obviously, these cases have no applicability here, since the Lamensdorfs cannot claim that they were mislead.

convincing evidence either that there has been an outright fraud committed in the plaintiff's

pleadings or that there is no reasonable basis in law and fact for the plaintiff's claim against the

putative fraudulently joined defendant." In re Massachusetts Diet Drug Lit., 338 F. Supp. 2d

198, 202 (D. Mass. 2004). "The burden of establishing that joinder is fraudulent is on the party

seeking removal to federal court, and the burden is a heavy one." Fabiano Shoe Co., Inc. v.

Black Diamond Equip., Ltd., 41 F. Supp. 2d 70, 71 (D. Mass. 1999). All factual and legal

ambiguities must be resolved in the plaintiff's favor, and any doubts about jurisdiction should be

resolved against removal. Mills v. Allegiance Healthcare Corp., 178 F. Supp. 2d 1, 4-6 (D.

Mass. 2001); In re Mass. Diet Drug Lit. at 202.

Substantively, "The linchpin of the fraudulent joinder analysis is whether the joinder of

the non-diverse party has a reasonable basis in law and fact." Mills at 4. See also Carey v.

Board of Governors of the Kernwood Country Club, 337 F. Supp. 2d 339, 341 n. 1 (D. Mass.

2004). An objectively valid basis for joining the defendant in the complaint renders the

plaintiff's subjective motivations largely irrelevant. Mills at 6; In re Mass. Diet Drug Lit. at 202.

The functional test is whether the alleged claim could survive a 12(b)(6) motion to dismiss. See,

e.g., Ritchey v. Upjohn Drug Co., 139 F.3d 1313, 1319 (9th Cir. 1998).

Here, the claim against ZHL not only can survive a motion to dismiss; it has, in essence,

already done so. The defendants have no colorable evidence, much less clear and convincing

evidence, that ZHL was amended into the case to defeat federal jurisdiction.[10] Ophnet brought a

claim for breach of the ZHL Management Agreement on the very first day the suit was filed.

See Ex. 1 at ¶¶ 38-40. *Defendants themselves* pointed out that ZHL was an indispensable party

---

[10] The assertion itself verges on the absurd. Since ZHL is a Massachusetts corporation with a principal place of business in Florida, it destroys diversity whichever side of the "v." it is on. If all they had wanted to do was to destroy diversity, Mr. Hirsch and Mr. Zolla could simply have caused ZHL to sue the Lamensdorfs.

by pointing out, correctly, that Dr. Lamensdorf signed the ZHL Management Agreement in his representative capacity as Chairman of ZHL's Board. See Ex. 5 at 10. As a party who signed on behalf of a disclosed principal, Dr. Lamensdorf presumptively cannot be held liable for ZHL's breach of the contract. See McCarthy v. Azure, 22 F.3d 351, 360-361 (1st Cir. 1994); Liberty Communications, Inc. v. MCI Telecommunications Corp., 733 So.2d 571 (Fla. App. 1999), mandamus den., 743 So.2d 509; Restatement 2d of Agency, § 320.[11] A party to a contract is also the archetypical Rule 19 indispensable party. See Hensohn v. Levin, 79 F.R.D. 441, 443 (D. Mass 1978) (holding that corporate party to contract was indispensable where suit only named individual officer who signed contract and ordering diversity-destroying joinder). There is nothing even remotely tainted about repleading a cause of action which the defendants themselves have pointed out must be repleaded if it is to be maintained.

There is also no question that ZHL is not merely a sham defendant. Contrast Poulos v. Naas Food, Inc., 959 F.2d 69, 73 (7th Cir. 1992) (holding that fraudulent joinder may be found where plaintiff has "no chance of recovering damages" against non-diverse defendant). The ZHL Management Agreement was signed by sophisticated commercial parties who were embarking on a multi-million dollar business venture. The contract specified Ophnet's duties with some precision, and set forth in detail the procedures that Dr. Lamensdorf was required to follow in order to terminate that part of the contract which he had the power to terminate. Nevertheless, Dr. Lamensdorf purported to terminate both § 4(c) and § 4 (d), only one of which

---

[11] The ZHL Management Agreement contains a clause stating "this Agreement shall be construed in accordance with and governed by the laws of Florida." Ex. 2 at ¶ 13(c). Florida holds as a matter of substantive law that a party to a contract must be named in a suit upon it. "A person whose rights and interests are to be affected by a decree [and whose] actions with reference to the subject matter of litigation are to be controlled by a decree is a necessary party to the action and the trial court cannot proceed without that person." Blue Dolphin Fiberglass Pools of Florida, Inc. v. Swim Industs. Corp., 597 So.2d 808, 809 (Fla. App. 1992).

he in fact had the power to terminate, and the correspondence itself shows that he never provided the required notice or cure period. See Ex. 3; infra at 20. Under § 4(d), Ophnet could (and would) have earned up to $50,000 per year for its services. See Ex. 2 at § 7(a)(2). Under § 4(c), the damages are $30,000 per year. See Ex. 2, § 7(a)(3) at p. 12. Damages in the three years since Dr. Lamensdorf's termination took effect therefore exceed $200,000, and as much as one-third of that will in essence come from the Lamensdorfs' pockets.

      The Lamensdorfs' claim that ZHL has been fraudulently joined because no discovery has been conducted into the claim against it is both irrelevant and untrue. The Lamensdorfs' correspondence speaks for itself. At that, Dr. Lamensdorf and Mrs. Lamensdorf have been deposed extensively about Ophnet's management of the ASC, its perceived 'incompetence' and his reasons for his terminating the contract. See Exhibit 12 (excerpts and exhibits from M. Lamensdorf Deposition Day 2); Exhibit 13 (excerpts and exhibits from M. Lamensdorf Deposition Day 3); Exhibit 14 excerpts and exhibits from K. Lamensdorf Day 3). The exhibits which show that he acted in bad faith in terminating Ophnet have been marked and discussed as well, including one in which where Dr. Lamensdorf transparently attempts to fire Ophnet in order to maneuver his wife's supposed "management company," Bayou JennKay, into the management of the surgery center:

> John, Ron & Ken,
> The Lantz will not survive under current management. The following changes will therefore occur:
> 1. Effective 8:00 am 2 January 2002, Bayou Jenkay [sic] is in charge. Under the supervision of BJI, Ophthnet [sic] will provide services as directed.
> 2. By 10:00 am 2 January 2002, BJI will be compensated $50,000. If the project is satisfactorily completed by 28 February 2002, BJI will receive a bonus of $10,000. Starting 1 March 2002, BJI will be placed on retainer of $5000 payable by 10:00 am the first of each month. Expenses and labor will be payable at that time.
> 3. The Lamensdorfs are beneficial owners of 75% of ZHL. These shares are considered to be paid in full and will not be further assessable. [sic]

Lamensdorf Ex.66, incorporated in Ex. 12 hereto.[12]  It is hornbook law that a power of

termination must be exercised (like any other power under a contract) in good faith.  The

extensive discovery conducted shows that Dr. Lamensdorf's grasping was the antithesis of good

faith and fair dealing.

Finally, the defendants attempt to deflect this Court's attention from the substance of the

claim by attacking Mr. Hirsch and Mr. Zolla (and their attorneys) for standing on both sides of

the case.  No doubt when close corporations do business with related close corporations there is

the potential for conflicting loyalties, but there is nothing which is in itself legally or morally

suspect about that circumstance.  The Lamensdorfs themselves prove the point.  They have

recently brought a lawsuit *against ZHL* in the State of Florida.  See Exhibit 15, hereto,

constituting an excerpt from the Florida complaint.  They have done so after bringing derivative

claims *on ZHL's behalf* in this lawsuit.  See excerpts from the Lamensdorfs' Answer and

Counterclaims to the Second Amended Complaint, attached hereto as Exhibit 16, at Count I

("Breach of ZHL Management Agreement") ¶¶ 28-34.  See also id. at ¶ 29 ("Defendants . . .

bring this action as shareholders of ZHL, on behalf of ZHL."); id. at Second Affirmative

Defense, p. 11 "Plaintiffs first breached the parties' Management Agreement for ZHL . . . and

such breach was material.").  The same lawyers in the Florida case represented the Lamensdorfs

when this case was in the Superior Court and they seek admission *pro hac vice* to this Court.

The Lamensdorfs' moral outrage is therefore as misplaced as it is irrelevant.

In summary, there was a reasonable basis to join ZHL at the time it was joined and there

is a reasonable basis to keep it in the case.  At a minimum, the Lamensdorfs' scant evidence

---

[12]  See also id., Ex. 63 at 2 ("Kathy has told me that Bayou Jenkay[sic] can have the [ASC] running
effectively by the end of March.  That would truly be a miracle . . .. She is only asking what Ken is
receiving, $75.00/hour, a real bargain.").  Dr. Lamensdorf has also made clear why he regarded Ophnet as
incompetent managers. See Ex. 12 at 278 ("They wouldn't hire the people I suggested.  They wouldn't
institute the reforms I suggested.  They wouldn't do any of the things that I suggested").

cannot conceivably support a finding by clear and convincing proof that ZHL was fraudulently joined. Thus, even if this Court were to recognize some form of equitable toiling to the absolute one-year bar of § 1446(b), there would be no basis to apply that exception here. Accordingly, this Court should find that it has no subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 and should remand the matter back to the Essex Superior Court.

Respectfully submitted,

OPHNET, INC., JOHN A. HIRSCH,
RONALD W. ZOLLA, and KENNETH CRAM,

By their Attorneys,

/s/ Edward Foye
J. Owen Todd (BBO # 499480)
Edward Foye (BBO #562375)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
617-720-2626

Date: June 9, 2005

EXHIBIT 1
TO
**MEMORANDUM IN SUPPORT OF MOTION TO REMAND**

COMMONWEALTH OF MASSACHUSETTS

ESSEX, s.s.

SUPERIOR COURT
CIVIL ACTION NO. _____

```
                                        )
OPHNET, INC., A Massachusetts Corporation   )
and JOHN A. HIRSCH and RONALD W. ZOLLA, )
Individually and as Shareholders of         )
ZHL, INC., A Massachusetts Corporation,     )
                                        )
              Plaintiffs,               )
                                        )
v.                                      )
                                        )
MICHAEL LAMENSDORF and KATHY            )
LAMENSDORF, Individually and as         )
Shareholders of ZHL, INC., and          )
MICHAEL LAMENSDORF, M.D., P.C.,         )
A Florida Professional Corporation,     )
                                        )
              Defendants.               )
                                        )
```

## **COMPLAINT**

### Introduction

1.     This complaint seeks to recover for breach of contract, breach of fiduciary duty, and violation of the duty of good faith and fair dealing in connection with certain written agreements between the plaintiffs and the defendants. Specifically, the plaintiffs and defendants entered into written agreements whereby the plaintiff agreed to and did (i) provide management services to the ophthalmology practice of Michael Lamensdorf, M.D. ("Dr. Lamensdorf") and (ii) agreed to and did construct an ambulatory surgery center specializing in ophthalmic (eye) surgeries. Dr. Lamensdorf has now terminated the plaintiffs' management services to the practice, as is his right under the contract, but has failed and refused to pay the deferred

compensation which the parties' written integrated contract requires him to pay. Moreover, beginning some two years ago, Dr. Lamensdorf began artificially depressing the profitability of the practice by excessive payment of salary to himself in derogation of the parties' written agreements, thereby depriving the plaintiffs of substantial additional payments which would otherwise be due. Dr. Lamensdorf has also now purported to terminate Ophnet, Inc. ("Ophnet") as the manager of the business affairs of the ambulatory surgery center which the parties jointly own through ZHL, Inc. ("ZHL"), a Massachusetts business corporation. Ophnet's termination is the latest in a series of concerted actions by Dr. Lamensdorf to obtain disproportionate financial benefits for himself from ZHL's business, in derogation of the parties written agreements and Dr. Lamensdorf's fiduciary duties to his fellow shareholders.

<div align="center">Parties</div>

2.    The plaintiff, John A. Hirsch ("Mr. Hirsch"), is an individual residing at 20 Schooner Ridge, Marblehead, Essex County, Massachusetts 01945. Mr. Hirsch is an officer, a director, and a one-third (33%) shareholder of ZHL, a Massachusetts business corporation whose assets include, inter alia, the Lantz Surgery Center ("Lantz") located in Sarasota, Florida.

3.    The plaintiff, Ronald W. Zolla ("Mr. Zolla"), is an individual residing at 15 Brookside Road, Topsfield, Essex County, Massachusetts 01983. Mr. Zolla is an officer, a director, and a one-third (33%) shareholder of ZHL, Inc.,

4.    Ophnet, Inc. is a Massachusetts business corporation which maintains a principal place of business at 17 Hawkes Street, Marblehead, Massachusetts 01945.

5.    Michael Lamensdorf, M.D. ("Dr. Lamensdorf") is a licensed ophthalmologist who maintains a regular place of business at 1428 South Tamiami Trail, Sarasota, Florida, 34239. Dr. Lamensdorf is a one-sixth (16.66%) shareholder in ZHL.

<div align="center">2</div>

6.      Michael Lamensdorf, M.D. P.C. ("the P.C.") is, upon information and belief, a professional corporation duly formed and registered under the laws of the State of Florida. It maintains a principle place of business at 1428 South Tamiami Trail, Sarasota, Florida 34239. Upon information and belief, Dr. Lamensdorf is the sole shareholder of the P.C.

7.      Kathy Lamensdorf (Mrs. Lamensdorf) is the wife of Dr. Lamensdorf, and maintains a regular place of business at 1428 South Tamiami Trail, Sarasota, Florida 34239. Mrs. Lamensdorf is a one-sixth (16.66%) shareholder in ZHL and, upon information and belief, an employee of the P.C.

<div align="center">Jurisdiction and Venue</div>

8.      Jurisdiction over the defendants exists under Mass. Gen. L. ch. 223A, § 3(a)-(d), inclusive, insofar as the defendants have established a persistent course of dealing with Massachusetts domiciliaries who have rendered services in Massachusetts for the defendants' benefit. The defendants have also caused Massachusetts domiciliaries to make loans through misrepresentation, and have caused tortious injury in the Commonwealth through their fraud and breach of fiduciary duties to Massachusetts residents. An additional basis for jurisdiction as to those counts relating to the business affairs of ZHL (Counts VI-VIII) is that the dispute concerns the internal business affairs of a Massachusetts business corporation. Venue is appropriate under Mass. Gen. L. ch. 223, § 1.

<div align="center">Facts Applicable to All Counts</div>

9.      Mr. Hirsch and Mr. Zolla are management consultants who have for nearly 20 years specialized exclusively in the management of ophthalmology practices. Typically, they work on a fee-for-services basis, in which they observe a practice's operations and recommend improvements in those operations. Through Ophnet, a company which they own and operate,

<div align="center">3</div>

and assisted by Kenneth Cram, a consultant who frequently works for Ophnet, they have helped

hundreds of ophthalmology practices around the country to improve operating systems, to

increase revenues and profits, and to enhance the quality of patient care.

10.    In 1995, Ophnet entered into a contract with Dr. Lamensdorf and the P.C. to

provide management and strategic planning services to Dr. Lamensdorf and the P.C. After

protracted negotiations, Dr. Lamensdorf and the P.C. on the one hand and Ophnet on the other

entered into a written, integrated Management Agreement on or about September 12, 1995

(hereafter, "the P.C. Management Agreement"). A true and accurate copy of the P.C.

Management Agreement, is attached hereto as Exhibit 1. Subsequently, the parties entered into

an Addendum to the P.C. Management Agreement on or about March 19, 1997, a true and

accurate copy of which is attached hereto as Exhibit 2. On or about January 20, 2000 and

September 19, 2000, the parties further amended the P.C. Management Agreement. True and

accurate copies of the amendments are collectively attached hereto as Exhibit 3. The Initial

Term of the agreement was from September 12, 1995 through December 31, 1996. The

agreement provided on its terms that it would automatically renew for successive five year

periods unless terminated by one of the parties in accordance with its provisions.

11.    Among other things, Ophnet in the P.C. Management Agreement agreed that it

would provide management guidance to the practice, including personnel management, internal

systems recommendations, guidance on training of new personnel, and other such expertise.

Because Dr. Lamensdorf's practice was in difficult financial straits, Ophnet agreed that it would

be compensated for its services through, inter alia, a guaranteed hourly income for time spent in

managing the practice at sharply reduced hourly rates from Ophnet's standard $195/hour

charges. Ophnet also became entitled to bonus income in the form of 50% of the practice's net

income, as defined in § 11 of the management agreement. Ex. 1 at § 11; Ex. 3 at § 4. The

formula for determining net income was complex and precise, but in substance the determination

involved subtracting from practice revenues (1) a substantial base salary of $250,000 for Dr.

Lamensdorf, (2) miscellaneous expenses including auto, travel, and lodging for Dr. Lamensdorf

of up to $19,000, and (3) ordinary and usual operating expenses, including Ophnet's consulting

compensation. Ex. 1 at §§ 5, 6, 11, and 13; Ex. 3 at § 4. In essence, therefore, Ophnet was

entitled to 50% of the P.C.'s profits subject to the definitions contained in the agreement itself.

As a further commitment to the practice and in a show of good faith, Ophnet further agreed that

in any year in which net operating income was not sufficient to pay Dr. Lamensdorf's $250,000

base salary that Ophnet would, in substance, loan the practice sufficient funds to ensure that Dr.

Lamensdorf's compensation never fell below that level.

     12.     Ophnet's deferred compensation was set forth in the termination clauses of the

agreement. Medical practices tend to be resilient businesses, insofar as once proper operating

procedures are established and appropriate training and management systems are in place, the

practice will enjoy the benefits of those systems for many years to come. Hence, the deferred

compensation clauses effectively provided Dr. Lamensdorf and the P.C. would pay Ophnet for

its services through revenue generated after Ophnet's termination.

     13.     In essence, the P.C. Management Agreement provided that either party could

terminate for cause if the practice's net income was negative for two successive years. In that

case, Dr. Lamensdorf's only obligation was to pay Ophnet's outstanding consulting expenses and

consulting compensation. Ex. 1, § 17(A). If Dr. Lamensdorf chose to terminate the agreement

after the first renewal term, an accounting would occur to determine practice net income for the

two previous years. Ophnet would then be entitled to receive an additional payment equal to

5

four times the annual practice net income generated over the previous two years. If Ophnet

terminated the Management Agreement, there would be an accounting and its severance payment

would equal two times average total practice net income over the previous two years. Ex. 1 at §§

11, 17(B).

14.    With Ophnet's assistance, Dr. Lamensdorf's practice grew and prospered.

Cataract surgeries -- by far the most profitable procedure for an ophthalmology practice --

increased by approximately 400% between 1995 and 2002. In 1997 Dr. Lamensdorf and Ophnet

agreed to purchase the Sarasota ophthalmology practice of Dr. Richard Baise ("Dr. Baise").

Ex. 2. The practice paid $220,000 for the purchase of charts and files of Dr. Baise from the

profits of the practice. Since those payments had the effect of reducing practice net operating

income (and therefore reducing substantially Ophnet's bonus compensation), the parties agreed

that if Dr. Lamensdorf terminated the agreement with Ophnet at any time Dr. Lamensdorf would

owe Ophnet $110,000 plus 7% interest up to the date of the termination and payment.

15.    In 1998, Dr. Lamensdorf, Mrs. Lamensdorf, Mr. Hirsch, and Mr. Zolla jointly

agreed to build an ambulatory surgery center ("ASC") which would specialize in eye surgeries.

To that end, they formed ZHL, Inc., a Massachusetts corporation. On or about September 8,

1998, the parties entered into a Shareholders Agreement concerning the business affairs of ZHL.

Under the Shareholders Agreement, the officers of the corporation included Mr. Hirsch as

president and Mr. Zolla as vice president; neither Dr. Lamensdorf nor Mrs. Lamensdorf was or is

an officer. Then and now, Mr. Hirsch owns one-third of the shares in ZHL, Mr. Zolla owns one-

third of the shares in ZHL, and Dr. Lamensdorf and Mrs. Lamensdorf each own one-sixth of the

shares. A true and accurate copy of the Shareholders Agreement, as amended on or about

August 19, 1999, is attached hereto as Exhibit 4.

16.     Because Ophnet had experience in the construction and operation of ambulatory surgery centers, ZHL effective January 15, 1999, entered into a Management Agreement (hereafter, "the ZHL Management Agreement") with Ophnet whereby Ophnet would oversee the construction and provide management services to the ASC. A true and accurate copy of the ZHL Management Agreement is attached hereto as Exhibit 5. Ophnet's compensation varied according to the services provided and the stage of construction of the ASC. Under § 4(c) of the ZHL Management Agreement, captioned Strategic Management and Marketing Services, Ophnet was to provide, inter alia, assistance in preparing the non-medical policies and procedures of the ASC. Ex. 5 at pp. 9-10. Under § 4(d), captioned "Operational Phase", Ophnet was, inter alia, to ensure that the ASC was staffed by an on-site manager and other non-physician and administrative support staff, ensure sufficient supplies and equipment for the ASC, monitor the day to day operations of the ASC, and be responsible for billings and collections. Ex. 5 at pp. 10-11. For Ophnet's strategic marketing and management services under § 4(c), it was to receive $30,000 per year in quarterly installments and under § 4(d) it was to receive $75 per hour up to an annual maximum amount of $50,000. Ex. 5 at § 7(a)(ii) and (iii), pp. 12-13.

17.     The ZHL Management Agreement also set forth the circumstances under which Ophnet's services could be terminated. Operational services under § 4(d) could be terminated without cause only upon 120 days written notice by owner to Ophnet or for good cause only after written notice of perceived deficiencies and Ophnet's failure to cure those perceived deficiencies within thirty days. By contract, Dr. Lamensdorf had sole discretion on behalf of ZHL to make the decision concerning termination. Ex. 5 at § 11. Under the strategic management and marketing provisions of the contract, however, Ophnet's services could only be terminated by

ZHL upon a majority vote of its shareholders and 120 days written notice from owner (ZHL) to project manager (Ophnet). Ex. 5 at § 11, p. 15.

18.    During the construction phase of the ASC, Dr. and Mrs. Lamensdorf each claimed, falsely, that they did not have sufficient funds to make the capital contributions necessary for the construction of the surgery center and to provide operating funds to permit ZHL to conduct its business activities. Accordingly, Mr. Hirsch and Mr. Zolla each individually agreed to and did loan ZHL $400,000 pursuant to a "Shareholder Resolution" dated and effective December 22, 2000. A true and accurate copy of the Shareholder Resolution is attached hereto as Exhibit 6. Under the Shareholder Resolution, Dr. Lamensdorf and Mrs. Lamensdorf were each obliged to make, beginning January 2001, monthly capital contributions of no less than $1,000 per month and upon receipt of those capital contributions, Mr. Hirsch's and Mr. Zolla's loan would be recharacterized as an equity contribution to ZHL on a dollar for dollar basis with capital contributed by the Lamensdorfs. Without Mr. Hirsch's and Mr. Zolla's infusion of much-needed funds, the surgery center could not have been constructed.

19.    The ASC recently opened for business in Sarasota as the Lantz Surgery Center. Dr. Lamensdorf and Mrs. Lamensdorf, however, have not been making their required capital contributions. Furthermore, Dr. Lamensdorf and Mrs. Lamensdorf have engaged in a protracted campaign of attempting to interfere in the non-medical aspects of the management of the ASC by demanding financial information on essentially each and every expense of the surgery center, and have attempted to interfere with the hiring, firing, and salary levels of administrative personnel hired and to contract unilaterally for the provision of goods and services on behalf of ZHL.

20.     On January 16, 2002, Dr. Lamensdorf, by letter purported to terminate Ophnet's services for both his medical practice under the P.C. Management Agreement and purported to terminate Ophnet's management contract with the ASC under the ZHL Management Agreement. A true and accurate copy of relevant correspondence is attached hereto as <u>Exhibit 7</u>. Upon information and belief, Dr. Lamensdorf's and Mrs. Lamensdorf's purpose in undertaking this relentless campaign of interference is an attempt to convert the proceeds and profits of the ASC to themselves in a manner disproportionate to their ownership interest in ZHL, and to provide them with a pretextual basis to terminate Ophnet and thereby deprive Mr. Hirsch and Mr. Zolla of a reasonable share of the profits of the business which they worked to create for over three years.

<div align="center">

**COUNT I**
**(Breach of Contract -- P.C. Management Agreement)**

</div>

21.     Ophnet herewith incorporates by reference the allegations of paragraphs 1-20 above as if set forth here in full.

22.     Under the P.C. Management Agreement, Dr. Lamensdorf and the P.C. are jointly and severally obligated to pay a substantial amount of money upon termination of the agreement. This is so regardless of whether (as Ophnet believes) Dr. Lamensdorf has actually terminated the agreement through his letter of January 16, 2002, or whether he has constructively terminated the agreement by making it impossible for Ophnet to perform its obligations. Dr. Lamensdorf and the P.C. jointly and severally owe Ophnet a substantial amount of money under the termination clauses of the agreement, including but not limited to four times the amount of average net income of the P.C. over the last two years.

23.     Dr. Lamensdorf and the P.C. have (i) refused to pay the correct amounts due for Ophnet's annual bonus for at least 2000 and 2001, and (ii) failed altogether to pay amounts due

<div align="center">9</div>

at termination. Furthermore, Dr. Lamensdorf in 2000 and 2002, in breach of the terms of the agreement, apparently paid himself a salary in excess of that permitted by the parties' contract and otherwise misstated the P.C.'s expenses thereby depriving Ophnet of earned bonus income and artificially depressing the amounts due under the deferred compensation clauses and Ophnet has been harmed thereby.

<div align="center">

**COUNT II**
**(Accounting)**

</div>

24.    Ophnet herewith incorporates by reference the allegations of paragraphs 1-23 above as if set forth here in full.

25.    The P.C. Management Agreement specifically requires that an accounting take place in order to establish practice net income for purposes of calculating Ophnet's deferred compensation.

26.    Dr. Lamensdorf and the P.C. have thus far failed to provide Mr. Hirsch and Mr. Zolla with the necessary financial information, despite requests, to calculate amounts due.

27.    This court should order and hold an accounting of the practice's net income.

<div align="center">

**COUNT III**
**(Breach of Fiduciary Duty – Medical Practice)**

</div>

28.    Ophnet herewith incorporates by reference the allegations of paragraphs 1-27 above as if set forth here in full.

29.    By virtue of its entitlement on an annual basis to 50% of all net practice income, Mr. Hirsch and Mr. Zolla are equitable 50% owners of the P.C. As such, Dr. Lamensdorf owes Ophnet the fiduciary duties of loyalty, care, and full disclosure.

30.    In derogation of those duties, Dr. Lamensdorf has engaged in questionable accounting practices overstating the practice's expenses as by paying himself as much as

<div align="center">10</div>

$350,000 in salary, despite the fact that his base salary under the P.C. Management Agreement is

capped at $250,000.

31.    The plaintiff has been harmed by these actions insofar as Dr. Lamensdorf's

improper accounting practices have significantly reduced Ophnet's payout for the last two years

and reduced amounts owed under the termination clauses.

<div align="center">

**COUNT IV**
**(Breach of Duty of Good Faith and Fair Dealing -- P.C. Management Agreement)**

</div>

32.    Ophnet herewith incorporates by reference the allegations of paragraphs 1-31

above as if set forth here in full.

33.    In the alternative or in addition to Count III, Dr. Lamensdorf and the P.C. owe

Ophnet a duty of good faith and fair dealing so as not to deprive Ophnet of the fruits of the

contract for which it bargained.

34.    Through the mechanism of, inter alia, paying himself an excessive salary, Dr.

Lamensdorf has substantially reduced the appropriate incentive payment to Ophnet for calendar

years 2000 and 2001 under the P.C. Management Agreement and artificially depressed the

amount that would otherwise be due under the termination clauses, thus causing Ophnet harm.

<div align="center">

**COUNT V**
**(Fraud – Medical Practice)**

</div>

35.    Ophnet herewith incorporates by reference the allegations of paragraphs 1-34

above as if set forth here in full.

36.    Through, inter alia, the excess payment of salary to himself, Dr. Lamensdorf and

the P.C. have defrauded Ophnet of monies which otherwise would be due.

37.    Ophnet has been harmed thereby.

## COUNT VI
### (Breach of Contract – ZHL Management Agreement)

38.     Ophnet herewith incorporates by reference the allegations of paragraphs 1-37 above as if set forth here in full.

39.     Dr. Lamensdorf has breached the ZHL Management Agreement by, among other things, (i) purporting to terminate the strategic management services that Mr. Hirsch, Mr. Zolla and Ophnet were to provide under § 4(c), a power which the contract does not confer upon him and (ii) purporting to terminate Ophnet's duties under the operational phase of the contract in bad faith.

40.     Ophnet, Mr. Hirsch and Mr. Zolla have been harmed thereby.

## COUNT VII
### (Fraudulent Inducement)

41.     Mr. Hirsch and Mr. Zolla herewith incorporate by reference the allegations of paragraphs 1-40 above as if set forth here in full.

42.     Dr. Lamensdorf and Kathy Lamensdorf induced Mr. Hirsch and Mr. Zolla to make substantial shareholders loans to ZHL based upon their representations that they could not afford to make the capital contributions which they were required to make to ZHL.

43.     These representations were made both telephonically to Mr. Hirsch and Mr. Zolla to their offices in Marblehead and Topsfield, respectively, as well as in person to Mr. Cram, Ophnet's agent, shortly before the parties signed the Shareholder Resolution on or about December 22, 2000.

44.     Mr. Hirsch and Mr. Zolla acted in reasonable reliance upon Dr. Lamensdorf's and Mrs. Lamensdorf's statements, and were harmed thereby.

## COUNT VIII
### (Breach of Fiduciary Duty)

45.    Mr. Hirsch and Mr. Zolla herewith incorporate by reference the allegations of paragraphs 1-44 above as if set forth here in full.

46.    As shareholders in ZHL, Dr. Lamensdorf and Mrs. Lamensdorf each owe fiduciary duties of loyalty, care, and full disclosure to Mr. Hirsch and Mr. Zolla.

47.    They have breached those duties by, inter alia, (i) the purported termination of the ZHL Management Agreement with Ophnet, (ii) failing to make full and accurate disclosure of their financial circumstances prior to Mr. Hirsch's and Mr. Zolla's agreeing to loan some $400,000 to ZHL, (iii) interfering with and attempting to usurp Ophnet's management authority and Mr. Hirsch's and Mr. Zolla's authority as majority shareholders by unwarranted interference in the business affairs and management of the ASC, (iv) further interfering with the business affairs of the ASC by, among other things, constant hectoring of employees regarding the performance of their duties and persistent bad faith inquiries requiring Mr. Hirsch and Mr. Zolla to document in minute detail expenditures made from the ASC's business account, and (v) keeping for themselves business opportunities which properly belong to the corporation. Among the actions they have undertaken in the latter category is a refusal to rent a Yag laser to ZHL which would permit it to expand its business unless ZHL agreed to rent the laser from the P.C. at a rate far above its fair market value. The effect of that refusal is that the corporation has been obliged to forego fees that would otherwise go to it, despite the absence of and financial benefit to Dr. Lamensdorf from his actions.

48.    Mr. Hirsch and Mr. Zolla have been damaged thereby.

WHEREFORE, Mr. Hirsch and Mr. Zolla herewith request that this Honorable Court:

A.    Enter damages on Counts I-VIII above in an amount to be determined at trial;

13

B.    Order, pursuant to Count II, an accounting of the P.C.;

C.    Award Mr. Hirsch and Mr. Zolla punitive damages under Counts III, V, VII and

VIII, if Florida law is deemed to apply to those counts;

D.    Award Mr. Hirsch and Mr. Zolla prejudgment interest on all counts;

E.    Award Mr. Hirsch and Mr. Zolla attorney's fees on Counts II, III and VIII; and

F.    Award whatever other or additional relief this Honorable Court deems just under

the circumstances.

<div align="center">Jury Claim</div>

Plaintiffs claim a trial by jury on all claims and issues so triable.

Respectfully submitted,

OPHNET, INC., JOHN A. HIRSCH and
RONALD W. ZOLLA,

By their Attorneys,

J. Owen Todd (BBO # 499480)
Edward Foye (BBO #562375)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
617-720-2626

Dated: March 4, 2002

EXHIBIT 2
TO
**MEMORANDUM IN SUPPORT OF MOTION TO REMAND**

## MANAGEMENT AGREEMENT FOR ZHL, INCORPORATED
## AMBULATORY SURGERY CENTER PROJECT

THIS AGREEMENT is effective as of the 15th day of January, 1999, by and between

**ZHL, INCORPORATED,** a Massachusetts corporation (the "Owner"), and **OPHNET, INC.,** a

Massachusetts corporation ("Project Manager").

### W I T N E S S E T H:


A.    Owner desires to employ the Project Manager to perform certain management

services in connection with the design, planning, permitting and construction of an ambulatory

surgical center (the "ASC") to be situated on a tract of land in Sarasota, Florida (the "Site"):

B.    The Project Manager agrees to perform such management services for Owner,

subject to the terms and conditions set forth below.

**NOW, THEREFORE,** in consideration of the mutual covenants and benefits contained

herein, and other good and valuable consideration, the receipt, adequacy and sufficiency of

which are hereby acknowledged, the Project Manager and Owner hereby agree as follows:

1.    **RECITALS.** The foregoing recitals are true and correct and the recitals and

instruments referred to therein are hereby incorporated herein by reference.

2.    **DEFINITIONS.**

(a)    Architect. "Architect" means the Architect who is responsible for the

design of the ASC and any other vertical structures constructed on the Site.

(b)    Construction Manager. "Construction Manager" means any person or entity retained by Owner to coordinate and manage the construction of the ASC and any other improvements which may be constructed on the Site.

(c)    Contractor. "Contractor" means any person or entity who enters into an agreement with Owner, Construction Manager or another Contractor for the purpose of improving the Site in any respect.

(d)    Ambulatory Surgical Center. "Ambulatory Surgical Center" means a facility licensed as an ambulatory surgical center pursuant to Section 395.003, *Florida Statutes.*

(e)    Engineer. "Engineer" means any person or entity who provides engineering services to the Project.

(f)    Project. "Project" means the design, construction and operation of the ASC.

(g)    Project Consultant. "Project Consultant" means any person or entity rendering professional and/or development consulting services to the Project and shall include, without limitation, the Architect, Construction Manager, attorneys, environmental consultants, and transportation consultants.

3.    **ENGAGEMENT.** Owner hereby retains and engages the Project Manager to provide certain business administration and management services described herein and to assist the Owner in completing the Project. In consideration of the services to be provided by the Project Manager, Owner shall pay the Project Manager in accordance with Paragraph 7 below.

-2-

4.    **PROJECT MANAGER'S SERVICES AND RESPONSIBILITY.** The Project

Manager covenants with the Owner to further the interest of the Owner by furnishing the Project

Manager's skills and judgment in furtherance of completion of the Project. The Project Manager

agrees to furnish business administration and management services and to perform in an

expeditious and economical manner consistent with the interests of the Owner. The Project

Manager's basic services consist of the three phases described below:

(a)    Pre-Construction Phase.

(i)  Assist the Owner in achieving a mutually agreed upon program for

completing the Project and identifying the Project budget requirements and other design

parameters;

(ii)    Assist the Owner in acquiring a suitable parcel of land for the Site of the

ASC,

(iii)  Review the ASC master plan and construction drawings and other design

documents prepared by the Architect and provide recommendations to Owner concerning

among other things, governmental requirements, aesthetics, and maintenance practicality

viewpoint;

(iv)  Provide recommendations on feasibility of construction methods and

availability of materials and labor, time requirements for procurement, installation and

construction and factors relating to cost including, but not limited to, costs of alternative

designs or materials, preliminary budgets and possible economics;

-3-

(v)  Prepare and periodically update progress schedules that coordinate and integrate the services of the project team and the Owner's responsibilities with anticipated construction schedules;

(vi)  Make recommendations to the Owner and Architect regarding safety precautions and programs;

(vii)  In consultation with the Architect, coordinate the contract documents regarding drawings and specifications as they are being prepared and advise on separation of the Project;

(viii)  Prepare contracts for the various categories of work necessary to complete the Project;

(ix)  Advise on the method to be used for selecting contractors and awarding contracts and make recommendations, as required, to provide that work of separate contractors is coordinated, and the likelihood of jurisdictional disputes has been minimized;

(x)  Periodically update cost evaluations and the Project Budget;

(xi)  Prepare a project construction schedule providing for all major elements such as phasing of construction and times of commencement and completion required of each separate contractor;

(xii) Recommend a schedule for the Owner's purchase of medical equipment, machinery and other items requiring long lead time procurement and expedite and coordinate delivery of such purchases;

(xiii) Provide an analysis of the types and quantities of labor required for the Project and review the availability of appropriate categories of labor for critical phases;

(xiv) Assist the Owner in preparing construction contracts, and advise the Owner on the acceptability of subcontractors, materials and supplies proposed by contractors;

(xv) Prepare for the Owner's approval a more detailed estimate of Construction Cost developed by using estimating techniques which anticipate the various elements of the Project, and based on Schematic Design Documents prepared by the Architect. Update and refine this estimate periodically as the Architect prepares Design Development and Construction Documents;

(xvi) Make recommendations for pre-qualification criteria for bidders and develop bidders' interest in the Project. Establish bidding schedules. Assist the Architect in issuing bidding documents to bidders. Conduct pre-bid conferences to familiarize bidders with the bidding documents and management techniques and with any special systems, materials or methods; and

-5-

(xvii) With the Architect's assistance, receive bids, prepare bid analyses and make recommendations to the Owner for award of Contracts or rejection of bids.

(b)    Construction Phase.

(i)    Administer in cooperation with the Architect each of the contracts;

(ii)    Provide administrative, management and related services as required to coordinate the work of the contractors with each other and with the activities and responsibilities of the Project Manager, the Owner and the Architect to complete the Project in accordance with the Owner's objectives for cost, time and quality. Provide sufficient organization, personnel and management to carry out the requirements of this Agreement;

(iii) Update cost estimates, maintain cost accounting records, identify variances between actual and estimated costs and advise the Owner and the Architect whenever projected costs exceed such estimates;

(iv) Update and revise the construction schedule, as required, to show current conditions and revisions required by actual experience;

(v)    Endeavor to achieve satisfactory performance by contractors and recommend courses of action to Owner when contract requirements are not being met and the non-performing contractor will not take corrective actions;

-6-

(vi)  Review and coordinate the safety programs developed by each contractor;

(vii)  Assist Owner in obtaining, in a timely fashion, all licenses, certificates, accreditations, permits and other governmental approvals necessary for the construction and operation of the Project;

(viii)  Determine, in general, if the work is being performed by the contractors in accordance with the requirements of the contract documents and endeavor to guard the Owner against defects or deficiencies in the work;

(ix)  Receive and review contractor's insurance certificates and forward them to Owner;

(x)  Receive the contractors' shop drawings, review them to ascertain if they are properly coordinated with related documents and forward them to the Architect for its approval;

(xi)  Review the progress of the work and submit progress reports to the Owner showing percentages of completion;

(xii)  Develop and implement procedures for processing the contractors' requisitions and make recommendations to the Architects for certifications for payments;

(xiii) Maintain records;

(xiv)  Schedule and conduct meetings;

-7-

(xv)  Arrange for delivery and storage of materials pre-purchased by the Owner;

(xvi)  Observe the contractors' check-out of the operational system and equipment and assist in their initial start-up and testing;

(xvii)  When a given contractor's work reaches the stage of substantial completion, prepare for the Architect's review a punchlist of incomplete or unsatisfactory work, as well as a schedule for their completion and assist the Architect in conducting inspections to determine if the work has reached substantial and final completion;

(xviii)  Assist the Owner and Architect in the close-out of the Project by securing and transmitting to the Owner guarantees, affidavits, waivers of lien and other similar documents;

(xix)  Schedule and conduct pre-construction, construction and progress meetings to discuss such matters as procedures, progress, problems and scheduling. Prepare and promptly distribute minutes;

(xx)  Revise and refine the approved estimate of construction cost, incorporate approved changes as they occur, and develop cash flow reports and forecasts as needed;

(xxi)  Provide regular monitoring of the approved estimate of Construction Cost, showing actual costs for activities in progress and estimates for uncompleted tasks. Identify variances between actual and budgeted or

-8-

estimated costs, and advise the Owner and the Architect whenever projected costs exceed budgets or estimates;

(xxii) Recommend necessary or desirable changes to the Architect and the Owner, review requests for changes, assist in negotiating contractors' proposals, submit recommendations to the Architect and the Owner, and if they are accepted, prepare and sign Change Orders for the Architect's signature and the Owner's authorization;

(xxiii) Develop and implement procedures for the review and processing of applications by contractors for progress and final payments;

(xxiv) Record the progress of the Project. Submit written progress reports to the Owner and the Architect including information on each contractor and each contractor's work, as well as the entire Project, showing percentages of completion and the number and amounts of change orders; and

(xxv) Maintain at the Project site, on a current basis, a record copy of all contracts, drawings, specifications, addenda, change orders and other modifications, in good order and marked to record all changes made during construction.

(c)     <u>Strategic Management and Marketing Services</u>.

(i)     Ensure that John A. Hirsch and Ronald W. Zolla are personally involved in the strategic management and marketing phase;

-9-

(ii)  Assist the Owner in devising and completing a marketing plan for the Project;

(iii)  Assist the Owner in pursuing eye surgeons and other surgeons who have the ability to use the ASC;

(iv)  Pursue managed care contracts for the ASC;

(v)  Provide annual financial performance assessments;

(vi)  In consultation with the Owner, create sales brochures, advertising materials and promotional materials; and

(vii)  Assist the Owner in preparing and formulating the ASC structure and its policies and procedures.

(d)  <u>Operational Phase</u>.

(i)  Ensure that the ASC is properly and efficiently staffed by an on-site manager and by other non-physician and administrative support staff;

(ii)  Monitor the day to day operation of the ASC;

(iii)  Ensure that the ASC has appropriate and sufficient supplies and equipment;

(iv)  Ensure that all regulatory requirements for the operation of the ASC are met on an on-going basis;

(v)  Ensure that appropriate accreditation standards are met;

-10-

(vi)  Ensure that the ASC operates in a cost-effective and efficient manner;

(vii)  Oversee the management of the non-physician and administrative staff of the ASC;

(viii)  Assist the Owner in meeting all federal, state, and local medical waste laws, rules, and regulations; and

(ix)  Ensure that billings and collections for services provided by the ASC are performed in a timely, efficient, and cost-effective manner.

5.    **TERM.**    Project Manager will provide services to the Owner for a period commencing on the effective date of this Agreement and terminating one (1) year after the effective date of this Agreement; provided, however, that the Agreement shall automatically be renewed for successive one (1) year terms thereafter, unless either party gives the other notice to terminate the Agreement at the expiration of the initial term or any one (1) year renewal term.

6.    **BEST EFFORTS.**    Project Manager agrees that he shall devote his best efforts, energies and skills to the discharge of his duties and responsibilities hereunder.

7.    **COMPENSATION TO THE PROJECT MANAGER.**

(a)    <u>Fee</u>.    As compensation for the services to be provided by the Project Manager to Owner hereunder, Owner shall pay the Project Manager as follows:

(i)    For services performed during the Pre-Construction Phase and the Construction Phase, the Project Manager shall receive Fifty Dollars and No/100 ($50) per hour of service; provided, however, that the maximum total amount that the Project Manager shall receive for such services shall be Fifty Thousand Dollars and No/100 ($50,000.00).    Owner agrees to promptly pay the compensation one month in arrears by the fifth (5th) day of the following month.

(ii)    For services performed during the Operational Phase, the Project Manager shall receive Seventy-five Dollars and No/100 ($75) per hour of service; provided, however, that the maximum annual amount that the Project Manager shall receive for such services shall be Fifty Thousand Dollars and No/100 ($50,000.00) per year. The hourly rate and the maximum annual amount shall be adjusted at the beginning of each year by an amount equal to the change in the Consumer Price Index.

(iii) For services performed during the Strategic Management and Marketing Phase, the Project Manager shall receive Thirty-Thousand and No/i 00 ($30,000.00) per year, payable in quarterly installments; provided, however, that such payments are authorized to be paid by the Owner only if, and to the extent that, the Owner's profits are available. Otherwise such payment obligations will

-12-

be maintained as an Owner liability to be paid when profits become available to cover the liability.

(b)    Out-of-Pocket Expenses.  Owner also agrees to reimburse Project Manager for all "Reimbursable Expenses" incurred in fulfillment of Project Manager's services. "Reimbursable Expenses" shall mean costs necessarily incurred in the proper performance of services and paid by the Construction Manager. Such costs shall be at rates not higher than the standard paid in the locality of the Project. The Project Manager shall submit an application for payment each month for all such Reimbursable Expenses incurred by the Project Manager during the prior month and said payment shall be due within ten (10) days of said application for payment. Notwithstanding anything to the contrary herein, Project Manager must obtain Owner's consent before incurring any Reimbursable Expenses exceeding $1,000.00.

**8.    RESPONSIBILITIES OF OWNER.**

(a)    Cooperation.  Owner shall work with the Project Manager in an expeditious and consistent manner in order to insure the continued progress and completion of the work, and promptly perform all obligations of Owner set forth in this Agreement. Further, the Owner shall render decisions in a timely manner pertaining to all documents and plans submitted by the Project Manager in order to avoid unreasonable delay in the orderly and sequential progress of the Project Manager's service.

(b)    Availability. Owner shall be available to meet or consult with the Project Manager upon reasonable notice on all matters pertaining to the management services provided and performed by the Project Manager under this Agreement.

-13-

9.    **LIABILITY.** Each party agrees to indemnify and save harmless the other party against and from any and all claims, liabilities, losses, costs, expenses, or damages arising in relation to the indemnifying party's (and its employees, agents and representatives) actions or omissions, including without limitation any legal fees or expenses incurred in connection therewith. In any case in which indemnification is sought hereunder, the party seeking indemnification shall promptly notify the other of any claim or litigation to which the indemnification relates and the party seeking indemnification shall afford the other the opportunity to participate and at the other party's option, fully control any compromise, settlement, litigation or other resolution or disposition of such claim or litigation.

10.    **TERMINATION BY THE PROJECT MANAGER.** The Project Manager's obligation or duty to perform the services under the Operational Phase set forth in Section 4(d) of this Agreement may be terminated without cause by the Project Manager upon one hundred eighty (180) days written notice by Project Manager to Owner. Upon such termination by the Project Manager as set forth above, the Project Manager shall be paid, or if already paid, shall retain, the portion of the fee set forth in Paragraph 7(a) above through the stage of the work which is then being performed by the Project Manager and Owner shall retain the exclusive right to all work product produced by the Project Manager prior to such termination. Thereafter neither the Project Manager nor Owner shall have any further rights or obligations under this Agreement, except that the indemnity provisions of Paragraph 9 hereof shall remain in full force and effect.

11.    **TERMINATION BY OWNER.** The services to be performed by the Project Manager under the Pre-Construction Phase and the Construction Phase set forth in Sections 4(a) and (b) of this Agreement may be terminated by Owner for good cause and the continuation

-14-

thereof for thirty (30) days after written notice from Owner to the Project Manager and its failure

to so cure within the thirty (30) day cure period. The Owner may terminate the Project

Manager's obligation or duty to perform the services under the Operational Phase set forth in

Section 4(d) of this Agreement, without cause, upon one hundred twenty (120) days written

notice by Owner to Project Manager, or, with good cause and the continuation thereof for thirty

(30) days after written notice from Owner to Project Manager and its failure to so cure within the

thirty (30) day cure period. The decision by Owner to terminate the above services shall be made

in the sole discretion of Michael Lamensdor{ M.D.  However, the services to be performed by

Project Manager under the Strategic Management and Marketing Phase set forth in Section 4(c)

may only be terminated by Owner upon a majority vote of its shareholders and one hundred

twenty (120) days written notice from Owner to Project Manager. Upon termination of any

section of this Agreement by Owner as set forth above, Owner shall pay to the Project Manager

the portion of its fee set forth in Paragraph 7(a) above for all services provided through the stage

of the work which is then being performed by the Project Manager and Owner shall retain the

exclusive right to all work product produced by the Project Manager prior to such termination.

Thereafter, neither Owner nor the Project Manager shall have any further rights or obligations

under this Agreement, except that the indemnity provisions of Paragraph 9 shall remain in full

force and effect.

### 12.    CONSTRUCTION MANAGER.

Notwithstanding anything herein to the contrary, the Owner reserves the right to hire an

actual construction manager to oversee the Project at any time and in its sole and absolute

discretion.

## 13.    MISCELLANEOUS.

(a)    <u>Entire Agreement</u>.  This Agreement represents the entire integrated agreement between the Project Manager and Owner and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument executed by both the Project Manager and Owner.

(b)    <u>Assignment</u>. This Agreement may not be assigned by either party without the prior written consent of the other party and any assignment made without such prior consent shall be deemed null and void.

(c)    <u>Governing Law</u>. This Agreement shall be construed in accordance with and governed by the laws of Florida.

(d)    <u>Time of the Essence</u>. Time is of the essence of this Agreement.

(e)    <u>Notice</u>. Any notice required or permitted to be delivered hereunder shall be in writing and shall be deemed to have been duly given on receipt, if delivered personally, or sent by Air Mail, postage prepaid, and at the time of such mailing, a copy of the notice or demand to be sent by facsimile to the parties at their address and facsimile number as set forth below:

<u>To the Owner</u>:

ZHL, Incorporated
17 Hawkes Street
Marblehead, MA  01945
Attention:  John A. Hirsch

Telephone:  781-631-8278

Facsimile:  781-639-1271

-16-

<u>To the Project Manager</u>:

Ophnet, Inc.
17 Hawkes Street
Marblehead, MA 01945
Attention: Ronald W. Zolla, Ph.D.

Telephone: 781-631-8278

Facsimile: 781-639-1271

(f)    <u>Authority</u>. The Project Manager and Owner represent and warrant to each other that the other party has full right, power and authority t~ enter into this Agreement and fully perform hereunder, and the persons executing this Agreement on behalf of the Project Manager or Owner have the full power and authority to bind such party to this contract.

(g)    <u>Waiver of Breach</u>. Waiver by either party of a breach of any provision of this Agreement shall not be deemed to be a waiver of any other breach and shall not be construed to be a modification of the terms of this Agreement.

(h)    <u>No Partnership</u>. The parties acknowledge and agree that they do not intend to create a partnership, joint venture, co-tenancy or agency relationship by virtue of this Agreement.

(i)    <u>Interpretation</u>. The terms of this Agreement shall be construed in accordance with the meaning of the language used and shall not be construed for or against either party by reason of the authorship of this Agreement or rules of construction which might otherwise apply.

j)    <u>Integration</u>. It is understood that there are no oral agreements between the parties hereto affecting this Agreement.

-17-

(k)     Severability. In the event that any part of this Agreement is construed as illegal or unenforceable by valid judgment or decree by a court of competent jurisdiction, the remaining part of this Agreement will be in full force and effect as though any illegal or unenforceable part or parts are not written into this Agreement.

(1)     Captions. Headings used herein are for convenience only and shall not be construed as controlling the scope of any provision hereof. ~

(m)     Binding on Parties. This Agreement shall inure to the benefit of and shall be fully, unconditionally, jointly and severally binding on the parties and their respective successors, heirs and assigns.

**IN WITNESS WHEREOF,** the Project Manager and Owner execute this Agreement the day and year first above written.

**OWNER:**

**ZHL, INCORPORATED,** a Massachusetts corporation

By: _____

Date: _8/24/99_

Name: _M. Michael Lamensdorf_
Michael Lamensdorf, M.D.
Title:   Chairman of the Board

**PROJECT MANAGER:**

**OPHNET, INC.,** a Massachusetts corporation
By: _____

Date: _2/1/99_

Name: _John A. Hirsch_
John A. Hirsch
Title:   President

EXHIBIT 3
TO
**MEMORANDUM IN SUPPORT OF MOTION TO REMAND**

John

Recall John the goal of the Lantz is to be a successful ambulatory surgery center, which, if well run, will generate a significant profit.

Recall John you agreed to develop a schedule for the succeeding six months for all of the doctors, locations and marketing.

Recall John you agreed to share all financials with me on an on going basis.

Recall John we all agreed repeatedly that I was not to be the medical director of the Lantz. You have repeatedly referred to me as the medical director. You expect me to fulfill the function of medical director, yet you not only do not give me the authority of the position, you undermine the authority that I deserve as the surgeon, the on site shareholder and as the person who has repeatedly taken steps to permit the Lantz to continue.

Recall John you have breached our agreement of confidentiality by telling Kasia about our plans at MLMD which are none of her business. You have also done it by telling Jay that "Mrs. Lamensdorf" asked for copies of his letters of recommendation. Obviously, you had not previously obtained them.

Recall John I have repeatedly warned that Kasia does not have the skill to be the administrator of the Lantz. The recent IOL identification fiasco represents a situation where I had created a system that works and does not need to be changed, yet she simply stopped it. This proves her inexperience.

Recall John I have been adamant that I do not want to supervise anesthesia. I have requested that you hire an anesthesiologist to oversee this area. Granted, the blocks have been the best. However, more patients have been to the emergency room from the Lantz than from my entire tenure at the Cape. Recall John that I have never had a hospital admission directly following my work at the Cape; now they are occurring weekly. Recall John that over thousands and thousands of patients at the Cape, I have not had a post operative patient have a heart attack as occurred yesterday.

Recall John we agreed that you would provide systems to facilitate flow so that my hourly volume would increase. Instead you provide staff that significantly slows the flow. Recall John that any systems that do exist, I introduced.

Recall John Ron agreed to develop a new marketing plan in 1998, 1999, 2000 and again August, 2001. Recall John I told you that we needed to move up market for two reasons: First, the lower end market has already been saturated and well covered. Second, middle and upper class patients are more suitable to the rapid turnover style of a successful ambulatory surgery center.

SISTEMAS-SPECIALISTS  941 955 7905   P. 2

Recall John we agreed that Zeiss makes excellent microscopes; indeed, the ones that I used at the Cape were 16 and 12 years old. When we negotiated with the people at Prescott's, we were told that the heads were brand new. Instead, we got heads that are totally unacceptable. We are now caught over a barrel and have to buy brand new ultra expensive scopes. This is an unnecessary expense that represents poor planning and lack of attention to detail by you.

Recall John we agreed disposables packs are both time savers and cost savers. This is not true when you purchase the absolute cheapest items which do not perform adequately, must be thrown away and replaced with suitable items. This is yet another waste of money.

Recall John a low wage employee may actually be a low value employee because of low productivity. Brooke, for instance, was a very expensive employee because she did nothing productive. She did insist on drinking her coffee inside of the "red lines" which breaks all of the sterility rules and can easily result in contamination. If we had a case of endophthalmitis, she would have been an extremely expensive employee. Marie is another expensive employee. Other than take out the trash, what does she do? Although she was to be terminated on 5 February 2002, she was still at the Lantz. Do you recall why John?

Recall John Sue is a very expensive employee. She constantly calls Carol, the billing clerk at MLMD, with questions. There is at least superficially (because, recall John, you refuse to share the financials with me) evidence that she is not billing or collecting correctly.

Recall John the building is filthy and roach infested.

Recall John Ron agreed to develop a plan and a general location for a second office by 28 February 2002. Oh yes, recall John it was to open 3rd quarter 2002 as documented by Ken. Where is it?

Recall John there is one and only one person who generates any income for the Lantz. Why do you ignore his suggestions and undermine his authority.

Recall John the ors where I am in control run well. Recall John pre op and post op where you have undermined my authority do not run well.

Recall John there is no reason to respond to each of these comments, as there are many more.

Recall John the Lantz was supposed to be a "turnkey" operation where all I had to do was "show up and operate." Nothing could be further from the truth. The Lantz has been a disaster from day one. The only improvements that have occurred are the ones that I have implemented.

Recall John Ophnet is terminated for cause.

Michael Lamensdorf, MD FACS
Shareholder ZHL

Ron Zolla   978-887-6140

MAILED 2/16/02

Ron Zolla, Vice President
Ophnet Inc.
17 Hawkes Street
Marblehead, Ma. 01945

781-631-7817

February 16, 2002   via Federal Express and U. S. Post Office certified mail

Michael Lamensdorf M.D.
Michael Lamensdorf M.D. P.C.
3550 Bayou Louise Lane
Sarasota, FL 34242

Subject:   Management Agreement between Michael Lamensdorf M.D.
and Michael Lamensdorf M.D. P.C. (the Practice) and Ophnet Inc.
executed 9/12/1995 including Addendum executed 3/19/1997 and
Amendments ( the Management Agreement )

Dear Dr. Lamensdorf:

John and I are in receipt of your facsimile to John dated and received
at our Ophnet offices on February 15, 2002 in which you concluded by
stating " Ophnet is terminated for cause". This statement is a clear
directive that you have terminated the subject management agreement
with Ophnet for Ophnet's failure " to develop a new marketing plan in
1998, 1999, 2000, and again in August 2001" and for Ophnet's failure " to
develop a plan and a general location for a second office " for the
practice in a timely way.

Therefore, effective on February 15, 2002 Ophnet has ended its
performance of management services to Michael Lamensdorf M.D. and
Michael Lamensdorf M.D. P.C. as delineated in the Management
Agreement.

Ophnet expects you to honor all of your obligations arising out of and
emanating from the management agreement.

Sincerely,

_Ronald Zolla_   2/16/2002

Ronald Zolla, Ph.D.

Vice President, Ophnet Inc.

# ZHL, Inc.
## 17 Hawkes Street
## Marblehead, Massachusetts  01945
## 781-631-7817

February 13, 2002

### VIA FACSIMILE  (941-349-0304)   AND   USPS CERTIFIED MAIL

Michael Lamensdorf, M.D.
Shareholder, ZHL, Inc.
3550 Bayou Louise Lane
Sarasota, FL  34242

Dear Michael:

Michael, please consider this letter a formal communication from me as President of ZHL, Inc.  It is important that you follow proper termination procedures in order to terminate the ZHL, Inc. management agreement with Ophnet, Inc.

The termination procedure is specified in paragraph eleven (11) of the management agreement between ZHL, Inc. and Ophnet, Inc.  Your February 12th fax to Ophnet did not serve as proper termination notice.

Also, you do not have the authority to unilaterally select or enter into a contract with Bayou Jenkay or any management company on behalf of ZHL, Inc. or Lantz or direct any third party to take any managerial action that is in conflict with our existing management agreement.

I have instructed Ken to continue his performance as required under the management agreement between ZHL, Inc. and Ophnet, Inc.

It is not proper for you to take any action to direct Bayou Jenkay to make any demands on Ophnet or the staff at Lantz.  In fact, with respect to communications clarity, all Lantz operational and management communications issues should be directed to Ken and all shareholder and contractual communications should be directed to me.

Michael, I suggest that you and I have a confidential telephone discussion to determine how we can work together to rectify outstanding issues.

On a positive note, Lantz's cash flow is beginning to improve. Therefore, Ron and I would like to discuss with you and Kathy how we might modify the repayment of loan obligations, in a cooperative way, to accelerate cash payments to you and Kathy.

Respectfully,

John A. Hirsch, Ph.D.
President, ZHL, Inc.


cc:    Ronald W. Zolla, Ph.D.
       Vice President, ZHL, Inc.

To Mr. and Mrs. John Hirsh, Mr. and Mrs. Ron Zolla and Kathy D. Lamensdorf, Shareholders ZHL

From Michael Lamensdorf, Shareholder ZHL

This is to formally notify you that I am exercising my right to replace Ophnet as the managing agent for the Lantz Surgery Center. Based on our extensive communication, Ophnet has had over 30 days to cure the problems which it has been unwilling or unable to do.

Therefore, effective 9:00am Wednesday 13 February 2002, Bayou Jenkay, Inc. will be responsible for all administrative services at the Lantz including but not limited to personnel, systems, billing and scheduling.

Bayou Jenkay will have a term of 90 days to substantially improve the Lantz. At that time the shareholders will meet and determine if Bayou Jenkay should continue in its role as outlined above and if the Lantz is ready to introduce additional surgeons.

Fortunately, I have been able to negotiate a reduced charge from BJI of $75.00/hour which is the same compensation that Mr. Ken Cram is receiving.

February 8, 2002

Ken, Thanks for suggesting that if I leave ES it would not be a problem. What you failed to understand is that if I leave, so does Michael. We are a team. ES is about Michael and me, no one else. That is why we are arranging to sell. No comment on the chance that you could oversee the day to day operations.

I have strongly encouraged Michael to cancel all surgery at the Lantz and look into what we could do at the Cape until such time that we are out. Ultimately it is his decision to cancel or not. He is such an emotional mess. He has worked so hard and just doesn't deserve this.

John's obnoxious note this morning was perfect in its timing. He is now referring to him and Ron as "shareholders." Looking to Michael for guidance. It was perfect. And, they are now referring to Michael as Medical Director. That title is true and so much more. Once again, we get to do all of the work, and get nothing to show for it. Since he has been Medical Director since at least September and has had sole responsibility for a myriad of other duties, please fed ex a check in the amount of $15,000 for this position. That comes to just $2500 per month. Obviously, we do not accept the insulting YAG proposal. That amount doesn't even come near to making up what Michael will be losing let alone pay us for the laser, our staff who must assist Michael and the inconvenience to surgeon and patient. We did cancel our YAGS for next week. We want $3500/month. Otherwise, the YAG will be moved next week. Once again, a major mess due to OPHNET's leading us on about something.

Pls confirm that you have discussed what I asked you to with Drs. Lenhart and Baise. Dr. Lenhart keeps calling me and I am not going to take his calls. Pls advise him of our changed situation. If OPHNET had a plan for him and would have helped in his infiltration to the practice and market, it may have worked. I blocked Dr. Baise's schedule after 4/8/02 as that is his 5th year anniversary date.

KDL

cc ML

EXHIBIT 4
TO
**MEMORANDUM IN SUPPORT OF MOTION TO REMAND**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 02-CV-10570-RCL

———————————————————————
                                                    )
OPHNET, INC., A Massachusetts Corporation      )
and JOHN A. HIRSCH and RONALD W. ZOLLA, )
Individually and as Shareholders of                )
ZHL, INC., A Massachusetts Corporation,         )
and KENNETH CRAM,                               )
                                                    )
                              Plaintiffs,          )
                                                    )
v.                                                  )
                                                    )
MICHAEL LAMENSDORF and KATHY             )
LAMENSDORF, Individually and as               )
Shareholders of ZHL, INC., and                   )
MICHAEL LAMENSDORF, M.D., P.C.,            )
A Florida Professional Corporation,              )
                                                    )
                              Defendants.          )
———————————————————————)


# PLAINTIFFS' *AMENDED AND CORRECTED*[1] MOTION TO AMEND COMPLAINT

The plaintiffs in this matter, John A. Hirsch, Ronald W. Zolla, Kenneth Cram and Ophnet,

Inc. herewith move pursuant to Fed. R. Civ. P. 15(a) and (d) and 14 U.S.C. to amend their

complaint. The proposed amended complaint is attached hereto as Exhibit A. In support of their

motion, the plaintiffs state:

---

[1] This motion is textually identical to the motion to amend which the plaintiffs previously brought.
The ad damnum to the Amended Complaint attached as Exhibit A, however, differs slightly from that
previously submitted. The changes are prompted by the defendants' pointing out in their opposition
to the original motion to amend that the ad damnum did not correspond to the additional counts
alleged. The plaintiffs regret any inconvenience to the Court.

1.     The plaintiffs originally filed their complaint in the Essex Superior Court for the

Commonwealth of Massachusetts, and amended as of right while the complaint was there pending.

After removal to this Court, the plaintiffs served their Amended Complaint.[2]

2.     The proposed Second Amended Complaint contains a somewhat expanded fact

statement and alleges additional claims against the existing defendants Michael Lamensdorf, M.D.,

Kathy Lamensdorf, and Michael Lamensdorf, M.D., P.C. ("the P.C."). Further analysis of

fragmentary financial records of the P.C. available to the plaintiffs now indicate that Dr.

Lamensdorf apparently engaged in a two-year pattern of fraud and deceit, systematically

understating the net operating income of the practice (and therefore underpaying the plaintiffs

pursuant to the terms of various contracts between them) by overpayments both to himself and to

corporations owned and controlled by Mrs. Lamensdorf.

3.     The corporation which Mrs. Lamensdorf owns and controls, Bayou JennKay, Inc., is

also now named in the Second Amended Complaint as a party defendant. The claims against Bayou

JennKay, Inc. include participation in the scheme to defraud Ophnet by understating practice

income and tortious interference with Ophnet's contracts to manage the P.C. and to manage the

ambulatory surgery center owned by ZHL, Inc., a Massachusetts corporation.

4.     Finally, the proposed Second Amended Complaint names ZHL, Inc. as a party

defendant. ZHL is sued as a party to the "Management Agreement for ZHL, Incorporated

Ambulatory Surgery Center Project", which is attached as Exhibit 5 to the Second Amended

---

[2] As of the date this motion was served pursuant to L.R. 15.1 upon the parties which the plaintiffs intended to add, amendment would have lain as of right, since less than 20 days had elapsed since service of the amended complaint and no responsive pleading had been filed within the meaning of Fed. R. Civ. P. 15(a). L.R. 15.1 appears to require notice to newly added parties even where the plaintiff seeks to amend within the twenty day time period provided for amendment as of right under Fed. R. Civ. P. 15(a). There is at present no occasion to consider the potential conflict between the Local Rule and the Rules of Civil Procedure, however, since there is authority to the effect that any amendment which will destroy diversity must be brought to the court by motion. Since amending to include ZHL, a Massachusetts Corporation, will destroy diversity, the plaintiffs seek to amend their entire complaint through motion.

Complaint. Previously, Ophnet had sued Dr. Lamensdorf for breach of the ZHL Management

Agreement by, among other things, (i) purporting to terminate the strategic management services

that Ophnet was to provide under the ZHL Management Agreement, a power which the contract

does not confer upon him and (ii) purporting to terminate Ophnet's duties under the operational

phase of the contract in bad faith. ZHL was not named in the Amended Complaint as a party

defendant.

5. In "Defendants' Memorandum of Law in Support of Their Motion to Compel

Arbitration" March 27, 2002, the defendants pointed out (at 10) that "Dr. Lamensdorf did not sign

the ZHL management agreement personally, he signed it in his capacity as chairman of the board of

ZHL." The evident assertion is that as a party who signed on behalf of a disclosed principal, Dr.

Lamensdorf cannot be held liable for the breach, and therefore the proper party to sue is ZHL. The

case which the defendants cite in their memorandum appears to be directly on point. See Liberty

Communications, Inc. v. MCI Telecommunications Corp., 733 So.2d 571, 574-575 (Fla. App., writ

den., 743 So.2d 509 (Fla. 1999), citing and adopting McCarthy v. Azure, 22 F.3d 351, 361 (1st Cir.

1994).

6. Whether this is so or not, it is unarguably clear that Florida law requires that in any

suit on a contract, all parties to the contract must be named in the suit. Since ZHL is undoubtedly a

party to the ZHL-Ophnet management agreement, and because Ophnet's damages are substantial

indeed from the wrongful termination of that agreement, the plaintiffs plainly have no choice but to

amend their complaint.

WHEREFORE, the plaintiffs respectfully request that this Honorable Court:

A. Permit the plaintiffs to file their Second Amended Complaint, attached hereto as

Exhibit A; and

3

B.    Grant whatever other or additional relief this Honorable Court deems just under the circumstances.

### Request for Oral Argument

Pursuant to L.R. 7.1(D), the plaintiffs herewith request oral argument on this motion.

Respectfully submitted,

OPHNET, INC., JOHN A. HIRSCH,
RONALD W. ZOLLA, and
KENNETH CRAM

By their Attorneys,

_____
J. Owen Todd (BBO # 499480)
Edward Foye (BBO #562375)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA  02109
617-720-2626

Dated:  May 22, 2002

### L.R. 7.1(A)(2) CERTIFICATE OF COMPLIANCE

The undersigned herewith certifies that he spoke by telephone with Jennifer Compton, Esq., attorney for the defendants, on May 21, 2002 about this motion, and no agreement was reached.

_____
Edward Foye

### L.R. 15.1 CERTIFICATE OF COMPLIANCE

The undersigned herewith certifies that on May 23, 2002, a copy of this motion and the proposed Second Amended Complaint attached thereto was provided to the Sarasota County Sheriff's Office for in-hand service upon Bayou JennKay, Inc. in conformance with Fed. R. Civ. P. 5(b)(1), and by delivering a copy in-hand upon Brandon White, Esq., Foley, Hoag & Eliot LLP, One Post Office Square, Boston, Massachusetts 02109, on May 23, 2002.  A separate piece of paper stating that the plaintiffs intended to file this motion ten business days after service was also provided to the Sheriff for in-hand service.

_____
Edward Foye

4

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 02-CV-10570-RCL

_____
OPHNET, INC., A Massachusetts Corporation )
and JOHN A. HIRSCH and RONALD W. ZOLLA, )
Individually and as Shareholders of )
ZHL, INC., A Massachusetts Corporation, and )
KENNETH CRAM, )
)
                       Plaintiffs, )
)
v. )
)
MICHAEL LAMENSDORF, Individually and )
as a Shareholder of ZHL, INC.; )
MICHAEL LAMENSDORF, M.D., P.C., )
A Florida Professional Corporation; )
BAYOU JENNKAY, INC., a Florida Corporation; )
and KATHY LAMENSDORF, Individually and )
as an officer of Bayou JennKay, Inc.; and )
ZHL, INC., a Massachusetts Corporation, )
)
                       Defendants. )
_____)

## SECOND AMENDED COMPLAINT

### Introduction

1.      This complaint seeks to recover for breach of contract, breach of fiduciary duty,

fraud, and tortious interference with economic relations in connection with certain written

agreements between the plaintiffs and the defendants.  Specifically, the plaintiffs and defendants

entered into written agreements whereby the plaintiffs agreed to and did (i) provide management

services to the ophthalmology practice of Michael Lamensdorf, M.D. ("Dr. Lamensdorf") and

(ii) construct an ambulatory surgery center specializing in ophthalmic (eye) surgeries.  Dr.

Lamensdorf has now terminated the plaintiffs' management services to the practice, as is his right under the contract, but has failed and refused to pay the deferred compensation which the parties' written integrated contract requires him to pay. Moreover, beginning some two years ago, Dr. Lamensdorf clandestinely began artificially depressing the profitability of the practice by excessive payment of salary to himself and excessive payments to Bayou JennKay, Inc., a corporation owned and controlled by his wife, Kathy Lamensdorf, in derogation of the parties' written agreements, thereby depriving the plaintiffs of earned compensation based on practice net income while he and Mrs. Lamensdorf falsely represented that the practice had become unprofitable. Dr. Lamensdorf has also now purported to terminate Ophnet, Inc. ("Ophnet") as the manager of the business affairs of the ambulatory surgery center which the parties jointly own through ZHL, Inc. ("ZHL"), a Massachusetts business corporation. Ophnet's termination is the latest in a series of concerted actions by Dr. Lamensdorf to obtain disproportionate financial benefits for himself and for Bayou JennKay from ZHL's business, in derogation of the parties' written agreements and Dr. Lamensdorf's fiduciary duties to his fellow shareholders.

<div align="center">Parties</div>

2.     The plaintiff, John A. Hirsch ("Mr. Hirsch"), is an individual residing at 20 Schooner Ridge, Marblehead, Essex County, Massachusetts 01945. Mr. Hirsch is an officer, a director, and a one-third (33%) shareholder of ZHL, a Massachusetts business corporation whose assets include, inter alia, the Lantz Surgery Center ("Lantz") located in Sarasota, Florida.

3.     The plaintiff, Ronald W. Zolla ("Mr. Zolla"), is an individual residing at 15 Brookside Road, Topsfield, Essex County, Massachusetts 01983. Mr. Zolla is an officer, a director, and a one-third (33%) shareholder of ZHL, Inc.

<div align="center">2</div>

4.    The plaintiff, Ophnet, Inc. ("Ophnet"), is a Massachusetts business corporation which maintains a principal place of business at 17 Hawkes Street, Marblehead, Massachusetts 01945.

5.    The plaintiff, Kenneth Cram, is an individual residing in Sanbornville, New Hampshire who maintains a place of business c/o Ophnet, Inc., 17 Hawkes Street, Marblehead, Massachusetts. Mr. Cram maintains a consulting relationship with Ophnet but is neither an employee nor an officer or shareholder of the corporation. He is a party plaintiff only as to Count IX.

6.    Michael Lamensdorf, M.D. ("Dr. Lamensdorf") is a licensed ophthalmologist who maintains a regular place of business at 1428 South Tamiami Trail, Sarasota, Florida, 34239. Dr. Lamensdorf is a one-sixth (16.66%) shareholder in ZHL.

7.    Michael Lamensdorf, M.D. P.C. ("the P.C.") is, upon information and belief, a professional corporation duly formed and registered under the laws of the State of Florida. It maintains a principle place of business at 1428 South Tamiami Trail, Sarasota, Florida 34239. Upon information and belief, Dr. Lamensdorf is the sole shareholder of the P.C.

8.    Kathy Lamensdorf (Mrs. Lamensdorf) is the wife of Dr. Lamensdorf, and maintains a regular place of business at 1428 South Tamiami Trail, Sarasota, Florida 34239. Mrs. Lamensdorf is a one-sixth (16.66%) shareholder in ZHL. She is also, upon information and belief, the controlling shareholder and an officer and director of Bayou JennKay, Inc.

9.    Bayou JennKay, Inc. is, upon information and belief, a Florida business corporation, whose principal place of business is, upon information and belief, 1428 South Tamiami Trail, Sarasota, Florida 34239.

3

10.     ZHL is a Massachusetts business corporation duly formed and registered under the laws of the Commonwealth, and maintains its principal place of business at 17 Hawkes Street, Marblehead, Massachusetts.  The Chairman of ZHL's Board of Directors is Michael Lamensdorf, M.D.

### Jurisdiction and Venue

11.     Jurisdiction over the defendants exists under Mass. Gen. L. ch. 223A, § 3(a)-(d), inclusive, insofar as the defendants have established a persistent course of dealing with Massachusetts domiciliaries who have rendered services in Massachusetts for the defendants' benefit.  The defendants have also caused Massachusetts domiciliaries to make loans through misrepresentation, and have caused tortious injury in the Commonwealth through fraud, tortious interference and breaches of fiduciary duties to Massachusetts residents.  Additional bases for jurisdiction as to those counts relating to the business affairs of ZHL is that the dispute concerns the internal business affairs of a Massachusetts business corporation.  As to the Lamenscram partnership, the parties thereto, including Dr. Lamensdorf and Mrs. Lamensdorf, consented to Massachusetts jurisdiction and venue in the Partnership Agreement itself.  Venue is appropriate under Mass. Gen. L. ch. 223, § 1.

### Facts Applicable to All Counts

12.     Mr. Hirsch and Mr. Zolla are management consultants who have for nearly 20 years specialized exclusively in the management of ophthalmology practices.  Typically, they work on a fee-for-services basis, in which they observe a practice's operations and recommend improvements in those operations.  Through Ophnet, a company which they own and operate, and assisted by Kenneth Cram, a consultant who frequently works for Ophnet, they have helped

hundreds of ophthalmology practices around the country to improve operating systems, to increase revenues and profits, and to enhance the quality of patient care.

13.    In 1995, Ophnet entered into a contract with Dr. Lamensdorf and the P.C. to provide management and strategic planning services to Dr. Lamensdorf and the P.C. After protracted negotiations, Dr. Lamensdorf and the P.C. on the one hand and Ophnet on the other entered into a written, integrated Management Agreement on or about September 12, 1995 (hereafter, "the P.C. Management Agreement"). A true and accurate copy of the P.C. Management Agreement, is attached hereto as Exhibit 1. Subsequently, the parties entered into an Addendum to the P.C. Management Agreement on or about March 19, 1997, a true and accurate copy of which is attached hereto as Exhibit 2. On or about January 20, 2000 and September 19, 2000, the parties further amended the P.C. Management Agreement. True and accurate copies of those amendments are collectively attached hereto as Exhibit 3. The Initial Term of the agreement was from September 12, 1995 through December 31, 1996. The agreement provided on its terms that it would automatically renew for successive five year periods unless terminated by one of the parties in accordance with its provisions.

14.    Among other things, Ophnet in the P.C. Management Agreement agreed that it would provide management guidance to the practice, including personnel management, internal systems recommendations, guidance on training of new personnel, and other such expertise. Because Dr. Lamensdorf's practice was in difficult financial straits, Ophnet agreed that it would be compensated for its services through, inter alia, a guaranteed hourly income for time spent in managing the practice at sharply reduced hourly rates from Ophnet's standard $195/hour charges. Ophnet also became entitled to bonus income in the form of 50% of the practice's net income, as defined in § 11 of the management agreement. Ex. 1 at § 11; Ex. 3 at § 4. The

formula for determining net income was complex and precise, but in substance the determination

involved subtracting from practice revenues (1) a substantial base salary of $250,000 for Dr.

Lamensdorf, which represented a more than 20% increase from his 1994 compensation;

(2) miscellaneous expenses including auto, travel, and lodging for Dr. Lamensdorf of up to

$19,000, and (3) ordinary and usual operating expenses, including Ophnet's consulting

compensation. Ex. 1 at §§ 5, 6, 11, and 13; Ex. 3 at § 4. In essence, therefore, Ophnet was

entitled to 50% of the P.C.'s profits subject to the definitions contained in the agreement itself.

As a further commitment to the practice and in a show of good faith, Ophnet further agreed that

in any year in which net operating income was not sufficient to pay Dr. Lamensdorf's $250,000

base salary that Ophnet would, in substance, loan the practice sufficient funds to ensure that Dr.

Lamensdorf's compensation never fell below that level. In 1995, Ophnet did in fact loan funds

to the practice to provide Dr. Lamensdorf with the agreed-upon compensation.

15.    Ophnet's deferred compensation was set forth in the termination clauses of the

agreement. Medical practices tend to be resilient businesses, insofar as once proper operating

procedures are established and appropriate training and management systems are in place, the

practice will enjoy the benefits of those systems for many years to come. Hence, the deferred

compensation clauses effectively provided Dr. Lamensdorf and the P.C. would pay Ophnet for

its services through revenue generated after Ophnet's termination.

16.    In essence, the P. C. Management Agreement provided that either party could

terminate for cause if the practice's net income was negative for two successive years. In that

case, Dr. Lamensdorf's only obligation was to pay Ophnet's outstanding consulting expenses and

consulting compensation. Ex. 1, § 17(A). If Dr. Lamensdorf chose to terminate the agreement

after the first renewal term, an accounting would occur to determine practice net income for the

6

two previous years. Ophnet would then be entitled to receive an additional payment equal to four times the annual practice net income generated over the previous two years. If Ophnet terminated the Management Agreement, there would be an accounting and its severance payment would equal two times average total practice net income over the previous two years. Ex. 1 at §§ 11, 17(B).

17.    With Ophnet's assistance, Dr. Lamensdorf's practice grew and prospered. Cataract surgeries -- by far the most profitable procedure for an ophthalmology practice -- increased by approximately 400% between 1995 and 2002. In 1997 Dr. Lamensdorf and Ophnet agreed to purchase the Sarasota ophthalmology practice of Dr. Richard Baise ("Dr. Baise"). Ex. 2. The practice paid $220,000 for the purchase of charts and files of Dr. Baise from the profits of the practice. Since those payments had the effect of reducing practice net operating income (and therefore reducing substantially Ophnet's bonus compensation), the parties agreed in the Addendum attached as Ex. 2 that if Dr. Lamensdorf terminated the agreement with Ophnet at any time Dr. Lamensdorf would owe Ophnet $110,000 plus 7% interest up to the date of the termination and payment. In connection with the purchase of Dr. Baise's practice, the Addendum further recited that the hard assets of the practice would be held not by the P.C. but rather the Lamenscram Partnership, an entity in which Mr. Hirsch, Mr. Zolla, Dr. Lamensdorf and Mrs. Lamensdorf were partners.

18.    As part of the original P.C. Management Agreement, the parties agreed that Mrs. Lamensdorf would be paid a salary of $20,000 per year once practice net income as defined in the agreement exceeded $100,000 per year. Mrs. Lamensdorf at that time had been assisting in various tasks for the practice, including such clerical matters as billing and collection work. Through the "Second Amendment to Management Agreement dated September 12, 1995" the

7

parties agreed that as of October 11, 2000, Mrs. Lamensdorf would be compensated for her

practice services. In particular, the Second Amendment recited that the parties

> have been informed by Kathy Lamensdorf that she has formed her own company Bayou
> JennKay, Inc. Furthermore, Bayou JennKay, Inc. has offered to contract to provide
> certain services to Eye Specialists [the P.C.] and Eye Specialists desires to receive such
> services as described and according to the compensation specified as follows:

> A.      Clerical services to be provided to Eye Specialists at a rate of eight ($8.00) dollars
> per hour.

> B.      Management services to include Marketing and Strategic Planning advice to be
> provided by Kathy Lamensdorf of Bayou JennKay, Inc. to Eye Specialists at a
> rate of twenty-two and 50/100 ($22.50) dollars per hour.

The parties further agree that Mrs. Lamensdorf would provide time sheets and an invoice for all

such services. Because practice expenses may under certain circumstances constitute a

deduction from net operating income, the P.C.'s and Dr. Lamensdorf's agreement that the P.C.

would not pay Bayou JennKay or Mrs. Lamensdorf at rates above those specified was of critical

importance to Ophnet due to the impact it could have both on its bonus income and deferred

compensation.

### The Construction of the ASC

19.      In 1998, Dr. Lamensdorf, Mrs. Lamensdorf, Mr. Hirsch, and Mr. Zolla jointly

agreed to build an ambulatory surgery center ("ASC") which would specialize in eye surgeries.

To that end, they formed ZHL, Inc., a Massachusetts corporation. On or about September 8,

1998, the parties entered into a Shareholders Agreement concerning the business affairs of ZHL.

Under the Shareholders Agreement, the officers of the corporation included Mr. Hirsch as

president and Mr. Zolla as vice president; neither Dr. Lamensdorf nor Mrs. Lamensdorf was or is

an officer. Then and now, Mr. Hirsch owns one-third of the shares in ZHL, Mr. Zolla owns one-

third of the shares in ZHL, and Dr. Lamensdorf and Mrs. Lamensdorf each own one-sixth of the

shares. A true and accurate copy of the Shareholders Agreement, as amended on or about August 19, 1999, is attached hereto as Exhibit 4.

20.      Because Ophnet had experience in the construction and operation of ambulatory surgery centers, ZHL effective January 15, 1999, entered into a Management Agreement (hereafter, "the ZHL Management Agreement") with Ophnet whereby Ophnet would oversee the construction and provide management services to the ASC. A true and accurate copy of the ZHL Management Agreement is attached hereto as Exhibit 5. Ophnet's compensation varied according to the services provided and the stage of construction of the ASC. Under § 4(c) of the ZHL Management Agreement, captioned Strategic Management and Marketing Services, Ophnet was to provide, inter alia, assistance in preparing the non-medical policies and procedures of the ASC. Ex. 5 at pp. 9-10. Under § 4(d), captioned "Operational Phase", Ophnet was, inter alia, to ensure that the ASC was staffed by an on-site manager and other non-physician and administrative support staff, ensure sufficient supplies and equipment for the ASC, monitor the day to day operations of the ASC, and be responsible for billings and collections. Ex. 5 at pp. 10-11. For Ophnet's strategic marketing and management services under § 4(c), it was to receive $30,000 per year in quarterly installments and under § 4(d) it was to receive $75 per hour up to an annual maximum amount of $50,000. Ex. 5 at § 7(a)(ii) and (iii), pp. 12-13.

21.      The ZHL Management Agreement also set forth the circumstances under which Ophnet's services could be terminated. Operational services under § 4(d) could be terminated without cause only upon 120 days written notice by owner to Ophnet or for good cause only after written notice of perceived deficiencies and Ophnet's failure to cure those perceived deficiencies within thirty days. By contract, Dr. Lamensdorf had sole discretion on behalf of ZHL to make the decision concerning termination. Ex. 5 at § 11. Under the strategic management and

9

marketing provisions of the contract, however, Ophnet's services could only be terminated by ZHL upon a majority vote of its shareholders and 120 days written notice from owner (ZHL) to project manager (Ophnet). Ex. 5 at § 11, p. 15.

22.     During the construction phase of the ASC, Dr. and Mrs. Lamensdorf each claimed, falsely, that they did not have sufficient funds to make the capital contributions necessary for the construction of the surgery center and to provide operating funds to permit ZHL to conduct its business activities. Accordingly, Mr. Hirsch and Mr. Zolla each individually agreed to and did loan ZHL $400,000 pursuant to a "Shareholder Resolution" dated and effective December 22, 2000. A true and accurate copy of the Shareholder Resolution is attached hereto as Exhibit 6. Under the Shareholder Resolution, Dr. Lamensdorf and Mrs. Lamensdorf were each obliged to make, beginning January 2001, monthly capital contributions of no less than $1,000 per month and upon receipt of those capital contributions, Mr. Hirsch's and Mr. Zolla's loan would be recharacterized as an equity contribution to ZHL on a dollar for dollar basis with capital contributed by the Lamensdorfs. Without Mr. Hirsch's and Mr. Zolla's infusion of much-needed funds, the surgery center could not have been constructed.

23.     The ASC recently opened for business in Sarasota as the Lantz Surgery Center. Dr. Lamensdorf and Mrs. Lamensdorf, however, have not been making their required capital contributions. Furthermore, Dr. Lamensdorf and Mrs. Lamensdorf have engaged in a protracted campaign of attempting to interfere in the non-medical aspects of the management of the ASC by demanding financial information on essentially each and every expense of the surgery center, and have attempted to interfere with the hiring, firing, and salary levels of administrative personnel hired. More recently, they have purported to negotiate with and/or to contract

10

unilaterally with Bayou JennKay and with unrelated third-party vendors for the provision of goods and services on behalf of ZHL.

24.    In mid-February 2002, Dr. Lamensdorf purported to terminate Ophnet's services for both his medical practice under the P.C. Management Agreement and purported to terminate Ophnet's management contract with the ASC under the ZHL Management Agreement. A true and accurate copy of relevant correspondence is attached hereto as Exhibit 7. Prior to the termination of the P.C. Management Agreement, Dr. Lamensdorf and Mrs. Lamensdorf in correspondence to Mr. Hirsch and Mr. Zolla claimed that the practice had not yet turned a profit. The fragmentary financial records of the P.C. available to Mr. Hirsch and Mr. Zolla lead them to believe and lead them to believe that after discovery they will be able to prove at trial, that these statements were knowingly false and made with an intent to deceive. In fact, it now appears that through September 2001 Dr. Lamensdorf had already paid himself in excess of $380,000 in salary, and had paid Bayou JennKay an exorbitant amount of fees in light of the caps on Bayou JennKay's hourly rate. Furthermore, prior to purporting to terminate Ophnet's management contract with the ASC Dr. Lamensdorf threatened to refuse to bring his surgical patients to the ASC as an economic lever against his fellow shareholders, insisted that Mr. Hirsch and Mr. Zolla sell them their full ownership interest in the ASC for the sum of $1, and endeavored to appoint Bayou JennKay, Inc. as the manager for the ASC. At the same time, Dr. Lamensdorf and Mrs. Lamensdorf were refusing to make capital contributions required by the Shareholder Resolution, thereby further attempting to exert economic pressure upon Mr. Hirsch and Mr. Zolla. This economic pressure was accompanied by a relentless series of unfounded complaints concerning Ophnet's management of the ASC and of the medical practice. Upon information and belief, Dr. Lamensdorf's and Mrs. Lamensdorf's purpose in undertaking this relentless campaign of

11

interference is an attempt to convert the proceeds and profits of the ASC to themselves in a manner disproportionate to their ownership interest in ZHL, and to provide them with a pretextual basis to terminate Ophnet and thereby deprive Mr. Hirsch and Mr. Zolla of a reasonable share of the profits of the business which they worked to create for over three years.

<div align="center">

**COUNT I**
**(Breach of Contract -- P.C. Management Agreement)**

</div>

25.     Ophnet herewith incorporates by reference the allegations of paragraphs 1-24 above as if set forth here in full.

26.     Under the P.C. Management Agreement, Dr. Lamensdorf and the P.C. are jointly and severally obligated to pay a substantial amount of money upon termination of the agreement. This is so regardless of whether (as Ophnet believes) Dr. Lamensdorf has actually terminated the agreement through his letter of January 16, 2002, or whether he has constructively terminated the agreement by making it impossible for Ophnet to perform its obligations.  Dr. Lamensdorf and the P.C. jointly and severally owe Ophnet a substantial amount of money under the termination clauses of the agreement, including but not limited to four times the amount of average net income of the P.C. over the last two years.

27.     Dr. Lamensdorf and the P.C. have (i) refused to pay the correct amounts due for Ophnet's annual bonus for at least 2000 and 2001, and (ii) failed altogether to pay amounts due at termination.  Furthermore, Dr. Lamensdorf in 2000 and 2001, in breach of the terms of the agreement, apparently paid himself a salary in excess of that permitted by the parties' contract and otherwise misstated the P.C.'s expenses thereby depriving Ophnet of earned bonus income and artificially depressing the amounts due under the deferred compensation clauses.  Ophnet has been harmed thereby.

<div align="center">

12

</div>

## COUNT II
**(Accounting)**

28.    Ophnet herewith incorporates by reference the allegations of paragraphs 1-27 above as if set forth here in full.

29.    The P.C. Management Agreement specifically requires that an accounting take place in order to establish practice net income for purposes of calculating Ophnet's deferred compensation.

30.    Dr. Lamensdorf and the P.C. have thus far failed to provide Mr. Hirsch and Mr. Zolla with the necessary financial information, despite requests, to calculate amounts due.

31.    This court should order and hold an accounting of the practice's net income.

## COUNT III
**(Breach of Fiduciary Duty -- Medical Practice)**

32.    Ophnet herewith incorporates by reference the allegations of paragraphs 1-31 above as if set forth here in full.

33.    By virtue of its entitlement on an annual basis to 50% of all net practice income, Ophnet is the equitable 50% owner of the P.C. As such, Dr. Lamensdorf owes Ophnet fiduciary duties of loyalty, care, and full disclosure in addition to implied duties of good faith and fair dealing.

34.    In derogation of those duties, Dr. Lamensdorf has engaged in questionable accounting practices overstating the practice's expenses as by paying himself as much as $350,000 in salary, despite the fact that his base salary under the P.C. Management Agreement is capped at $250,000. No equivalent profit distributions were made to Ophnet.

13

35.    The plaintiff has been harmed by these actions insofar as Dr. Lamensdorf's improper accounting practices have significantly reduced Ophnet's payout for the last two years and reduced amounts owed under the termination clauses.

## COUNT IV
### (Breach of Duty of Good Faith and Fair Dealing -- P.C. Management Agreement)

36.    Ophnet herewith incorporates by reference the allegations of paragraphs 1-35 above as if set forth here in full.

37.    In the alternative or in addition to Count III, Dr. Lamensdorf and the P.C. owe Ophnet a duty of good faith and fair dealing so as not to deprive Ophnet of the fruits of the contract for which it bargained.

38.    Through the mechanism of, inter alia, paying himself an excessive salary, Dr. Lamensdorf has substantially reduced the appropriate incentive payment to Ophnet for calendar years 2000 and 2001 under the P.C. Management Agreement and artificially depressed the amount that would otherwise be due under the termination clauses, thus causing Ophnet harm.

## COUNT V
### (Fraud -- Medical Practice)

39.    Ophnet herewith incorporates by reference the allegations of paragraphs 1-38 above as if set forth here in full.

40.    Through, inter alia, the excess payment of salary to himself, Dr. Lamensdorf and the P.C. have defrauded Ophnet of monies which otherwise would be due both as to Ophnet's incentive payments (i.e., 50% of net operating income) and as to the termination clauses.

41.    Ophnet has been harmed thereby.

## COUNT VI
### (Fraud -- Receipt of Proceeds)

42.     Ophnet, Mr. Hirsch and Mr. Zolla herewith incorporate by reference the allegations of paragraphs 1-41 above as if set forth here in full.

43.     Upon information and belief, the basis of which is set forth in ¶ 24 above and reflected in the correspondence attached hereto as Ex. 7, Mrs. Lamensdorf and Bayou JennKay participated in a plan to defraud Ophnet of earned compensation due under the P.C. Management Agreement through the submission of false and inflated invoices and/or claiming compensation for work not performed. Upon information and belief, this scheme ante-dated the Second Amendment to the P.C. Management Agreement and continued through at least December 2001. Ophnet, Mr. Hirsch and Mr. Zolla were harmed thereby.

## COUNT VII
### (Deceit)

44.     Ophnet, Mr. Hirsch and Mr. Zolla herewith incorporate by reference the allegations of paragraphs 1-43 above as if set forth here in full.

45.     In late 2001 and early 2002, Mrs. Lamensdorf stated to Mr. Hirsch and Mr. Zolla that the P.C. would not be profitable (and so unable to pay bonus income). Those statements include those made in some of the correspondence attached as Ex. 7, and they were knowingly false when made. These statements were also made with the knowledge that as a result of a relationship of trust and confidence that had evolved over the years, Mr. Hirsch and Mr. Zolla would rely upon those statements to their detriment. They did, in fact rely upon those statements to their detriment.

46.     Ophnet, Mr. Hirsch, and Mr. Zolla have been harmed thereby.

15

## COUNT VIII
### (Tortious Interference with Economic Relations -- Bayou JennKay, Inc.)

47.     Ophnet, Mr. Hirsch and Mr. Zolla herewith incorporate by reference the allegations of paragraphs 1-46 above as if set forth here in full.

48.     Ophnet had a contractual relationship with Dr. Lamensdorf and the P.C. that was of economic benefit to it.  Mr. Hirsch and Mr. Zolla had an economically advantageous relationship with the medical practice through their ownership of Ophnet.

49.     Bayou JennKay, Inc., through improper motive and means, including but not limited to the siphoning of funds from the medical practice described above and through a series of false statements made to Dr. Lamensdorf and the P.C. concerning Ophnet's management of the medical practice (many of which are reflected in the correspondence attached hereto as Exhibit 7) caused the P.C. and Dr. Lamensdorf to terminate the P.C. Management Agreement. Ophnet has been harmed thereby.

## COUNT IX
### (Breach of Contract -- ZHL Management Agreement)

50.     Ophnet herewith incorporates by reference the allegations of paragraphs 1-49 above as if set forth here in full.

51.     Dr. Lamensdorf and ZHL have breached the ZHL Management Agreement by, among other things, (i) purporting to terminate the strategic management services that Mr. Hirsch, Mr. Zolla and Ophnet were to provide under § 4(c), a power which the contract does not confer upon them and (ii) purporting to terminate Ophnet's duties under the operational phase of the contract in bad faith.

52.     Ophnet has been harmed thereby.

16

## COUNT X
### (Interference with Economic Relations -- ZHL Management Agreement)

53.    Ophnet herewith incorporates by reference the allegations of paragraphs 1-52 above as if set forth here in full.

54.    As a result of the Ophnet-ZHL Management agreement, Ophnet had a contractual relationship with ZHL that was of economic benefit.

55.    Bayou JennKay, Inc., through its agents, interfered with this contractual relationship by improper motive and means, specifically through (i) attempting to assume Ophnet's management duties without Ophnet's prior consent or the consent of the majority of the ZHL shareholders and (ii) knowingly and falsely claiming that Ophnet had failed to perform its contractual duties.  Bayou JennKay's purpose in doing so was to obtain for itself the financial benefits of managing the ASC even though it was aware at the time of its interference that a valid and binding contract existed between Ophnet and ZHL for the management of the ASC.

56.    Ophnet has been harmed thereby.

## COUNT XI
### (Fraudulent Inducement)

57.    Mr. Hirsch and Mr. Zolla herewith incorporate by reference the allegations of paragraphs 1-56 above as if set forth here in full.

58.    Dr. Lamensdorf and Kathy Lamensdorf induced Mr. Hirsch and Mr. Zolla individually to make substantial loans to ZHL based upon their representations that they could not afford to make the capital contributions which they were required to make to ZHL.

59.    These representations were made both telephonically to Mr. Hirsch and Mr. Zolla to their offices in Marblehead and Topsfield, respectively, as well as in person to Mr. Cram,

17

Ophnet's agent, shortly before the parties signed the Shareholder Resolution on or about December 22, 2000.

60.    Mr. Hirsch and Mr. Zolla acted in reasonable reliance upon Dr. Lamensdorf's and Mrs. Lamensdorf's statements, and were harmed thereby.

## COUNT XII
### (Breach of Fiduciary Duty)

61.    Mr. Hirsch and Mr. Zolla herewith incorporate by reference the allegations of paragraphs 1-60 above as if set forth here in full.

62.    As shareholders in ZHL, Dr. Lamensdorf and Mrs. Lamensdorf each owe fiduciary duties of loyalty, care, and full disclosure to Mr. Hirsch and Mr. Zolla.

63.    They have breached those duties by, inter alia, (i) the purported termination of the ZHL Management Agreement with Ophnet, (ii) failing to make full and accurate disclosure of their financial circumstances prior to Mr. Hirsch's and Mr. Zolla's agreeing to loan some $400,000 to ZHL, (iii) interfering with and attempting to usurp Ophnet's management authority and Mr. Hirsch's and Mr. Zolla's authority as majority shareholders by unwarranted interference in the business affairs and management of the ASC, (iv) further interfering with the business affairs of the ASC by, among other things, constant hectoring of employees regarding the performance of their duties and persistent bad faith inquiries requiring Mr. Hirsch and Mr. Zolla to document in minute detail expenditures made from the ASC's business account, and (v) keeping for themselves business opportunities which properly belong to the corporation. Among the actions they have undertaken in the latter category is a refusal to rent a Yag laser to ZHL which would permit it to expand its business unless ZHL agreed to rent the laser from the P.C. at a rate far above its fair market value. The effect of that refusal is that the corporation has been obliged to forego fees that would otherwise go to it, despite the absence of any financial

18

benefit to Dr. Lamensdorf from his actions. Dr. Lamensdorf and Mrs. Lamensdorf have more recently begun entering into contracts for ZHL or negotiating with vendors for such contracts without consultation with Mr. Hirsch or Mr. Zolla, even though they have no actual authority to bind the corporation.

64.     Mr. Hirsch and Mr. Zolla were harmed thereby.

## COUNT XIII
### (Partnership Dissolution -- Lamenscram Partnership)

50.     Mr. Hirsch, Mr. Zolla and Mr. Cram herewith incorporate by reference the allegations of paragraphs 1-64 as if set forth here in full.

51.     After the purchase of Dr. Baise's practice, described in paragraph 17 above, the parties agreed in an amendment to the Practice Management Agreement (Ex. 2) that the hard assets of the practice would be held by the Lamenscram Partnership. Subsequently, the parties entered into a written partnership agreement, a true and accurate copy of which is attached hereto as Exhibit 8. Among other things, the Lamenscram Partnership Agreement in Article X, § 2, p. 6 provided that "all of the parties consent to personal jurisdiction and venue in Massachusetts and Florida."

52.     The business relationship among the parties is currently such that Mr. Hirsch, Mr. Zolla, and Mr. Cram, who collectively hold one-half of the Partnership interests (with Dr. Lamensdorf and Mrs. Lamensdorf collectively holding the other one-half) now wish to dissolve the partnership, which may be terminated pursuant to articles VII and IX of the Partnership Agreement.

53.     The Court should now declare the termination of the partnership, value the respective partners' interests, and require an equitable distribution of partnership property.

## COUNT XIV
### (ZHL Restraints on Competition)

54.    Mr. Hirsch and Mr. Zolla herewith incorporate by reference the allegations of paragraphs 1-53 above as if set forth here in full.

55.    The ZHL Shareholders Agreement (Ex. 4) contains within it at § 9.4(a) a restrictive covenant on competition. Specifically, the covenant provides:

> (a) <u>Competitive Business</u>. Each Shareholder hereby agrees that during the term of this Agreement, he or she will not, within a fifteen (15) mile radius of any place of business of the Corporation, including, but not limited to, the Center, (i) render services, or (ii) become a proprietor, partner, agent, trustee, director, officer, shareholder or member, directly or indirectly, of, or be employed by, or render aid or advice to, or perform any services of any nature whatsoever for, any organization that renders services or which is engaged or proposes to engage in any business or activity which renders services that are substantially similar to the business conducted by the Corporation, unless as otherwise specifically permitted elsewhere in this Agreement (the "Restrictive Covenant").

The covenant also states (at ¶ 9.4(d)) that it is independent of and divisible from the remainder of the contract, thus assuring that Dr. Lamensdorf cannot relieve himself of his obligations under it merely by declaring a breach of the Shareholders Agreement.

56.    The restrictive covenant does <u>not</u> in any manner require that Dr. Lamensdorf perform surgeries at the ASC, nor does it in any manner restrain or even purport to restrain his medical judgment. Rather, the effect of the restrictive covenant is to preclude Dr. Lamensdorf from taking a paid position with a competing ASC for as long as Mr. Hirsch and Mr. Zolla remain shareholders of ZHL, and to forbid him from taking an ownership interest in another ASC while Mr. Hirsch and Mr. Zolla remain shareholders in ZHL. As such, the covenant effectively does little more than articulate Dr. Lamensdorf's common law duty of loyalty and care.

57.    Notwithstanding the reasonableness of the covenant, Dr. Lamensdorf has directly and indirectly threatened not only to cease performing operations at the surgery center (which is

his right) but also to take an interest in a competing surgery center or to assume a paid position with a competing surgery center, or even to construct a competitive surgery center of his own -- conduct which the Restrictive Covenant expressly forbids..

58.     Because of Dr. Lamensdorf's threats, an actual controversy has arisen over the scope and validity of § 9.4(a), and this Court should declare the rights of the parties with respect to that provision of the contract.

WHEREFORE, Ophnet, Mr. Hirsch, and Mr. Zolla, and (as to Count XIII only) Mr. Cram herewith request that this Honorable Court:

A.     AwardEnter damages on Counts I-VIIIXII above in an amount to be determined at trial;

B.     Order, pursuant to Count II, an accounting of the P.C.;

C.     Award Ophnet, Mr. Hirsch and/or Mr. Zolla, as appropriate, punitive damages under Counts III, V, VI, VII, and VIII, X and XII if Florida law is deemed to apply to those counts;

D.     Award Ophnet, Mr. Hirsch and/or Mr. Zolla, as appropriate, prejudgment interest on all counts;

E.     Award Ophnet, Mr. Hirsch and/or Mr. Zolla, as appropriate, attorney's fees on Counts II, III and VIIIXII;

F.     Declare the dissolution of the Lamenscram Partnership pursuant to Count IXXIII and conduct an accounting of the parties' entitlements to the partnership's assets;

G.     Declare, pursuant to Count XIV, the rights of the parties concerning the restrictive covenant contained in § 9.4(a) of the ZHL Shareholders Agreement; and

21

H.    Award whatever other or additional relief this Honorable Court deems just under

the circumstances.

<div align="center">Jury Claim</div>

Plaintiffs claim a trial by jury on all claims and issues so triable.



Respectfully submitted,

OPHNET, INC., JOHN A. HIRSCH,
RONALD W. ZOLLA, and
KENNETH CRAM,

By their Attorneys,



_____
J. Owen Todd (BBO # 499480)
Edward Foye (BBO #562375)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
617-720-2626

Dated:

EXHIBIT 5
TO
**MEMORANDUM IN SUPPORT OF MOTION TO REMAND**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

OPHNET, INC., A Massachusetts
Corporation and JOHN A. HIRSCH and
RONALD W. ZOLLA, Individually and as
Shareholders of ZHL, INC., A Massachusetts
Corporation,

Plaintiffs,

v.

MICHAEL LAMENSDORF and KATHY
LAMENSDORF, Individually and as
Shareholders of ZHL, INC., and MICHAEL
LAMENSDORF, M.D., P.C., A Florida
Corporation,

Defendants.

CIVIL ACTION No.

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF

## MOTION TO COMPEL ARBITRATION

Defendants, MICHAEL LAMENSDORF M.D. (hereinafter Dr. Lamensdorf") and KATHY LAMENSDORF (hereinafter "Mrs. Lamensdorf") and MICHAEL LAMENSDORF, M.D., P.C., a Florida Professional Corporation, (hereinafter "the P.C."), by and through their undersigned counsel, hereby submit this Memorandum of Law in support of Defendants' Motion to Compel Arbitration pursuant to Rule 7.1(B) of the Local Rules of the United States District Court for the District of Massachusetts, and state as follows:

## FACTUAL BACKGROUND

On September 12, 1995 Ophnet, Dr. Lamensdorf and the P.C. entered into a Management Agreement (hereinafter "the P.C. Management Agreement"), which is attached to the Plaintiffs' Complaint as Exhibit 1. On March 19, 1997 Dr. Lamensdorf and Mr. Hirsch, as President of Ophnet entered into an Addendum to the P.C. Management Agreement, which is attached to Plaintiffs' Complaint as Exhibit 2. On September 12, 1995 Dr. Lamensdorf, the P.C. and Ophnet entered into the First Amendment to the P.C. Management Agreement, which is attached to Plaintiffs' Complaint as Exhibit 3. On September 8, 1998, Dr. Lamensdorf, Mrs. Lamensdorf, Mr. Hirsch and Mr. Zolla entered into the ZHL Shareholders' Agreement, which is attached to Plaintiffs' Complaint as Exhibit 4. On January 15, 1999, Ophnet and ZHL entered into the ZHL Management Agreement, which is attached to Plaintiffs' Complaint as Exhibit 5. On December 22, 2000 Dr. Lamensdorf, Mrs. Lamensdorf, Mr. Hirsch and Mr. Zolla entered into a Shareholder Resolution, which is attached to Plaintiffs' Complaint as Exhibit 6.

In the Recitals section of the First Amendment to the P.C. Management Agreement, the agreement states "WHEREAS, the Physician and Ophnet hereby intend the first amendment to be integrated into the Management Agreement to become the amended agreement." The parties intended the P.C. Management Agreement and the Fist Amendment to the P.C. Management Agreement to be read in conjunction with one another as one single agreement.

Paragraph 23 of the P.C. Management Agreement states "this Agreement shall be construed and interpreted in accordance with the laws of the State of Florida." Paragraph 7 of the First Amendment to the P.C. Management Agreement states:

> 7. <u>Dispute Resolution</u>. Notwithstanding any contrary term in any of the agreements referenced in recital section of this agreement, Physician and Ophnet agree that should a dispute arise between them in the further relating to or arising from the prior agreements, the amended agreement or any future agreement relating to or concerning the Physician or Ophnet, they will adhere to the following sequential approach to resolving the dispute:
>
> A. <u>Direct Resolution</u>. The parties will use best efforts to communicate directly with each other to resolve the dispute.

B.  <u>Mediation</u>. If after thirty (30) days any party reasonably believes that dispute resolution through direct communication is highly improbably, such party will provide written notice of their desire to mediate. The cost of the mediation shall be deemed an expense of Ophnet or the Physician depending on which party chose to mediate. The parties agree to designate a mutually acceptable, objective and unbiased person with adequate skills, knowledge, experience and training to mediate the dispute. The parties agree to use best efforts to resolve their dispute through the mediation process. If the mediator, after the first mediation session, certifies in writing to the parties that resolution through the mediation process is highly improbable, the parties agree to submit the unresolved issues to binding arbitration.

C.  <u>Arbitration</u>. If the parties cannot resolve the issues between them through direct resolution or mediation, either party may, after complying with the requirements of Paragraphs A and B, submit the dispute to binding arbitration. Notice of an intent to submit the dispute to binding arbitration shall be provided in writing to the other party. Following receipt of the notice, the parties agree to designate a mutually acceptable, objective and unbiased person with adequate skills, knowledge, experience and training to arbitrate the disputed issues. The arbitration shall be conducted under the rules of the American Arbitration Association unless the parteis agree otherwise. Unless the parties agree otherwise, the arbitrator shall be a preson who resides and conducts his business in the state of Florida. If the parties cannot agree upon a mutually acceptable arbitrator, they shall request that the American Arbitration Association appoint an arbitrator with the following skills and qualifications:

(a)  The arbitrator shall have been certified by the AAA for not less than five years;
(b)  The arbitrator shall have mediated or arbitrated at lease five disputes in the prior five years concerning the rights and obligations of partners in a partnership or shareholders in a close corporation; and
(c)  The parties shall express their preference for an arbitrator with knowledge in the field of health care administration. This criteria shall be submitted to the AAA and be known to it at the time the parties seek assignment of an arbitrator.

Pursuant to the PC Management Agreement and the First Amendment thereto, the parties have agreed to resolve disputes arising from the P.C Agreement the Amended P.C Agreement *or any future agreements relating to or concerning Dr. Lamensdorf and Ophnet* in binding arbitration. The parties did not reserve any right in the Agreements to litigate their disputes in a court of law.

The ZHL Shareholder's Agreement, attached to Plaintiffs' Complaint as Exhibit 4, includes the following provisions:

Section 10.3    Dispute Resolution.   If a dispute arises between any of the parties to this agreement, the parties agree tot eh following sequential approach in resolving a dispute:

(a)    Direct Resolution.   The parties will use best efforts to communicate directly with each other to resolve the dispute.

(b)    Mediation.   If after thirty (30) days any party reasonably believes that dispute resolution is highly improbable, such party will provide thirty (30) days notice of desire to mediate.   The parties agree to designate a mutually acceptable, objective and unbiased person with adequate skills, knowledge, experience and training to mediate the dispute. The parties agree to use best efforts to resolve their dispute through the mediation process.   If and when, in the mediator's reasonable judgment, resolution by mediation becomes highly improbable, or after sixty (60) days, whichever occurs first, the parties agree to submit the unresolved issues to binding arbitration.

(c).    Arbitration.   Upon unsuccessful resolution of any issues in dispute following the steps set forth in subsections (a) and (b) above, the parties agree to, within thirty (30) days, designate a mutually acceptable, objective and unbiased person with adequate skills, knowledge, experience and training to arbitrate the disputed issues.   The parties agree to comply with the arbitration process and agree to adhere to the arbitrator's decision on each disputed issue.

Section 10.8    Governing Law.   This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Florida.

Disputes between the shareholders are governed by the ZHL Shareholder Agreement in which the parties agreed to resolve disputes arising between the shareholders in binding arbitration.   The parties did not reserve any right in the ZHL Shareholder Agreement to litigate their disputes in a court of law.   The parties to the ZHL Shareholder Agreement clearly intended to resolve their disputes in binding arbitration.   The parties also agreed that any disputes would be governed by Florida Law.

## ARGUMENT

## I. THE PARTIES HAVE AGREED TO ARBITRATE THE DISPUTES IN PLAINTIFFS' COMPLAINT

It is now an axiom of federal and Florida law that written agreements to arbitrate are binding and enforceable and a court must compel arbitration if an arbitrable issues exists. *See Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 218 (1985); *KFC National Management Co. v. Beauregard,* 739 So.2d 630, 631 (Fla. 5th DCA 1999); 9 U.S.C. sec 2; Fla. Stat. 682.02. Public policy favors arbitration as an efficient means of settling disputes, because it avoids the delay and expense of litigation. *KFC National Management Co. v. Beauregard,* 739 So.2d 630, 631 (Fla. 5th DCA 1999). All questions concerning the scope or waiver of the right to arbitrate should be resolved in favor of arbitration rather than against it. *Heidrun Eckes-Chantre-Tabet Und Kinder Vermogensanlage Gesellschaftbugerlichen Rechts III v. Largo Development Corp.,* 2002 WL 181106; 27 Fla. Law Weekly D339 (Fla. 3d DCA 2002); *KFC National Management Co. v. Beauregard,* 739 So.2d 630, 631 (Fla. 5th DCA 1999); *EMSA Ltd. Partnership v. Mason,* 677 So.2d 105, 107 (Fla. 4th DCA 1996); *Regency Group, Inc. v. McDaniels,* 647 So.2d 192, 193 (Fla. 1st DCA 1994).

Under both federal statutory provisions and Florida's Arbitration Code, there are three elements for courts to consider in ruling on a motion to compel arbitration of a given dispute: (1) whether a valid written agreement to arbitrate exists, (2) whether an arbitrable issue exists, and (3) whether the right to arbitration was waived. *Seifert v. U.S. Home Corp.,* 750 So.2d 633, 636 (Fla. 1999); *Cuningham Hamilton Quiter, P.A., v. B.L. of Miami, Inc.,* 776 So.2d 940, 942 (Fla. 3d DCA 2001); *Gale Group, Inc. v. Westinghouse Electric Corp.,* 683 So.2d 661, 662-63 (Fla. 5th DCA 1996).

## II. DEFENDANTS HAVE NOT WAIVED THEIR RIGHT TO ARBITRATE

There is no issue that Defendants may have waived any right to arbitrate these disputes. Defendants have merely removed the case to Federal court and filed a Motion to Compel Arbitration. Defendants have not participated in the litigation beyond the steps necessary to protect their rights. The removal of the case to federal court and the filing of a Motion to Compel Arbitration does not waive a party's right to arbitrate. *See Prestige Protective Corp v. Burns International Security Services Corp.,* 776 So.2d 311 (Fla. 4th DCA 2001); *Merrill Lynch*

*Pierce Fenner & Smith, Inc. v. Ashman,* 791 So.2d 25, 26 (Fla. 2d DCA 2001); *Heidrun Eckes-Chantre-Tabet Und Kinder Vermogensanlage Gesellschaftbugerlichen Rechts III v. Largo Development Corp.,* 2002 WL 181106; 27 Fla. Law Weekly D339 (Fla. 3d DCA 2002); *Gale Group, Inc. v. Westinghouse Electric Corp.,* 683 So.3d 661, 663 (Fla. 5th DCA 1996). By failing to follow the dispute resolution process set forth in the agreements, Plaintiffs' may have waived their right to demand that Defendants engage in the dispute resolution process set forth in the agreement, but Defendants have not waived their right to participate in that process. *See Prestige Protective Corp. v. Burns International Security Services Corp.,* 776 So.2d 311 (Fla. 4th DCA 2001).

## III. THE WRITTEN AGREEMENTS ARE VALID

Admission of execution of the contract containing the arbitration provision requires claims to go to arbitration. *See Feather Sound Country Club, Inc. v. Barber,* 567 So.2d 10, (Fla. 2d DCA 1990). In their Complaint, Plaintiffs clearly admit that the agreements were made and entered into. Courts must yield their jurisdiction where the making of an arbitration agreement is admitted. *See Mirson v. Corradino Group, Inc.,* 751 So.2d 699, 700 (Fla. 3d DCA 2000).

It is well established that a dispute must be arbitrated where a complaint alleges fraud or some other ground for avoiding or invalidating a contract as to the entire agreement rather than as to the arbitration clause. *See Great Western Financial Securities Corp. v. Grandison,* 701 So.2d 1202, 1203 (Fla. 5th DCA 1997). Plaintiffs' Complaint does not allege fraud or fraudulent inducement as to the arbitration provisions of the agreements and therefore Plaintiffs claims for fraud and fraudulent inducement do not preclude arbitration of these issues.

## III. PLAINTIFFS' CLAIMS ARE ARBITRABLE ISSUES

Whether an arbitration clause requires arbitration of a particular dispute necessarily rests on the intent of the parties. *Seifert* 750 So.2d at 636. Whether a particular claim must be submitted to arbitration necessarily depends on the existence of some nexus between the dispute and the contract containing the arbitration clause. *See id.* at 638. If the contract places the parties in a unique relationship that creates new duties not otherwise imposed by law, then a

dispute regarding a breach of a contractually-imposed duty is one that arises from the contract and is therefore arbitrable. *See id.* at 640.

### Count I - Breach of the P.C. Management Agreement

A complaint for breach of contract, to which is attached a copy of the contract providing that the sole remedy for breach will be by arbitration, fails on its face to state a cause of action for any judicial relief, other than to compel arbitration. *See Opti, Inc. v. Sales Engineering Concepts, Inc.,* 701 So.2d 1234, 1235 (Fla. 4th DCA 1997). Count I of Plaintiffs' Complaint is for Breach of the P.C. Management Agreement. Paragraph 7 of the First Amendment to the P.C. Management Agreement states:

7. <u>Dispute Resolution</u>. Notwithstanding any contrary term in any of the agreements referenced in recital section of this agreement, Physician and Ophnet agree that should a dispute arise between them in the further relating to or arising from the prior agreements, the amended agreement or any future agreement relating to or concerning the Physician or Ophnet, they will adhere to the following sequential approach to resolving the dispute:

A. <u>Direct Resolution</u>. The parties will use best efforts to communicate directly with each other to resolve the dispute.

B. <u>Mediation</u>. If after thirty (30) days any party reasonably believes that dispute resolution through direct communication is highly improbably, such party will provide written notice of their desire to mediate. The cost of the mediation shall be deemed an expense of Ophnet or the Physician depending on which party chose to mediate. The parties agree to designate a mutually acceptable, objective and unbiased person with adequate skills, knowledge, experience and training to mediate the dispute. The parties agree to use best efforts to resolve their dispute through the mediation process. If the mediator, after the first mediation session, certifies in writing to the parties that resolution through the mediation process is highly improbable, the parties agree to submit the unresolved issues to binding arbitration.

C. <u>Arbitration</u>. If the parties cannot resolve the issues between them through direct resolution or mediation, either party may, after complying with the requirements of Paragraphs A and B, submit the dispute to binding arbitration. Notice of an intent to submit the dispute to binding arbitration shall be provided in writing to the other party. Following receipt of hte notice, the parties agree to designate a mutually acceptable, objective and unbiased person with adequate skills, knowledge, experience and training to arbitrate the disputed issues. The arbitration shall be conducted under the rules of the American Arbitration Association unless the parteis agree otherwise. Unless the parties agree otherwise, the arbitrator shall be a preson who resides and conducts his business in the state of Florida. If the parties cannot agree upon a mutually acceptable

arbitrator, they shall request that the American Arbitration Association appoint an arbitrator with the following skills and qualifications:

(a)   The arbitrator shall have been certified by the AAA for not less than five years;
(b)   The arbitrator shall have mediated or arbitrated at lease five disputes in the prior five years concerning the rights and obligations of partners in a partnership or shareholders in a close corporation; and
(c)   The parties shall express their preference for an arbitrator with knowledge in the field of health care administration. This criteria shall be submitted to the AAA and be known to it at the time the parties seek assignment of an arbitrator.

As the parties have agreed to resolve any disputes pursuant to the P.C. Management Agreement in arbitration, any action for breach of the P.C. Management Agreement should properly be brought in the arbitration forum.

## Count II - Accounting

Count II of Plaintiffs' Complaint is for Accounting. Plaintiffs' allege that they are entitled to an accounting from Defendants because such a duty is imposed by the P.C. Management Agreement. As set forth above, the parties have agreed to resolve any disputes arising out of the P.C. Management Agreement in arbitration, therefore, any action for accounting provided for in that agreement should properly be brought in arbitration.

## Count III - Breach of Fiduciary Duty

Count III of Plaintiffs' Complaint is for Breach of Fiduciary Duty. If the contract places the parties in a unique relationship that creates new duties not otherwise imposed by law, then a dispute regarding a breach of a contractually-imposed duty is one that arises from the contract and is therefore arbitrable. *See id.* at 640. Plaintiffs' allege that by virtue of the provision in the P.C. Management Agreement entitling Ophnet to fifty percent (50%) of the net practice income that the agreement thereby imposes a duty of loyalty, care and full disclosure upon Dr. Lamensdorf. The allegations in Count III therefore arise out of the P.C. Management Agreement. As set forth above, the parties have agreed to resolve any disputes arising out of the P.C. Management Agreement in arbitration, therefore, any action for breach of a duty allegedly

imposed by the P.C. Management Agreement should properly be brought in the arbitration forum.

### Count IV - Breach of Duty of Good Faith and Fair Dealing - P.C. Management Agreement

Count IV of Plaintiffs' Complaint is entitled "Breach of Duty of Good Faith and Fair Dealing – P.C. Management Agreement". The duties of good faith and fair dealing are implied contractual duties. *See Hospital Corp. of America v. Florida Medical Center, Inc.,* 710 So.2d 573, 575 (Fla. 4th DCA 1998). Claims for breach of the duty of good faith and fair dealing cannot be asserted as independent sources of breach when all other terms of the contract have been performed pursuant to the contractual requirements. *See id.* These contractual duties are imposed by the P.C. Management Agreement. As set forth above, the parties have agreed to resolve any disputes regarding breach of the P.C. Management Agreement in arbitration, therefore, any action for breach of a duty allegedly imposed by the P.C. Management Agreement should properly be brought in the arbitration forum.

### Count V - Fraud

It is well established that a dispute must be arbitrated where a complaint alleges fraud or some other ground for avoiding or invalidating a contract as to the entire agreement rather than as to the arbitration clause specifically. *See Great Western Financial Securities Corp. v. Grandison,* 701 So.2d 1202, 1203 (Fla. 5th DCA 1997). Plaintiffs' Complaint does not allege fraud as to the arbitration provisions of the agreements and therefore Plaintiffs' claims for fraud may be arbitrated. Count V of Plaintiffs' Complaint alleges fraud against defendants for allegedly paying Dr. Lamensdorf a salary in excess of the cap imposed by the P.C. Management Agreement and therefore defrauding Ophnet of monies it would otherwise be due under the P.C. Management Agreement. Claims for fraud may be subject to an arbitration clause if the clause provides for arbitration of disputes "arising out of or relating " to the conduct of the parties to the agreement. *See Hirshenson v. Spaccio,* 800 So.2d 670, 674-75 (Fla. 5th DCA 2001). The parties to the P.C. Management Agreement agreed to arbitrate disputes arising "between the them in the future relating to or arising from the prior agreements, the amended agreement or any future

agreement relating to or concerning the Physician or Ophnet". This language is broader than the language in *Hirsheson* in which fraud claims were compelled to arbitration. *See id.* Therefore, Plaintiffs' fraud claims should be compelled to arbitration.

Further, any alleged duty to abide by the salary cap or to pay certain monies are duties imposed by the P.C. Management Agreement. As set forth above, the parties have agreed to resolve any disputes arising out of the P.C. Management Agreement in arbitration, therefore, any action for breach of a duty allegedly imposed by the P.C. Management Agreement which then allegedly caused a defrauding of a party to the P.C. Agreement out of monies allegedly owed under the P.C. Management Agreement should properly be brought in the arbitration forum.

**Count VI - Breach of Contract - ZHL Management Agreement**

Count VI alleges that Dr. Lamensdorf breached the ZHL Management Agreement, attached to Plaintiffs' Complaint as Exhibit 5. Dr. Lamensdorf did not sign the ZHL Management Agreement personally, he signed it in his capacity as Chairman of the Board of ZHL. As Dr. Lamensdorf did not sign this contract personally, this Count of the Complaint is presumably based upon Dr. Lamensdorf's capacity as shareholder of ZHL and therefore such disputes are governed by the ZHL Shareholder Agreement. Pursuant to the ZHL Shareholder Agreement, the parties have agreed to resolve their disputes arising between the parties to this agreement in binding arbitration. The ZHL Shareholder Agreement contains the following arbitration provision:

Section 10.3   Dispute Resolution.   If a dispute arises between any of the parties to this agreement, the parties agree tot eh following sequential approach in resolving a dispute:

(a)   Direct Resolution.   The parties will use best efforts to communicate directly with each other to resolve the dispute.

(b)   Mediation.   If after thirty (30) days any party reasonably believes that dispute resolution is highly improbable, such party will provide thirty (30) days notice of desire to mediate. The parties agree to designate a mutually acceptable, objective and unbiased person with adequate skills, knowledge, experience and training to mediate the dispute. The parties agree to use best efforts to resolve their dispute through the mediation process. If and when, in the mediator's reasonable judgment, resolution by mediation

becomes highly improbable, or after sixty (60) days, whichever occurs first, the parties agree to submit the unresolved issues to binding arbitration.

(c). <u>Arbitration</u>. Upon unsuccessful resolution of any issues in dispute following the steps set forth in subsections (a) and (b) above, the parties agree to, within thirty (30) days, designate a mutually acceptable, objective and unbiased person with adequate skills, knowledge, experience and training to arbitrate the disputed issues. The parties agree to comply with the arbitration process and agree to adhere to the arbitrator's decision on each disputed issue.

Section 10.8    <u>Governing Law.</u> This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Florida.

Also, the P.C. Management Agreement provides for the arbitration of any disputes arising between the Physician and Ophnet relating to or arising out of the P.C. Management Agreement *and* any future agreement relating to or concerning the Physician [Dr. Lamensdorf] or Ophnet. The ZHL Management Agreement is a future agreement relating to or concerning the Physician [Dr. Lamensdorf] and Ophnet and as such, any disputes arising out of the ZHL Management Agreement should be arbitrated.

Further, the ZHL Management Agreement contains no choice of forum provision. Where two contracts exist between the parties the court should look to the contract with the more specific terms for guidance regarding the intent of the parties. *See K.P. Meiring Construction, Inc. v. Northbay I & E, Inc.,* 761 So.2d 1221, 1224 (Fla. 2d DCA 2000) (holding that the subcontract should govern regarding arbitration, forum, or choice of law as it defined specific terms as to these issues). As the ZHL Management Agreement is related to the ZHL Shareholder Agreement the Court should look to the Shareholder Agreement to discern the intent of the parties regarding their intent to arbitrate. As the ZHL Shareholder Agreement mandates arbitration but the ZHL Management Agreement is silent on the issue of forum selection, the ZHL Shareholder Agreement is a good indication of the parties intent to arbitrate their disputes.

**Count VII - Fraudulent Inducement**

Count VII alleges that Dr. and Mrs. Lamensdorf fraudulently induced Mr. Hirsch and Mr. Zolla into making loans to ZHL as memorialized in the Shareholder Resolution attached to

Plaintiffs' Complaint as Exhibit 6. Disputes regarding any shareholder action, such as shareholder resolutions, must be litigated by the parties in their capacities as shareholders. Therefore, these disputes are governed by the ZHL Shareholder Agreement, which contains the arbitration provision set forth above.

A claim for fraud in the inducement of the entire contract is properly decided in arbitration. *See Micronair, Inc. v. city of Winter Haven,* 800 So.2d 622, 624-25 (Fla. 2d 2001). A claim of fraud recognizes the validity of the contract and the agreement to arbitrate but seeks to avoid them. *See id.* Plaintiffs do not allege that they were fraudulently induced into entering into the arbitration provision of the agreements at issue, therefore, Plaintiffs' fraudulent inducement claims are arbitrable. *See also Medident Construction, Inc. v. Chappel,* 632 So.2d 194, 195 (Fla. 3d DCA 1994) (stating that where fraud or some other ground for avoidance or invalidity of the contract is alleged as to the entire agreement rather than specifically as to the arbitration clause , the entire matter should be resolved by arbitration) (citing *Manning v. Interfuture Trading, inc.,* 578 So.2d 842 (Fla. 4th DCA 1991); *Ronbeck Construction Co. v. Savanna Club Corp.,* 592 So.2d 344 (Fla. 4th DCA 1992); *Beaver Coaches v. Revels Nationwide R.V. Sales, Inc.,* 543 So.2d 359 (Fla. 1st DCA 1989). Therefore, this issue is arbitrable and should be decided in the arbitration forum.

**Count VIII - Breach of Fiduciary Duty**

Count VIII alleges that Dr. and Mrs. Lamensdorf, as shareholders of ZHL owe a fiduciary duty of care, loyalty and full disclosure to Plaintiffs. If the contract places the parties in a unique relationship that creates new duties not otherwise imposed by law, then a dispute regarding a breach of a contractually-imposed duty is one that arises from the contract and is therefore arbitrable. *See Seifert,* 750 So.2d at 640. This Count is against Dr and Mrs. Lamensdorf in their capacities as ZHL shareholders and therefore such disputes are governed by the ZHL Shareholder Agreement. Plaintiffs allege that the ZHL Shareholder Agreement imposes upon Defendants certain duties that were breached. Pursuant to the ZHL Shareholder Agreement, the parties have agreed to resolve disputes arising between the parties to this

agreement in binding arbitration. As such, the parties have agreed to resolve any disputes between shareholders in arbitration, therefore, any action for allegedly breaching a duty imposed by the contract containing a mandatory arbitration provision should properly be brought in the arbitration forum.

## CONCLUSION

Two agreements, the P.C. Management Agreement and the ZHL Shareholder Agreement contain mandatory arbitration provisions. Counts I through IV of Plaintiffs' Complaint relate to and arise out of the P.C. Management Agreement in which the parties agreed to arbitrate their disputes. Counts VI through VIII relate to the parties in their capacities as shareholders and as such, are governed by the ZHL Shareholder Agreement, which mandates arbitration of disputes between the shareholders. The language in the arbitration provisions is broad and encompasses the Plaintiffs causes of action. The parties intended and agreed to arbitrate the disputes in the Complaint. Therefore, Plaintiffs should be compelled to arbitrate these disputes in accordance with the intent and agreement of the parties.

WHEREFORE, Defendants MICHAEL LAMENSDORF M.D. (hereinafter "Dr. Lamensdorf") and KATHY LAMENSDORF (hereinafter "Mrs. Lamensdorf") and MICHAEL LAMENSDORF, M.D., P.C., A Florida Professional Corporation, (hereinafter "the P.C."), respectfully request that this Court order and decree that:

A.      This matter be compelled to arbitration pursuant to the agreements of the parties;

B.      This Court enter an Order staying any and all civil actions or proceedings subject to the arbitration proceeding until completion of the arbitration or further order of this Court; and

C.    For all other such further relief as the Court deems necessary and proper.

<div style="margin-left: 40%">

Respectfully submitted,

MICHAEL LAMENSDORF and KATHY LAMENSDORF, Individually and as Shareholders of ZHL, INC., and MICHAEL LAMENSDORF, M.D., P.C., A Florida Corporation,

By its attorneys,

</div>

Dated: March 27, 2002

<div style="margin-left: 40%">

Brandon F. White, Esq.
Elizabeth A. Heinrich, Esq. (BBO # 648090)
Foley, Hoag & Eliot LLP
One Post Office Square
Boston, Massachusetts 02109
(617) 832-1000

</div>

OF COUNSEL
ABEL, BAND, RUSSELL, COLLIER,
PITCHFORD & GORDON, CHARTERED
Michael S. Taaffe
Fla. Bar No. 490318
Jennifer B. Compton
Fla. Bar No. 0128041
240 South Pineapple Avenue
Post Office Box 49948
Sarasota, Florida  34230-6948
(941) 366-6660
(941) 366-3999 (fax)
Attorneys for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished via: facsimile    U.S. Mail    Fed Ex, postage prepaid, to J. Owen Todd and Edward Foye; Todd & Weld, LLP; 28 State Street, 31st Floor; Boston, MA 02109 this 27 day of March, 2002.

By: _____
Elizabeth Heinrich

EXHIBIT 6
TO
**MEMORANDUM IN SUPPORT OF MOTION TO REMAND**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 02-CV-10570-RCL

|  |  |  |
|---|---|---|
| OPHNET, INC., A Massachusetts Corporation and JOHN A. HIRSCH and RONALD W. ZOLLA, Individually and as Shareholders of ZHL, INC., A Massachusetts Corporation, and KENNETH CRAM, | ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | **Hearing Requested** |
| MICHAEL LAMENSDORF and KATHY LAMENSDORF, Individually and as Shareholders of ZHL, INC., and MICHAEL LAMENSDORF, M.D., P.C., A Florida Professional Corporation, | ) ) ) ) ) ) |  |
| Defendants. | ) ) |  |

## PLAINTIFFS' *RENEWED* MOTION TO REMAND[1]

The plaintiffs in this matter, John A. Hirsch, Ronald W. Zolla, Kenneth Cram, and

Ophnet, Inc. herewith move to remand this action to state court for lack of diversity. In support

of their motion, the plaintiffs state:

1.    Concurrently with the filing of this motion, the plaintiffs have moved to amend

their complaint.[2]

---

[1] On May 20, 2002, the court denied a prior motion to remand because it found that the plaintiffs had failed to give sufficient notice to prospective newly-added defendants under L.R. 15.1. Without waiving any appellate rights, the perceived deficiencies no longer exist since the prospective new defendants have had the motion to amend and the proposed amended complaint for nearly a month. See "Certificate of Compliance with L.R. 7.1 and 15.1 (Motion to Amend Complaint)," submitted concurrently herewith, at Exhibit A.

2.    The proposed Second Amended Complaint contains a somewhat expanded fact statement and alleges additional claims again the defendants Michael Lamensdorf, M.D., Kathy Lamensdorf, and Michael Lamensdorf, M.D., P.C. ("the P.C."). Further analysis of fragmentary financial records of the P.C. available to the plaintiffs now indicate that Dr. Lamensdorf apparently engaged in a two-year pattern of fraud and deceit, systematically understating the net operating income of the practice (and therefore underpaying the plaintiffs pursuant to the terms of various contracts between them) by overpayments both to himself and to corporations owned and controlled by Mrs. Lamensdorf. The corporation which Mrs. Lamensdorf owns and controls, Bayou JennKay, Inc., is also named in the Second Amended Complaint as a party defendant.

3.    For present purposes, however, the amendment which matters is the naming of ZHL, Inc., as a party defendant. ZHL is sued as a party to the "Management Agreement for ZHL, Incorporated Ambulatory Surgery Center Project", which was attached as Exhibit 5 to the Amended Complaint and is Exhibit 6 to the Second Amended Complaint. In the Amended Complaint, Ophnet in Count VI sued Dr. Lamensdorf for breach of the ZHL Management Agreement by, among other things, (i) purporting to terminate the strategic management services that Ophnet was to provide under § 4(c), a power which the contract does not confer upon him and (ii) purporting to terminate Ophnet's duties under the operational phase of the contract in bad faith. ZHL was not named in the Amended Complaint as a party defendant.

---

[2] The plaintiffs originally filed their complaint in the Essex Superior Court, and amended as of right while the complaint was there pending. After removal to this court, the plaintiffs served their Amended Complaint. The Amended Complaint was served after removal, but less than twenty days have elapsed since service and no responsive pleading has yet been filed within the meaning of Fed. R. Civ. P. 15(a). Accordingly, amendment will arguably lie as of right. Since there is authority to the effect that the allowance of an amendment which destroys diversity requires leave of court, however, the amendment is presented by motion.

4.    In "Defendants' Memorandum of Law in Support of Their Motion to Compel Arbitration" March 27, 2002, the defendants pointed out (at 10) that "Dr. Lamensdorf did not sign the ZHL management agreement personally, he signed it in his capacity as chairman of the board of ZHL." The evident assertion is that as a party who signed on behalf of a disclosed principal, Dr. Lamensdorf cannot be held liable for the breach, and therefore the proper party to sue is ZHL.

5.    Whether this is so or not, it is unarguably clear that Florida law requires that in any suit on a contract, all parties to the contract must be named in the suit. Since ZHL is undoubtedly a party to the ZHL-Ophnet management agreement, and because Ophnet's damages are substantial indeed from the wrongful termination of that agreement, the plaintiffs plainly have no choice but to amend their complaint. ZHL is also a Rule 19 indispensable party.

6.    As a result of the amendment, however, diversity will be destroyed. See 28 U.S.C. § 1447(c) and (e). Accordingly, under § 1447(e), remand will be required, since the presence of a Massachusetts corporation on the opposite side of the case from other Massachusetts domiciliaries will destroy diversity.

7.    In further support of their motion, the plaintiffs respectfully refer the Court to "Plaintiffs' Consolidated Memorandum of Law in Support of (i) Motion to Amend Complaint and (ii) Renewed Motion to Remand for Lack of Subject Matter Jurisdiction," submitted concurrently herewith.

WHEREFORE, the plaintiffs respectfully request that this Honorable Court:

A.    Declare that no subject matter jurisdiction exists due to an absence of complete diversity under 28 U.S.C. § 1332; and

B.    Remand this action to the state court pursuant to 28 U.S.C. §§ 1447(c) and (e);

and

C.    Grant whatever other or additional relief this Honorable Court deems just under

the circumstances.

### REQUEST FOR ORAL ARGUMENT

Pursuant to L.R. 7.1(D), the plaintiffs herewith request oral argument on this motion.

Respectfully submitted,

OPHNET, INC., JOHN A. HIRSCH,
RONALD W. ZOLLA, and
KENNETH CRAM,

By their Attorneys,

J. Owen Todd (BBO # 499480)
Edward Foye (BBO #562375)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA  02109
617-720-2626

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the
above document was served upon the
attorney of record for each other party
by mail-hand on May 22, 2002

Dated:  May 22, 2002

### L.R. 7.1(A)(2) CERTIFICATE OF COMPLIANCE

The undersigned herewith certifies that he spoke by telephone with Jennifer Compton,
Esq., attorney for the defendants, on May 21, 2002 about this motion, and no agreement was
reached.

Edward Foye

EXHIBIT 7
TO
**MEMORANDUM IN SUPPORT OF MOTION TO REMAND**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 02-CV-10570-RCL

|  |  |
|---|---|
| OPHNET, INC., A Massachusetts Corporation and JOHN A. HIRSCH and RONALD W. ZOLLA, Individually and as Shareholders of ZHL, INC., A Massachusetts Corporation, and KENNETH CRAM,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL LAMENSDORF and KATHY LAMENSDORF, Individually and as Shareholders of ZHL, INC., and MICHAEL LAMENSDORF, M.D., P.C., A Florida Professional Corporation,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Hearing Requested**

## PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF (i) MOTION TO AMEND COMPLAINT AND (ii) RENEWED MOTION TO REMAND FOR LACK OF SUBJECT MATTER JURISDICTION

The plaintiffs have moved (i) to amend their complaint pursuant to Fed. R. Civ. P. 15(a) and (d) to assert additional claims against existing defendants and to name an additional diverse defendant, (ii) to amend their complaint pursuant to 28 U.S.C. §§ 1447(c) and (e) to name a new and non-diverse defendant, and (iii) to remand to the Superior Court for Essex County, Massachusetts for lack of subject matter (diversity) jurisdiction. The motion to amend is necessary to add an indispensable party in connection with claims previously asserted relating to the breach of one of the contracts that are the subject of this lawsuit. The damages deriving from

this breach are substantial, but Florida law is clear that no recovery can be had unless all parties to that contract are named. Once the non-diverse party is joined, however, this Court will no longer have subject matter jurisdiction and remand will be required.

<div align="center">The Procedural Posture of the Case</div>

On or about March 7, 2002, the plaintiffs served their original state court complaint upon the defendants. The complaint alleged, in substance, that the plaintiffs and defendants entered into a written agreement whereby Ophnet, Inc. ("Ophnet"), a Massachusetts corporation owned by Mr. Hirsch and Mr. Zolla, agreed to and did provide management services to the ophthalmology practice of Michael Lamensdorf, M.D., P.C. ("the P.C."). That contract and its amendments will be referred to as the "Ophnet-P.C. Management Agreement." Later, Messrs. Hirsch and Zolla individually and Dr. Lamensdorf and his wife individually agreed to and did form a Massachusetts corporation, ZHL, Inc. ("ZHL"). ZHL was formed for the purpose of constructing an ambulatory surgery center ("ASC") specializing in ophthalmic (eye) surgeries. ZHL contracted with Ophnet to, inter alia, supervise the construction of the ASC and to manage its operations ("Ophnet-ZHL Management Agreement").[1]

The original complaint alleged that the P.C. had terminated the Ophnet-P.C. Management Agreement and had refused to pay the deferred compensation due under the written contracts. At the same time, Dr. Lamensdorf on behalf of ZHL purported to terminate the Ophnet-ZHL Management Agreement under a provision which delegated to him the authority to terminate Ophnet's duties under the operational phase of the contract. See Amended Complaint at Count VI; (proposed) Second Amended Complaint ("SAC") at Count VIII. ZHL, however, failed to provide Ophnet with contractually-mandated notice and opportunity to cure. Id. Dr.

---

[1] For ease of reference, a copy of the Ophnet-ZHL Management Agreement is attached hereto as Exhibit A; a copy is also attached to the Second Amended Complaint as Exhibit 5.

Lamensdorf also purported to terminate the strategic management services that Ophnet was to provide under a completely separate term of the Ophnet-ZHL Management Agreement which did not confer termination authority upon him. See Ex. A at §§ 4(c) and (d) and 11. See also SAC at Ex. 7, incorporating the letters by which Dr. Lamensdorf purported to terminate Ophnet and Ophnet's response thereto.

On or about March 20, 2002, while the case was still pending in state court, the plaintiffs amended their compliant as of right to allege an additional claim against Dr. Lamensdorf deriving from his threats to withdraw his surgical work from the ASC. The plaintiffs also expanded their statement of facts, and requested dissolution of the Lamenscram Partnership, an entity formed to hold the hard assets of the P.C.

On March 27, 2002, the defendants filed with this Court a Notice of Removal pursuant to 28 U.S.C. §§ 1441 and 1446. The sole basis for removal was diversity of citizenship. See "Defendants' Notice of Removal," March 27, 2002, at 2. Concurrently, the defendants also filed as their ostensible responsive pleading a "Motion to Compel Arbitration."

On April 2, 2002, shortly after the notice of removal was filed, the plaintiffs served their Amended Complaint upon the defendants. On April 16, 2002 the defendants served an amended motion to compel arbitration. On April 17, 2002, the plaintiffs pursuant to L.R. 15-1 provided notice to the prospective new defendants of the motion to amend with copies of the proposed Second Amended Complaint.

<div align="center">The Additional Allegations of The Second Amended Complaint</div>

The proposed Second Amended Complaint contains a somewhat expanded fact statement and alleges additional claims against Dr. Lamensdorf, Mrs. Lamensdorf, and the P.C. Further analysis of fragmentary financial records of the P.C. available to the plaintiffs now indicate that

<div align="center">3</div>

Dr. Lamensdorf apparently engaged in a two-year pattern of fraud and deceit. The Ophnet-P.C. Management Agreement requires Dr. Lamensdorf to pay Ophnet 50% of the P.C.'s net operating income (a defined term). Dr. Lamensdorf, however, apparently systematically understated the P.C.'s net operating income by (i) taking a salary more than $100,000 in excess of his contractually allotted $250,000 per year and (ii) paying his wife's corporation exorbitant sums for clerical and "strategic consulting" services. The net effect of these maneuvers was to artificially depress the practice's profitability and thereby deprive Ophnet of incentive payments otherwise due. Because Ophnet's deferred compensation is also directly pegged to the P.C.'s net operating income, Dr. Lamensdorf effectively misappropriated Ophnet's earned income twice.

The corporation which Mrs. Lamensdorf owns and controls, Bayou JennKay, Inc., is also now named in the Second Amended Complaint as a party defendant. The claims against Bayou JennKay, Inc. include participation in the scheme to defraud Ophnet by understating practice income and tortious interference with Ophnet's contracts to manage the P.C. and the ASC.[2]

Finally, the proposed Second Amended Complaint names ZHL as a party defendant. ZHL is sued for breach of the Ophnet-ZHL Management Agreement. Previously, Ophnet had sued Dr. Lamensdorf for breach of the Ophnet-ZHL Management Agreement but, as the defendants have pointed out, Dr. Lamensdorf signed the contract solely in his representative capacity of chairman of ZHL's Board. Thus, ZHL is now named as a party defendant in connection with Ophnet's termination.

_____

[2] After terminating Ophnet as ZHL manager, Dr. Lamensdorf purported to appoint Bayou JennKay to that position, at the "bargain" rate of $75 per hour, although Bayou JennKay's compensation under the Ophnet-P.C. Management Agreement had been capped at $8.00 per hour for clerical services and $22.50 per hour for "strategic planning." See Affidavit of John A. Hirsch at ¶¶ 23-25.

<u>Argument</u>

I.    The Additional Claims As To Existing Defendants And As To Bayou JennKay May Be
      Asserted As Of Right; Even If The Court Had Discretion In The Matter, The Claims Are
      Meritorious On Their Face And At This Early Stages Of The Litigation The Defendants
      Cannot Claim Prejudice.

Under Fed R. Civ. P. 15(a), a plaintiff may amend her complaint as a matter of right within

20 days of service if no responsive pleading has been filed. Although the plaintiffs once before

amended in state court, they have not amended since the action was removed to this Court. The

defendants' Motion to Compel Arbitration is not a responsive pleading. Accordingly, the better

view is that, under Fed. R. Civ. P. 15(a), the plaintiffs may amend their complaint as a matter of

right as to Bayou JennKay and as to the additional claims asserted against existing defendants.[3]

See <u>Albany Ins. Co. v. Almacenadora Somex, S.A.</u>, 5 F.3d 907, 910 (5th Cir. 1993). See

<u>generally</u> Charles A. Wright <u>et al.</u>, Federal Practice and Procedure, § 1482 (2d ed. 1990 & Supp.

2001) (stating that motion to amend brought while right to amend as of course remains viable

"should not be handled as a matter addressed to court's discretion but should be allowed as a

matter of right").

Even if the matter were addressed to the court's discretion, the plaintiffs' claims are

meritorious on their face. Under the Second Amendment to the Ophnet-P.C. Management

Agreement, the practice agreed not to pay Mrs. Lamensdorf or Bayou JennKay more than $8.00

per hour for clerical services and not more than $22.50 per hour for "strategic planning" services.

See SAC at ¶ 18 and Ex. 3. The plaintiffs' financial records through early October 2001, however

(the last records to which the plaintiffs have access) show that in the first nine months of 2001

alone Bayou JennKay and Mrs. Lamensdorf together received <u>over</u> $300,000 from the P.C.

---

[3] Because the weight of authority holds that one may not amend as of right to destroy diversity, amending
as of right as to Bayou JennKay would lead to the filing of a Second Amended Complaint, and a
subsequent amendment to ZHL would then result in the filing of a Third Amended Complaint. Judicial and
party economy therefore argues for presenting <u>all</u> proposed amendments by motion.

Assuming Mrs. Lamensdorf spent every moment on strategic planning and consulting and did no clerical work whatsoever, at $22.50 per hour, this works out to some 370 hours per week of creative thinking.[4] See Hirsch Aff. at Exhibit H. Mrs. Lamensdorf, on behalf of Bayou JennKay, was also the apparent motivating force in the termination of the Ophnet-ZHL Management Agreement, insofar as it was her company that Dr. Lamensdorf attempted to replace Ophnet with as manager. See Kurker v. Hill, 44 Mass. App. Ct. 184, 192 (1998) (complaint stated a sufficient claim for interference with advantageous and contractual relations where non-shareholders of a closed corporation "engaged in a conspiracy to undervalue the [corporation's] assets and freeze out the plaintiff"); Augat v. Aegis, Inc., 409 Mass. 165, 172-173 (1991) (imposing liability on competitor of corporation for knowing participation with corporation's key employee's violation of duty of loyalty); Mello-Tone Vending, Inc. v. Sherry, Inc., 39 Mass. App. Ct. 315, 318-319 (1995) (holding competitor who induced repudiation of contract liable for tortious interference).[5] Accordingly, the proposed amendments state substantial claims.

The defendants also cannot in any manner claim prejudice. As discussed in other motions and memoranda submitted concurrently herewith, the defendants have refused to provide discovery properly served while the action was pending in state court, have refused to provide any discovery in this court (including mandated automatic disclosures or participation in mandated

---

[4] Ophnet has repeatedly requested that the P.C. provide copies of financial records so that it could calculate the amounts due under the Ophnet-P.C. Management Agreement, including propounding a request for production of documents while this matter was in state court. The P.C. has refused to produce such records, including the contractually-mandated invoices from Bayou JennKay that it is obliged to keep. See Affidavit of John A. Hirsch, April 26, 2002, at ¶ 24 and n.3.

[5] Although there are choice of law provisions in some of the contracts, Bayou JennKay is not a party to any of the contracts, and Mrs. Lamensdorf is not a party to any of the contracts that matter. At that, tort claims are subject to an independent inquiry on choice of law. Without going into needless detail, the complained-of injuries occurred in Massachusetts, and Mrs. Lamensdorf's misrepresentations were received here. Thus, the Commonwealth undoubtedly has the most significant relationship to the claims. See Cohen v. McDonnell Douglas Corp., 389 Mass. 327, 333, 450 N.E.2d 581 (1983).

discovery conferences), and have even refused to answer the complaint or the amended complaint previously served upon them, although the answers will have a substantial bearing upon whether the controversy between the parties is arbitrable. By definition, parties who have not answered have not been prejudiced. See Wright & Miller, § 1480 at 577 ("an amendment as of right cannot prejudice an opposing party in any significant way since by definition he has not served a responsive pleading and therefore probably has not relied to any appreciable extent on the contents of the original pleading."). Thus, even assuming that amendment as to the additional facts and new, diverse defendant is within the court's discretion, amendment should be allowed.

II.    The Plaintiffs Should Be Permitted To Amend Their Complaint Where They Have Promptly Acted To Allege Substantial Claims And To Rectify Deficiencies Which The Defendants Themselves Identified.

The amendment adding ZHL stands on a different footing. "If after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder or permit joinder and remand the action to the State court." 28 U.S.C. § 1447(e). Whether to allow amendment is guided by such equitable factors as "the extent to which the purpose of the amendment is to defeat federal jurisdiction, whether plaintiff has been dilatory in asking for amendment, whether plaintiff will be significantly injured if amendment is not allowed, and any other factors bearing on the equities." Hensgens v. Deere & Co., 833 F.2d 1179, 1182 (5th Cir. 1987), cited with approval in Casas Office Machines, Inc. v. Mita Copy Star America, Inc., 42 F.3d 668, 673 (1st Cir. 1994). See generally Gilberg v. Stepan Co., 24 F. Supp. 2d 355, 357 (D. N.J.) (citing cases adopting Hensgens). Here, each of the recognized favors permitting amendment.

The plaintiffs have not in any sense been dilatory in seeking amendment. See Coley v. Dragon, Ltd., 138 F.R.D. 460, 466 (E. D. Va.) (permitting amendment under § 1447(e) after delay of five months); Irizarry v. Marine Powers Int'l, 153 F.R.D. 12, 15 (D. P.R. 1994) (permitting

7

amendment under § 1447(e) thirteen months after original complaint filed, but within court's scheduling order for amendments). See also L.R. 15.1 (providing that additional parties should be joined by amendment "as soon as possible"). Plaintiffs commenced the L.R. 15.1 amendment process only two months after the first complaint was filed, and within weeks after defendants made known their view that Dr. Lamensdorf had signed the Ophnet-ZHL Management Agreement solely in his representative capacity. Accordingly, there can be no reasonable doubt that the plaintiffs have moved promptly.

The defendants also cannot present any colorable evidence that the amendment has been interposed to defeat federal jurisdiction. Since the first day of this suit, Ophnet has brought a claim for breach of the Ophnet-ZHL Management Agreement. The defendants themselves pointed out the fact that ZHL is an indispensable party. As the defendants observed in their "Memorandum of Law in Support of their Motion to Compel Arbitration," March 27, 2002 (hereafter, "Defendants' First Arbitration Memo"), "Dr. Lamensdorf did not sign the ZHL Managements Agreement personally, he signed it in his capacity as Chairman of the Board of ZHL." Id. at 10. The evident assertion is that as a party who signed on behalf of a disclosed principal, Dr. Lamensdorf cannot be held liable for ZHL's breach of the contract, and so the proper party to sue is ZHL itself. See McCarthy v. Azure, 22 F.3d 351, 360-361 (1st Cir. 1994); Liberty Communications, Inc. v. MCI Telecommunications Corp., 733 So.2d 571 (Fla. App. 1999), mandamus den., 743 So.2d 509; Restatement (Second) of Agency, § 320.[6] Whether a claim will also lie against Dr. Lamensdorf individually or not, Florida holds as a matter of substantive law that a party to a contract must be named in a suit upon the contract. "A person

---

[6] The Ophnet-ZHL Management Agreement contains a clause stating "This Agreement shall be construed in accordance with and governed by the laws of Florida." Ex. A at § 13(c). The effect of this clause is very much open to doubt, but Massachusetts law on this point is identical: a party to a contract must be joined in a suit for breach of contract.

whose rights and interest are to be affected by a decree [and whose] actions with reference to the

subject matter of litigation are to be controlled by a decree is a necessary party to the action and

the trial court cannot proceed without that person." <u>Blue Dolphin Fiberglass Pools of Florida, Inc.</u>

<u>v. Swim Industs. Corp.</u>, 597 So.2d 808, 809 (Fla. App. 1992). The rule is rigorously applied, and

appears to admit of no exceptions. <u>See</u> <u>Allman v. Wolfe</u>, 592 So.2d 1261, 1263 (Fla. App. 1992);

<u>Loxahatchee River Env. Control Dist. v. Martin County Little Club, Inc.</u>, 409 So.2d 135, 137 (Fla.

App. 1982) (overturning judgment on contract claims where all parties to the contract were not

before the court). Obviously, the rule would apply with even greater strictness where, as here,

Ophnet seeks <u>actual damages</u> from ZHL as a result of the wrongful termination of the contract.[7]

The mere fact that the claim itself has been in the case since the very day it was filed put the

defendants on notice of the possibility of a diversity-destroying amendment, and forecloses a

finding that the amendment is a sham. <u>See</u> <u>Gilberg</u>, 24 F. Supp. 2d at 358. A party to a contract is

also the archetypical Rule 19 indispensable party. If the plaintiffs did not seek to amend, the

Court itself would be obliged to order ZHL joined. <u>See</u> <u>Heinsohn v. Levin</u>, 79 F.R.D. 441, 443

(D. Mass. 1978) (holding that corporate party to contract was indispensable where suit only named

individual officer who signed contract and ordering diversity-destroying joinder). There is

nothing even remotely tainted about repleading a cause of action which the defendants themselves

have pointed out must be repleaded if it is to be maintained.

Plainly no prejudice will accrue to the defendants. There has been no discovery

whatsoever, and the defendants cannot claim that this matter has progressed to a point where [they

---

[7] Since Ophnet is wholly-owned by Mr. Hirsch and Mr. Zolla and since ZHL is two-thirds owned by Mr. Hirsch and Mr. Zolla, the defendants will no doubt attempt to depict the amendment as effectively a plaintiff suing itself. ZHL, however, is an independent corporation; one-third of it is owned by Dr. Lamensdorf and Mrs. Lamensdorf; the damages are sufficiently substantial (<u>see</u> Ex. A at § 7) that even one-third of the recovery is worth pursuing; and ZHL will have a more than plausible right of indemnification against Dr. Lamensdorf for the entire sum for which it is held liable.

have] a vested interest in this federal forum. Gilberg v Stepan Co., 24 F. Supp. 2d. 355, 358

(D.N.J. 1998). See also Bryant v. Prestige Farms, Inc., 2000 U.S. Dist. LEXIS 3788 (N.D. Miss.)

at *6-*9. The Massachusetts Superior Court is a sophisticated court that regularly deals with

interstate commercial disputes. No doubt the primary issue before the Court in the short run will

be the defendants' Motion to Compel Arbitration, and this Court may be expected to have greater

familiarity with the Federal Arbitration Act than the Massachusetts Court. State courts, however,

routinely apply the FAA when called upon to do so and it is not an area of the law that demands

specialized expertise. See Mugano-Bornstein v. Crowell, 42 Mass. App. Ct. 347, 349 (1997).

Since the law to be applied in either forum would be precisely the same law, there is no issue of

forum shopping and because the substantive law to be applied to each of the claims is state law,

there is little federal interest in adjudicating the dispute. See Heninger v. Wecare Distribs., Inc.,

706 F. Supp. 860, 862-863 (S.D. Fla. 1989).

There can also be no doubt that the plaintiffs will be harmed if amendment is not

permitted. Under the Operational Phase, Ophnet is entitled to an hourly rate of $75 per hour up to

$50,000 per year. For its strategic management and marketing services, Ophnet is entitled to

receive $30,000 per year. See Ex. A at § 7(a). Thus, the damages for breach of the agreement

will, conservatively, exceed $70,000 and, depending on how many years into the future one

computes the losses, could total substantially more. Although Ophnet is entitled to (and will)

bring a state court action to collect the sums due if it must, that is a course that will inevitably

result in duplication of party and judicial efforts. See Municipal Employees Retirement Sys. v.

Federal Ins. Co., 1999 U.S. Dist. LEXIS 17269 at *6-*7 (allowing amendment that was "not

merely a tactical move to destroy diversity, but rather to assert significant and viable claims").

Other equitable factors which this Court may consider also counsel for allowing amendment. See St. Louis Trade Diverters, Inc. v. Constitution State Insurance, Co., 738 F. Supp. 1269, 1270 (E.D. Mo. 1990). The alternative to joinder is a separate state court action against ZHL. Having all "defendants as parties to this action will promote the efficient use of judicial resources and there is a lack of significant federal interest in deciding the state law issues which predominate in this case. The high probability of multiple law suits militates strongly in favor of a remand in this case." Heninger, 706 F. Supp. at 862-63. If claims against ZHL for terminating Ophnet's management contract and claims against Dr. Lamensdorf for his part in the termination occur in separate courts, the possibility of inconsistent judgments is a matter heavily to be weighed.[8] See Carter v. Dover Corp., 753 F. Supp. 788, 790 (E.D. Pa. 1993) ("The most logical, economical and equitable approach is to determine the respective rights and liabilities of all relevant parties inter se in one proceeding."). It is also of some significance that despite their expressed preference for a federal forum, the defendants have consistently ignored this court's local rules before filing motions, have refused to provide automatic disclosures required by the local rules, have resisted holding the mandatory scheduling conference which L.R. 16.4 requires after removal, and have brought motions to stay discovery properly served while this action was pending in a state court. Any professed desire to be in a federal forum plainly does not extend to shouldering the burdens and obligations concomitant to the chosen forum. Finally, if the defendants are correct that all claims in this litigation must be arbitrated, it is difficult to see why it matters which court stands down in favor of arbitration. Accordingly, judicial and party economy argue strongly for remand. Finally, the defendants cannot reasonably raise an issue concerning fraudulent joinder of parties. Contrast JMTR Enterprises, L.L.C. v. Duchin, 42 F. Supp. 2d. 87,

---

[8] It is also perhaps worth noting in passing that notwithstanding the plaintiffs' Motion to Compel Arbitration, there is no "Arbitration Clause" in the ZHL Management Agreement, and there is no "Arbitration Clause" in any other agreement to which ZHL is a party.

11

92-93 (D. Mass. 1998). ZHL was not created as an assignee of Mr. Hirsch's and Mr. Zolla's claims; it is a real corporation, with a real business, and its revenues are substantial. The revenues which Ophnet loses from the purported termination of the contract will also be substantial. See Ex. A, § 7 (outlining compensation). Neither the company nor the claim was created for purposes of this litigation. At a minimum, the plaintiffs have failed to provide any cognizable facts from which fraud may be inferred. Hence, amendment of the complaint cannot be denied on that basis.

### Conclusion

For each of the foregoing reasons, the Court should permit the plaintiffs to file their Second Amended Complaint, and should remand this case to the Massachusetts Superior Court for Essex County.

### Request for Hearing

The plaintiffs respectfully request to be heard on their Motion to Amend and on their Motion to Remand.

Respectfully submitted,

OPHNET, INC., JOHN A. HIRSCH, RONALD W. ZOLLA, and KENNETH CRAM

By their Attorneys,

J. Owen Todd (BBO # 499480)
Edward Foye (BBO #562375)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
617-720-2626

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail-hand on May 22, 2002

Dated: May 22, 2002

EXHIBIT 8
TO
**MEMORANDUM IN SUPPORT OF MOTION TO REMAND**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CASE NO.02-CV-10570-RCL

|  |  |
|---|---|
| OPHNET, INC., A Massachusetts Corporation<br>and JOHN A. HIRSCH and RONALD W. ZOLLA,<br>Individually and as Shareholders of<br>ZHL, INC., A Massachusetts Corporation, and<br>KENNETH CRAM,<br><br>       Plaintiffs<br><br>v.<br><br>MICHAEL LAMENSDORF and KATHY<br>LAMENSDORF, Individually and as<br>Shareholders of ZHL, INC., and<br>MICHAEL LAMENSDORF, M.D., P.C.,<br>A Florida Professional Corporation,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION TO REMAND AND MOTION TO AMEND AND MEMORANDUM OF LAW IN SUPPORT

Defendants, MICHAEL LAMENSDORF M.D. (hereinafter Dr. Lamensdorf") and

KATHY LAMENSDORF (hereinafter "Mrs. Lamensdorf") and MICHAEL LAMENSDORF,

M.D., P.C., a Florida Professional Corporation, (hereinafter "the P.C."), by and through their

undersigned counsel, hereby submit this Response to Plaintiffs' Renewed Motion to Remand and

Motion to Amend and Memorandum of Law in Support and state as follows:

1

EXHIBIT 9
TO
**MEMORANDUM IN SUPPORT OF MOTION TO REMAND**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| OPHNET, INC., et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. NO. 02-10570-RCL |
| | ) | |
| | ) | |
| MICHAEL LAMENSDORF, et al., | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |

ORDER ON PLAINTIFF'S
MOTION TO AMEND AND REMAND

LINDSAY, District Judge.

Before the court is a motion filed by the plaintiffs, Ophnet, Inc. et al., to amend their

complaint to add claims against existing defendants and to add ZHL, Inc., an additional, non-

diverse defendant. Amendment with regard to existing defendants is hereby allowed. ZHL, Inc.

appears to be an indispensable party. Accordingly, the motion to amend to add that corporation

as a defendant is allowed. Because the addition of ZHL destroys this court's subject matter

jurisdiction, this case is REMANDED to Essex Superior Court (Massachusetts).

SO ORDERED.

DATED: 7/24/02

_____
United States District Judge



EXHIBIT 10
TO
**MEMORANDUM IN SUPPORT OF MOTION TO REMAND**

**Commonwealth of Massachusetts**
**County of Essex**
**The Superior Court**

Civil Docket **ESCV2002-00419**

RE:     Ophnet Inc A Massachusetts Corporation et al v Lamensdorf et al

TO:     Edward Foye, Esquire
        Todd & Weld
        28 State Street
        31st floor
        Boston, MA 02109

## CLERK'S NOTICE

This is to notify you that in the above referenced case the Court's action on **03/03/2005**:

*RE: Defendant Michael Lamensdorf, Kathy Lamensdorf Individually and as Shareholders of Zhl Inc, Michael Lamensdorf M D P C's MOTION to continue Pretrial Conference till May, 2005, memorandum in support of motion to postpone pre-trial conference, Limited opposition to defendants' motion to postpone pre-trial conference and in support of plaintiff's cross-motions (i) for issuance of a commission and letter rogatory and (ii) for the provision of a date certain for trial, filed 3/2/05*

**is as follows:**

**MOTION (P#51) ALLOWED. Pretrial conference to be scheduled in May, 2005. All discovery is to be concluded by May 30, 2005. Trial will be scheduled in October, 2005. No further continuances. (Richard Welch, III, Justice) 3/3/05 Notices mailed March 03, 2005**

Dated at Salem, Massachusetts this 3rd day of March, 2005.

                                        Thomas H. Driscoll Jr.,
                                        Clerk of the Courts

                            BY:

                                        JoDee Doyle - Sheila Gaudette
                                        Assistant Clerk

Telephone: (978) 462-4474

Copies mailed 03/03/2005

COMMONWEALTH OF MASSACHUSETTS

ESSEX COUNTY, ss

ESSEX SUPERIOR COURT
OF THE TRIAL COURT
CIVIL ACTION No. 02-0419

OPHNET, INC., A Massachusetts
Corporation and JOHN A. HIRSCH and
RONALD W. ZOLLA, Individually and as
Shareholders of ZHL, INC., A Massachusetts
Corporation, and KENNETH CRAM,

Plaintiff,

v.

MICHAEL LAMENSDORF, Individually
and as a Shareholder of ZHL, INC.;
MICHAEL LAMENSDORF, M.D., P.C.,
A Florida Professional Corporation; BAYOU
JENNKAY, INC., a Florida Corporation; and
KATHY LAMENSDORF, Individually and
as an officer of Bayou JennKay, Inc.; and
ZHL, INC., a Massachusetts Corporation,

Defendants.

## MOTION TO POSTPONE PRE-TRIAL CONFERENCE

Defendants Michael Lamensdorf, Kathy Lamensdorf, Michael Lamensdorf, M.D., P.C.
and Bayou JennKay, Inc. (collectively "defendants") hereby move to postpone the pre-trial
conference currently scheduled for March 8, 2005. Defendants request that the pre-trial
conference be set for May, 2005. In support of their motion, defendants submit the attached
memorandum.

*[Handwritten annotations in margins:]*

*Allowed. Pretrial conference to be scheduled in May, 2005. All discovery is to be concluded by May 30, 2005.*

*3/2/05 Filed*

*Trial will be scheduled in October, 2005. No further continuances.*

*Richard E. Welch III  3/3/05*

EXHIBIT 11
TO
**MEMORANDUM IN SUPPORT OF MOTION TO REMAND**

COMMONWEALTH OF MASSACHUSETTS

ESSEX, s.s.                                      SUPERIOR COURT
                                                CIVIL ACTION NO. B 2 0419

_____

OPHNET, INC., A Massachusetts Corporation      )
and JOHN A. HIRSCH and RONALD W. ZOLLA,        )
Individually and as Shareholders of            )
ZHL, INC., A Massachusetts Corporation, and    )
KENNETH CRAM,                                  )
                                               )
                    Plaintiffs,                )
                                               )
v.                                             )
                                               )
MICHAEL LAMENSDORF and KATHY                   )
LAMENSDORF, Individually and as                )
Shareholders of ZHL, INC., and                 )
MICHAEL LAMENSDORF, M.D., P.C.,                 )
A Florida Professional Corporation,            )
                                               )
                    Defendants.                )
_____)


## COURT BINDER

| 1. | 03/04/02 | Civil Action Cover Sheet **and** Tracking Order |

| 2. | 03/04/02 | Complaint |

| 3. | 03/07/02 | Summonses with return of service |

Kathy Lamensdorf
Michael Lamensdorf
Michael Lamensdorf, M.D., P.C.

| 4. | 03/19/02 | Plaintiffs' First Request for Production of Documents to the Defendant Michael Lamensdorf, M.D., P.C. **and** Return of Service |

| 5. | 03/20/02 | Notice of Amended Pleading |

| 6. | 03/20/02 | Amended Complaint |

| 7. | 03/27/02 | Defendant's Notice to State Court of Filing Notice of Removal |

| 8. | 03/27/02 | Defendants' Notice of Removal |

| 9. | 03/27/02 | Defendants' Motion to Compel Arbitration |

2

10.  03/27/02    Defendants' Memorandum of Law in Support of Motion to Compel Arbitration

11.  04/09/02    Motion to Strike Defendants' "Motion to Compel Arbitration" or, in the Alternative, for an Extension of time to Respond.

12.  04/09/02    Certificate of Attempt to Comply with L.R. 7.1(A)(2)

13.  04/16/02    Motion for Admission of Michael S. Taaffe and Jennifer B. Compton to Practice in This Court Pro Hac Vice

14.  04/16/02    Affidavit of Michael S. Taaffe, Esq. in Support of Motion to Admit Pro Hac Vice

15.  04/16/02    Affidavit of Jennifer B. Compton, Esq. in Support of Motion to Admit Pro Hac Vice

16.  04/16/02    Defendants' Motion for Enlargement of Time

17.  04/16/02    Defendants' Memorandum of Law in Support of Defendants' Motion for Enlargement of Time

18.  04/16/02    Defendants' Opposition to Plaintiffs' Motion to Strike Defendants' Motion to Compel

19.  04/16/02    Defendants' Amended Motion to Compel Arbitration and Stay the Proceedings

20.  04/16/02    Defendants' Memorandum of Law in Support of Amended Motion to Compel Arbitration and Stay the Proceedings

**See Court Binder 2**

COMMONWEALTH OF MASSACHUSETTS

ESSEX, s.s.                                          SUPERIOR COURT
                                                    CIVIL ACTION NO. B 2 0419

_____
                                              )
OPHNET, INC., A Massachusetts Corporation     )
and JOHN A. HIRSCH and RONALD W. ZOLLA,       )
Individually and as Shareholders of           )
ZHL, INC., A Massachusetts Corporation, and   )
KENNETH CRAM,                                 )
                                              )
                    Plaintiffs,               )
                                              )
v.                                            )
                                              )
MICHAEL LAMENSDORF and KATHY                  )
LAMENSDORF, Individually and as               )
Shareholders of ZHL, INC., and                )
MICHAEL LAMENSDORF, M.D., P.C.,               )
A Florida Professional Corporation,           )
                                              )
                    Defendants.               )
_____)


## COURT BINDER 2

21.    04/17/02    Notice of Intent to File Amended Complaint

22.    04/17/02    Plaintiffs' Motion to Amend Complaint

23.    4/30//02    Opposition to Defendants' Motion for an Enlargement of Time [to Answer Complaint]

24.    04/30/02    Motion to Submit a Memorandum in Excess of Twenty (20) Pages

25.    04/30/02    Opposition to Defendant's Motion to Compel Arbitration

26.    04/30/02    Affidavit of John A. Hirsch

27.    04/30/02    Plaintiffs' Motion to Amend Complaint

28.    04/30/02    Motion to Waive In Part Compliance With L.R. 15.1    **DENIED**

29.    04/30/02    Plaintiffs' Motion to Remand    **DENIED**

4

| 30. | 04/30/02 | Plaintiffs' Consolidated Memorandum of Law in Support of (i) Motion to Amend Complaint and (ii) Motion to Remand for Lack of Subject Matter Jurisdiction                                    **DENIED** |
|-----|----------|-----|
| 31. | 05/01/02 | L.R. 7.1 Certificate of Compliance Regarding "Motion to File Brief in Excess of Twenty (20) Pages" and Certificate of Attempted Compliance with L.R. 7.1 Concerning "Motion to Waive in Part Compliance with L.R. 15.1" |
| 32. | 05/14/02 | Defendants' Motion for Leave to Respond to Plaintiffs' Opposition to Defendants' Motion to Compel Arbitration        **DENIED** |
| 33. | 05/14/02 | Defendants' Opposition to Plaintiffs' Motion to Remand and Motion to Amend and Memorandum of Law in Support |
| 34. | 05/16/02 | Plaintiffs' Amended and Corrected Motion to Amend Complaint |
| 35. | 05/20/02 | Motion for Admission of Michael S. Taaffe and Jennifer B. Compton to Practice in this Court *Pro Hac Vice* |
| 36. | 05/22/02 | Notice of Intent to File Amended and Corrected Motion to Amend Complaint |
| 37. | 05/22/02 | Plaintiffs' Amended and Corrected Motion to Amend Complaint |
| 38. | 05/22/02 | Plaintiffs' Renewed Motion to Remand |
| 39. | 05/22/02 | Plaintiffs' Motion to Amend Complaint |
| 40. | 05/22/02 | Certificate of Compliance with L.R. 7.1 and 15.1 (Motion to Amend Complaint) |

**See Court Binder 3**

COMMONWEALTH OF MASSACHUSETTS

ESSEX, s.s.                                                    SUPERIOR COURT
                                                              CIVIL ACTION NO. B 2 0419

_____
                                              )
OPHNET, INC., A Massachusetts Corporation     )
and JOHN A. HIRSCH and RONALD W. ZOLLA,       )
Individually and as Shareholders of           )
ZHL, INC., A Massachusetts Corporation, and   )
KENNETH CRAM,                                 )
                                              )
                              Plaintiffs,     )
                                              )
v.                                            )
                                              )
MICHAEL LAMENSDORF and KATHY                  )
LAMENSDORF, Individually and as               )
Shareholders of ZHL, INC., and                )
MICHAEL LAMENSDORF, M.D., P.C.,               )
A Florida Professional Corporation,           )
                                              )
                              Defendants.      )
_____)


## COURT BINDER 3

41.    05/22/02    Plaintiffs' Consolidated Memorandum of Law in Support of (i) Motion to
                   Amend Complaint and (ii) Renewed Motion to Remand for Lack of
                   Subject matter Jurisdiction

42.    05/22/02    Notice of Appearance (Taaffe and Compton)

43.    05/23/02    Notice of Change of Firm Name and Address

44.    06/04/02    Defendants' Opposition to Plaintiffs' Renewed Motion to Remand And
                   Motion to Amend and Memorandum of Law in Support

45.    07/24/02    Order on Plaintiff's Motion to Amend and Remand

46.    07/25/02    Order of Remand

47.    07/31/02    Second Amended Complaint

48.    07/31/02    Plaintiffs' Amended and Corrected First Request for Production of
                   Documents to the Defendant Michael Lamensdorf, M.D., P.C.

| 49. | 08/06/02 | Plaintiffs' First Request for Production of Documents to the Defendant Bayou JennKay, Inc. |
|---|---|---|
| 50. | 08/15/02 | Defendants', Michael Lamensdorf, Michael Lamensdorf, M.D., P.C., Bayou JennKay, Inc., and Kathy Lamensdorf, Addendum to Defendants' Amended Motion to Compel Arbitration |
| 51. | 08/20/02 | Renewal of Defendants' Motion for Enlargement of Time |
| 52. | 08/20/02 | Defendants', Michael Lamensdorf, Michael Lamensdorf, M.D., P.C., Bayou JennKay, Inc., and Kathy Lamensdorf, Motion to Compel Arbitration of Second Amended Complaint and to Stay Judicial Proceedings        **SERVED 9A** |
| 53. | 08/20/02 | Defendants', Michael Lamensdorf, Michael Lamensdorf, M.D., P.C., Bayou JennKay, Inc., and Kathy Lamensdorf, Memorandum of Law in Support of Defendants' Motion to Compel Arbitration of Second Amended Complaint        **SERVED 9A** |
| 54. | 08/21/02 | Motion for Admission of Michael S. Taaffe and Jennifer B. Compton to Practice in this Court Pro Hac Vice        **SERVED 9A        ALLOWED** |
| 55. | 8/21/02 | Letter to court withdrawing #49<br>(Defendants', Michael Lamensdorf, Michael Lamensdorf, M.D., P.C., Bayou JennKay, Inc., and Kathy Lamensdorf, Addendum to Defendants' Amended Motion to Compel Arbitration) |
| 56. | 09/04/02 | Motion to Submit Memorandum in Excess of Twenty (20) Pages |
| 57. | 09/04/02 | Opposition to Defendants' Motion to Compel Arbitration |
| 58. | 09/03/02 | Second Affidavit of John Hirsch |

# GO TO VOLUME 4

COMMONWEALTH OF MASSACHUSETTS

ESSEX, s.s.                                    SUPERIOR COURT
                                              CIVIL ACTION NO. B 2 0419

_____
                                              )
OPHNET, INC., A Massachusetts Corporation     )
and JOHN A. HIRSCH and RONALD W. ZOLLA,       )
Individually and as Shareholders of           )
ZHL, INC., A Massachusetts Corporation, and   )
KENNETH CRAM,                                 )
                                              )
                    Plaintiffs,               )
                                              )
v.                                            )
                                              )
MICHAEL LAMENSDORF and KATHY                  )
LAMENSDORF, Individually and as               )
Shareholders of ZHL, INC., and                )
MICHAEL LAMENSDORF, M.D., P.C.,               )
A Florida Professional Corporation,           )
                                              )
                    Defendants.               )
_____)


## COURT BINDER 4

| | | |
|---|---|---|
| 59. | 09/04/02 | Opposition to Defendants' Motion for Enlargement of Time [to Answer Complaint] |
| 60. | 09/05/02 | Notice of Filing Motion |
| 61. | 09/05/02 | Defendants' Request for Hearing |
| 62. | 09/05/02 | List of Documents Filed Pursuant to Superior Court Rule 9A |

62. 09/05/02   List of Documents Filed Pursuant to Superior Court Rule 9A

- 51.   Renewal of Defendants' Motion for Enlargement of Time
- 52.   Defendants', Michael Lamensdorf, Michael Lamensdorf, M.D., P.C., Bayou JennKay, Inc., and Kathy Lamensdorf, Motion to Compel Arbitration of Second Amended Complaint and to Stay Judicial Proceedings
- 53.   Defendants', Michael Lamensdorf, Michael Lamensdorf, M.D., P.C., Bayou JennKay, Inc., and Kathy Lamensdorf, Memorandum of Law in Support of Defendants' Motion to Compel Arbitration of Second Amended Complaint
- 56.   Motion to Submit Memorandum in excess of Twenty (20) Pages
- 57.   Opposition to Defendants' Motion to Compel Arbitration
- 58.   Second Affidavit of John Hirsch
- 59.   Opposition to Defendants' Motion for Enlargement of Time [to Answer Complaint]
- 60.   Notice of Filing Motion
- 61.   Defendants' Request for Hearing

| 63. | 9/18/02 | Affidavit of Proof of service as to the Defendant ZHL, Inc. |
|-----|---------|------------------------------------------------------------|
| 64. | 9/18/02 | Affidavit of Proof of service as to the Defendant Bayou JennKay, Inc. |
| 65. | 9/18/02 | Notice of Extension of Time to Respond to Complaint as to the Defendant ZHL, Inc. Only |
| 66. | 9/19/02 | Affidavit of Elizabeth Heinrich, Esq. |
| 67. | 9/19/02 | Notice of Filing Motion |

68.    9/19/02    List of Documents Filed Pursuant to Superior Court Rule 9A
      54.   Motion for Admission of Michael S. Taaffe and Jennifer B. Compton to Practice in this Court Pro Hac Vice
      66.   Affidavit of Elizabeth Heinrich, Esq.
      67.   Notice of Filing Motion

| 69. | 09/23/02 | Notice to Appear for Motion Hearing (10/24 at 2:00 p.m. – Newburyport) |
|-----|----------|------------------------------------------------------------------------|
| 70. | 9/30/02 | Clerk's Notice (#53 allowed – Taaffe & Compton admitted pro hac vice) |
| 71. | 10/17/02 | Plaintiffs' Compendium of Law in Opposition to Motion to Compel Arbitration |
| 72. | 10/24/02 | Authorities for Argument on Defendants' Motion to Compel (handed to EF at motion hearing) **SEE 3-RING BINDER** |
| 73. | 10/29/01 | Supplemental Submission of Defendants Michael Lamensdorf, Michael Lamensdorf, M.D., P.C., Bayou JennKay, Inc. and Kathy Lamensdorf |
| 74. | 11/01/02 | Supplemental Post-Hearing Memorandum in Opposition to Defendants' Motion to Compel Arbitration |
| 75. | 11/01/02 | Supplemental Affidavit of John A. Hirsch in Opposition to Defendants' Motion to Compel Arbitration. |

76.    11/4/02    Notice of Filing Motion **and** List of Documents Filed Pursuant to Superior Court Rule 9A
      73.   Supplemental Submission of Defendants Michael Lamensdorf, Michael Lamensdorf, M.D., P.C., Bayou JennKay, Inc. and Kathy Lamensdorf
      74.   Supplemental Post-Hearing Memorandum in Opposition to Defendants' Motion to Compel Arbitration
      75.   Supplemental Affidavit of John A. Hirsch in Opposition to Defendants' Motion to Compel Arbitration.

| 77. | 1/21/03 | Clerk's Notice re: Memorandum of Decision of Rouse, J. |
|-----|---------|---------------------------------------------------------|
| 78. | 1/21/03 | Memorandum of Decision |

| 79. | 2/11/03 | Defendants' Michael Lamensdorf, Michael Lamensdorf, M.D., P.C., Bayou Jenkay, Inc., and Kathy Lamensdorf, Motion for Clarification |
| 80. | 2/24/03 | Plaintiffs' Cross Motion for Sanctions |
| 81. | 2/24/03 | Plaintiffs' Cross Motion for Clarification |
| 82. | 2/24/03 | Plaintiffs' Consolidated Memorandum of Law (I) in Opposition to Defendants' Motion for Clarification; and (II) in Support of Plaintiffs' Motions for Clarification and for Sanctions |
| 83. | 2/24/03 | Plaintiffs' Request for a Hearing |
| 84. | 3/14/03 | Notice to Appear for Motion Hearing – 3/28/03 @3:00 p.m. Suffolk |
| 85. | 4/2/03 | Clerk's Notice - Plaintiffs' Cross Motion for Clarification - DENIED |
| 86. | 4/2/03 | Clerk's Notice - Defendants' Motion for Clarification -- - DENIED |
| 87 | 4/7/03 | Motion for Reconsideration |
| 88. | 4/7/03 | Motion for Stay Pending Reconsideration |
| 89. | 4/22/03 | Plaintiffs' Opposition to Defendants' Motion for Reconsideration |
| 90. | 4/22/03 | Plaintiffs' Opposition to Defendants' "Motion for Stay Pending Reconsideration" |
| 91. | 4/23/03 | Notice of Filing Motion |
| 92. | 4/23/03 | List of Documents Filed Pursuant to Superior Court Rule 9A |

COMMONWEALTH OF MASSACHUSETTS

ESSEX, s.s.                                   SUPERIOR COURT
                                             CIVIL ACTION NO. B 2 0419

```
_____
                                        )
OPHNET, INC., A Massachusetts Corporation )
and JOHN A. HIRSCH and RONALD W. ZOLLA, )
Individually and as Shareholders of       )
ZHL, INC., A Massachusetts Corporation, and )
KENNETH CRAM,                             )
                                        )
                    Plaintiffs,          )
                                        )
v.                                       )
                                        )
MICHAEL LAMENSDORF, Individually and     )
as a Shareholder of ZHL, INC.;           )
MICHAEL LAMENSDORF, M.D., P.C.,          )
A Florida Professional Corporation;      )
BAYOU JENNKAY, INC., a Florida Corporation; )
and KATHY LAMENSDORF, Individually and   )
as an officer of Bayou JennKay, Inc.; and )
ZHL, INC., a Massachusetts Corporation,  )
                                        )
                    Defendants.          )
_____)
```

**COURT BINDER – VOLUME V**

| Tab | Document | Dated |
|-----|----------|-------|
| 93. | Plaintiffs' Motion to Compel Production of Documents and to Deem all Objections Waived (Memorandum Incorporated) | 5/2/03 |
| 94. | Ophnet, Inc.'s First Set of Interrogatories to Michael Lamensdorf M.D. | 5/8/03 |
| 95. | Ophnet, Inc.'s First Set of Interrogatories to Michael Lamensdorf M.D., P.C. | 5/8/03 |
| 96. | Ophnet, Inc.'s First Set of Interrogatories to Kathy Lamensdorf | 5/8/03 |
| 97. | Affidavit of Opposition | 5/19/03 |
| 98. | Notice of Filing and List of Documents under Superior Court Rule 9A | 5/19/03 |
| 99. | Notice to Appear for Hearing on 6/20/03 @3:30 | 5/23/03 |

| Tab | Document | Dated |
|---|---|---|
| 100. | Clerk's Notice – Plaintiff's Motion to Compel Production of Documents and to Deem all Objections Waived (Memorandum Incorporated) – **ALLOWED** | 5/29/03 |
| 101. | Motion for Admission of Anthony J. Abate to Practice in this Court Pro Hac Vice | **6/5/03 (SERVED 9A) FILED 6/23/03** |
| 102. | Affidavit of Anthony Abate in Support of Motion to Admit Pro Hac Vice | **6/5/03 (SERVED 9A) FILED 6/23/03** |
| 103. | Defendants' Answer, Affirmative Defenses, and Counterclaims | 6/5/03 |
| 104. | Withdrawal of Motion for Reconsideration | 6/18/03 |
| 105. | List of Documents Filed Pursuant to Superior Court Rule 9A | 6/23/03 |
| 106. | Notice of Filing Motion | 6/23/03 |
| 107. | Defendant Michael Lamensdorf, M.D., P.A.'s Answers to Ophnet, Inc.'s First Set of Interrogatories | 6/23/03 |
| 108. | Defendant Michael Lamensdorf's Answers to Ophnet, Inc.'s First Set of Interrogatories | 6/23/03 |
| 109. | Defendant Kathy Lamensdorf's Answers to Ophnet, Inc.'s First Set of Interrogatories | 6/23/03 |
| 110. | Defendant Michael Lamensdorf's First Request for Production of Documents to Plaintiff, Kenneth Cram | 6/24/03 |
| 111. | Defendant, Michael Lamensdorf's First Request for Production of Documents to Plaintiff, Ophnet, Inc. | 6/24/03 |
| 112. | Defendant, Michael Lamensdorf's First Request for Production of Documents to Plaintiff, Ronald Zolla | 6/24/03 |
| 113. | Defendant Michael Lamensdorf's First Request for Production of Documents to Plaintiff, John A. Hirsch | 6/24/03 |
| 114. | Ophnet's Answer to Counterclaim | 6/27/03 |
| 115. | Clerk's Notice -- Motion for Admission of Anthony J. Abate to Practice in this Court Pro Hac Vice – **ALLOWED** | 7/1/03 |
| 116. | Response of Plaintiff Kenneth Cram to Defendant, Michael Lamensdorf's, First Request for Production of Documents | 8/8/03 |
| 117. | Response of Plaintiff John Hirsch to Defendant, Michael Lamensdorf's, First Request for Production of Documents | 8/13/03 |

| Tab | Document | Dated |
|---|---|---|
| 118. | Response of Plaintiff Ronald W. Zolla to Defendant, Michael Lamensdorf's, First Request for Production of Documents | 8/13/03 |
| 119. | Response of Plaintiff Ophnet, Inc. to Defendant, Michael Lamensdorf's, First Request for Production of Documents | 8/13/03 |
| 120. | Notice of Deposition – Mark Briefman CPA @1:00 Wednesday November 12, 2003 | 10/9/2003 |
| 121. | Notice of Deposition – Kathy Lamensdorf @1:00 p.m. Thursday, November 13, 2003 | 10/9/2003 |
| 122. | Notice of Deposition – Michael Lamensdorf @1:00 p.m. Friday, November 13, 2003 | 10/9/2003 |
| 123. | Re Notice of Deposition of Kathy Lamensdorf **@9:30 a.m.** Thursday November 13, 2003 | 10/16/2003 |
| 124. | Re Notice of Deposition of Michael Lamensdorf **@9:30 a.m.** Friday November 14, 2003 | 10/16/2003 |
| 125. | Defendant Bayou JenKay, Inc.'s First Set of Interrogatories to Plaintiff John A. Hirsch | 10/16/2003 |
| 126. | Defendant Michael Lamensdorf M.D.'s First Set of Interrogatories to Plaintiff John A. Hirsch | 10/16/2003 |

COMMONWEALTH OF MASSACHUSETTS

ESSEX, s.s.                                    SUPERIOR COURT
                                               CIVIL ACTION NO. B 2 0419

|  |  |
|---|---|
| OPHNET, INC., A Massachusetts Corporation and JOHN A. HIRSCH and RONALD W. ZOLLA, Individually and as Shareholders of ZHL, INC., A Massachusetts Corporation, and KENNETH CRAM,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL LAMENSDORF, Individually and as a Shareholder of ZHL, INC.; MICHAEL LAMENSDORF, M.D., P.C., A Florida Professional Corporation; BAYOU JENNKAY, INC., a Florida Corporation; and KATHY LAMENSDORF, Individually and as an officer of Bayou JennKay, Inc.; and ZHL, INC., a Massachusetts Corporation,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COURT BINDER – VOLUME 6

| Tab | Document | Dated |
|---|---|---|
| 127. | Notice of Deposition to John Hirsch @9:30 a.m. on 12/2/03 | 11/10/03 |
| 128. | Notice of Deposition to R. Zolla @9:30 a.m. 12/3/03 | 11/10/03 |
| 129. | Notice of Deposition to Anusia Hirsch @9:30 a.m. on 12/4/03 | 11/10/03 |
| 130. | Notice of Deposition of Kenneth Cram @9:30 a.m. on 3/10 & 3/11 | 3/1/04 |
| 131. | Notice of Conciliator's Hearing and Order to Counsel on 7/13/04 @12:30 p.m. | 5/11/04 |
| 132. | Notice to Appear for Final Pre-Trial Conference @9/28/04 @2:30 p.m. | 5/11/04 |
| 133. | Joint Motion to Postpone Conciliation and Pre-Trial Conference until March, etc. | 7/1/04 |

| Tab | Document | Dated |
|---|---|---|
| 134. | Clerk's Notice – Motion Allowed | 7/9/04 |
| 135. | Notice to Appear for Final Pre-Trial Conference for March 8, 2005 Ctrm 1, @2:00 Newburyport | 7/9/04 |
| 136. | Notice of Docket Entry that The Affidavit of compliance with the long-arm statute with proof of service on out of state defendant K. Lamensdorf, individual and as a shareholder of ZHL on 3/7/02 | 8/19/04 |
| 137. | Notice of Deposition (continued) to K. Lamensdorf – 11/3/04 @9:30 a.m. in FL | 9/23/04 |
| 138. | Notice of Deposition (continued) to M. Lamensdorf – 11/4/04 @9:30 a.m. in FL | 9/23/04 |
| 139. | Re-Notice of Deposition of M. Lamensdorf – 1/19/05 @9:30 a.m. in FL | 11/2/04 |
| 140. | Re-Notice of Deposition of K. Lamensdorf – 1/20/04 @9:30 a.m. in FL | 11/2/04 |
| 141. | Plaintiff's Second Request for Production of Documents to the Defendant Michael Lamensdorf, M.D., P.C. | 12/3/04 |
| 142. | Plaintiff's Second Request for Production of Documents to the Defendant Michael Lamensdorf | 12/3/04 |
| 143. | Plaintiff's Second Request for Production of Documents to the Defendant Bayou JennKay, Inc. | 12/3/04 |
| 144. | Plaintiff's Second Request for Production of Documents to the Defendant Kathy Lamensdorf | 12/3/04 |
| 145. | Defendant's Response to Plaintiffs' Second Request for Production of Documents to the Defendant Kathy Lamensdorf | 1/6/05 |
| 146. | Defendant's Response to Plaintiffs' Second Request for Production of Documents to the Defendant Michael Lamensdorf | 1/6/05 |
| 147. | Defendant's Response to Plaintiffs' Second Request for Production of Documents to the Defendant Michael Lamensdorf, M.D., P.C. | 1/6/05 |
| 148. | Defendant's Response to Plaintiffs' Second Request for Production of Documents to the Defendant Bayou JennKay, Inc. | 1/6/05 |
| 149. | Emergency Motion to Compel Production of Documents from the Defendants Michael Lamensdorf and Michael Lamensdorf, M.D., P.C. | 1/11/05 |
| 150. | Memorandum of Law in Support of Emergency Motion to Compel Production of Documents from the Defendants Michael Lamensdorf and Michael Lamensdorf, M.D., P.C. | 1/11/05 |

COMMONWEALTH OF MASSACHUSETTS

ESSEX, s.s.                                  SUPERIOR COURT
                                             CIVIL ACTION NO. B 2 0419

_____
                                        )
OPHNET, INC., A Massachusetts Corporation )
and JOHN A. HIRSCH and RONALD W. ZOLLA, )
Individually and as Shareholders of       )
ZHL, INC., A Massachusetts Corporation, and )
KENNETH CRAM,                             )
                                        )
                    Plaintiffs,         )
                                        )
v.                                      )
                                        )
MICHAEL LAMENSDORF, Individually and    )
as a Shareholder of ZHL, INC.;          )
MICHAEL LAMENSDORF, M.D., P.C.,         )
A Florida Professional Corporation;     )
BAYOU JENNKAY, INC., a Florida Corporation; )
and KATHY LAMENSDORF, Individually and  )
as an officer of Bayou JennKay, Inc.; and )
ZHL, INC., a Massachusetts Corporation, )
                                        )
                    Defendants.         )
_____)


**COURT BINDER – VOLUME 7**

| Tab | Document | Dated |
|-----|----------|-------|
| 151. | Plaintiffs Motion to Compel Production of Documents from the Defendants Kathy Lamensdorf and Bayou JennKay, Inc. (Memorandum Incorporated) | 1/12/05 |
| 152. | Defendants Motion to Compel Production of Documents from Plaintiff Ophnet, Inc. | 1/12/05 |
| 153. | Memorandum in Support of Defendant's Motion to Compel Production of Documents from Plaintiff Ophnet, Inc. | 1/12/05 |
| 154. | Defendants Motion to Compel Production of Documents from Plaintiff John Hirsch. | 1/12/05 |
| 155. | Memorandum in Support of Defendant's Motion to Compel Production of Documents from Plaintiff John Hirsch. | 1/12/05 |

| Tab | Document | Dated |
|---|---|---|
| 156. | Defendants Motion to Compel Production of Documents from Plaintiff Ron Zolla | 1/12/05 |
| 157. | Memorandum in Support of Defendant's Motion to Compel Production of Documents from Plaintiff Ron Zolla | 1/12/05 |
| 158. | Defendants Motion to Compel Production of Documents from Plaintiff Kenneth Cram | 1/12/05 |
| 159. | Memorandum in Support of Defendant's Motion to Compel Production of Documents from Plaintiff Kenneth Cram | 1/12/05 |
| 160. | Clerk's Notice - Emergency Motion & Memorandum to Compel Production of Documents from the Defendants Michael Lamensdorf and Michael Lamensdorf, M.D., P.C. – **ALLOWED as to paragraph A the other relief requested is DENIED** | 1/13/05 |
| 161. | Clerk's Notice - Plaintiffs Motion to Compel Production of Documents from the Defendants Kathy Lamensdorf and Bayou JennKay, Inc. (Memorandum Incorporated) – **ALLOWED** | 1/13/05 |
| 162. | Opposition to Plaintiffs' Application for Emergency Motion to Compel Production of Documents from Defendants | 1/13/05 |
| 163. | Notice of Appearance of Matthew E. Miller | 1/14/05 |
| 164. | Defendants' Emergency Motion for Stay Pending Reconsideration | 1/14/05 |
| 165. | Memorandum in Support of Defendants' Emergency Motion for Reconsideration of Order Granting Plaintiffs' Emergency Motion to Compel Production of Documents | 1/14/05 |
| 166. | Defendants' Emergency Motion for Reconsideration of Order Granting Plaintiffs' Emergency Motion to Compel Production of Documents | 1/14/05 |
| 167. | **DENIED** Emergency Motion for Stay Pending Reconsideration | 1/14/05 |
| 168. | **DENIED** Defendants' Emergency Motion for Reconsideration of Order Granting Plaintiffs' Emergency Motion to Compel Production of Documents – **docs to be produced 1/18/05 with the exception of medical records protected by disclosure by either Florida or federal HIPAA law** | 1/14/05 |
| 169. | Clerk's Notice  - Defendants' Emergency Motion for Stay Pending Reconsideration – **DENIED** | 1/18/05 |
| 170. | Clerk's Notice - Defendants' Emergency Motion for Reconsideration of Order Granting Plaintiffs' Emergency Motion to Compel Production of Documents – **docs to be produced 1/18/05 with the exception of medical records protected by disclosure by either Florida or federal HIPAA law** | 1/18/05 |
| 171. | Cross-Motion for Sanctions | 1/27/05 |

| Tab | Document | Dated |
|---|---|---|
| 172. | Consolidated Memorandum (i) in Opposition to Defendants' Motion to Compel Production of Documents from John A. Hirsch, Ronald W. Zolla, and Kenneth Cram and (ii) in Support of Cross-Motion for Sanctions | 1/27/05 |
| 173. | Amended Responses of Plaintiff John A. Hirsch to Defendant, Michael Lamensdorf's First Request for Production of Documents (#72) | 1/27/05 |
| 174. | Amended Responses of Plaintiff Ronald Zolla to Defendant, Michael Lamensdorf's First Request for Production of Documents (#72) | 1/27/05 |
| 175. | Amended Responses of Plaintiff Kenneth Cram to Defendant, Michael Lamensdorf's First Request for Production of Documents (#72) | 1/27/05 |

COMMONWEALTH OF MASSACHUSETTS

ESSEX, s.s.                                      SUPERIOR COURT
                                                CIVIL ACTION NO. B 2 0419

_____
                                          )
OPHNET, INC., A Massachusetts Corporation )
and JOHN A. HIRSCH and RONALD W. ZOLLA, )
Individually and as Shareholders of       )
ZHL, INC., A Massachusetts Corporation, and )
KENNETH CRAM,                             )
                                          )
                    Plaintiffs,           )
                                          )
v.                                        )
                                          )
MICHAEL LAMENSDORF, Individually and      )
as a Shareholder of ZHL, INC.;            )
MICHAEL LAMENSDORF, M.D., P.C.,           )
A Florida Professional Corporation;       )
BAYOU JENNKAY, INC., a Florida Corporation; )
and KATHY LAMENSDORF, Individually and    )
as an officer of Bayou JennKay, Inc.; and )
ZHL, INC., a Massachusetts Corporation,   )
                                          )
                    Defendants.           )
_____     )

**COURT BINDER – VOLUME 8**

| Tab | Document | Dated |
|-----|----------|-------|
| 176. | Opposition to Defendants' Motion to Compel Production from Ophnet, Inc. | 1/28/05 |
| 177. | Amended Response of Plaintiff Ophnet, Inc. to Defendant, Michael Lamendorf's First Request for Production of Documents | 1/28/05 |
| 178. | Amended Response of Plaintiff John A. Hirsch to Defendant, Michael Lamendorf's First Request for Production of Documents | 1/28/05 |
| 179. | Amended Response of Plaintiff Ronald W. Zolla to Defendant, Michael Lamendorf's First Request for Production of Documents | 1/28/05 |
| 180. | Amended Response of Plaintiff Kenneth Cram to Defendant, Michael Lamendorf's First Request for Production of Documents | 1/28/05 |

| Tab | Document | Dated |
|-----|----------|-------|
| 181. | Notice of Continued Deposition of **Mark Briefman** 2/11/05 @9:30 a.m. in FL | 2/1/05 |
| 182. | Notice of Continued Deposition of **Kathy Lamensdorf** 2/14/05 @9:30 a.m. in FL | 2/1/05 |
| 183. | Notice of Continued Deposition of **Michael Lamensdorf** 2/11/05 @9:30 a.m. in FL | 2/1/05 |
| 184. | Notice of Docket Entry – Request of Michael Lamensdorf to file reply to Opp to Mt. to Compel – **ALLOWED** | 2/4/05 |
| 185. | Defendant's Opposition to Plaintiffs' Cross-Motion for Sanctions w/Certificate of Service | 2/7/05 |
| 186. | 9A Document List | 2/7/05 |
| 187. | Notice of Continued Deposition of Michael Lamensdorf 3/1/05 @1:00 p.m. in Florida | 2/10/05 |
| 188. | Clerk's Notice – Plaintiff Opposition cross-motion for sanctions John A. Hirsch, Ronald W. Zolla, and Kenneth Cram – **DENIED** | 2/11/05 |
| 189. | Clerk's Notice  - Defendant's Mt. to compel prod of docs from K. Cram **ALLOWED as to 24, 25, and 72 DENIED in all other respects** | 2/11/05 |
| 190. | Clerk's Notice  - Defendant's Mt. to compel prod of docs from R. Zolla **ALLOWED as to 24, 25, and 72 DENIED in all other respects** | 2/11/05 |
| 191. | Clerk's Notice  - Defendant's Mt. to compel prod of docs from J. Hirsch **ALLOWED as to 24, 25, and 72 DENIED in all other respects** | 2/11/05 |
| 192. | Clerk's Notice  - Defendant's Mt. to compel prod of docs from Ophnet - **ALLOWED as to 12, 13, 20, 21 and 41  DENIED in all other respects** | 2/11/05 |
| 193. | Notice of Continued Deposition of K. Lamensdorf to 2/28/05 @10:00 a.m. | 2/15/05 |
| 194. | Mt. to Postpone pre-trial Conference by Defendants | 2/18/05 |
| 195. | Memo in Support of Mt. to Postpone pre-trial Conf by Defendants | 2/18/05 |
| 196. | Plaintiff's Cross-Motion to Set A Date Certain for Trial | 3/1/05 |
| 197. | Limited Opposition to Defendants' Motion to Postpone Pre-Trial Conference and in Support of Plaintiff's Cross-Motions (i) for Issuance of a Commission and Letter Rogatory and (ii) for the Provision of a Date Certain for Trial | 3/1/05 |
| 198. | Plaintiff's Cross Motion for the Issuance of a Commission and Letter Rogatory to Mark Briefman | 3/1/05 |

| Tab | Document | Dated |
|---|---|---|
| 199. | Affidavit of Ronald Zolla | 3/1/05 |
| 200. | Defendant's Opposition to Plaintiff's Cross Motion to Set a Date Certain for Trial | 3/2/05 |
| 201. | Superior Court Rule 9A Document List w/Certificate of Service | 3/2/05 |
| 202. | Clerk's Notice - Memo in Support of Mt. to Postpone pre-trial Conf by Defendants – **ALLOWED** – **pre-trial conf to be scheduled in may, 2005 all discovery to be concluded by 5/30/05; trial will be scheduled in October, 2005 – no further continuances** | 3/3/05 |
| 203. | Clerk's Notice - Plaintiff's Cross Motion for the Issuance of a Commission and Letter Rogatory to Mark Briefman – **ALLOWED** | 3/3/05 |
| 204. | Notice to Appear for Final Pre-Trial Conference 5/10/05 Crtm 1 @ Newburyport | 3/8/05 |
| 205. | Trial Notice – 10/13/05 @9:00 a.m. Crtm 1 @ Newburyport | 3/8/05 |
| 206. | Defendants, Michael and Kathy Lamensdorf's Motion for the Issuance of a Commission and Letter Rogatory to William Hirsch | 4/19/05 |
| 207. | Memorandum in Support of Defendants, Michael and Kathy Lamensdorf's Motion for the Issuance of a Commission and Letter Rogatory to William Hirsch | 4/19/05 |
| 208. | Motion to Postpone Pre-trial Conference | 4/22/05 |
| 209. | Notice of Deposition – John Hirsch, May 11, 2005 @9:30 a.m. at Foley Hoag | 4/25/05 |
| 210. | Notice of Deposition – Ron Zolla, May 12, 2005 @ 9:30 a.m. at Foley Hoag | 4/25/05 |
| 211. | Notice of Deposition of Kathy Lamensdorf 5/27/05@10:00 a.m. at Abel Band | 4/27/05 |
| 212. | Plaintiff's Third Request for Production of Documents to the Defendants Michael Lamensdorf and Kathy Lamensdorf | 4/27/05 |
| 213. | Notice of Taking Deposition – Kenneth Cram – May 11, 2005 @2:00 p.m. at Foley Hoag | 4/29/05 |
| 214. | Defendants, Dr. Michael Lamensdorf, Michael Lamensdorf, M.D. P.A., Kathy Lamensdorf and Bayou JennKay, Inc.'s Response to Plaintiff's Motion to Postpone Pre-Trial Conference. | 5/2/05 |
| 215. | Notice of Filing and List of Documents Under Superior Court Rule 9A | 5/2/05 |
| 216. | Affidavit of Matthew E. Miller, Esq. | 5/4/05 |
| 217. | Superior Court Rule 9A Document List | 5/4/05 |
| 218. | Certificate of Service of Matthew Miller | 5/4/05 |

| Tab | Document | Dated |
|---|---|---|
| 219. | Clerk's Notice – motion to continue pre-trial conference – **ALLOWED – now on 6/14/05 @2:00 p.m.** | 5/6/05 |
| 220. | Notice of Cancellation of Depositions of Kenneth Cram, John Hirsch and Ronald W. Zolla | 5/6/05 |
| 221. | Notice of Continued Deposition of Mark Briefman | 5/9/05 |
| 222. | Opposition to Defendants' Motion for a Letter Rogatory to Depose Dr. Thomas Quigley | 5/9/05 |
| 223. | Notice of Removal | 5/10/05 |
| 224. | Subpoena Duces Tecum for Deposition of M. Briefman w/Return of Service | 5/5/05 (rtrn) 5/11/05 |
| 225. | | |

# CASE WAS REMANDED = USDC COURT <u>NOW</u>
# USDC CIVIL ACTION NO. 05-10970-DPW

I:\DATA\WPDOCS\HIRSCH\LAMENSDORF\Pleadings\Court Binder.doc

EXHIBIT 12
TO
**MEMORANDUM IN SUPPORT OF MOTION TO REMAND**

**Page 141**

```
 1              COMMONWEALTH OF MASSACHUSETTS

 2    ESSEX. s.s.                    SUPERIOR COURT
                                     CIVIL ACTION NO. B 2 0419
 3    - - - - - - - - - - - - - - - -

 4    OPHNET, INC , & Massachusetts
      Corporation, and JOHN A. HIRSCH
 5    and RONALD W. ZOLLA, Individually
      and as Shareholders of ZHL, INC , &
 6    a Massachusetts Corporation, and
      KENNETH CRAM,
 7                                   DEPOSITION OF
                  Plaintiffs,
 8                                   MICHAEL LAMENSDORF
      vs.
 9                                   VOLUME II
      MICHAEL LAMENSDORF, Individually
10    and as a Shareholder of ZHL, INC.;
      MICHAEL LAMENSDORF, M.D , P.C., a
11    Florida Professional Corporation;
      BAYOU JENNKAY, INC., & Florida
12    Corporation; and KATHY LAMENSDORF,
      Individually and as an officer of
13    Bayou JennKay, Inc.; and ZHL, INC ,
      a Massachusetts Corporation,
14
                  Defendants.
15    - - - - - - - - - - - - - - - -

16

17         TAKEN BY:   THE PLAINTIFFS HEREIN

18         BEFORE:     Laurie J. Cheffy
                       Court Reporter
19                     Notary Public
                       State of Florida at Large
20
           PLACE:      Abel, Band, Russell, Collier,
21                     Pitchford & Gordon, Chartered
                       240 South Pineapple Avenue
22                     Tenth Floor
                       Sarasota, Florida  34236
23
           DATE:       January 19, 2005
24                     Commencing at 10:10 a.m.

25             (Appearances on Page 2)
```

**Page 142**

```
 1    APPEARANCES:

 2             EDWARD FOYE, Esquire
               Todd & Weld LLP
 3             28 State Street, 31st Floor
               Boston, Massachusetts  02109
 4                On Behalf of the Plaintiffs

 5             ANTHONY J. ABATE, Esquire
               SCOTT A. LaPORTA, Esquire
 6             Abel, Band, Russell, Collier,
               Pitchford & Gordon, Chartered
 7             240 South Pineapple Avenue
               Sarasota, Florida  34236
 8                On Behalf of the Defendants

 9

10    ALSO PRESENT:

11             Kathy Lamensdorf
               John Hirsch
12             Ronald Zolla (By telephone)

13

14

15                                         *

16               I N D E X

17    EXAMINATION OF MICHAEL LAMENSDORF

18                                         Page

19        Direct by Mr  Foye . . . . . . . . . . . . . . 145

20

21

22

23

24

25
```

**Page 143**

```
 1              E X H I B I T S

 2    (Note:  The following exhibits 25 thru 35 were
            marked in Volume I taken on 11/14/03)
 3

 4    Description

 5    25 - 9/1/00 letter to Michael Lamensdorf, M.D.
            from Anthony K  Black
 6
      26 - 2/21/02 letter to Michael Lamensdorf, M.D.
 7          from Kenneth G. Cram

 8    27 - Lamenscram Partnership Agreement

 9    28 - First Amendment to Management Agreement
            Dated September 12, 1995
10
      29 - Second Amendment to Management Agreement
11          entered into 10/11/00

12    30 - Letter to "John" from Michael Lamensdorf,
            MD FACS
13
      31 - 2/16/02 letter to Michael Lamensdorf, M. D.
14          from Ronald Zolla, Ph.D.

15    32 - 2/16/02 letter to John Hirsch from Michael
            Lamensdorf, M D , F.A.C.S
16
      33 - Shareholders' Agreement
17
      34 - First Amendment to the ZHL, Inc
18          Shareholder's Agreement

19    35 - Management Agreement for ZHL, Incorporated
            Ambulatory Surgery Center Project
20

21

22                                         Marked

23    52 - 2002 Individual Income Tax Return     145

24    53 - 2003 Individual Income Tax Return     145

25    54 - 2001 Income Tax Return for S Corporation  145
```

**Page 144**

```
 1    EXHIBIT INDEX (cont'd)

 2

 3    Description                              Marked

 4    55 - 2003 Income Tax Return for S Corporation  145

 5    56 - 1/17/05 letter to Michael Lamensdorf, MD,
            PA, from Lichtenstein Briefman Glass &
 6          Vross CPAs w/ attached balance sheets and
            income statements for 12/31/04 and 2003  171
 7
      57 - 1/17/05 letter to Michael Lamensdorf, MD,
 8          PA, from Lichtenstein Briefman Glass &
            Vross CPAs w/ attached balance sheets and
 9          income statements for 12/31/03 and 2002  172

10    58 - Letter to Ken from Michael Lamensdorf    184

11    59 - 8/10/95 memo to Ken Cram from Joseph Rugg
            re Draft Management Agreement           186
12
      60 - Fax cover page dated 9/22/00 to John Hirsch
13          from Kathy w/ attached letter           189

14    61 - 12/6/01 letter to Michael and Kathy from
            John re lantz Update                    207
15
      62 - 12/15/01 letter to Michael from John re Lantz  215
16
      63 - Letter to John from Michael Lamensdorf   216
17
      64 - 1/1/02 letter to Michael from John       227
18
      65 - 1/2/02 letter to John Hirsch from Kathy re
19          Your memo dated 1/1/02                  228

20    66 - Letter to John, Ron & Ken                230

21    67 - 1/10/02 memo to Kathy Lamensdorf from John
            Hirsch                                  236
22

23

24

25             (EXHIBITS ATTACHED)
```

Page 201

1  whatever.
2      Q. So you can't remember whether you were
3  favorably impressed with their work or unfavorably
4  impressed with it at that time or not. Is that your
5  testimony?
6      A. Your question once again is compound and
7  complex, but I believe that I have stated that I do not
8  recall how I felt about Ophnet at the time of this
9  document, which was I believe dated in December of 2001.
10  Actually, it was dated October of 2000, so even longer
11  ago than I thought.
12      Q. I'd like to show you the document that was
13  marked as Exhibit 35 in this case. I'm going to call
14  your attention to the last page of Exhibit 35. I'm
15  going to ask you, is that your signature there?
16      A. Yes.
17      Q. And did you sign that on or about 8/24/99?
18      A. My signature on there and it's dated
19  8/24/99, so I would have to assume that that's when I
20  signed it.
21      Q. Was there any discussion prior to your
22  signing that document regarding whether Bayou Jenkay
23  should manage the ASC?
24      A. I don't recall.
25      Q. Did Mr. Hirsch or Mr. Zolla raise that

Page 202

1  topic with you?
2      A. I still don't recall.
3      Q. As of 8/24/99, did you have any experience
4  operating a surgery center?
5      A. Define that, please.
6      Q. Did you have any administrative
7  responsibilities at the Cape?
8      A. No.
9      Q. Did you have any administrative
10  responsibilities at any surgery center ever?
11      A. No.
12      Q. Did your wife have any administrative
13  responsibilities at the Cape as of 8/24/99?
14      A. I do not recall her having any.
15      Q. Did your wife have any administrative
16  responsibilities at any surgery center ever?
17      A. Yes.
18      Q. When?
19      A. There was a period of about a month or so
20  when she got things running well at the Lantz; may have
21  taken her two months to correct all their egregious
22  errors.
23      Q. Did she manage to correct them?
24      A. Things ran well for that period of time.
25      Q. What errors did she correct?

Page 203

1      A. You'll have to discuss that with her.
2      Q. Well, from your perspective, what ran well
3  while she was in charge that didn't run well while she
4  wasn't in charge?
5      A. Well, what didn't run well is easy to say
6  because nothing ran well. I believe that there is the
7  letter that I wrote which gave a list of the things that
8  went wrong. I have not read that letter in a long time,
9  but that may well aid the process.
10      Q. But apart from the contents of that letter,
11  you have no recollection as we sit here today of what
12  that was?
13      A. As I sit here today, I remember, one, the
14  building was dirty. Two, the staff was poorly trained.
15  Three, they did not respect sterility. Four, the
16  patients were improperly treated. Five, the government
17  was improperly billed. I'm sorry. By government, I
18  mean Medicare and other insurance companies.
19          Six, anesthesia was unsupervised. Seven,
20  at the time they took over or at the time they set up
21  the center, the equipment, specifically the microscopes,
22  were woefully inadequate.
23      Q. Which of those were successfully dealt with
24  while Mrs. Lamensdorf was running the ASC?
25      A. The building was no longer dirty. The

Page 204

1  billing practices, I do not believe she -- I can't
2  address those. We hired, or she hired rather, employees
3  who were competent.
4      Q. Okay. When did the Lantz open for
5  business?
6      A. I do not recall the date.
7      Q. Was it in November 2001?
8      A. I do not recall the date.
9          MR. ABATE: Are you okay?
10          THE WITNESS: Oh, yes. I'm fine. Thank
11      you for asking.
12          MR. FOYE: Off the record.
13      (OFF THE RECORD)
14  BY MR. FOYE:
15      Q. At the time the Lantz was opening, were
16  there discussions between you and Ophnet regarding the
17  recruitment of other physicians to work there?
18      A. Yes.
19      Q. Could you please tell me what you remember
20  about those discussions?
21      A. Yes.
22      Q. Would you please tell me what you remember
23  about those discussions?
24      A. Yes. I begged them to recruit other people
25  to participate.

Page 205

1    Q. What was their response?
2    A. Placatering noise.
3    Q. Can you be more specific than that?
4    A. Ron would say that he was going to get on
5  it and he would make contact with people and nothing
6  happened. There was also a discussion on Ron's part
7  that he wanted to wait until the center was finished.
8    Q. Did Ron say why that was so?
9    A. He explained it but I couldn't understand
10  his logic.
11    Q. Can you recall what he had to say about it?
12    A. You would have to discuss that with him.
13    Q. Would I have to discuss it with him because
14  you have no memory of what he had to say?
15    A. You would have to discuss it with him
16  because his logic was so convoluted that I couldn't
17  follow it.
18    Q. Well, quite apart from whether it was
19  logical or illogical, can you remember what he had to
20  say?
21    A. He said something to the effect that if we
22  discussed it with them afterwards, after it was a fait
23  accompli, we would be in a stronger bargaining position.
24    Q. Did you undertake at any time to actively
25  attempt to recruit other physicians to the Lantz?

Page 206

1    A. As I sit here now, I do not recall having
2  actively recruited any other physicians.
3    Q. Why not?
4    A. I was asked not to by John and Ron.
5    Q. Did they discuss with you why that was?
6    A. It was their responsibility.
7    Q. After the Lantz opened, were there some
8  issues you had with some of the scrub techs who had been
9  hired?
10    A. Yes.
11    Q. Who did you have the issues with and what
12  were the issues?
13    A. One of the scrub techs was named Al. He
14  had difficulty with sterility. He didn't understand how
15  to pass instruments correctly. He had general'
16  difficulty performing his function.
17        There was another scrub tech who as I sit
18  here now cannot remember her name, but she had similar
19  difficulties.
20    Q. Does Robyn ring a bell?
21    A. It could. I don't recall as I sit here
22  now. Actually, yes, I do believe Robyn was her name.
23    Q. How long after the surgery center opened
24  were Al and Robyn terminated?
25    A. As quickly as I could arrange it.

Page 207

1    Q. And I take by that that you demanded that
2  they be fired; is that correct?
3    A. My demands were never met. I begged.
4    Q. They were in fact fired; is that correct?
5    A. I have no recollection.
6        MR. FOYE: Would you mark that as our next
7  exhibit, please?
8  (EXHIBIT 61 WAS MARKED FOR IDENTIFICATION)
9        THE WITNESS: (Reviews document.)
10  BY MR. FOYE:
11    Q. Do you recognize Exhibit 61, Doctor?
12    A. I do not recall this exhibit.
13    Q. Do you recall receiving it at any time?
14    A. I do not recall ever seeing this before.
15    Q. Did in fact, just to call your attention to
16  paragraph 4 of that document, did in fact some of your
17  early patients at the Lantz have postoperative
18  complications?
19    A. Yes.
20    Q. As of December 2001, what were those
21  complications?
22    A. I do not recall what complications occurred
23  as of December 2001.
24    Q. Did it have anything to do with corneas?
25    A. Are you asking me what complication

Page 208

1  occurred while the Lantz was in operation or were you
2  referring to a specific time frame?
3    Q. I was referring to the specific time frame
4  of the first two months that the Lantz opened, whether
5  there were particular postoperative problems at that
6  time.
7    A. I cannot remember as I sit here today when
8  and what complications occurred.
9    Q. Could you tell me what complications
10  occurred without reference to the chronology?
11    A. Without reference to the chronology, as I
12  sit here based solely on memory, without having access
13  to the documents which you have been supplied with in
14  the past, a large number of patients became dehydrated.
15  Several patients, I believe multiple patients had to go
16  to the emergency room for IV fluids. Patients were
17  admitted to the hospital. Patients were admitted to the
18  CCU. There was corneal abrasions on a routine basis.
19  Nausea and vomiting occurred because of dehydration
20  frequently.
21        And I'm sure there were more complications.
22  Somebody with less force of personality and skill than I
23  would have had significantly more complications than I
24  did.
25    Q. Did you ever ascertain the reason for

Page 209

1  patient hydration problems?
2      A. Yes.
3      Q. What was the reason?
4      A. Incompetence by Ophnet.
5      Q. Specifically, what was the reason?
6      A. They used what's referred to as a heplock,
7  which is a -- H-E-P -- which is a way of giving IV
8  medicines. The standard of care in Sarasota County is
9  to give IV fluids.
10         In addition, they gave only minimal
11  hydration in the postoperative area, despite my repeated
12  requests, until finally Gatorade was given, but this was
13  still inadequate. None of this meets the standard of
14  care in this community.
15     Q. Did you know it at the time?
16     A. Yes.
17     Q. What did you do about it?
18     A. Informed Mr Hirsch on a routine basis.
19     Q. Did you direct the staff with regard to
20  correct procedures for patient hydration?
21     A. Yes.
22     Q. Is it your testimony that the staff just
23  disobeyed your instructions?
24     A. Staff were employed by Mr. Hirsch. I
25  suggest you discuss it with him.

Page 210

1      Q. Well, I'm asking you, Doctor. Did they
2  obey your instructions or did they disobey them?
3      A. Mr. Hirsch's employees did not obey my
4  instructions.
5      Q. When should IV fluids be given to the
6  patient?
7      A. During the procedure, before the procedure,
8  and depending on the patient's health, after the
9  procedure.
10     Q. Did you check to see whether the patients
11  were, in fact, being given IV fluids before the
12  procedure?
13     A. Yes.
14     Q. Were they?
15     A. No.
16     Q. What did you do about that?
17     A. I repeatedly asked Mr. Hirsch and Mr. Cram
18  to take care of it.
19     Q. Were the patients being given IV fluids
20  during the procedure?
21     A. No.
22     Q. What did you do about that?
23     A. May I speak to Mr. Abate, please?
24     Q. I don't think this conceivably can have
25  anything to do with privilege, sir. I can't conceivably

Page 211

1  see this having anything to do with privilege. What
2  did --
3         MR. ABATE: Well --
4         THE WITNESS: You know what?
5         MR. FOYE: I'm not going to stop you from
6  walking out of the room.
7         THE WITNESS: Thank you.
8         MR. FOYE: But I'm going to state that I
9  think this is not a proper subject for an
10  attorney-client conference.
11        MR. ABATE: Fine.
12        THE WITNESS: Thank you. I'm glad you
13  think that way.
14     (OFF THE RECORD)
15        MR. FOYE: Could you read the question
16  that's before the witness, please?
17     (QUESTION READ BACK BY THE COURT REPORTER)
18        THE WITNESS: I left.
19  BY MR. FOYE:
20     Q. On any particular occasion when you saw
21  that the patient was being wheeled into the operating
22  room without an appropriate IV hookup, what did you do
23  about that?
24     A. Ophnet informed me that the standard of
25  care at their other surgery centers was to use the

Page 212

1  heplock method and that this was an acceptable way to do
2  it.
3      Q. At some point, once you required the
4  patients to begin taking Gatorade after their
5  operations, did the hydration issue cease?
6      A. No.
7      Q. Did it get better?
8      A. Minimally.
9      Q. You also mentioned that patients were
10  admitted to the hospital at various times. What caused
11  those hospital admissions?
12     A. That information was detailed to Mr. Hirsch
13  in the letters that I sent to him. I will point out,
14  it's now been three years and I have not reviewed those
15  materials.
16     Q. By the way, you said a minute ago that you
17  didn't have access to them. In what sense don't you
18  have access to the correspondence produced in this
19  litigation?
20     A. I'm sitting here in this room and I don't
21  have that correspondence.
22        MR. ABATE: I think he said documents you
23  have access to, I think was his statement, that
24  you have access to at this moment but he doesn't
25  have access to.

Page 213

1          MR. FOYE: I see  I misunderstood
2          THE WITNESS: That is correct  You, Mr
3  Foye, I believe have those documents. I'm
4  sitting here and only have the documents that you
5  have showed me
6  BY MR. FOYE:
7          Q.  There's no problem though at any time if
8  you ask your lawyers to see various documents that they
9  could have presented them to you  Fair to say?
10         A.  Earlier I wanted to talk to my attorney and
11 you objected, so I would say that's not fair to say
12         Q.  If I represented to you there have been
13 many boxes of documents produced by both sides in this
14 litigation, would you doubt me?
15         A.  I know that our side produced many boxes of
16 documentation.
17         Q.  Have you read those boxes?
18         A.  Have I read the boxes of documents?
19         Q.  Have you read what's in the boxes
20         A.  The boxes of documentation that we supplied
21 you  I've read documents that I wrote and I've read
22 other documents, but I did not assemble that material,
23 as you well know.
24         Q.  Didn't ask you that though, Doctor  I just
25 asked you if you read what was in the boxes that your

Page 214

1  side produced.
2          A.  I have read some of the documents
3          Q.  Have you read what was in the documents
4  that Mr. Hirsch and Mr. Zolla produced?
5          A.  I have read documents that Mr. Hirsch and
6  Mr. Zolla produced when they were provided to me
7  originally but I have not sat down and gone through the
8  boxes of documents
9          Q.  Fair enough  With regard to the patients
10 who were admitted to the hospitals, was that chiefly a
11 result of nausea?
12         A.  As I sit here now, I do not recall why the
13 patients were admitted to the hospitals. I documented
14 that.
15         Q.  What was the issue with corneal abrasions?
16         A.  Corneal abrasions are an indication of how
17 much swelling, in simplistic terms, and this is not
18 intended for an ophthalmologist but in simplistic terms,
19 corneal abrasion can indicate how much trauma occurred
20 to the cornea
21         When I operate, when I operate at
22 HealthSouth, it is highly unusual, in the order of once
23 or twice a year, that I get a corneal abrasion.
24         While we were at Lantz, we were having
25 corneal abrasions on a very high percentage of patients

Page 215

1  every operating day.
2          Q.  What caused that?
3          A.  Poor equipment, microscopes, lack of
4  assistance from the techs whom you described earlier,
5  poor hydration.
6          Q.  When you say poor hydration, is that the
7  failure of the techs to properly keep the eye wet during
8  the procedure or is that the failure to ensure that the
9  patient has proper IV fluids?
10         A.  Technically the answer is both.  However,
11 when I answered you, I specifically said the techs, so
12 what I was referring to was the lack of IV fluids.
13         Q.  What was Mr. Hirsch's reaction when you
14 called these perceived deficiencies to his attention?
15         A.  Placatering noise.
16         Q.  And he fired Robyn and Al, didn't he?
17         A.  He routinely did the minimum.
18         MR. FOYE: Could we mark this as our next
19 exhibit, please.
20 (EXHIBIT 62 WAS MARKED FOR IDENTIFICATION)
21         THE WITNESS: (Reviews document.)
22 BY MR. FOYE:
23         Q.  Do you recognize Exhibit 62?
24         A.  No, I do not recognize Exhibit 62.
25         Q.  Did you receive that on or about December

Page 216

1  15th, 2001?
2          A.  I do not recall ever having seen Exhibit
3  62.
4          Q.  After December 15th, did you in fact review
5  all potential new staff?
6          A.  To the best of my memory, yes, I did.
7          Q.  And were future potential hires presented
8  to you before an offer was made?
9          A.  As I sit here now, I do not recall.
10         Q.  Did you approve the hiring of all potential
11 new staff after that date?
12         A.  To the best of my recollection, I believe
13 that I approved people conditionally pending a trial
14 period, whose duration I do not recall at this time.
15         Q.  And then after the trial period, you would
16 tell Mr. Hirsch whether they had worked out or not; is
17 that correct?
18         A.  As I recall, we left before the trial
19 period was over.
20         MR. FOYE: Would you mark this as our next
21 exhibit?
22 (EXHIBIT 63 WAS MARKED FOR IDENTIFICATION)
23         THE WITNESS: (Reviews document )
24         For the sake of expedition, would you mind
25 if I took a break while we read this?

Page 217

1      MR. FOYE: Not at all.
2      THE WITNESS: Because it's going to take me
3  a while to read the rest of this.
4      MR. FOYE: Not at all.
5      THE WITNESS: Thank you.
6      MR. FOYE: And off the record.
7      (RECESS FROM 2:00 TO 2:17 P.M.)
8  BY MR. FOYE:
9      Q. Do you recognize, Doctor, what's been
10  marked as Exhibit 63?
11     A. Yes.
12     Q. What is that?
13     A. One of the letters that I was referring to
14  earlier.
15     Q. And the first sentence of that letter
16  reads, quote, It is inevitable when starting any new
17  venture that there be unforeseen problems, period, close
18  quote. Did I read that correctly?
19     A. Absolutely correct.
20     Q. Why is it, referring to the second
21  paragraph on the first page, that none of your
22  associates at the Cape chose to come to Lantz?
23     A. I gave Ron and John and Ken a list of
24  people that I thought would make excellent employees at
25  the Lantz. They have since told me that Ron and John

Page 218

1  offered them contracts that were so low in reimbursement
2  and with such poor benefits they couldn't possibly
3  accept.
4      Q. Were they more specific than that?
5      A. As I sit here now, I do not recall anything
6  more specific.
7      Q. Nobody said anything on the order of we
8  were making 16, they only offered us 15, or something of
9  that sort?
10     A. Oh, I see what you're saying. No, I think
11  that they -- although I was not told specific numbers, I
12  believe that they were making something in the order of
13  16 and offered something in the order of six, with only
14  part-time pay and no fringe benefits. Although nothing
15  specific was said, that was what my impression was.
16     Q. Regarding the third paragraph on the first
17  page, did Mr. Hirsch ever tell you in words or in
18  substance that it was not possible to create a turnkey
19  system for an ambulatory surgery center, that they were
20  all different?
21     A. I do not recall any such discussion.
22     Q. Why did you say in the fourth paragraph
23  that Lantz existed only because of the force of your
24  personality?
25     A. Because of the brute incompetence by

Page 219

1  Ophnet.
2      Q. How did the force of your personality come
3  to weigh that?
4      A. How did the force of my personality -- The
5  work conditions were so abysmal that someone with less
6  skill than mine would have had many disasters.
7      Q. With regard to sterilization, what did you
8  do to improve sterile technique at the Lantz?
9      A. We got Nicole involved and she took over
10  that.
11     Q. Who is Nicole, please?
12     A. Nicole was one of the people that worked at
13  Eye Specialists and, as I recall, we were bringing over
14  as many as six people every OR day because Ophnet was
15  unwilling to obtain proper staff.
16     Q. And did you demand that Lantz reimburse Eye
17  Specialists for the cost of that personnel?
18     A. I think "demand" was a harsh word. John
19  paid for their time as I recall.
20     Q. Who, referring to the sixth paragraph on
21  the first page, who is Jan?
22     A. Jan was a nurse who had been hired to be a
23  circulator. At the time that she was hired, I believe
24  this was her first experience being in an operating
25  room. I do not think that she had had any experience

Page 220

1  whatsoever being a circulator. I do not feel that and
2  as I recall, to the best of my knowledge, she had no
3  experience prepping patients either.
4      Q. Did you at any point instruct Jan in the
5  proper method of prepping patients?
6      A. The next sentence says, "Both Nicole and I
7  have explained the proper procedure, yet she refuses to
8  follow it."
9      Q. How long did Jan remain an employee of the
10  Lantz?
11     A. You would have to consult with Mr. Hirsch
12  on that regard.
13     Q. This letter was -- strike that. There is
14  no date on it but there is a fax flag up at the top, is
15  there not, that identifies it as being sent on 12/31/
16  2001?
17     A. Which I will point out is New Year's Eve
18  and I was working.
19     Q. Did you write this yourself?
20     A. I wrote this and typed it. I apologize for
21  the typographical errors.
22     Q. How long after 12/31/01 did Jan remain at
23  the ASC?
24     A. You will have to consult with Mr. Hirsch on
25  that.

Page 221

1  Q. Did she get better at prep work?
2  A. As I sit here now, I do not recall.
3  Q. Did they find somebody who was better?
4  A. As I sit here now, I do not recall.
5  Q. Over on page 2, the third paragraph on that
6  page, I'd like to read that into the record or at least
7  the first sentence or two of it.
8  "Kathy has told me that Bayou Jenkay can
9  have the Lantz running effectively by the end of March.
10  That would truly be a miracle when you consider that our
11  best grade to date is D-plus and we have fallen back to
12  F-plus. She is only asking what Ken is receiving, $75
13  an hour, a real bargain. We should, of course, accept."
14  Did I read that correctly?
15  A. Yes, you did.
16  Q. What particular expertise did Mrs.
17  Lamensdorf have in running surgery centers as of
18  12/31/01 that led you to make that statement?
19  A. She had common sense.
20  Q. In your view, is that what was lacking at
21  the Lantz at that time?
22  A. No.
23  Q. What was lacking at the Lantz at that time?
24  A. "Which brings us to your past track
25  record," reading from the letter, the next paragraph.

Page 222

1  "It is certainly not one to be proud of," certainly not
2  for -- and this is my addition -- certainly not for
3  someone who told me that -- alleged that they were
4  expert at running a surgery center. But let's read.
5  One, cases cancelled because we had not
6  completed the inspection process. Two, cases for which
7  Eye Specialists will not be paid for because we had not
8  completed the inspection process. Three, dirty
9  instruments. Four, broken instruments. Five, multiple
10  corneal abrasions. Six, inadequate post-op
11  instructions. Seven, chronic problems with post-op
12  dehydration. Eight, poor sterile technique. Nine,
13  total lack of systems.
14  10, employees who have absolutely no
15  training. 11, inadequate review of permit, resulting in
16  the cancellation of a case. 12, we are unable to
17  perform more than 16 cases because of these problems.
18  13, other surgeons were to be working on days when I am
19  in the office.
20  Q. What does 12 mean?
21  A. Because of the poor running of the surgery
22  center by Ophnet, the turnover was so slow that we could
23  only do that many cases.
24  Q. Per day?
25  A. That is correct.

Page 223

1  Q. Which of those 13 items that you just read
2  into the record did your wife have expertise in as of
3  12/31/01?
4  A. My wife could arrange for people to keep
5  instruments clean. My wife could arrange for
6  instruments to be cared for properly. My wife could
7  arrange for employees to be adequately trained. My wife
8  could arrange for adequate hydration to be supplied.
9  The postoperative instruction problem went
10  away when employees from Eye Specialists were brought
11  over to handle those problems. The inadequate review of
12  permit problem went away when Eye Specialists employees
13  were brought over to handle those problems.
14  Q. What --
15  A. The vast majority of them.
16  Q. I'm sorry. Have you finished your answer?
17  A. Yes, sir.
18  Q. What could she have done that you could not
19  with regard to the hydration issues?
20  A. My wife was able to hire nurses who knew
21  how to start IVs. Mr. Hirsch was evidently not able to
22  do that.
23  Q. You said earlier that they used a heplock.
24  Could you explain to me what that is?
25  A. It's a heparin lock, L-O-C-K.

Page 224

1  Q. I'm sorry.
2  A. And heparin keeps the -- Ordinarily, blood
3  will clot and heparin is an anticoagulant that keeps the
4  blood from clotting to allow the -- It's got a little
5  end that you could stick a needle into and then give
6  medicine or IV fluids through.
7  Q. And because this device was not in use,
8  sufficient IV was not flowing into the patients?
9  A. I don't understand your question.
10  Q. Let me rephrase it. How did the lack of a
11  heplock influence whether the patients were properly
12  hydrated?
13  A. Ophnet specified that a heplock be used. I
14  requested repeatedly that a continuous IV be used, which
15  would allow the patients to be hydrated with a liter of
16  fluid or more.
17  During the course of our discussion here,
18  you've consumed a large amount of water. While the
19  patients are in the center, they are not allowed to eat
20  or drink anything and they become dehydrated. I would
21  say you and I are each drinking at least a cup of water
22  an hour or more. They were not receiving that.
23  Q. Did that dehydration ultimately contribute
24  to the nausea problems?
25  A. Yes.

Page 225

1    Q. How so?
2    A. In post-anesthesia patients, dehydration
3  causes nausea.
4    Q. Did the Gatorade that was prescribed for
5  the patients influence the nausea in any way?
6    A. To a limited extent, it improved the
7  problem but did not make it go away because the patients
8  did not drink a sufficient amount. There's a difference
9  between one cup of Gatorade and a liter of IV fluid.
10    Q. Could you go to the last page of that
11  document, page 3, to numbered paragraph 5? I'm going to
12  read part of that into the record.
13    "I was led to believe that as a surgeon, I
14  could only own one-third of a surgery center. I have
15  since learned that is not true. I have also been told
16  that when a surgeon partners with an outside group,
17  especially one like me who is going to cover all of the
18  freight, he gets 50 percent without putting up any
19  money."
20    As to that latter statement, who told you
21  that?
22    A. Multiple people at the American Academy of
23  Ophthalmology meeting.
24    Q. Other surgeons?
25    A. Both surgeons and people who establish

Page 226

1  centers. I'm sorry, as I sit here now, I cannot
2  remember the name of any of those people.
3    Q. Did you consider at any time hiring those
4  people to manage the Lantz?
5    A. No. I had an arrangement with Ophnet. I
6  had made an arrangement for them to manage the Lantz.
7    Q. Did you have the authority to terminate
8  Ophnet as manager of the surgery center?
9    A. Mr. --
10    MR. ABATE: Let me object to the form. Go
11    ahead and answer it.
12    THE WITNESS: Mr. Hirsch repeatedly told me
13    that if I was unhappy that that was my right.
14  BY MR. FOYE:
15    Q. And at some point, you did in fact purport
16  to terminate Ophnet as the manager of the surgery
17  center, correct?
18    A. Why are you saying "purport"?
19    Q. To avoid any kind of raising of the issue
20  of whether that termination was effective or not.
21    A. Obviously it wasn't effective. I wrote
22  them a letter with a much longer list of problems than
23  this letter. This letter, if I were to receive this
24  letter, I would just be devastated that my work was so
25  brutally incompetent, and yet I sent them an even longer

Page 227

1  letter and they still maintained their incompetence.
2    Q. That said, did you consider having any of
3  the outside management firms that you spoke to at the
4  American Academy meeting come in to manage the surgery
5  center?
6    A. No. At the time that this letter was
7  written and indeed until sometime after we left, I very
8  much wanted Ophnet to successfully run the center.
9    Q. Well, you said in this letter, did you not,
10  sir, that you wanted Bayou Jenkay to run the center.
11    A. Yes.
12    Q. Why Bayou Jenkay rather than one of the
13  outside firms you had consulted at the American Academy?
14    A. Bayou Jenkay was ready to start yesterday.
15    Q. How important was the $75 an hour in that
16  letter?
17    A. $75 was intended as an insult to them.
18  That number was taken because it was Ken Cram's pay. I
19  wanted to demonstrate for how little the thing could be
20  corrected if they hadn't been so lazy and unwilling to
21  perform any work.
22    MR. FOYE: Could you mark this as our next
23    exhibit, please?
24    (EXHIBIT 64 WAS MARKED FOR IDENTIFICATION)
25    THE WITNESS: (Reviews document.)

Page 228

1  BY MR. FOYE:
2    Q. Have you had the opportunity to look over
3  Exhibit 64, Doctor?
4    A. Yes.
5    Q. Do you recognize that document?
6    A. I don't remember whether I have read this
7  letter or not before.
8    Q. Did you in fact receive it on or about
9  January 1, 2002?
10    A. I do not remember reading this letter
11  before.
12    Q. It would follow then that you have no
13  memory of having any reaction to the letter. Fair to
14  say?
15    A. I think that would be fair to say.
16    Q. You don't remember being angry or unhappy
17  or upset when that came over the fence?
18    A. I don't remember being angry or upset about
19  something that I don't remember.
20    MR. FOYE: Could you mark this as our next
21    exhibit.
22    (EXHIBIT 65 WAS MARKED FOR IDENTIFICATION)
23    THE WITNESS: (Reviews document.)
24  BY MR. FOYE:
25    Q. Looking at Exhibit 65, Doctor, I'm just

Page 229

1 going to read the first sentence into the record and
2 then we're going to move on to the next topic. Quote,
3 Michael asked that I respond to a few of your comments
4 in this memo, close quote. And above that is a Re line
5 saying "Your memo dated 1/1/2002."
6        Did I read that correctly?
7    A. Yes.
8    Q. And this document is signed KDL, correct?
9    A. Yes.
10   Q. Somebody was reading the mail. Fair to
11 say?
12   A. This is a letter from Kathy to John Hirsch.
13 I do not read Kathy's mail.
14   Q. But doesn't that letter say that it's
15 responding to the letter of January 1st, 2002, addressed
16 to you?
17   A. Yes.
18   Q. And that's the letter that you have no
19 recollection reading; is that correct?
20   A. I still have no recollection of the letter.
21   Q. And the phrase in Exhibit 65, "Michael
22 asked that I respond to a few of your comments in this
23 memo," that doesn't refresh your recollection that you
24 saw Mr. Hirsch's letter?
25   A. For the record, I do not remember the

Page 230

1 letter which is marked as Exhibit 64, one way or the
2 other.
3    Q. Thank you, Doctor.
4        MR. FOYE: 66
5    (EXHIBIT 66 WAS MARKED FOR IDENTIFICATION)
6        THE WITNESS: (Continues to review Exhibit
7 65.)
8        (Reviews Exhibit 66.)
9        I have read Exhibit 66
10 BY MR. FOYE:
11   Q. Did you have, regarding paragraph 2 of
12 Exhibit 66, any discussions with Mrs. Lamensdorf about
13 that provision?
14   A. I don't think I did. I think it was mine.
15 I don't remember discussing it one way or another.
16        Incidentally, I believe that was
17 significantly less than Ophnet was getting paid, but --
18   Q. Why did you have Ophnet providing services
19 under the supervision of Bayou Jenkay rather than --
20   A. Excuse me.
21   Q. I'm sorry. You can answer that question.
22   A. You are done with that question.
23   Q. I'm done with that question.
24   A. I felt that Ophnet was completely
25 incompetent. I think we've demonstrated that repeatedly

Page 231

1 through the documents that you yourself have provided,
2 the overwhelming incompetence of Ophnet. We wanted the
3 surgery center to succeed.
4    Q. As of January 2nd, you were still doing
5 your surgeries at the surgery center, correct?
6    A. I believe I stayed to February or March. I
7 don't remember the last day.
8    Q. Paragraph 3, "The Lamensdorfs are
9 beneficial owners of 75 percent of ZHL. Those shares
10 are considered to be paid in full and will not be
11 further assessable."
12   A. I thought that was very generous on my part
13 to allow them to continue at all based on the brute
14 incompetence that they had demonstrated.
15   Q. And as of January 1, prior to this edict,
16 how much of the surgery center had you owned personally?
17   A. I don't know.
18   Q. How much had your wife owned?
19   A. I don't know.
20   Q. How much had Mr. Hirsch and Mr. Zolla
21 between them owned?
22   A. I don't recall. I think that each of them
23 owned one-third and that Kathy and I owned one-third or
24 one-sixth each, as I recall.
25   Q. Why 75 percent?

Page 232

1    A. I wanted them to continue to be partners.
2    Q. Did you plan to invest any additional
3 capital for your 75 percent ownership?
4    A. I believe that you read, these shares are
5 considered to be paid in full and will not be further
6 assessable. I think that's a very generous offer even
7 today.
8    Q. Why?
9    A. To let them retain anything.
10   Q. Had they invested money in the surgery
11 center?
12   A. They were supposed to provide a surgery
13 center. They didn't.
14   Q. Had they invested money in it?
15   A. I don't know.
16   Q. Did they find the land?
17   A. No.
18   Q. Who did?
19   A. I did.
20   Q. Did they negotiate the contract for the
21 sale of the land?
22   A. I don't know. There were a lot of alleged
23 negotiations that Ron supposedly did that I had already
24 done. I will refer you to one we can document, the
25 surgery microscopes.

Page 233

Q  What did you have to do with the
construction of the ASC?

A  More and more as it went along, I went
there fairly frequently to look and see what was going
on  I designed the surgery portion, the operating rooms
area, at my own expense

Q  We actually talked about that last time
I'm making a conscious effort to avoid asking you any
questions that I asked you last time and I apologize for
the lapse

MR. ABATE: And I am following along to
make sure you don't

MR. FOYE: Thank you.

BY MR. FOYE:

Q  4, "A Florida-based CPA who is mutually
acceptable to all but who has no relationship with any
of the involved parties will be employed." What was the
purpose of that provision?

A  Mr Hirsch's brother allegedly -- oh, I
like your word "purportedly" -- purportedly was the CPA
for ZHL  In view of the fact that he was his brother,
how would I know whether things were correct?

Q  Could you have asked your own CPA to review
them?

A  There was no point in asking my CPA because

Page 234

my CPA is my CPA  I specifically said to have someone
who was mutually acceptable to all parties who was not a
party to any of the other parties

Q  Where did you, going to paragraph 2, where
did you decide on the $50,000 payment?

A  I'm sorry  I don't recall  I think it was
random, as were all the numbers

Q  And in the second sentence of paragraph 2,
you say, "If the project is satisfactorily completed by
28 February 2002." What did you mean by "the project"?

A  The project was to get the Lantz to be
working in an acceptable manner  Basically, all Ophnet
had to do was stay at home and they would have gotten 25
percent of the profits

Q  Was there at this time cash flow issues
with the surgery center?

A  I don't know

Q  In the following month, in January, did
operating conditions improve in any way at the surgery
center?

A  We have discussed this  Yes

Q  How did they improve?

A  Kathy was in control at that point and a
lot of the things ran better

Q  She was in control during what period of

Page 235

time again?

A  She was not in complete control  From the
surgical standpoint, things were improved  For
instance, we still had the homemade, garage type
insurance billing, which I believe was illegal

Q  When you say "homemade, garage type
insurance billing," could you be more specific?

A  That's not really my area of expertise
The only thing I recall is that Ophnet had hired someone
who had never billed Medicare before for our surgery
center.

Q  Did that result in any inaccuracies in the
Medicare billing to your knowledge?

A  This is outside my area of expertise.

Q  But to your knowledge, there were no
inaccuracies?

A  I believe that rather than billing under
the Lantz number they were billing under my number, but
this has been a long time and basically I'm saying I
remember some inaccuracies but if you want to know what
they were, you would have to ask Mr Hirsch

Q  I'm showing you what was previously marked
as Exhibit 23  Could you read that document over?

A  (Witness reviews document )

I have read the document labeled Exhibit

Page 236

#23.

Q  Have you seen that before today?

A  If it's labeled Exhibit 23 and it's part of
my deposition, then I must have seen it

Q  It may have been part of someone else's
deposition  Let me ask you the better question  Did
you review this document on or about January 8th, 2002?

A  This letter was written by Kathy  I did
not read it at that time

Interesting  In just a few days, we were
already able to say, firstly, surgery at the Lantz went
well yesterday

MR FOYE: 67?

(EXHIBIT 67 WAS MARKED FOR IDENTIFICATION)

MR FOYE: Could we go off the record?

We're going off the record for a second

(OFF THE RECORD)

BY MR. FOYE:

Q  Showing you what's been marked as Exhibit
67, did you review that correspondence on or about
January 10th, 2002?

A  To the best of my memory, I've never seen
Exhibit 67 before today

Q  Have you had the opportunity to read
Exhibit 67?

Page 237

1    A. Yes.
2    Q. Did Mrs Lamensdorf on or about January
3    10th, 2002, communicate to you the substance of that
4    letter?
5    A. I do not recall discussing this letter with
6    Mrs Lamensdorf.
7    Q. Fair enough, but did she inform you that
8    Lantz intended to reimburse Eye Specialists for services
9    that were being rendered?
10    A. Do you mean that -- would you -- I don't
11    recall a discussion.
12    Q. Did Mrs Lamensdorf inform you, in words or
13    substance, that John Hirsch had told her that Ken and
14    Kasia were investigating the abrasions at the Lantz and
15    that they wanted to be certain that Lantz procedures and
16    protocols were not contributing to the problem?
17    A. That doesn't make any sense since we know
18    that they were the cause
19    Q. Regardless, did Mrs Lamensdorf inform you
20    that that's what Mr Hirsch had told her?
21    A. A moment ago, I believe I told you that I
22    do not remember discussing this letter or the contents
23    with Mrs Lamensdorf.
24    Q. Let me just read the last paragraph into
25    the record. "Ron and I will do what we can to remove

Page 238

1    financial stress from you and Michael. Unfortunately,
2    things are expensive and start-ups can be particularly
3    cash draining. Although Ron and I, too, have cash flow
4    issues (especially at tax time), we will do our best to
5    help out in this area."
6    Did I read that correctly?
7    A. Yes.
8    Q. Did Mrs. Lamensdorf, in words or substance,
9    communicate that to you on or about January 10th?
10    A. My answer remains. I do not remember
11    having discussed this.
12    MR. FOYE: Thank you very much, Doctor, and
13    we will --
14    MR. LaPORTA: We'll see you tomorrow.
15    MR. FOYE: -- see you tomorrow for Mrs .·
16    Lamensdorf's deposition and see you next Tuesday
17    for the continuation of yours.
18    (WHEREUPON THE DEPOSITION WAS RECESSED AT 3:00 P.M.)
19    * * *
20
21
22
23
24
25

Page 239

1    STATE OF FLORIDA    )
2    COUNTY OF SARASOTA )
3
4    I, LAURIE J. CHEFFY, court Reporter. Notary
5    Public, State of Florida at Large, certify that I was
6    authorized to and did stenographically report the
7    deposition of MICHAEL LAMENSDORF. that a review of the
8    transcript was requested, and that the transcript is a
9    true and complete record of my stenographic notes to the
10    best of my ability and understanding.
11
12    I further certify that I am not a relative,
13    employee, attorney or counsel of any of the parties. nor
14    am I a relative or employee of any of the parties'
15    attorney or counsel connected with the action, nor am I
16    financially interested in the action.
17
18    Dated this 22nd day of January, 2005
19
20
21    LAURIE J. CHEFFY
22    Notary Public
23    State of Florida
      Commission expires 3-20-06
24
25

Page 240

1
2    CERTIFICATE OF OATH
3
4    STATE OF FLORIDA   )
5    COUNTY OF SARASOTA)
6
7
8    I, the undersigned authority, certify that
9    MICHAEL LAMENSDORF personally appeared before me and was
10    duly sworn.
11
12    WITNESS MY HAND AND OFFICIAL SEAL THIS 2ND
13    DAY OF JANUARY. 2005.
14
15
16
17
18
19
20    LAURIE J. CHEFFY
      Notary Public
21    State of Florida
      Commission expires 3-20-06
22
23
24
25

To: Michael and Kathy                    December 6, 2001
From: John
Re: Lantz Update

1. Al and Robyn were terminated this morning. I coached
   Kasia through the process. She let them go in a way that was
   most likely to have them speak favorably of Lantz and Dr.
   Lamensdorf in their future travels. Kasia then had a meeting
   with the remaining staff to explain Al and Robyn's exodus so
   as to minimize remaining employee anxiety regarding their
   own jobs. I spoke with Kasia after she had completed these
   duties and I believe she did a good job.

   Today, I have been calling every contact I can think of to
   source the scrub techs and Pre-op nurse we need. Kasia is
   working on this as well with my guidance. ( Kasia called
   Elma Overholt in Eustis Florida the day Kathy L. gave her
   the CV and left a message on an answering machine. She did
   not hear back. I called Elma this evening and got the
   machine too…I'll keep trying.)

   I do have some leads and feelers but no one to present and
   discuss as of yet. It is hard to complete this particular task in
   a day– I will produce candidates, however, we are battling
   time, as you know. Therefore, I ask that you think, think,
   think about any potential leads, get me their numbers and I
   will act. I can be reached at my office tomorrow anytime
   after 7:00 (781-631-9217).

2. We will get our Medicare number tomorrow morning so we
   can go ahead and bill the cases we did on Tuesday. Getting
   the number after the certification visit can take weeks,
   however, I was successful in shortening the process. I will
   review each of the claims after Sue has prepared them to
   make sure they are accurate before being submitted. These

1



OPH 019245

will be paper claims.  Getting into the Medicare system electronically takes five or six weeks, however, I am working on that too and may be able to shorten the time lag.  So far, I am pleased with Sue's performance on billing and insurance. She listens, follows instructions and calls me when she's not sure...yes, she has more to learn...and she will.  Further, she has a great attitude and is good with the patients and people, generally.

3. Kathy, I am working the lists and memos with Kasia that you took the time to compose. If other matters or observations come up, fax me or call me.

4. Michael, I am very, very sorry that your patients had post-op complications.  I take the matter very seriously and we will see this through to a successful resolution. We are going to have the best surgery center in Sarasota.

OPH 019246

December 15, 2001

To: Michael
From: John
Re: Lantz

1. Totally agree that you should review all potential new staff. Needed to bring Cathy Rutheford (Medical Assistant) and Martha Sullivan, R.N. (Pre-op) in right away in order to keep the operation running smoothly so that you and your patients are properly served on Tuesday and Thursday. Cathy, an experienced medical assistant, shadowed Pam last Thursday and by the end of the morning was greeting and starting drops. I watched her, personally, with four patients and at the end of the day asked Pam for her opinion of Cathy. It was positive. Cathy also worked in post-op and I personally saw her assisting Pam or Tanya in seating the patient, providing fluids/food and reinforcing post-op instructions delivered by Pam or Tanya. I asked Pam about this function and she believed that Cathy would do a good job. Cathy will be at Lantz all day on Monday for further orientation and training. As with all employees, they have an initial probationary period. If you disapprove of the hire we can make a change in a planned manner that does not disrupt the flow of providing good care for your patients and a good experience for you as surgeon. I will present her to you on Tuesday for your review.

EXHIBIT

6 2

M. Lamensdorf 1/19/05

Regarding Martha Sullivan, R. N., Gail's position was being filled be Jo Ellen (You liked her socks/scrub pants combo) from a temp agency. Jo Ellen, while adequate to fill a short- term void, would not be a good long -term hire. Martha is not as strong a player as I would like but she is better than Jo Ellen and more cost –effective. Martha shadowed Jo Ellen last Thursday and I watched her closely. She caught on fairly quickly and had a good hands-on mentality. She was very nice to your patients. She has good basic nursing skills. I need to observe further to see if she has the energy and stamina for the position which will be important as we ramp up the cases per hour. I do not think she will be an "A" player, however, as you know it takes time to gather and create a team of mostly "A" players. She will be working pre-op on Tuesday along side Jo Ellen in order to further learn the role and the flow. I will present her to you on Tuesday for your review.

Again, future potential hires will be presented to you before an offer is made.

2. Yag move. If you agree, we want to do this as soon as possible. Ken is going to coordinate the physical move and the timing of it with Eye Specialist's as well as the scheduling phase-in. He will also talk with you about the day of week and time of day you want to do them. Attached is the informed consent and one-pager we use in Ft. Myers. Perhaps it can

2

OPH 019250

serve as a point of departure for the appropriate Lantz form. On Tuesday I'd like to talk with you about your specific care protocol for Yags…ie. Pressures one hour post-op, etc. Or better yet if it is in writing in your office or one of your staffer's knows all the details, please fax it to Lantz on Monday or have the staffer call me and talk me through it, as the case may be.

3. I'll take care of stopping Sally Poirrer's calls to you.

4. Attached is draft of Lantz general patient brochure. Do you or Kathy have any text changes? Please advise so we can get 'um done.

5. See you in surgery at Lantz on Tuesday. Have a nice weekend.

3

OPH 019251

John,

It is inevitable when starting any new venture, that there be unforeseen problems. A new business needs to be well funded and appropriately staffed.

Unfortunately, none of my "associates" at the Cape chose to come to the Lantz, as they were not offered employment contracts that they could accept. Just as unfortunately, none of the employees that you hired had any experience in cataracts. Potentially, this could have been compensated for if they had been outstanding employees; none of them are. Indeed, it is unlikely that more than one or two of them will be at the Lantz in three months. Turnover in a new venture is to be expected; but, this staff has not even met the minimum standard. Clearly, excellent people were available, viz, the resumes Kathy received and forwarded from just one ad.

A primary reason to partner with an outpatient surgery center group, is a turnkey package of systems. I assumed since you have developed or are associated with at least three other ambulatory surgery centers that systems would be in place at the opening of the Lantz. Unexpectedly, there were essentially, no systems.

To date the Lantz exists only because of my force of personality and because of the back up provided by Eye Specialists.

Sterilization: With the lack of sterile technique, it is a miracle that we have not had a case of endophthalmitis. I have never seen equipment so poorly cared for; it is a miracle that we have not had a total disaster. The first would have closed the Lantz; the second would have been merely tragic.

Jan seems to have a mental block about prepping. Both Nicole and I have explained the proper procedure, yet she refuses to follow it.

I told you that we needed an ultrasound to clean the tips at the end of each surgical day. You did mention something about ultrasound shortening the life of the instruments. However, nothing could shorten the life of instruments as much as your employees. Your decision to not purchase an ultrasound and your decision alone resulted in the cancellation of thirteen cases. Prior to canceling the cases I had 1, tried three hand pieces; 2, tried six different tips; 3, replaced the tubing; 4, retuned the phaco; and, 5, used another machine. What exactly was Kasia supposed to achieve in 30 minutes when both Nicole and I have forgotten more about trouble shooting a phaco than she knows? I removed the remaining cortex using a 3cc syringe, something that I could have done at any time. I was testing in order to determine the full extent of the disaster. Mr. Lotto, the next patient, only has one eye. His block certainly would have worn off by then. Don't you think that I took that into consideration? And, if I would not operate on him, why would I operate on anyone else? Documenting protocol for such a situation after it occurs is perfectly representative of the lack of established systems at the Lantz.

EXHIBIT

63

M. Lamensdorf 1/19/05

— 2 —

Passive aggressive behavior: Passive aggressive behavior is destructive in medical settings. Unfortunately, the Lantz is rife with passive aggressive behavior. If I change the routine on one patient, I am asked on each succeeding patient what to do. This is both irritating and absurd. It needs to stop. Passive aggressive behavior often comes from the top. We have previously established that I will not stop seeing patients to talk to you. You know that I do not take a break when I am seeing patients. You know that I am not available at 10:30. Sending me a fax on Christmas Eve that would irritate me was in particularly poor taste.

Hiring: When was the decision made to hire those with no training and minimal potential? This is certainly not a job for the inexperienced, particularly when there is no one to train them. For that matter why are we "settling" at any position when quality resumes are streaming in? Laura is the first person that I have ever met who is truly a "cipher". Does she do anything? We should be proud of every employee!

Kathy has told me that Bayou Jenkay can have the Lantz running effectively by the end of March. That would truly be a miracle when you consider that our best grade to date is D+ and we have fallen back to F+. She is only asking what Ken is receiving, $75.00/hour, a real bargain. We should, of course, accept.

Which brings us to your past track record. It is certainly not one to be proud of:

1. Cases cancelled because we had not completed the inspection process.
2. Cases for which Eye Specialists will not be paid for because we had not completed the inspection process. Thank you for reimbursing us.
3. Dirty instruments.
4. Broken instruments
5. Multiple corneal abrasions
6. Inadequate post op instructions
7. Chronic problems with post op dehydration
8. Poor sterile technique.
9. Total lack of systems.
10. Employees who have absolutely no training
11. Inadequate review of permit, resulting in the cancellation of a case.
12. We are unable to perform more than 16 cases because of these problems
13. Other surgeons were to be working on days when I am in the office

Ophmet has abandoned Eye Specialists:

1. The new computer system was not ordered properly requiring a substantial delay and pushing us back to the end of the installation queue.
2. Because of the computer problems, we have been unable to bill for patient visits in December.
3. Bonnie cannot assume accounts payable because she is overwhelmed by the computer problems. As agreed months ago, Kathy will no longer be handling accounts payable effective 31 December 2001.
4. There is a significant decrease in cash flow because of decreased surgery.

Some Additional Concerns:

1. When we first started I asked you what a reasonable budget was. You knew that we planned to renovate our home. I asked if $100,000 was reasonable, which with your and Ron's contribution would represent $300,000 or a total budget of about $1,000,000. You indicated that it might be reasonable. I planned accordingly. Obviously it was much too low.
2. When asked about a possible completion date, Kathy and I were mislead. More time was spent on the negotiation for the land than everything else.
3. We opened during the holiday season which has allowed me to subtly push off many surgical candidates into the future. Carol keeps asking why I cannot do more than 16 cases.
4. My mental energy is gone. I am not as fluid in making the difficult diagnoses that I take great pride in making. My "free" time after surgery is usually devoted to the business of life. I plan projects one year in advance. None of these have even been started.
5. I was led to believe that as a surgeon, I could only own one third of a surgery center. I have since learned that is not true. I have also been told that when a surgeon partners with an outside group, especially one like me who is going to cover all of the freight, he gets 50% without putting up any money. After all what is the purpose for the outside partners? For that matter, Ron's contributions to date have only been the negotiations for the land and the loan and financial. Why does that entitle him to one third of the cash flow?

Scheduling: Scheduling has become a nightmare. We cannot do more than 16 cases on any one day. At the Cape, we were routinely doing 43 cases every two weeks. At the Lantz, we have yet to do 30 in the same time period. This has resulted in a dramatic decrease in revenue for Eye Specialists. In addition, we are losing at least three cases to other Surgeons every week. In the past, because of my flexibility, we would routinely do procedures at the convenience of the patients. Now we are looking for excuses to delay surgery.

The Lantz Eye Surgery Center was created so that I, Michael Lamensdorf MD, could perform more surgery in less time with better results with less stress for both the patients and me. When I went to the Cape, I walked in the door, did more cases and went home with only minimal thought about the facility. Now I am doing fewer cases, with less control, poorer staff, mediocre equipment and worries 24/7. This has all come at tremendous up front cost, loss of revenue and high opportunity cost. This has to end now by hiring Bayou Jenkay, Inc.


Michael Lamensdorf MD

January 1, 2002

Dear Michael,

I read your letter today that you faxed to me and to Ken Cram last night. I shared it with Ron and we have discussed some of it's contents. In particular, we discussed your statement that we hire Bayou Jenkay, Inc. to manage Lantz. Ron and I are not opposed to replacing Ophnet, Inc. with Bayou Jenkay, Inc. to manage Lantz. However, we need to identify and address the issues associated with this proposed change so we all have some idea of what Lantz's future may look like under Bayou Jenkay's management. Also, we would need to craft a transition plan that minimizes disruption to the operation of the facility.

Ron and I will talk, put our thoughts on paper regarding this proposed management change, and get them to you next week. We will also address the other statements and concerns in your letter in a separate writing.

As to Ophnet running the operation this week, there are three topics to address:

1. Michelle Corbett, CST – Michelle responded to our ad on December 17th. Noting that she had experience at the Cape I asked Ken to ask you about her viability as a scrub tech at Lantz. Ken said that when he spoke with you about Michelle you thought that she was a good person and should be interviewed and considered. We interviewed her, concluded that she might be a fit and asked her to "shadow" in the OR on Thursday, December 20th. I apprised you of this upon your arrival Thursday morning. When you saw her that morning, the two of you exchanged a friendly greeting and you seemed to approve of her presence in the OR throughout the day. Consistent with our hiring approach, I asked her to wait in Kasia's office at the end of surgery so that you could interview her and approve or disapprove the making of an offer to her. You interviewed her and afterward we walked to the men's dressing room together and I asked you if we should make her an offer. You said you liked her, thought she would be a hard worker, and said we should hire her. It was on this basis that I made her an offer of employment.

Now, all employees are hired on an initial 90 day probationary basis and certainly if you don't want someone in the OR with you for good

1



EXHIBIT

64

M. Lamensdorf 1/19/05

OPH 019266

reason, bad reason or no reason at all, they won't be in the OR. However, I am concerned about fundamental fairness to Michelle and generating "bad press" in the potential employee community which could make hiring good people more difficult in the future regardless of who's managing Lantz. Michael, after you left on the 20th I resumed my meeting with Michelle and extended the offer which she accepted. After she accepted the offer, she made a special point of saying that you were a kind man and that she looked forward to working with you. I believe that her words were sincere because she made the statement after the offer/acceptance dialogue and not as obsequious flattery in hopes of prompting an offer.

If we have any performance problems with Michelle during the probationary period we would then have a rational basis for letting her go. If Eye Specialists staff have hearsay information about Michelle's performance elsewhere, these concerns could be explored. If Nicole or Tina have a problem with Michelle, it would be a worthwhile exercise for all concerned to explore the problem and try to work it out. If ultimately Michelle is out lets do it in a fair and reasonable manner. She thinks the world of you right now and I see harm to your reputation and to that of Lantz if we arbitrarily withdraw an offer which has been accepted and relied upon. So, she will report to work Thursday morning. Ken will look to your direction at morning report as to how you want to use her. She could be in the OR's shadowing from the start, you could bring her in after five cases or so to shadow, she could scrub a few cases, the last case or whatever. It's your call.

2. When we met at your house on December 11th, Kathy said that after Surgery on December 13th, Eye Specialists would no longer supply personnel other than Nicole (and then subsequently Tina after I pursued her and directed her to Kathy who offered her employment). We responded accordingly and do not need to have additional Eye Specialist's staff in attendance on surgery days. Nonetheless, if Eye Specialists wants to send one staff member to provide extra care in greeting or postop, Pam would be fine. Also, if Nicole, Tina or Pam believes that they see a performance problem with a Lantz staffer, it would be helpful if the specifics of the problem could be relayed to Ken or Kasia so that corrective action can be taken.

OPH 019267

3. Ken – He is on-site to implement decisions made by me while Ophnet is managing the facility. His job is a tough one on a good day. Please be supportive of his efforts. If you have a problem with a decision, write to me and let me know and we will try to be responsive and work it out.

Finally, if at any time in the future while Ophnet is managing Lantz, you decide to not do your cases, please let us know as early as possible so we can try to contain staff expenses.

John

P.S. Just received your January 1st letter. Will discuss it with Ken/Kasia and take appropriate action.

3

OPH 019268

January 2, 2002

To:  John Hirsch
From:  Kathy

Re:  Your memo dated 1/1/2002

Michael asked that I respond to a few of your comments in this memo.

Firstly, the miscommunication in regards to hiring Michele would not have occurred if a system was in place whereby the applicant would be told that he/she would be hearing from us within a certain period of time after shadowing.  The habit of forcing Michael to make a hasty decision about an applicant following the stress of working at the Lantz is not a wise hiring tactic.  An applicant EXPECTS to leave without a job offer.  As I requested at our last meeting, any potential candidates need to be forwarded to us with info on applicant's background, proposed schedule and salary info.  I said that then Michael or I would interview the applicant and then make an informed decision.  That system was agreed upon and should have been followed with Michael.  Michael feels that he did indeed ask you to talk to Nicole about Michele.  Nicole had already spoken to Kasia about her concerns with Michele after she shadowed.

Are you aware that Michele went around telling everyone that Michael made her cry at the Cape?  Are you aware that she told Nicole that Nicole was going back to ES as she wasn't needed at the Lantz anymore?  She is inexperienced.  She is thin-skinned.  Her behavior at the Cape caused Michael problems.

Are you aware that Kasia told Nicole that we were hiring an OD and that Nicole and Tina would have to then work at ES?  No one at ES knows anything about the OD as we do not have a contract and I handle that kind of information in a formal and professional manner.  Kasia should not be discussing ANYTHING about ES as she knows nothing about ES.  Please stop sharing information about ES with Kasia and other staff members.

The Lantz HAS two scrub techs.  As I discussed at our last meeting, when I agreed that ES would hire Tina to help the Lantz, ES does not need Tina now so she could be a scrub tech until Pam leaves which is in May or June.  If indeed we hire an OD, ES has 7 staff members on Thursdays to service him without Nicole and Tina and we would re-arrange Tuesdays as well.  The only workers at Lantz that Michael has any confidence in and can trust are Nicole and Tina.  Period.  They are the scrub techs until there is a FABULOUS (meaning suberby trained and experienced) scrub tech to consider.  We had talked about this at our meeting.

The Lantz does not need scrub techs.  I would not have hired Tina if I knew she would scrub for three weeks.  Nicole is interested in scrubbing for the long term.  The Lantz needs to replace Jan as a



EXHIBIT

65

M. Lamensdorf 1/19/05

LAM 1064

circulating nurse. She cannot retain information, is slow, passive aggressive and continues to make mistakes. We reviewed this at the meeting. Next, trained and mature medical assistants need to be hired to replace Laura and perhaps Brooke as well. They cannot learn sterilization. Laura has a weak work ethic. She is unproductive. Brooke has an attitude dilemma. Next, a post operative person who knows what they are doing needs to be hired.

The reason ES employees are going to Lantz when we have no patients is to make sure our patients get the best care possible. That does not happen without them. Also, they confirm that Michael and I are right on the money in our assessment of the Lantz staff. ES staff are trained by me and work in an efficient, high standard environment every day. Tomorrow, there will be five ES staff members at the Lantz to troubleshoot. They will be Nicole and Tina as scrub techs, Pam to assist in drop zone, Carrie to train staff in post op and Dawn to observe in pre op as no one has yet.

Pam came to me today (she has been off) to report that Melissa seems to be a great employee but that she would be more appropriate (even great) for post op. She seems to be conpletely under-used in the drop zone area. Pam does not feel that Marie is appropriate for the positions she has seen her in at this point. Pam also relayed concern about Tanya's continued boisterousness. I believe Pam even mentioned something to her about it. I did previously discuss that very same issue. She cannot speak loudly, yell or talk about how much work she has, things that are going wrong etc. for everyone in pre and post to hear (including staff). She is a nice person but needs her hard edge polished. She will not be able to polish her edge on her own.

I did relay that ES employees would not be available at the Lantz. They are not at the Lantz to "fill in." They are at the Lantz to insure catastrophes are averted. They also provide Michael with valuable information as they are keen observers. ES staff had been at the Lantz actually IN PLACE OF Lantz staff previously. At least removing them at that time helped to force hiring. If they were not at the Lantz, Michael would not be operating. So, they will be at the Lantz if Michael wants them to be. Carrie asked if she could please go to post op tomorrow as she is so concerned by what she saw there last week and doesn't want anything to happen to our patients. Yu are completely incorrect in saying that the Lantz does not need ES staff.

I am not interested in "managing" the Lantz. I would be interested in the oversight of personnel (creating real job descriptions, followed by schedule development and staff needs assessment, followed by interviewing, followed by hiring, followed by training schedule, followed by evaluating). I would also be interested in creating systems and processes for all activities at the Lantz. Once in order (I feel I would need three months) I would need to arrange monthly and quarterly oversight. In that regard, please forward the 90 day evaluations that have been written to this point.

LAM 1065

We have always been correct about Ken. Ken has not been attentive to ES in months. That is not a judgement. That is a fact. We sit here with no marketing or development plan, no plan for the optometrist, no print ads, direct mail that I once again initiated, a computer DISASTER (Ken was to oversee), no plans for a satellite, no optical assistant (Ken was to help Chris with this). Do you want me to continue? If Ken continues to only work for the Lantz, we need to re-assess our arrangement. To imply that we are not supportive of his efforts is insulting.

If there is another comment about Michael cancelling his cases, we are through. Finished. Walk away. He never cancelled ONE SURGERY in his 21 years of being a surgeon. To imply that he didn't know protocol in such a situation is insulting. To imply that our patients could have waited hours for new equipment just represents how little you understand about standard of care. To imply anyone HAS been sensitive to staff costs is insulting.

If Michele is on site tomorrow, she needs to shadow only. Quietly shadow. She is not to talk about Michael making her cry or how well she knows him (she doesn't at all) or initiate any activity unless she is directed to. She is not experienced so she cannot scrub. We ask that she be terminated after tomorrow with the information given that Nicole and Tina are going to be long term scrub techs and we do not need a third scrub tech. Happens all the time. Michael's and Lantz's reputation won't suffer any more than they already have. We are worried about hiring GREAT staff not about hurting people's feelings. we need to get her off the payroll.

I have asked Ken for a full listing of employees at Lantz and their job descriptions as Michael doesn't know who is currently employed or for what. I have not received that.

KDL

Rec'd 2/6/02

John, Ron & Ken,

The Lantz will not survive under current management. The following changes will therefore occur:

1. Effective 8:00 am 2 January 2002, Bayou Jenkay, Inc. is in charge. Under the supervision of BJI, Ophthnet will provide services as directed.
2. By 10:00 am 2 January 2002, BJI will be compensated $50,000. If the project is satisfactorily completed by 28 February 2002, BJI will receive a bonus of $10,000. Starting 1 March 2002, BJI will be placed on retainer of $5000 payable by 10:00 am the first of each month. Expenses and labor will be payable at that time.
3. The Lamensdorfs are beneficial owners of 75% of ZHL. These shares are considered to be paid in full and will not be further assessable.
4. A Florida based CPA who is mutually acceptable to all, but who has no relationship with any of the involved parties will be employed.



EXHIBIT

66

M. Lamensdorf 1/19/05

LAM 1071

January 10, 2002

TO:     Ms. Kathy Lamensdorf        *941- 349-0304*        *6 pages*

FROM:   John A. Hirsch, Ph.D.

Dear Kathy:

Thanks for your January 8 correspondence. We appreciate your prompt feedback on
the abrasions. I know that Ken was concerned and, after the receipt of your note,
called me about the abrasions. Ken and Kasia are investigating the issue at Lantz.
They want to be certain that Lantz procedures and protocols are not contributing to
this problem. He indicated that he and Kasia will work with Marie and Tanya to
make sure PO drop instructions are emphasized as Michael suggested.

On a related note, Ken asked if he can be the prime recipient of correspondence
regarding Lantz operations. Ken has really taken the initiative and wants to please
Michael. He wants to minimize implementation lags.

Ken also indicted to me that your feedback concerning the start-up issues/problems
has been invaluable to he and Kasia. Kathy, thank you for your patience and
pleasant persistence. Your good thinking has made a big difference in the rapid
improvement in service levels at Lantz.

Regarding payments from Lantz to Eye Specialists for Tina and Nicole's hours and
for reimbursement for assets purchased, this is very reasonable and we will be
pleased to promptly compensate Eye Specialists for these services and reimburse Eye
Specialists for these purchases.

Please send invoices to Anusia for the assets listed and we will send a check to Eye
Specialists in that amount as a reimbursement.

Further, we absolutely agree to pay Eye Specialists for Nicole and Tina's time spent
at Lantz in the past and going forward. Your suggested rate of fifteen dollars
($15.00) per hour seems fair and does not raise a legal issue as long as it is a fair
market value (which it seems to be).

1



EXHIBIT
67
M. Lamensdorf 1/19/05

Ken suggested that to minimize the administrative burden on Eye Specialists, Lantz can keep track of Tina and Nicole's hours on our time clock and reimburse for their hours worked on a monthly basis. If you have an alternative, preferred approach, please let Ken know. He will work this out with you. I will ask Anusia to prepare and send a check to you, tomorrow, for one thousand fourteen hundred forty dollars ($1440.00) for Tina and Nicole's time through January 8, 2002. The balance of January's payment will be paid in early February. Accompanying payment will be an itemized list of specific days worked for both Nicole and Tina for your records.

As further financial assistance, Ron and I feel (and Ken agrees) it is only fair to pay you for other Eye Specialists' staff hours worked during start-up as well. While Ken and Kasia want to be able to staff Lantz without need for Eye Specialists' staff, and although Eye Specialists often does not have staff available, Ken feels assistance provided during start-up was valuable to he and Kasia. So, if you and Ken can compare records during the start-up days and determine the number of Eye Specialists' staff hours/days spent at Lantz from commencement through January 8, 2002, Lantz will compensate Eye Specialists for this. Moreover, when we introduce new services (like yags), Eye Specialists staff can be very helpful and we could use this approach once again.

Do not rush to repay Ophnet for the surgeries that Ophnet paid Eye Specialists. It is fine that you postpone repayment beyond when you are reimbursed by Medicare. Please see a copy of a letter I mailed to you, yesterday (attachment).

Ron and I will do what we can to remove financial stress from you and Michael. Unfortunately, things are expensive and start-ups can be particularly cash draining. Although Ron and I, too, have cash flow issues (especially at tax time), we will do our best to help out in this area.

Warm regards,

John

Attachment

2

EXHIBIT 13
TO
**MEMORANDUM IN SUPPORT OF MOTION TO REMAND**

Page 242

1  COMMONWEALTH OF MASSACHUSETTS
2  ESSEX, s.s.                    SUPERIOR COURT
                            CIVIL ACTION NO. B 2 0419
3  - - - - - - - - - - - - - - - - - - - - - - - - -
4  OPHNET, INC., a Massachusetts
   Corporation, and JOHN A. HIRSCH
5  and RONALD W. ZOLLA, Individually
   and as Shareholders of ZHL, INC.,
6  a Massachusetts Corporation, and
   KENNETH CRAM,
7                       DEPOSITION OF
            Plaintiffs,
8                       MICHAEL LAMENSDORF
   vs.
9                       VOLUME III
   MICHAEL LAMENSDORF, Individually
10 and as a Shareholder of ZHL, INC.;
   MICHAEL LAMENSDORF, M.D., P.C., a
11 Florida Professional Corporation;
   BAYOU JENNKAY, INC., a Florida
12 Corporation; and KATHY LAMENSDORF,
   Individually and as an officer of
13 Bayou JennKay, Inc.; and ZHL, INC.,
   a Massachusetts Corporation,
14
            Defendants.
15 - - - - - - - - - - - - - - - - - - - - - - - - -
16
17     TAKEN BY:  THE PLAINTIFFS HEREIN
18     BEFORE:  Laurie J. Cheffy
                Court Reporter
19              Notary Public
                State of Florida at Large
20
       PLACE:   Abel, Band, Russell, Collier,
21              Pitchford & Gordon, Chartered
                240 South Pineapple Avenue
22              Tenth Floor
                Sarasota, Florida  34236
23
       DATE:    January 25, 2005
24              Commencing at 2:15 p.m.
25     (Appearances on Page 2)

Page 243

1  APPEARANCES:
2          EDWARD FOYE, Esquire
           Todd & Weld LLP
3          28 State Street, 31st Floor
           Boston, Massachusetts  02109
4
           On Behalf of the Plaintiffs
5          MICHAEL S. TAAFFE, Esquire
           Abel, Band, Russell, Collier,
6          Pitchford & Gordon, Chartered
           240 South Pineapple Avenue
7          Sarasota, Florida  34236
           On Behalf of the Defendants
8
9  ALSO PRESENT:
10         Kathy Lamensdorf
11
12
13
14             * * *
15
16
17
18             I N D E X
19 EXAMINATION OF MICHAEL LAMENSDORF
20                          Page
21  Direct by Mr. Foye ............... 247
22
23
24
25             * * *

Page 244

1
2              E X H I B I T S
3  (Note:  The following exhibits 25 thru 35 were
   marked in Volume I taken on 11/14/03; 52 thru 67
   were marked in Volume II taken on 1/19/05)
4
5  Description
6  25 - 9/1/00 letter to Michael Lamensdorf, M.D.
        from Anthony K. Black
7
8  26 - 2/21/02 letter to Michael Lamensdorf, M.D.
        from Kenneth G. Cram
9  27 - Lamenscram Partnership Agreement
10 28 - First Amendment to Management Agreement
        Dated September 12, 1995
11
12 29 - Second Amendment to Management Agreement
        entered into 10/11/00
13 30 - Letter to "John" from Michael Lamensdorf,
        MD FACS
14
15 31 - 2/16/02 letter to Michael Lamensdorf, M.D.
        from Ronald Zolla, Ph.D.
16 32 - 2/16/02 letter to John Hirsch from Michael
        Lamensdorf, M.D., F.A.C.S.
17
18 33 - Shareholders' Agreement
19 34 - First Amendment to the ZHL, Inc.
        Shareholder's Agreement
20 35 - Management Agreement for ZHL, Incorporated
        Ambulatory Surgery Center Project
21
22
23
24 52 - 2002 Individual Income Tax Return
25 53 - 2003 Individual Income Tax Return

Page 245

1  EXHIBIT INDEX (cont'd.)
2  Description
3  54 - 2001 Income Tax Return for S Corporation
4  55 - 2003 Income Tax Return for S Corporation
5  56 - 1/17/05 letter to Michael Lamensdorf, MD,
        PA, from Lichtenstein Briefman Glass &
6       Vross CPAs w/ attached balance sheets and
        income statements for 12/31/04 and 2003
7
8  57 - 1/17/05 letter to Michael Lamensdorf, MD,
        PA, from Lichtenstein Briefman Glass &
9       Vross CPAs w/ attached balance sheets and
        income statements for 12/31/03 and 2002
10
11 58 - Letter to Ken from Michael Lamensdorf
12 59 - 8/10/95 memo to Ken Cram from Joseph Rugg
        re Draft Management Agreement
13
14 60 - Fax cover page dated 9/22/00 to John Hirsch
        from Kathy w/ attached letter
15
16 61 - 12/6/01 letter to Michael and Kathy from
        John re Lantz Update
17
18 62 - 12/15/01 letter to Michael from John re Lantz
19 63 - Letter to John from Michael Lamensdorf
20 64 - 1/1/02 letter to Michael from John
21 65 - 1/2/02 letter to John Hirsch from Kathy re
        Your memo dated 1/1/02
22
23 66 - Letter to John, Ron & Ken
24 67 - 1/10/02 memo to Kathy Lamensdorf from John
        Hirsch
25

Page 262

BY MR. FOYE:

2   Q. Did you at some point have a conversation
3 with Mr. Hirsch in which he told you that Surgery Center
4 only requires 750 cases each year to be profitable?
5     MR. TAAFFE: Could you read the question
6 back? Thank you.
7     (QUESTION READ BACK BY THE COURT REPORTER)
8     MR. TAAFFE: Just for the record, are you
9 talking about the Lantz Surgery Center or any
10 surgery center?
11     MR. FOYE: Any surgery center.
12     THE WITNESS: I do not remember the
13 specifics of the conversation but I do remember
14 the number 750 cases.
15 BY MR. FOYE:
16   Q. Do you remember when that conversation took
17 place?
18   A. I do not remember the specifics of the
19 conversation.
20     May I ask my attorney something?
21     MR. TAAFFE: Sure.
22     (WITNESS CONFERS WITH COUNSEL OFF THE RECORD)
23 BY MR. FOYE:
24   Q. I'd like to show you what was marked as
25 Exhibit 64 and I'd like to call your attention to the

Page 263

1 second paragraph on the second page.
2   A. By the second paragraph, are you referring
3 to the one, "If we have any performance problems with
4 Michelle"? Is that what you're referring to?
5   Q. Yes. Were, in fact, there any performance
6 problems with Michelle?
7   A. May I have a break so I can talk to my
8 attorney, please?
9     MR. FOYE: Sure.
10     THE WITNESS: Thank you.
11     (RECESS FROM 2:47 TO 2:55 P.M.)
12     THE WITNESS: On advice of counsel, I do
13 not want to say anything defamatory about Ms.
14 Corbett. On the paragraph on the first page, the
15 first paragraph, I do not feel that this is not
16 factually correct. I did not interview Ms.
17 Corbett. I had worked with her at the Cape
18 Center and did not need to interview her. We
19 exchanged pleasantries, just as you exchanged
20 pleasantries with Attorney Taaffe when you came
21 into the room. That did not mean that we were on
22 a friendly basis.
23     I do recall telling Mr. Hirsch that I did
24 not think that Ms. Corbett would be an
25 appropriate employee. I was embarrassed by Mr.

Page 264

1 Hirsch because he had Ms. Corbett wait and then
2 discuss this with me, and it was obvious that her
3 employment was being discussed and I felt
4 embarrassed.
5     You undoubtedly have in your possession the
6 follow-along document that Kathy, my wife, sent
7 you asking that this not be done. As part of our
8 experience or expectation of a turnkey
9 experience, I was not to be involved in human
10 resources. It's not my skill area.
11 BY MR. FOYE:
12   Q. Did you read Exhibit 64 at or about the
13 time of the date on it?
14   A. Yes.
15   Q. Did you perceive that Mr. Hirsch was giving
16 you the opportunity to approve or reject Michelle as an
17 employee in that document?
18   A. I perceived that Mr. Hirsch was attempting
19 to embarrass me.
20   Q. How so?
21   A. I believe I've discussed that in detail.
22   Q. Was there something about your relationship
23 with Michelle that made her an inappropriate employee?
24   A. I had no relationship with Michelle other
25 than she had scrubbed for me at the Cape.

Page 265

1   Q. Had she done a good job?
2   A. I thought she was adequate at best, which
3 is inappropriate for anyplace that I work.
4   Q. Did you tell Mr. Hirsch that she was
5 adequate at best?
6   A. I believe I told Mr. Hirsch that she would
7 be, as I've stated before, an inappropriate employee for
8 the Lantz.
9   Q. Did Mr. Hirsch then go ahead and hire her
10 anyway?
11   A. I do not recall.
12   Q. When you told Mr. Hirsch she wouldn't be a
13 good employee, did you do that before or after she was
14 hired?
15     MR. TAAFFE: Objection. He just stated he
16 didn't know if she was ever hired, so I think
17 your question is inappropriate based on his prior
18 testimony.
19 BY MR. FOYE:
20   Q. Was she hired?
21   A. I would have to ask you. You have the
22 documents. Why don't you look through the records and
23 let me know if she was hired.
24   Q. Did she ever assist you in surgery?
25   A. Did she ever assist me in surgery where?

Page 266

1      MR. TAAFFE: Where?
2      THE WITNESS: At the Cape? I've already
3   stated several times that she assisted me at the
4   Cape prior to the Lantz's opening.
5   BY MR. FOYE:
6      Q. Did she ever assist you at the Lantz?
7      A. To the best of my knowledge, recollection
8   rather, I do not recall her working in the OR with me.
9   I believe that at that time we had Tina and Nicole
10  helping us in the OR.
11     Q. Was Tina an Eye Specialists employee?
12     A. Tina was an interesting case. The work
13  situation, the operative conditions for me were so
14  intolerable it was unbelievable. We had Nicole, who was
15  an employee, was scrubbing the cases. She told me that
16  she had a friend named Tina who would be willing to take
17  a day off and to assist. Tina watched me do one case
18  and then assisted me for the remainder of the morning.
19     I believe at this point she was actually
20  not an employee of anywhere, that is of us, the Lantz or
21  Eye Specialists.
22     Q. Nicole, however, I take it was an Eye
23  Specialists employee?
24     A. Nicole was an Eye Specialists employee.
25     Q. Was she a full-time employee?

Page 267

1      A. Yes.
2      Q. Did the Lantz reimburse Eye Specialists for
3   her salary on days when she assisted you in surgery at
4   the Lantz?
5      A. I do not have a direct recollection as to
6   whether we were reimbursed or not, but I believe that
7   the arrangement was that we were reimbursed.
8      Q. Was it your idea that Nicole and Tina
9   assist you or was it Mr. Hirsch's?
10     A. Mr. Hirsch was completely unwilling to
11  obtain adequate assistance for us, so I found people so
12  that we could perform the surgery so that revenue could
13  be generated so that the Lantz could continue.
14  Evidently that was not Mr. Hirsch's goal.
15     Q. Did he stand in your way when it came to
16  hiring Tina and Nicole?
17     A. Nicole was already hired.
18     Q. Did he stand in your way when it came to
19  using Nicole to assist you with surgery?
20     A. This document I believe is dated January
21  1st. I believe that he was on holiday and was not in
22  attendance at the Lantz Surgery Center, so I don't think
23  he knew or cared. I think he was off water-skiing
24  someplace.
25     Q. Taking a look at Exhibit 64 again, would

Page 268

1   you tell me what the date is on that letter from Mr.
2   Hirsch to you?
3      A. January the 1st, 2002.
4      Q. Does that refresh your recollection about
5   what Mr. Hirsch was doing on New Year's Day, 2002?
6      A. I have no idea what he was doing on January
7   1st, 2002. So he spent 15 or 20 minutes responding to
8   my letter. He certainly wasn't doing his effort to make
9   it better.
10     Q. Regardless of what Mr. Hirsch was or was
11  not doing on January 1st, did he stand in the way of
12  Tina assisting you at Lantz?
13     A. To the best of my recollection, we
14  presented him with a fait accompli.
15     Q. Did he thereafter undertake any steps to
16  prevent Tina or Nicole from continuing to assist you?
17     A. I do not recall any discussions with Mr.
18  Hirsch concerning Tina or Nicole thereafter.
19     Q. How long did Tina continue to assist you?
20     A. Tina continued to assist me long after we
21  left the Lantz.
22     Q. How long did Nicole continue to assist you?
23     A. Nicole continued to assist me long after we
24  left the Lantz.
25     Q. Did they continue to assist you throughout

Page 269

1   the time you operated at the Lantz?
2      A. To the best of my recollection.
3      Q. Did you bring in any other employees or
4   individuals to help out at the Lantz?
5      A. Did I personally?
6      Q. Yes.
7      A. Eye Specialists brought in multiple
8   employees to help out at the Lantz.
9      Q. Who were they?
10     A. Carol Colson worked on the billing. Pam
11  McKay worked in post-op. Kerry Krause, K-R-A-U-S-E,
12  worked in post-op. Julie I believe worked in reception.
13  Undoubtedly there were more. I just can't think of them
14  at the moment.
15     Q. Did Carol Colson do a good job at Lantz?
16     A. Yes.
17     Q. Did she continue to stay at Lantz through
18  your tenure there?
19     A. No.
20     Q. When did she leave?
21     A. She only spent a limited time there. Mr.
22  Hirsch would not permit her to correct the problems.
23     Q. Was Miss Colson an Eye Specialists
24  employee?
25     A. All of the people that I have listed for

Page 270

1  you are Eye Specialists employees. I have told you, I
2  am not in human resources and I do not hire people.
3      Q. How did Mr. Hirsch get in the way of Miss
4  Colson straightening out the situation with the billing?
5      A. He wouldn't let her work.
6      Q. How did he do that?
7      A. I was not present.
8      Q. How did you learn that he wouldn't let her
9  work?
10     A. Miss Colson told me.
11     Q. What did she tell you?
12     A. I do not recall the conversation.
13     Q. Ms. McKay, how did she do in post-op?
14     A. All of my employees were excellent.
15     Q. And that applies to Ms. Krause as well?
16     A. Of course.
17     Q. And did that apply to Julie as well?
18     A. Of course.
19     Q. Did Ms. McKay and Ms. Krause continue to
20  work in post-op throughout your tenure at the Lantz?
21     A. I do not recall. I do recall that they
22  told -- that Kerry Krause told me that the nursing staff
23  was letting patients leave with the heplock that we
24  discussed at our last meeting still in place, various
25  other things along those lines; also that people were

Page 271

1  not being adequately hydrated, as we discussed.
2      Q. When did those conversations take place?
3      A. Contemporaneous.
4      Q. Contemporaneous with what?
5      A. With the events those days when they
6  occurred.
7      Q. Did it happen in January, February, March?
8      A. As you know, I do not know the date. I
9  believe it's been more than adequately documented and
10  undoubtedly you'll bring it out as the next document you
11  want me to look at.
12         May I ask my attorney a question? This
13  will only take 12 seconds.
14         MR. TAAFFE: There's no question pending,
15      right?
16         THE WITNESS: Just off the record.
17      (WITNESS CONFERS WITH COUNSEL OFF THE RECORD)
18         THE WITNESS: Thank you.
19  BY MR. FOYE:
20     Q. Showing you what's been marked as Exhibit
21  65, this as you know from our prior session together is
22  a letter which Mrs. Lamensdorf wrote to John Hirsch on
23  or about 1/1.
24     A. On January the 2nd.
25     Q. On January the 2nd.

Page 272

1      A. So this is the follow-on letter.
2         Quote, The habit of forcing Michael to make
3  a hasty decision about an applicant following the stress
4  of working at the Lantz is not a wise hiring tactic,
5  unquote.
6      Q. Is that a reference to Michelle?
7      A. Yes, it's in direct reference to her.
8      Q. Looking at page 2, the second paragraph
9  from the bottom, does that say "If they were not at the
10  Lantz, Michael would not be operating"? Did I read that
11  correctly?
12     A. Yes.
13     Q. Was that in fact your position that if you
14  could not hire the people you wanted that you would not
15  be operating at the Lantz?
16         MR. TAAFFE: Object to the paraphrasing of
17      the sentence.
18         MR. FOYE: Fair enough.
19  BY MR. FOYE:
20     Q. Is that a truthful statement that I just
21  read into the record?
22     A. The way you stated it was so totally out of
23  context it's unbelievable. What the letter says is that
24  the quality of the employees was so abysmal at the Lantz
25  that if we did not bring Eye Specialists employees over,

Page 273

1  I would not have been able to operate.
2      Q. Did Mr. Hirsch or Mr. Cram succeed in
3  hiring any good employees?
4      A. Any good employees. That's an interesting
5  question. I believe that Kathy gave Mr. Hirsch the
6  resume of some people who may have turned out to be good
7  employees, although I don't know because we left. There
8  was one lady whose name I believe was Cathy who assisted
9  in the back who seemed to be a good employee. I believe
10  that there was a nurse that Kathy Lamensdorf found whose
11  name was Heather who was a good employee. But once
12  again, I did not work with her a prolonged period of
13  time.
14     Q. So of the employees that they hired while
15  you were there, none of them were any good. Fair
16  statement?
17         MR. TAAFFE: Object to the restatement of
18      his prior testimony. You can answer the question
19      if you can.
20         THE WITNESS: I do not as I sit here recall
21      all of the employees. I do recall a large number
22      who were absolutely inappropriate. I do not
23      recall any employee that they hired directly who
24      was outstanding or even above average.
25  BY MR. FOYE:

Page 274

1  Q. Now, could you turn to page 3 of Exhibit
2  65? Does that document state -- Could you tell me again
3  the date of that document, January 2nd?
4  A. Yes. This is the -- Page 3 starts: Ken
5  has not been attentive to Eye Specialists in months.
6  That is not a judgment. That is a fact. We sit here
7  with no marketing or development plan, no plan for the
8  optometrist, no print ads, direct mail. That I once
9  again initiated. A computer disaster. Ken was to
10  oversee. No plans for a satellite, no optical
11  assistant. Ken was to help Chris with this.
12       Do you want me to continue? That's what
13  the letter says, sir. Do you want me to continue?
14  Q. Yes, please.
15  A. I don't understand you, sir. Why don't you
16  ask me a question.
17  Q. Would you continue reading?
18       MR. TAAFFE: Objection. We're not going to
19  have -- If you're going to have him read a
20  document that's already been marked as an
21  exhibit, we're wasting everyone's time. I assume
22  you can read, your clients can read, and I know
23  the Court can read.
24  BY MR. FOYE:
25  Q. Was it your position that if Ken continued

Page 275

1  to only work for the Lantz that you needed to reassess
2  your arrangement with Ophnet?
3  A. That was not stated in the letter. We were
4  asking for help. We were asking for Ophnet to fulfill
5  their contract obligations as you showed me that they
6  signed.
7  Q. To continue with the sentence that you
8  apparently didn't want to read, "If Ken continues to
9  only work for the Lantz --
10  A. Yes.
11  Q. -- we need to reassess our arrangement."
12  Did I read that correctly?
13  A. That's what it says. You are correct.
14  Q. Did that accurately state your position?
15  A. To imply that, quote, continuing, To imply
16  that we are not in support of his efforts is insulting,
17  period, unquote. Yes, you're quite correct. In fact,
18  this is significant evidence that Ophnet did indeed
19  abandon us.
20  Q. Is it significant evidence that if Ophnet
21  abandoned you it happened sometime after January 2nd?
22  A. No. It happened sometime before January
23  2nd.
24  Q. What was --
25       MR. FOYE: Could we mark this as our next

Page 276

1  exhibit, please?
2       MR. TAAFFE: Have you withdrawn that
3  question, "What was"?
4       MR. FOYE: Yes.
5  (EXHIBIT 85 WAS MARKED FOR IDENTIFICATION)
6       MR. TAAFFE: Do we have another copy of
7  that or not?
8       MR. FOYE: I don't.
9       MR. TAAFFE: Let me share this with you.
10       THE WITNESS: (Reviews document.)
11       Pretty reasonable. I've read it.
12  BY MR. FOYE:
13  Q. How would your purchasing an additional 33
14  and a third percent of the Lantz for one dollar have
15  helped the Lantz out of the crisis situation it was
16  facing?
17  A. The Lantz was incompetently managed.
18  Everything about the Lantz, as you have proven and
19  documented, was completely incompetent. We were able to
20  show that more than adequate employees were easily
21  available. We could have cleaned up the billing and no
22  longer been billing illegally. We could have hired and
23  provided legal employees who were competent and skilled
24  and knowledgeable.
25       In addition, this would have been an

Page 277

1  excellent opportunity for them because instead of it
2  losing a tremendous amount of money, we would have moved
3  on and things would have been working right. They did
4  absolutely nothing to do anything to correct anything at
5  any time. They were trying to create a disaster. They
6  succeeded.
7  Q. Why were they trying to create a disaster?
8  A. You would have to ask them. That's their
9  business plan. It's not mine.
10  Q. Weren't they the two-thirds owners of the
11  Surgery Center?
12  A. They do not work in the same business logic
13  as the rest of the free world does.
14  Q. Why do you say that?
15  A. Because nothing they do makes sense.
16  Q. What in particular would you have been able
17  to do as the two-thirds owner of the Lantz that you were
18  not able to do otherwise?
19  A. I would get them out. They were completely
20  incompetent. They were preventing us from success.
21  They were preventing us from running a successful
22  operation. They were preventing us from hiring and
23  using reasonable employees. We've gone through this.
24  Q. How did they prevent you from hiring and
25  using reasonable employees?

Page 278

1  A. We've gone over this. You know. They were
2  in control. They wouldn't hire the people that I
3  suggested. They wouldn't institute the reforms that I
4  suggested. They wouldn't do any of the things that I
5  suggested.
6  Q. Perhaps I misunderstood your prior
7  testimony, Dr. Lamensdorf, but I understood you to say
8  that you hired all of the people who were helping you in
9  the operating room as of this time. Did I misunderstand
10  you?
11  A. Nothing could be further from the truth.
12  My people were bodyguards there to protect the patients
13  from your employees.
14  Q. As of January 7th, who -- I beg your
15  pardon. As of February 7th. As of February 7th, who
16  had Ophnet prevented you from hiring?
17  A. Okay. One, Ophnet prevented me from using
18  Carol Colson to bill correctly. Two, Ophnet would not
19  allow me to replace Jay, the nurse anesthetist, with
20  qualified anesthesia. Three, Ophnet I believe at that
21  time was still employing people who were not nurses as
22  nurses. Four, Ophnet did not adequately research people
23  by getting their background documents.
24  Remember, I am not a human resources expert
25  and exact documents are not what I -- the words, I don't

Page 279

1  know them, but you know what I mean. The list goes on
2  and on and on and on and on.
3  Q. What was wrong with the billing as of this
4  time?
5  A. They were using a -- Once again, you know
6  this is outside my area of expertise. They were using a
7  computer program that was written by somebody evidently
8  in his garage who had no experience with Medicare
9  billing. This was his first thing and he was billing
10  Medicare inappropriately.
11  Q. Did that ultimately result in a failure of
12  reimbursement to the Surgery Center for any cases?
13  A. I believe it failed in reimbursement for
14  any number of cases. But you're going to ask me how
15  many and I'm sorry, at this point three years later, I
16  do not recall how many, nor do I remember their names,
17  nor do I remember the exact dates.
18  In letters that we have discussed, I
19  documented that and read it into the record.
20  Q. Did you have any discussions with Mr.
21  Hirsch about replacing Jay, the nurse anesthetist?
22  A. Multiple.
23  Q. What did you say to him and what did he say
24  to you?
25  A. I do not recall the verbatim conversation.

Page 280

1  Q. What was the sum and substance of it?
2  A. Bronx cheer.
3  Q. I beg your pardon?
4  A. Noise.
5  Q. Was that your part of the conversation or
6  his?
7  A. His. I provided reasonable reasons that
8  Jay was an inappropriate individual. I was tired of
9  patients being admitted to the hospital, an experience
10  that I had not had before. And interestingly, in the
11  three years since then, none of my patients have been
12  admitted to the hospital as a result of anything related
13  to this either. Interesting, isn't it?
14  Q. What did Mr. Hirsch have to say on that
15  subject to you?
16  A. As we've discussed before, placatering
17  noise.
18  Q. Did he tell you that he was going to hire
19  somebody new as soon as he could find somebody new or
20  words to that effect?
21  A. Mr. Hirsch told me that he had no interest
22  in looking for anybody new and was not going to do
23  anything to help me in that regard.
24  Q. The first sentence of Exhibit 85 refers to
25  a particular individual, and if it's all right with you

Page 281

1  I'd like us in the course of our discussions here, to
2  make life a little simpler for the Court Reporter and
3  for Mr. Taaffe and I later on, I'd like to refer to that
4  individual as Mr. P. Is that acceptable to you?
5  A. That would be fine because we should not
6  have that person's name in the record.
7  MR. TAAFFE: We're talking about a patient?
8  MR. FOYE: Mm-hmm.
9  MR. TAAFFE: Okay. I think that's
10  appropriate due to patient confidentiality, HIPAA
11  rules, et cetera. And this document we're
12  referring to is going to be considered a
13  confidential document for the record also, as all
14  these other patient charts and records we've
15  admitted.
16  MR. FOYE: Absolutely.
17  MR. TAAFFE: Thank you.
18  BY MR. FOYE:
19  Q. What happened to Mr. P?
20  A. I do not recall specifically why he was
21  admitted to the hospital. I'm sorry. There were so
22  many people who were admitted that I don't remember each
23  one.
24  MR. TAAFFE: Do you have a copy of this?
25  MR. FOYE: I don't.

Page 282

1    MR. TAAFFE: Let's make a note of that.
2    MR. FOYE: Wait. Hang on.
3    MR. TAAFFE: Thank you.
4 BY MR. FOYE:
5    Q. Looking at the next to last paragraph of
6 Exhibit 85, how much was your medical practice earning
7 per month in surgery revenues at this time?
8    A. You're aware that I do not know the answer
9 to that question.
10    Q. Was it $100,000 a month?
11    A. You're aware that I do not know the answer
12 to that question.
13    Q. Why did you choose the figure $100,000 in
14 that letter?
15    A. I do not recall.
16    Q. Did the Lantz have an employee named Laura?
17    A. Laura. I believe so.
18    Q. What did she do?
19    A. Hard to say.
20    Q. How long was she there?
21    A. I believe in my letter I described her as
22 being a cipher. I'd never met anyone who had so little
23 personality before. I was not really sure what she did.
24 Best of my knowledge, she still works there.
25    Q. What was her assigned task?

Page 283

1    A. She was supposed to assist in the turnover
2 of the rooms and to sterilize instruments.
3    Q. What was the problem with her?
4    A. She was fairly inept. She was somebody who
5 was responsive to Nicole's suggestions and she did
6 improve with time.
7    Q. What about Brooke? Was there someone named
8 Brooke from Surgery Center?
9    A. I believe Brooke worked with Laura in
10 turnover. Brooke caused me considerable stress. She
11 insisted on drinking coffee beyond the red line, which
12 is the sterile area. That is not acceptable technique.
13 I do not think she knew how to put on a mask properly.
14 She was in charge of sterilizing the instruments, thus
15 caused me a considerable concern.
16    Q. How long was she there?
17    A. You're aware that I do not know the answer
18 to that.
19    Q. Was she there throughout your tenure?
20    A. You're aware that I do not know the answer
21 to that.
22    Q. You mentioned issues with the anesthesia.
23 Was that the Garamycin?
24    A. Garamycin's an antibiotic.
25    Q. Okay. What type of anesthesia was being

Page 284

1 used as of February 2002?
2    A. Mediocre.
3    Q. Do you remember the name of the mediocre
4 anesthetic?
5    A. You mean the medicine?
6    Q. The particular anesthetic used, yes.
7    A. No. Xylocaine? Marcaine? I don't recall.
8    Q. Did that have any relationship to the --
9    A. You're talking about the Wydase fiasco?
10    Q. Why don't you tell me about that.
11    A. Kasia had not ordered supplies
12 appropriately. Jay, the nurse anesthetist, would not do
13 blocks without Wydase. So we sat there for four hours
14 while people went around and looked for other materials.
15 This is something that's inexcusable. It should have
16 been on hand and in stock and should not have been
17 discovered the morning of surgery that this was not
18 available.
19    Q. Were the surgeries cancelled as a result?
20    A. I don't recall if surgeries were cancelled
21 but I remember sitting in the lounge for a long time
22 waiting for the Wydase to appear.
23    MR. FOYE: Would you mark this as our next
24 exhibit, please?
25    (EXHIBIT 86 WAS MARKED FOR IDENTIFICATION)

Page 285

1    THE WITNESS: (Reviews document.)
2    I have read the document.
3 BY MR. FOYE:
4    Q. The four patients who were in bad shape
5 referred to in the second paragraph, why were they in
6 bad shape? What happened to them?
7    A. Why are you doing this to me? You're
8 showing me these documents which I have showed and sent
9 them. These show, these documents, how incredibly
10 incompetent your clients are. If there were malpractice
11 for this thing, they would never be able to work, their
12 licenses would be revoked, they would never be able to
13 do anything in medicine again.
14    As to the four specific people, I don't
15 remember. There were so many people. This is just so
16 horrible. How can you sit here and ask me these
17 questions about -- These prove how brutally incompetent,
18 how incredibly incompetent, how unbelievably incompetent
19 your clients are. It's inexcusable that anybody could
20 be this moronically stupid.
21    Now, let's look at this word by word here.
22 Gina's observations. This reminds me of yet another
23 employee that we had to send to protect our patients
24 from the incompetence of your clients. Four patients
25 were in bad shape. Two took themselves to the emergency

Page 286

1  room Thursday night.
2      Let me tell you how many patients have gone
3  to the emergency room in the last three years that I've
4  operated on. I'll tell you. Zero.
5      The emergency room doctor called me to find
6  out what was going on. Evidently your clients were
7  unwilling to buy current drugs. They evidently were
8  buying medicines that were illegally brought into the
9  country or something. I don't recall exactly. But they
10 didn't meet the standards of the United States.
11     Q. Why do you say that?
12     A. Why do I say that? Because it says please
13 send the name of the dilating drops and please send me
14 the names of the anesthesia stuff. It says right here
15 in the letter.
16     Q. Why did those patients --
17     A. All materials on site at the Lantz must be
18 checked for expiration dates because evidently they were
19 using medicines that were expired. It's not my
20 responsibility as a surgeon to go into the room and
21 examine every document and to examine every vial to make
22 sure that it's current. That is the responsibility of
23 the managing partners, and that was your partners. That
24 was your clients. That's Mr. Zolla and Mr. Hirsch's
25 responsibility. That's why we're here today, because of

Page 287

1  their brutal incompetence, criminal incompetence.
2      Q. Why do you say it was their incompetence
3  and not yours --
4      A. Excuse me for a moment.
5      Q. -- that led those patients to go to the
6  hospital?
7      A. Excuse me for a moment.
8      MR. TAAFFE: Let's take a break. Let's
9  take a little break. I'll make copies of these
10 documents for you at the break.
11 (RECESS FROM 3:37 TO 3:52 P.M.)
12     MR. FOYE: I think we had a question on the
13 table at the time of the break.
14     THE WITNESS: I'm sorry. Are we on the
15 record, please?
16     MR. FOYE: Yes, we are.
17     MR. TAAFFE: Could you read back the last
18 question again, please?
19 (QUESTION READ BACK BY THE COURT REPORTER)
20     THE WITNESS: I had no control over the
21 Lantz.
22 BY MR. FOYE:
23     Q. What was the patients' presenting complaint
24 at the emergency room?
25     A. I do not recall these specific patients.

Page 288

1      Q. Was this a nausea issue?
2      A. You're asking me a specific question about
3  patients and I can't tell you the specific answers. As
4  I would assume, it was the ongoing dehydration story.
5      Q. Remind me again so I don't get it wrong.
6  What were the symptoms of the dehydration?
7      A. Nausea, vomiting, blood pressure problems,
8  pulse problems, heart problems, breathing problems.
9      Q. Did you eventually get to the bottom of
10 that?
11     A. I left.
12     Q. Did you get to the bottom of that problem
13 before you left?
14     A. I left because of that problem. I had no
15 authority and I could not make any changes.
16     MR. TAAFFE: Let me just, for the record,
17 on this Exhibit 86, is this a complete document?
18 It seems like something has overlaid something
19 else. I just want to make sure this is not a new
20 document or something.
21     MR. FOYE: This is the document as it
22 survives in Ophnet's files. Apparently there was
23 some sort of an issue in receipt of the fax such
24 that there was a portion of it that was cut off.
25     MR. TAAFFE: Okay. And so what you're

Page 289

1  saying is, number 3 where it says "I will arrive
2  by 9am to observe in the surgical area, I will
3  observe sterilization staff in particular but
4  will also observe in surgery," is that a run-on
5  sentence? There's nothing in between there?
6      MR. FOYE: I don't know.
7      MR. TAAFFE: Okay. That's fine.
8      MR. FOYE: I haven't compared it to the
9  version that you've produced, and I assume you
10 did produce a version of it.
11     MR. TAAFFE: I don't even know if we did.
12 I'm just looking at this and I see the paste-over
13 lines, and I'm not sure why that is and --
14     MR. FOYE: That accurately reproduces what
15 is in Ophnet's file.
16 BY MR. FOYE:
17     Q. Looking at the next to last paragraph, Dr.
18 Lamensdorf, of Exhibit 86, do you know what was referred
19 to in that fax, "proposal for our payback of Lantz
20 debt"?
21     A. Which paragraph are you talking about? My
22 next to last paragraph is "We need this information."
23 Is that what you're talking about?
24     Q. The second to last paragraph I guess then.
25     A. The second to last is "We need this

Page 290

1    information."
2        Q. Third to last. Sorry.
3        A. I do not know. Kathy wrote this letter.
4        Q. Did you owe any Lantz debt as of February
5    3rd, 2002?
6        A. As I sit here now, I am not aware.
7        Q. Did Mr. Cram at some point express to you
8    the view that the nausea problems might have had
9    something to do with asking older patients to drink a
10   full bottle of Gatorade right after surgery?
11       A. I do not recall any conversations with Mr.
12   Cram.
13       Q. Did he ever express that to you in writing?
14       A. I do not recall receiving in writing a
15   suggestion that the treatment for dehydration would be
16   the cause.
17          MR. FOYE: Would you mark that as our next
18       exhibit, please, 87?
19          (EXHIBIT 87 WAS MARKED FOR IDENTIFICATION)
20          THE WITNESS: (Reviews document.)
21   BY MR. FOYE:
22       Q. Looking at paragraph 2 of that exhibit, did
23   you in fact advise your patients to drink 20 ounces of
24   Gatorade?
25       A. I do not recall reading this letter. I do

Page 291

1    not recall receiving this letter. I --
2        Q. Is that -- I'm sorry. Please finish your
3    answer.
4        A. I did ask the patients to drink Gatorade.
5    I do not remember the volume. Also, I do not remember
6    over what time frame.
7        Q. Is that your fax number, (941) 349-0304?
8        A. I don't see the fax number. Oh, 349-0304.
9    My fax number is 955-7905.
10       Q. Do you know why this document has your
11   Bates stamp on it?
12       A. I don't know what a Bates stamp is.
13       Q. At the bottom of the page, LAM 476, I'll
14   represent to you and for the record that that is a
15   number that was affixed by the good people at Abel Band
16   before they produced it to us.
17          MR. TAAFFE: That doesn't mean it was
18       received from them. It could have been received
19       from you and returned to them.
20          MR. FOYE: I don't think that was my
21       question. I'm --
22          MR. TAAFFE: Well, don't imply to him in
23       your question because in discovery there's a
24       Bates stamp on the bottom of a page that it
25       signifies that it's his document that was

Page 292

1    produced, that he had possession of it before it
2    was produced.
3        MR. FOYE: Could you read back what my
4    question was?
5    (QUESTION READ BACK BY THE REPORTER AS FOLLOWS:
6        "Question: At the bottom of the page, LAM
7    476, I'll represent to you -- ")
8        MR. FOYE: Before that. Before that.
9    (QUESTION READ BACK BY THE REPORTER AS FOLLOWS:
10       "Question: Do you know why this document
11   has your Bates stamp on it?")
12       MR. TAAFFE: Read the complete question,
13   please, because I was objecting to his attempt to
14   -- Repeat the full question to the end, before I
15   interrupted.
16   (TESTIMONY READ BACK BY THE REPORTER AS FOLLOWS:
17       "Question: Do you know why this document
18   has your Bates stamp on it?
19       "Answer: I don't know what a Bates stamp
20   is.
21       "Question: At the bottom of the page, LAM
22   476, I'll represent to you and for the record
23   that that is a number that was affixed by the
24   good people at Abel Band before they produced it
25   to us.")

Page 293

1        MR. TAAFFE: I object to your reference as
2    to what that is in an attempt to influence his
3    answer. If you have another question, please ask
4    it.
5        MR. FOYE: Okay. Well, let me --
6    BY MR. FOYE:
7        Q. Putting aside all the lawyer talk, Dr.
8    Lamensdorf, do you know why that document has your Bates
9    stamp on it?
10       MR. TAAFFE: Asked and answered. Do you
11   want to read back your question and your prior
12   answer? He said he didn't know.
13       MR. FOYE: Okay. He's not denying it so
14   I'll accept that as his answer.
15       MR. TAAFFE: He's not denying what? You
16   don't have to put snide comments on the record.
17   Let's get it straight. He said he didn't know.
18   An "I don't know" is not a denial or an
19   admission. If you'd like me to read what "I
20   don't know" means in the dictionary, I can get
21   one out for you, but in Florida that's what it
22   means. In Massachusetts it may mean something
23   else, but --
24   BY MR. FOYE:
25       Q. Do you currently, currently now, Doctor,

Page 294

1 not as of this time but currently, advise your patients
2 to drink 20 ounces of Gatorade after surgery?
3    A. Yes.
4    Q. Do you currently advise them to eat a
5 muffin?
6    A. No.
7    Q. As of February 2002, were you advising them
8 to eat a muffin?
9    A. I do not recall ever advising anyone to eat
10 a muffin.
11    Q. Were you as of February 2002 advising them
12 to drink 20 ounces of Gatorade after surgery?
13    A. I do not recall that specific date but I've
14 been advising people to drink Gatorade for a long time.
15    Q. Is it accurate to say, as Mr. Cram does in
16 the last sentence of the first paragraph of number 2,
17 that at the Cape, the patients had the IV with 500 cc of
18 Ringers lactate during the case?
19    A. Yes. That is the standard of care in
20 Sarasota.
21    Q. Is that what you did at the Cape?
22    A. Yes.
23    Q. Did you do it differently at the Lantz?
24    A. Ron and John provided the heplock that
25 we've discussed before. I requested that the patients

Page 295

1 be given 500 cc's of Ringers lactate or D5/W, which is a
2 similar solution. They refused.
3    Q. Were they doing that in November? Did they
4 refuse to do that in November as well as refusing to do
5 it in February?
6    A. They refused on multiple occasions. I do
7 not remember the exact date of when they refused.
8    Q. But the problems didn't materialize until
9 February, correct?
10    A. I do not think that is true.
11    Q. Is it accurate to say as Mr. Cram does in
12 the second paragraph of number 2 that when the Lantz
13 first started up in November, patients were offered
14 apple juice, water or Gatorade?
15    A. I do not recall.
16    Q. Is it accurate to say that the patients
17 were drinking about eight to 10 ounces before leaving
18 with instructions to drink the rest and more during the
19 remainder of the day?
20    A. I don't know what "the rest" means. I'm
21 not aware of what those instructions were in November.
22    Q. Turning to the next page, is it accurate to
23 say that starting at the first of January the Lantz
24 started requiring all patients to drink a full bottle of
25 Gatorade?

Page 296

1    A. I do not recall.
2    Q. Is that general chronology accurate, that
3 in January the cornea problems arose, that the patients
4 were then told to begin drinking Gatorade without being
5 given the option of water or juice, and then people
6 started showing up at the emergency rooms with nausea or
7 vomiting and other complaints?
8    A. No.
9    Q. Will the patient records at the Lantz tell
10 me which patients did and didn't eventually wind up
11 going to the emergency room?
12    MR. TAAFFE: Object to the form of the
13    question. You're talking about patient records
14    now at the Lantz?
15    MR. FOYE: Yes.
16    MR. TAAFFE: You're talking about what
17    time? You mean presently?
18    THE WITNESS: I was not the medical
19    director. I was not my responsibility to keep
20    up with those things.
21 BY MR. FOYE:
22    Q. Whose responsibility was it to keep the
23 patients' charts at the Lantz?
24    A. I do not recall.
25    Q. We're discussing now the patients that you

Page 297

1 did surgery on as of February 2002. Did you have any
2 responsibility for those charts?
3    A. No.
4    Q. Who did?
5    A. I still don't know.
6    Q. Did you ever personally make any notations
7 in a chart when a patient presented himself at the
8 emergency room?
9    A. That is an extremely vague question.
10    MR. TAAFFE: Yeah. Can you define "chart"?
11    The emergency room chart or what chart? You mean
12    the chart back at --
13    THE WITNESS: Was I a medical student
14    working in the emergency room?
15    MR. TAAFFE: I'm sorry. Could you clarify
16    the question first?
17    MR. FOYE: Sure.
18    MR. TAAFFE: Do you know what I'm saying?
19    I don't mean to interrupt but it's kind of
20    confusing what chart you're talking about.
21 BY MR. FOYE:
22    Q. Based on Exhibit 86, four patients
23 presented themselves to the emergency room in bad shape,
24 correct?
25    A. That's what it says.

Page 298

1     Q. And they did so on or about February 3rd,
2 2002, correct?
3     A. That's what it says.
4     Q. If I wanted to know the identity of those
5 patients, where could I go and look?
6     A. I believe under HCFA law you would not be
7 entitled to find the names of those patients.
8     Q. If you wanted to find the names of those
9 patients, where could you go and look?
10     A. I could look in my charts.
11     Q. By your charts, you mean the charts in your
12 medical office, correct?
13     A. Yes.
14     Q. Was equivalent information recorded in the
15 charts at the Lantz?
16     A. I have no way of knowing.
17     Q. Did you ever ask anyone to record that
18 information in the charts at the Lantz?
19     A. I sent John written documentation when
20 people were admitted to the hospital.
21     Q. Did you direct Mr. Hirsch to do anything
22 with that documentation?
23     A. It's not my position to direct Mr. Hirsch
24 to do anything with the documentation.
25     Q. Did you have any expectation about what Mr.

Page 299

1 Hirsch would do with it at the time you sent it to him?
2     A. I sent him documentation so it could be
3 included in the chart.
4     Q. Did you at some point stop sending Mr.
5 Hirsch such documentation?
6     A. When I left.
7     Q. Did you continue to send him documentation
8 relating to patients going to the emergency room
9 throughout your tenure at Lantz?
10     A. Your question is confusing.
11     Q. At some point, did the patients stop going
12 to the emergency room?
13     MR. TAAFFE: Object to the form. What
14 patients and what time frame? Patients go to the
15 emergency room every single day. Even today I'll
16 bet you there's some there.
17 BY MR. FOYE:
18     Q. Did you find the question confusing,
19 Doctor?
20     A. I have no idea what you're asking me in
21 that question.
22     Q. At some point, did patients that you
23 operated on no longer go to the emergency room?
24     A. After I left the Lantz.
25     Q. But throughout your time at the Lantz, they

Page 300

1 continued to go to the emergency room, correct?
2     A. I do not have a calendar with me. I do not
3 recall on what dates who went where.
4     Q. If I represented to you that you continued
5 to do surgeries through May 22nd of 2002, would that
6 help refresh your recollection about when you left
7 Lantz?
8     A. If that was the last day, that was the last
9 day. I was trying to fulfill my obligations under the
10 terms of the contract based on advice from my attorney.
11     Q. Were they still going to the emergency room
12 in March?
13     A. I'm going to tell you one more time that I
14 do not recall who went when.
15     Q. And you don't recall if they were still
16 going in April?
17     A. You know the answer.
18     Q. And you don't recall if they were still
19 going in May; is that correct?
20     A. You know the answer.
21     Q. Looking at the last paragraph, numbered
22 paragraph 4 of the exhibit --
23     A. Which exhibit?
24     Q. 87.
25     A. Yes.

Page 301

1     Q. At some point, did you have a discussion
2 with Mr. Hirsch about bringing in outsiders to look into
3 the issues at the Lantz?
4     A. Repeatedly.
5     Q. What did you say to him and what did he say
6 to you?
7     A. I told him things were not going well; we
8 needed help. He made placatering noise.
9     Q. Did he tell you he was going to bring in
10 outside consultants if such were necessary?
11     A. He told me he was not going to bring in
12 outside consultants.
13     Q. Did he tell you why?
14     A. No.
15     Q. Looking at paragraph 3 of the exhibit, was
16 there an issue with the microscopes at the Lantz as of
17 this time?
18     A. There was an issue of the microscopes. You
19 will recall that I do not have a calendar with me and I
20 do not recall the specific dates.
21     Q. What was the issue with the microscopes?
22     A. They were terrible.
23     Q. What kind of microscopes were they?
24     A. To the best of my recollection, the bad
25 microscopes were Zeiss.

Page 302

1    Q. Do you remember the particular model?
2    A. You're aware that I have difficulty
3 remembering model numbers.
4    Q. Does paragraph 3 of that exhibit help you
5 out at all?
6    A. No.
7    Q. Were the microscopes you were using at
8 Lantz different from the ones you were using at Cape?
9    A. Yes.
10    Q. What's a YAG laser?
11    A. A YAG laser is a neodynium laser used to
12 make peripheral iridotomies and posterior capsulotomies.
13    Q. My apologies, Doctor. It's getting late.
14 But I neglected to mark this as our next exhibit. I'll
15 show you this and then we'll go on to the YAG. Thank
16 you for helping me out.
17        (EXHIBIT 88 WAS MARKED FOR IDENTIFICATION)
18        THE WITNESS: (Reviews document.)
19        This can't have been addressed to me.
20 BY MR. FOYE:
21    Q. Why do you say that?
22    A. It addresses me as medical director of the
23 Lantz. I was not medical director of the Lantz. I have
24 never been medical director of anywhere.
25    Q. Did you receive it on or about February

Page 303

1 4th?
2    A. I don't know.
3    Q. Does Mr. Hirsch inform you in that letter
4 that "Since the issues being raised are of a medical
5 nature, Ophnet will look to you for direction"?
6    A. I don't know to whom he's directing it to.
7    Q. Were you aware either on February 4th or at
8 some subsequent time that Mr. Hirsch was of the opinion
9 that medical issues were solely under your direction at
10 the Lantz?
11    A. No.
12    Q. Is it your testimony that Mr. Hirsch never
13 informed you February 4th or some other time that Ken
14 Cram had been directed to allocate whatever financial
15 resources were necessary to fully address the problems
16 at the Lantz?
17    A. This is the first I've ever heard this.
18    Q. Did in fact Mr. Cram --
19        MR. TAAFFE: Let me ask you a question. Do
20 you have one of these with one of your Bates
21 stamp numbers on it since this has no Bates stamp
22 from either Lantz or from you and it was never
23 produced to us before today and it was requested?
24 It doesn't have an Ophnet number on it. It
25 doesn't have a Lantz number on it. It doesn't

Page 304

1 have a Lamensdorf number on it.
2        MR. FOYE: I didn't keep Bates-stamped
3 copies in most instances of documents that we
4 produced to you. In most instances, we produced
5 the documents -- I'm explaining to you what
6 happened.
7        MR. TAAFFE: All right.
8        MR. FOYE: In most instances, we produced
9 the documents and they were then Bates-stamped at
10 the printer and delivered to you in Bates-stamped
11 form. The originals then came back to me.
12        I designated a certain number of files,
13 correspondence files typically, for inclusion in
14 the -- that I wanted Bates-stamped copies of and,
15 in those instances, I got xeroxes of them with
16 the Bates stamps on them, but I don't have a
17 complete set of Bates-stamped documents. That's
18 number one.
19        Number two, these files were assembled
20 quite some time ago in certain instances. I do
21 not in fact know whether we produced that
22 document to you with or without Bates stamp, nor
23 do I know whether you produced that document to
24 me.
25        MR. TAAFFE: Well, the documents up until

Page 305

1 the last set of documents which we haven't had
2 time to Bates-stamp we've produced to you with
3 Bates stamp numbers on them. Only the most
4 recent ones were produced without Bates stamp
5 numbers on them. Your document doesn't have a
6 Bates stamp number and I don't believe we've ever
7 seen this document, nor can you give me a Bates
8 stamp number showing that you've ever produced it
9 to me till today.
10        And so, therefore, I question its validity.
11        MR. FOYE: Fair enough.
12        MR. TAAFFE: Or its fabrication.
13 BY MR. FOYE:
14    Q. Were you aware, Doctor, from any source
15 whatsoever that Mr. Hirsch had directed Mr. Cram to
16 allocate financial resources to fully address the
17 problems at the Lantz?
18    A. Absolutely not.
19    Q. Did Mr. Hirsch ever inform you in this
20 letter or elsewhere that he would be supportive of
21 bringing in a medical expert to review all the policies
22 and procedures in an effort to pinpoint the problems?
23    A. Mr. Hirsch refused at every count to bring
24 in an outside expert of any kind to assist in any manner
25 relating to the Lantz.

Page 306

1 MR. FOYE: Just to close the subject of the
2 production of this document, I would be willing
3 to bet you anything between 25 cents and a dollar
4 that if you checked Mr. Hirsch's two affidavits
5 in this case, this is one of the documents
6 attached to it.
7 THE WITNESS: It's still fabricated.
8 BY MR. FOYE:
9 Q. Doctor, why do you say that the document is
10 fabricated?
11 A. It addresses me as the medical director.
12 We agreed on multiple occasions that I was not the
13 medical director. Ron Zolla was adamant that I would
14 not be the medical director. I told them repeatedly I
15 did not have any experience being medical director, I
16 did not want to be medical director, I did not want that
17 responsibility. I remember writing them on more than
18 one occasion for guidance about being a medical director
19 because I had no experience. I had no authority as
20 medical director. I had no anything as a medical
21 director.
22 MR. FOYE: Would you mark that as our next
23 exhibit, please?
24 (EXHIBIT 89 WAS MARKED FOR IDENTIFICATION)
25 BY MR. FOYE:

Page 307

1 Q. Is that your signature at the bottom of
2 page 2 of that exhibit?
3 A. Perhaps.
4 Q. Is it or isn't it?
5 A. Yes, appears to be, but I do not recall
6 signing this document, nor do I recall ever seeing this
7 document, nor was I aware that there was a policies and
8 procedures manual.
9 Q. Were there any other positions besides you
10 as of February 2002 with active medical staff status at
11 the Lantz Surgery Center?
12 A. No.
13 Q. Do you have any other reasons for saying
14 that that document, the one we were talking about a
15 moment ago, is fabricated, 86?
16 MR. TAAFFE: You mean other than what he's
17 previously testified to as not seeing it and et
18 cetera?
19 MR. FOYE: Mm-hmm.
20 MR. TAAFFE: Okay.
21 THE WITNESS: No.
22 MR. FOYE: Would you mark this as our next
23 exhibit, please?
24 (EXHIBIT 90 WAS MARKED FOR IDENTIFICATION)
25 THE WITNESS: (Reviews document.)

Page 308

1 I've read the document.
2 BY MR. FOYE:
3 Q. Do you know who the patient was who went to
4 the emergency room on Tuesday referred to in that
5 e-mail?
6 A. You're aware that I am not a calendar and
7 do not recall. There were so many.
8 Q. At some point, did you decide that you
9 wanted to retire from surgery?
10 A. I was so distressed that I considered
11 retiring. I was held as a slave. I was miserable.
12 Q. Who was holding you as a slave, Doctor?
13 A. They were holding the Lantz over me.
14 Q. In what sense?
15 A. You know. We've discussed it.
16 Q. Did that have anything to do with the
17 amount of debt you were in relative to the Lantz?
18 A. I have no idea what you're talking about.
19 Q. Were you in fact in any debt relative to
20 the Lantz?
21 A. According to whom?
22 Q. According to you.
23 A. No.
24 Q. Had you paid that $1,000 a month that the
25 shareholder resolution required you to pay?

Page 309

1 A. I do not recall.
2 Q. Up to this point, had Mr. Hirsch and Mr.
3 Zolla been making additional capital contributions to
4 the Lantz as stated in the shareholder resolutions?
5 A. They were managing the center in an
6 incompetent manner. I do not know if they had to add
7 money or not. You would have to contact CPA Hirsch.
8 I've never seen those documents.
9 MR. FOYE: Could we mark this as our next
10 exhibit?
11 (EXHIBIT 91 WAS MARKED FOR IDENTIFICATION)
12 THE WITNESS: (Reviews document.)
13 BY MR. FOYE:
14 Q. Have you ever seen that document before
15 today?
16 A. You know I haven't.
17 Q. Do you know who Jay Horowitz is?
18 A. Yes.
19 Q. Who is he?
20 A. He was the nurse anesthetist.
21 THE WITNESS: May I ask a question off the
22 record that Mr. Foye can answer or you can
23 answer?
24 MR. TAAFFE: Why don't you just ask me. If
25 I can't answer it, I'll ask him.

Page 310

1  THE WITNESS: Are the Bates stamps placed
2  after the documents are given to another party?
3  MR. TAAFFE: Usually they're placed before
4  the documents are given to the other party.
5  THE WITNESS: Who puts the Bates stamps on
6  it?
7  MR. TAAFFE: The party making the
8  production.
9  THE WITNESS: I see.
10  MR. TAAFFE: That's standard practice,
11  although today, because we were rushed, some of
12  these things that we produced, they don't have
13  Bates stamp numbers and I'll go back and try to
14  put them in order sequentially with the Bates
15  numbers on them.
16  THE WITNESS: So Bates stamps are done —
17  this is a sequential number.
18  MR. TAAFFE: Correct. Arguably speaking,
19  it should be. That's not always the case, as Mr.
20  Foye knows.
21  MR. FOYE: Would you mark that as our next
22  exhibit?
23  (EXHIBIT 92 WAS MARKED FOR IDENTIFICATION)
24  THE WITNESS: (Reviews document.)
25  MR. TAAFFE: Off the record.

Page 311

1  MR. FOYE: Off the record.
2  (OFF THE RECORD)
3  BY MR. FOYE:
4  Q. Showing you what's been marked as Exhibit
5  92, Doctor, have you seen that document before today?
6  A. I do not recall ever having seen that
7  document.
8  Q. Did you in fact ever talk with Mr. Cram
9  about bringing in any of these four individuals listed
10  in Exhibit 92 to look over the situation at the Lantz?
11  A. To the best of my recollection as I sit
12  here now, I never -- I do not recall ever having had
13  that conversation.
14  Q. Did you have a conversation with Mr. Hirsch
15  or Mr. Zolla about consulting with any of these four
16  individuals?
17  A. To the best of my recollection, I do not
18  recall ever discussing this with any Ophnet individual.
19  Q. What were they, "they" being Hirsch, Zolla
20  and Cram, doing about the difficult situation at the
21  Lantz as of early February 2002?
22  A. Making it as difficult as possible for me.
23  Q. Anything else?
24  A. To the best of my recollection, they were
25  doing nothing proactive to ameliorate the situation.

Page 312

1  Q. Even though they owned two-thirds of this
2  surgery center, correct?
3  A. Strange, isn't it?
4  Q. I'm going to ask you to --
5  MR. FOYE: Could we mark that as our next
6  exhibit, please?
7  (EXHIBIT 93 WAS MARKED FOR IDENTIFICATION)
8  THE WITNESS: (Reviews document.)
9  I have read the document.
10  BY MR. FOYE:
11  Q. Did you write this document?
12  A. Yes.
13  Q. You personally or did someone write it for
14  you?
15  A. I wrote it. I typed it.
16  Q. What did you mean when you said that you
17  wanted a credit toward our contribution to the cost of
18  the Lantz of $4,000 a month which would make us even in
19  five years or less?
20  A. I believe it's self-explanatory.
21  Q. I thought you didn't owe any money to ZHL
22  at this time.
23  A. You asked me earlier did I owe any to ZHL.
24  As I sit here today, I feel that I did not owe anything
25  to ZHL at the time.

Page 313

1  Q. Why were you asking for a credit toward
2  your contribution?
3  A. They were harassing me continuously for
4  additional cash contributions.
5  Q. Did you ever tell them, "I don't owe you
6  anything more"?
7  A. Yes, repeatedly.
8  Q. Did you ever tell them that in writing?
9  A. You have all the documents that I have
10  written. I suspect I did on more than one occasion.
11  Q. Where did the number come from when you say
12  that the $4,000 contribution would make you even in five
13  years or less?
14  A. I don't know.
15  Q. Would you agree with me that $4,000 times
16  60 months is $240,000?
17  A. I can multiply.
18  Q. Is that the position that Mr. Hirsch and
19  Mr. Zolla were taking, that you owed Lantz $240,000?
20  A. As I recall, they were continuously telling
21  me that I owed them more money continuously.
22  Q. How many YAG cases were you doing in a
23  typical month as of February 2002?
24  A. It's stated in the letter.
25  Q. Looking at paragraph 9, is that what you're

Page 314

1 referring to, "Over the last five years, MLMD has
2 averaged 40-plus lasers per month"?
3    A. Yes.
4    Q. And the next sentence says, tell me if I
5 read it correctly, "Even with a large fall off in
6 volume, the laser should still generate in excess of
7 $6,000 a month." Did I read that correctly?
8      MR. TAAFFE: Objection. The document
9   speaks for itself. Ask a probative question, not
10   whether you can read. I assume, you graduated
11   law school, you can read. Ask a question that's
12   going to get us further down the road and not
13   waste time.
14 BY MR. FOYE:
15    Q. What did you mean when you said "even with
16 a large fall off in volume"?
17    A. It says it in the document.
18    Q. What did you mean by it? Did you
19 anticipate there was going to be a large fall-off in
20 volume?
21    A. A large volume of patients will be lost
22 because of the inconvenience. That's line 3.
23    Q. What is inconvenient about the Lantz
24 compared to your office?
25    A. It speaks for itself.

Page 315

1    Q. How far is the Lantz from your office?
2    A. In the case of my office, the patient is
3 sitting in my office and the laser is in my office and
4 it doesn't represent an extra trip. If they get into
5 the car and if it's two miles, four miles or six miles,
6 it's still an extra trip and an extra inconvenience.
7 For many of my patients who go by taxi, it represents an
8 extra cost.
9    Q. What sort of medical condition does YAG
10 laser surgery address?
11    A. We've reviewed that already.
12    Q. I missed it. Can you help me out?
13    A. Posterior capsulotomies and peripheral
14 iridotomies.
15    Q. When you make those diagnoses, do you
16 typically perform a YAG on the spot or do you ask a
17 patient to come back at some other time?
18    A. Typically at that time.
19    Q. Does the medical practice receive
20 reimbursement from Medicare and Medicaid for those
21 procedures?
22    A. It does not receive a facility fee,
23 representing a savings to Medicare and insurance
24 companies of in excess of $400 per case.
25    Q. Would Medicare and Medicaid pay a facility

Page 316

1 fee if the surgery were done at the Lantz?
2    A. If the Lantz is correctly credentialed.
3    Q. Was it correctly credentialed as of
4 February 6, 2002?
5    A. I have no way of knowing.
6    Q. Did you look into that before you wrote a
7 letter proposing to do your surgeries at the Lantz?
8    A. I asked Ron and John to do it but I have no
9 way of knowing if they did, just as they did nothing
10 else I asked or little else, rather, that I asked.
11      MR. TAAFFE: You've got about five minutes
12   to go.
13      MR. FOYE: Let me finish up with this
14   document then --
15      MR. TAAFFE: That's fine.
16      MR. FOYE: -- and we'll reach our break
17   point.
18 BY MR. FOYE:
19    Q. Were YAG surgeries in fact performed at the
20 Lantz at any time?
21    A. I believe that I did YAGs there on one
22 occasion, and I believe that the Lantz purchased a YAG
23 laser for its employee, Dr. Winkle, although that's just
24 hearsay.
25    Q. Going back just briefly to the issue of

Page 317

1 medical director, did Mr. Hirsch and Mr. Zolla ever have
2 any discussions with you about some physician becoming
3 the medical director of the Lantz?
4    A. Yes.
5    Q. Who did they have in mind?
6    A. I don't know.
7    Q. Did you have any suggestions for them?
8    A. Yes.
9    Q. Who did you have in mind?
10    A. As I sit here now, I do not recall.
11    Q. Did it concern you that as of February
12 2002, you were operating in a medical center that
13 patients were going to the emergency room from on a
14 regular basis and that that same medical center didn't
15 have a medical director?
16    A. Yes.
17    Q. What affirmative steps did you take to
18 attract a medical director to ZHL?
19    A. You've introduced them into evidence during
20 the course of this deposition.
21    Q. Did you talk to any doctors?
22    A. It was not my position. Mr. Zolla
23 repeatedly asked me not to.
24    Q. Did he say why?
25    A. He thought it would be better if he

Page 318

```
1    negotiated.
2         Q. Did he say why?
3         A. I believe I answered that question.
4         Q. Was he particular about why he did not want
5    you negotiating with other doctors?
6         A. You would have to consult with Mr. Zolla as
7    to what his thought process was.
8         Q. You have no memory of what he said,
9    however.
10        A. Are you asking me for a verbatim transcript
11   of a discussion that happened more than three years ago?
12        Q. No. I just want to know what he said to
13   the best as you can recall it.
14        A. Best as I recall, he was going to do the
15   negotiation, he was going to talk to the people and he
16   was going to find the medical director.
17        Q. And was he any more particular with you
18   than you have told me already about why he did not want
19   you, a physician in the Sarasota community, trying to
20   attract a medical director to the Lantz?
21        A. Yes. He thought he could do a better job.
22            MR. FOYE: I think we've reached a --
23            MR. TAAFFE: A breaking point?
24            MR. FOYE: -- natural breaking point.
25            MR. TAAFFE: Great. Thank you.
```

Page 321

```
1              CERTIFICATE OF OATH
2
3
4    STATE OF FLORIDA  )
5    COUNTY OF SARASOTA)
6
7
8         I, the undersigned authority, certify that
9    MICHAEL LAMENSDORF personally appeared before me and was
10   duly sworn.
11
12       WITNESS MY HAND AND OFFICIAL SEAL THIS 14TH
13   DAY OF FEBRUARY, 2005.
14
15
16
17
18
19
20              LAURIE J. CHEFFY
                Notary Public
21              State of Florida
                Commission expires 3-20-06
22
23
24
25
```

Page 319

```
1    (WHEREUPON THE DEPOSITION ENDED AT 4:57 P.M.)
2              •  •  •
3    STATE OF FLORIDA   )
4    COUNTY OF SARASOTA )
5
6         I, LAURIE J. CHEFFY, Court Reporter, Notary
7    Public, State of Florida at Large, certify that I was
8    authorized to and did stenographically report the
9    deposition of MICHAEL LAMENSDORF, that a review of the
10   transcript was requested, and that the transcript is a
11   true and complete record of my stenographic notes to the
12   best of my ability and understanding.
13
14       I further certify that I am not a relative,
15   employee, attorney or counsel of any of the parties, nor
16   am I a relative or employee of any of the parties'
17   attorney or counsel connected with the action, nor am I
18   financially interested in the action.
19
20       Dated this 14th day of February, 2005.
21
22
23              LAURIE J. CHEFFY
                Notary Public
24              State of Florida
25              Commission expires 3-20-06
```

Page 321

```
1                 ERRATA SHEET
2
3
4         I, the undersigned, MICHAEL LAMENSDORF, do
     hereby certify that I have read the foregoing deposition
     and that, to the best of my knowledge, said deposition
5    is true and accurate (with the exception of the
6    following corrections listed below:)
7    PAGE LINE
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25   DATE        DEPONENT'S SIGNATURE
```

## SHAREHOLDER RESOLUTION

John Hirsch, Ron Zolla, Michael Lamensdorf, M.D. and Kathy Lamensdorf both as individuals and as shareholders of ZHL, Inc. on this 22[th] day of December, 2000, hereby agree as follows:

1.     John Hirsch and Ron Zolla agree to each individually loan to ZHL, Inc. an amount not to exceed two hundred thousand dollars ($200,000.00) each or a total not to exceed four hundred thousand dollars ($400,000.00) for the purpose of:

    a)   providing an equity contribution to the construction of a surgery center to be constructed on ZHL property on Proctor Road in Sarasota, Florida, and,

    b)   providing operating funds to conduct ZHL, Inc. business activities.

    ZHL Inc. agrees to pay John Hirsch and Ron Zolla the applicable Federal interest rate for short-term loans on the total outstanding loan balance compiled at the end of each month. This loan repayment interest will accrue as a current liability of ZHL, Inc. payable to Ron Zolla and John Hirsch.

2.     John Hirsch is hereby authorized to execute a loan agreement and mortgage with Colonial Bank in Sarasota, Florida whereby ZHL will borrow an amount not to exceed one million two hundred thousand dollars ($1,200,000.00) from Colonial Bank at an interest rate of eight and one-half percent (8½%) for the purpose of constructing the surgery center building.

3.     John Hirsch is hereby authorized to execute an agreement with John Swift Inc., the general contractor, to construct the surgery center per specifications provided

1



EXHIBIT

84

M. Lamensdorf 4/25/05

to contractor on ZHL, Inc. property for a total cost of one million two hundred seventy eight thousand two hundred and forty seven dollars, ($1,278,247.00).

4. Michael Lamensdorf, M.D. and Kathy Lamensdorf agree to make monthly capital contributions to ZHL, Inc. of no less than one thousand dollars ($1,000.00) per month commencing in January, 2001. Upon receipt of each additional capital contribution from Michael and Kathy Lamensdorf, the shareholders loan to John Hirsch and Ron Zolla will be reclassified from loan payable to paid-in capital such that the paid-in capital will be contributed by each ZHL shareholder in proportion to each shareholder's equity. Michael and Kathy Lamensdorf will use best efforts to follow a monthly schedule of additional capital contributions so that the shareholder loans payable to John Hirsch and Ron Zolla will be entirely reclassified as paid-in capital no later than December 31, 2002.

_____ 12/22/00
John Hirsch

_____
Ron Zolla

_____
Kathy Lamensdorf

_____
Michael Lamensdorf, M.D.

RWZdec2200

2

To the owners of ZHL:

With the admission of Mr. P████ last night, it is obvious that drastic steps need to be taken. The Lantz has proven to be a mighty rock that destroys all. Ken is certainly trying, but he has almost nothing to work with.

Frankly, I am tired of expressing concerns and writing letters that are never answered. The only way that I see this changing, is if I own a majority of ZHL. Therefore, I propose that I purchase an additional 33.33% for $1.00. We will then be able to proceed rapidly towards resolving the myriad problems at the Lantz. Please respond by Friday at noon so that we can start as soon as possible.

Michael

Since I wrote this letter this morning at 8:00am, I have spent 30 minutes talking with a post op patient who sees 20/20 without correction, but will not let me operate on her other eye because of anesthesia concerns.

Obviously, things need to change now. If my suggestion is unacceptable, the only alternative that is apparent would be to cancel the surgery and for Ophthnet to compensate MLMD $100,000/mo so that bills can be paid despite the loss of surgery revenue. Sarasota is a small town. The word is spreading.

I look forward to your response by noon Friday so that appropriate steps can be taken in a timely manner.



EXHIBIT
85
M. Lamensdorf 1/25/05

February 3, 2002

Ken,

A quick note about Thursday surgery results and Gina's observations:

Four patients were in bad shape. Two took themselves to the emergency room Thursday night. The ER doctor called Michael Friday morning to question him as to what was going on. He specifically asked what anesthesia was used and how (same question the internist had last week). Michael also had to send one patient from two weeks ago to Marion Coates due to his continued inflammation. This is the second patient in as many weeks for whom he has had to make such a referral.

Michael and I spent four hours in the car yesterday and talked about nothing but the problem. From that conversation, I ask the following:

1. Please fax to ES tomorrow a.m. the name of the dilating drops used, the manufacturer and from whom the Lantz purchased them (include all ingredients).
2. Please fax to ES tomorrow a.m. all anesthesia information – all medicine used, the name and manufacturer and from whom the Lantz purchases them (include all ingredients).
3. Please fax tomorrow a.m. the name of any materials used in the sterilization process, the manufacturer and from whom the Lantz purchased them.
4. Please fax tomorrow a.m. from whom the Lantz is getting the gentamicin and the ingredients and brand name of the irrigation solution. Michael has discussed the BSS with Frank.
5. ALL MATERIALS ON SITE AT THE LANTZ MUST BE CHECKED FOR EXPIRATION DATES.

We will review all of the above tomorrow. I had Michael think of everything, big and small (from my pedestrian questions) so that he will be able to continue to operate at the Lantz. He does not want to go to the Lantz on 2/5/02 but our financial situation is so horrible, he just must do the surgery to get the revenue.

FOR TUESDAY, FEBRUARY 5, 2002:

1. The Lantz supplies Michael with Garamicin or another brand name for his injection.
2. Pam will direct all efforts in the post operative area. We will not continue to have patients so mis-directed and so confusingly served in that area. Whoever is scheduled for post op that day, will be aware that Pam is in charge.
3. There is a time clock on site, being used, and written directions given to all staff relative to its use and guidelines.
3. I will arrive by 9am to observe in the surgical area. I will observe sterilization staff in particular but will also observe in surgery.

Michael would like for you to address Tayna's personal hygiene and Brooke's nails which he feels are totally inappropriate for her work.

Lastly, we would like a monthly accounting of all Lantz (as opposed to ZHL) financial activity (deposits and any expenses). So, we need one for November, December and January. Do we have a bank account? With whom? Where was the money the Lantz received deposited?

We have asked numerous times for a complete listing of all staff ( name, position (responsibilities), salary/benefits and schedule).

We have asked numerous times for a proposal for our payback of Lantz debt.

We need this information by the end of this week so that we can plan for the future.

Thanks, Ken. Go Patriots!

KDL



EXHIBIT
86
M. Lamensdorf 1/25/05

OPH 019499

2821 Proctor Rd, Sarasota, FL 34231



# Fax

| To: | Michael | From: | Ken |
|---|---|---|---|
| Fax: | 349-0304 | Pages: | 2 |
| Phone: | | Date: | 2/4/2002 |
| Re: | Surgery Tomorrow + Other Items | CC: | |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

• Comments:  Michael,

As a follow up to our discussion this afternoon I want to give you the latest information on a couple items.

1. Gentimicin injectable is no longer made by Scheering. Ledderly acquired it from Scheering (or Ledderly bought Scheering) and Ledderly now lists it on "permanent backorder" as of August 2001. We are told there are currently 2 manufacturers of Gentimicin; Abbott in North Chicago, IL and APP in Los Angeles. We have used only the Abbott since Lantz opened. Kasia was running low on it so ordered more and received a batch made by APP. All of it is bought through a medical supplier named McKesson. A bottle is put in each OR each operating day and it is drawn up for each case between cases. For tomorrow we have plenty of both so if you want to try the APP instead of the Abbott just give Kasia the word when you come in.

2. Gatorade. Kasia and I were discussing the nausea/vomiting incidents. Is it possible that requiring elderly people who are not used to drinking electrolyte replacement drinks to drink 20 oz of Gatorade in a relatively short time, along with eating a muffin, is causing the stomach upset, nausea and vomiting? Kasia worked in the past in a doctor's office where they did blood glucose testing and she said that routinely when they gave patients 6-8 oz of a sugary drink that a significant number would complain of mild to moderate nausea. Our patients are NPO 12-16 hours then the first thing they have is the Gatorade. Kasia recalls from her visit to the Cape that the patients had the IV (which NONE of us want to do) with 500 cc of Ringer's Lactate during the case, then were offered coffee or water post-op.

When we first started in November, patients were offered apple juice, water or Gatorade and were drinking about 8-10 ounces before leaving with instructions to drink the rest (and more) during the remainder of the day. She also recalls that most of the women chose juice or water and only some of the men chose Gatorade, with most still choosing juice or water.



EXHIBIT
87
M. Lamensdorf 1/25/05

Beginning about the first of January, to address the possibility that the cornea problems are/were related to patient hydration, we started requiring all patients to drink a full bottle (20 oz) of Gatorade and no longer offer the option of water or juice.

As of last Tuesday, we started giving each patient a bottle of water (20 oz) along with a can of soup (Campbell's Chicken with Rice or Stars) to take home with instructions to have the soup as a "light" lunch and to drink a minimum of 4-5 more bottles of water before the end of the day.

I do not profess to be a medical expert and it may only be coincidence but it seems that the nauseas/vomiting is getting worse the more we make the post-op patients drink.

We have sufficient water on hand (and we could certainly get some juice in the morning) If you wanted to try something besides the Gatorade.

3. **Microscopes.** The Zeiss tech was in today and reinstalled the original MDU head in OR1. He will be in the area tomorrow and has offered to come back and install the 6SFR/C heads that Prescott sent for evaluation. He says it only takes him about 5 minutes to switch a head so if you wanted to look through these heads you could do it between the end of cataracts and the beginning of YAGs. He is the same tech who services the scopes at the Cape and he told me the Cape actually has 3 different heads, all Zeiss. He said OR1 at the Cape has the 6SFC on a ceiling mount. OR3 has an MDO on a ceiling mount and OR4 (he was unsure of the last OR number but said it was the third OR used for eyes) has an MDU on a floor stand. Finally, the new Zeiss VISU 150 demo is due to arrive late Wed and the Zeiss rep. Greg Zaskis, said he would be here to set it up for you to check out on Thursday. At that point it is your choice as to what gives you the result you need. IF tha 6SFR/Cs were it, they are here. If it is the Zeiss then we have one and would need to see how soon Zeiss could get another one here as they all come out of New York and are not always "on the shelf." E.g., the bells and whistles stand I spoke about last week is on 8 week backorder from Germany. We will get you good scopes!

4. **Outside help.** I asked John to make discreet inquiries into outside help through OOSS and any other organizations or sources he could think of. None of us wants to air any problems to outsiders so he will NOT tell anyone specifically who we are but will find out what resources are available and will summarize them for you so we can collectively make an informed decision if we want to bring in outside help. He may have information for us as soon as tomorrow.

As always, I DO look forward to seeing you in surgery tomorrow....:-)

Ken

Page 2



- OPHTHALMOLOGY MARKETING
  AND MANAGEMENT CONSULTING

- AMBULATORY SURGERY
  CENTER DEVELOPMENT

## facsimile transmittal

DATE: 2/12/02

TO: Kathy Lamendorf          FAX NUMBER: 941-955-7905

FROM: Anusia Hirsch          FAX NUMBER: 781-639-1271

RE:                          PAGES Including cover: (1)

Hi Kathy,

I received your fax and have passed it along to Ken. Lantz will be issuing a check to take care of this invoice.

thanks.
Anusia

2-12-02
2- Anusia — When?
KDC

NOTE: This facsimile contains PRIVILEGED AND CONFIDENTIAL Information intended only for the use of the specific individual or entity named above. If you or your employer are not the intended recipient of this facsimile or an employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any unauthorized dissemination or copying of this facsimile or the information contained in it is strictly prohibited. If you have received this facsimile in error, kindly notify the persons named above by telephone or return fax and we can arrange for the original fax to be returned to us. Thank you.

AUTONOMY IS GOOD MEDICINE®

February 4, 2002

To: Michael Lamensdorf, M.D.
    Medical Director, Lantz Surgery Center

From: John Hirsch, Ph.D.
      President, Ophnet, Inc.

Re: Post-Op Patient Status

Ken faxed your February 3rd letter to him discussing post-op problems, to me this morning. Patient quality of care is our most important objective at Lantz. Ron and I agree with you that immediate resolution of these post-op problems is priority one. Accordingly, Ron and I have asked Ken to give this issue his maximum attention and commitment.

Since the issues being raised are of a medical nature, Ophnet will look to you for direction. Ken and Kasia will compile the information you requested in items 1-5 of your letter and have it available for your review, today.

Further, we welcome Pam's presence and direction in the post-op area. Also, if it is your desire to have Kathy observe the surgical areas and provide assistance in helping to identify possible solutions, we welcome her thoughts on this matter, too.

Moreover, Ron and I have directed Ken to allocate whatever financial resources are necessary to fully address these problems. For example, we would be supportive of bringing in a medical expert to review all policies and procedures in an effort to pinpoint the problems.

Ken will be in contact with you today and will look to, and respond to, your direction.



**EXHIBIT**
88
M. Lamensdorf 1/25/05

Walter P. Lantz Surgery Center _____ Policies and Procedures Manual

## 1. MEDICAL DIRECTOR

### a. Responsibilities

Directs and monitors all medical activities; ensures high quality care for patients.

### b. Duties

1. Directly responsible to the Governing Authority.

2. May directly supervise the Administrator and/or Director of Nursing.

3. Shall be immediately available for decisions regarding patient care.

4. Shall assist the staff in identifying and solving patient care problems on a day to day basis.

5. Shall provide continuity of patient care by coordinating the care provided by physician(s) with care provided by the nursing and support staff.

6. Review of professional performance of physician(s) and patient care personnel.

7. Reviews the credentials of all applicants for medical staff privileges and makes recommendations to the Credentials Committee regarding medical staff membership and delineation of privileges.

8. Investigate any breach of ethics noted or reported and makes appropriate recommendations to the Governing Authority.

9. Enforces the Medical Staff Bylaws, Rules and Regulations.

10. Interprets and gives necessary guidance on the medical policies that may enhance patient care.

11. Ensure adherence to the policies and procedures through collaboration with the Administrator and the DON.

12. Acts as a liaison between the Surgical Center, the medical staff and the Governing Authority.

13. Communicates and represents the opinions, policies, concerns, needs and grievances of the medical staff to the Governing Authority.



*Chapter Two: Job Descriptions  <Revised Jul-01>*                    3

14. Accountable to the Governing Authority for the quality and efficiency of surgical services and performance within the Surgical Center and for the effectiveness of patient care and the quality assurance functions delegated to the staff.

15. Participates in all committee meetings.

c. **Qualifications**

The Medical Director shall be a physician with active medical staff status at the Lantz Surgery Center. The Medical Director shall demonstrate an ability to act as a liaison and coordinator of the surgical staff, medical staff members, administration, including all committees to create an effective and efficient environment to deliver quality patient care.

Signature: _____    Date: _10 Sept 01_

Page 1 of 1

MLamensdor@aol.com, 10:36 PM 2/6/02 -0500, More of the same

Delivered-To: gtcinternet-com-kcram@gtcinternet.com
From: MLamensdor@aol.com
Date: Wed, 6 Feb 2002 22:36:03 EST
Subject: More of the same
To: ski@flatwater.com
X-Mailer: AOL 6.0 for Windows US sub 10552

Ken, Well, we are batting 100.....one of our surgical patients from Tuseday went to the ER tonight........I do not have much info as Michael can't talk about it. He has relayed a number of staff issues that he has asked me to "fix." I told him I am not welcome as per John Hirsch's recent memo. He said if I do not do my "culture thing," this "Gig" is over. I do not know what to do. I have told you quite frankly of my personal distress over ES and the Lantz. Michael is a mess. As a last ditch effort, I will reiterate what we have been saying for a long time now. I truly feel that if you allow the following, life will improve for everyone (and that includes dear Maureen):

1. Let me present my "culture" dogma - I guarantee results or at least recommendations for staff change that will only help the Lantz.
2. Replace Laura and Brooke NOW
3. Replace Marie NOW
As I mentioned, we won't do any more YAGS until we have a fair arrangement for the laser lease and a way to make up for losing $ on every YAG we now do.

On a different note, after you left today, I asked the Lantz if they were set up for Master Card, etc. We cannot do LASIK there until they are set up - so they need to be set-up by 2/18/02. Since we are doing LASIk there on 2/19/0, the Lantz needs to learn coding etc for LASIK. Since Eye Specialists will again be losing revenue for the facility/laser fee, we need to also work out payment for supplying LASIK staff which will be at least Dawn, me and one other if it can be accomodated. I will need to buy another TV with VCR for the LASIK pateints for the treatment room. Also, I think the patient should make out his/her check or charge his/her card for both the surgeon and facility charge - the Lantz will then give ES a check (that same day) for the surgeon's fee. I will then prepare a check for Shriver on appropriate dates. LVC, Inc. would then direct its facility charges to the Lantz. I will have Dawn fax Kasia those supplie! s necessary for the LASIK cases. Hoping Maureen and you enjoy some down time together.
I wish I could go with her - please have her take the message to her sons that I love the website. That's it - thanks. KDL

2/8/02

TO: JOHN/RON

FROM: KEN

KATHY SENT THIS WED NIGHT BUT I JUST LOOKED AT IT THIS MORNING.

ML DID FAX ME A COPY OF HIS LETTER TO YOU YESTERDAY.

Ken



EXHIBIT
90
m.Lamensdorf 1/25/05

2/8/02

OPH 019488

February 8, 2002

To: Michael
From: John
Re: Mr. Rand note and separate note from Kathy regarding Jay Horowitz

Concerning Mr. Rand and any other clinical/medical issues, Michael, we must look to you, as Medical Director, for specific direction in our collective effort to solve these problems. Ron and I, as shareholders of ZHL, Inc., will work to provide whatever resources you deem necessary to solve these clinical/medical patient care issues.

Jay Horowitz's references from both Ohio and Florida are attached and I have also listed below the names and phone numbers of physicians in the area who know him and his work:

Charles Slonim, M.D. Ophthalmologist   Tampa  813-971-9709

Noel Tenenbaum, M.D. Plastic Surgeon  Sarasota area  727-786-6921

Harris Silverman, M.D. Ophthalmologist Bradenton area  941-792-2020

David Holcomb, M.D.  Facial Plastics  Sarasota area  941-365-8679

Gulf Coast Endoscopy  Ron Demasi, M.D.  Medical Director  941-484-5000

Michael, we have always shown great deference to you and have followed your leadership in all patient care matters. Accordingly, Ophnet and Ken are prepared to take any action you deem appropriate regarding anesthesia service at Lantz. Ken has indicated that, to date, Jay has been a team player and appears to conduct himself in a professional manner.

EXHIBIT
9 /
M. Lamensdorf 1/25/05

OPH 019284

February 10, 2002

Michael,

I need to apprise you of several things that have occurred since Friday.

First, I got a call from Kasia a short while ago telling me her father died today. Although her mother and father were living in Sarasota the family is from Illinois. The funeral is service is Tuesday morning in Sarasota and they are burying him in Illinois on Thursday. Kasia will be at Lantz tomorrow, Monday, to get things ready for Tuesday but will not be there the rest of the week as she will be at the funeral Tuesday and will be going to Illinois for the burial. That leaves us with only Jan to circulate. It will slow us down somewhat but with the time improvement we gained last week with the custom packs we should be able to manage from a patient flow standpoint.

Second, with the departure of Tanya, we have only Marie in post-op with any training at all. We have a new Medical Assistant, Nancy Harris, starting this week but she is not trained. Kathy told me that Pam was not available on Tuesday. It would be very helpful if she could come but if not, I will spend my time in post-op to support Marie and Nancy as much as possible.

Third, John did find an outside resource through the AAO without giving any specific details. They put him on to the AOSRN (American Society of Operating Room Nurses). I have the contact details for 4 people who may be able to help. They are as follows:

1. Gloria Nault, RN
   Clinical Director of a Portland, ME ophthalmic surgery center
   Certified OR Nurse
   Certified Ophthalmic Nurse
   15 years experience
   Tel: 888-374-2020
   John spoke with her and she is willing to get on the phone with us and start the process of finding where our problem(s) is(are). She would also be willing to come onsite if necessary as well.

2. Sue Clouser, RN
   Board of Directors of ASORN
   Near Dallas, TX
   Works in an ASC that does 98% ophthalmic procedures
   972-517-4615
   John also had contact with her and she would also be willing to help. She suggested we talk to Gloria Nault first but that she would also be willing to help.

3. Beth Hurley, RN
   Scottsdale Eye

EXHIBIT

92

M.Lomensdof 1/25/05

OPH 019473

Runs large free standing ASC
480-949-1280
Recommended by ASORN but John has not spoken to her.

4. Sharon Sjulstad, RN
   Barnet, Dulaney and Perkins Eye Center
   Phoenix, AZ
   Runs their ASC
   602-955-1000
   Recommended by ASORN but John has not spoken to her.

If you would like, I could see if I could set up a conference call with Gloria Nault for you, Kasia and I for the end of the day Monday. I will be there by early Monday afternoon (barring flight delays...we have some potentially nasty weather coming in tonight) and Kasia said she would be there tomorrow. Perhaps we could get the process started.

You can leave me a message either at Lantz or on my cell phone, 603-682-4358, for tomorrow morning.

I really want to see us get past these problems.

Ken

OPH 019474

John & Ron,

I have not yet received the lease for the YAG which was moved from MLMD to the Lantz some time ago.  While preparing it, please consider the following:

1. Doing YAGs at the Lantz is an inconvenience for the patients, the staff and for me.
2. It represents considerable extra work in scheduling.
3. A large volume of patients will be lost because of the inconvenience.
4. MLMD is compensated considerably less for each procedure performed at the Lantz.
5. MLMD must provide staff.
6. It lengthens an already long day.
7. To date, I have been the only person to use the YAG.  With the arrival of new surgeons, it is possible that others will be using the laser.
8. I understand that the Lantz will be compensated over $400/case.
9. Over the last 5 years, MLMD has averaged 40+ lasers/month.  Even with a large fall off in volume, the laser should still generate in excess of $6000/month.
10. The YAG was bought and paid for long before the association of MLMD with Ophthnet.

There seems to be two alternatives for compensation:  First, a credit towards our contribution to the cost of the Lantz of $4000/month which would make us even in 5 years or less.  Second, a cash payment of $3000/month.

Please arrange for us to have the final documents by Friday 8 February 2002 at noon so that we will have time to make appropriate arrangements.

Thank you.

Michael

Separately, Kathy has asked repeatedly for an accounting for the Lantz.  Please supply us with this information by Friday noon.  Please include a list of all checks paid, all deposits made and complete payroll details.  Is the credit card payment system set up?  Has Mr. Merrifield's payment been made?  Are we current on billings?  Please supply us with this information on an ongoing basis by the 5th of the next month.

Thank you.

FAX : 781 - 639 - 1271



EXHIBIT

93

M Lamendorf 1/25/05

EXHIBIT 14
TO
**MEMORANDUM IN SUPPORT OF MOTION TO REMAND**

---

**Page 331**

1    COMMONWEALTH OF MASSACHUSETTS

2    ESSEX, s.s.     SUPERIOR COURT
     CIVIL ACTION NO. B 2 0419

3    - - - - - - - - - - - - - - - - - -

4    OPHNET, INC., a Massachusetts
     Corporation, and JOHN A. HIRSCH

5    and RONALD W. ZOLLA, Individually
     and as Shareholders of ZHL, INC.,

6    a Massachusetts Corporation, and
     KENNETH CRAM,

7          Plaintiffs,       DEPOSITION OF

8                 KATHY LAMENSDORF

9    vs.               VOLUME III
     MICHAEL LAMENSDORF, Individually

10    and as a Shareholder of ZHL, INC.;
     MICHAEL LAMENSDORF, M.D., P.C., a

11    Florida Professional Corporation;
     BAYOU JENNKAY, INC., a Florida

12    Corporation; and KATHY LAMENSDORF,
     Individually and as an officer of

13    Bayou JennKay, Inc.; and ZHL, INC.,
     a Massachusetts Corporation,

14

15          Defendants.
     - - - - - - - - - - - - - - - - - -

16

17      TAKEN BY: THE PLAINTIFFS HEREIN

18      BEFORE: Laurie J. Cheffy
           Court Reporter

19            Notary Public
           State of Florida at Large

20

21      PLACE: Abel, Band, Russell, Collier,
           Pitchford & Gordon, Chartered

21            240 South Pineapple Avenue

22            Tenth Floor
           Sarasota, Florida 34236

23

24      DATE: February 28, 2005
           Commencing at 10:15 a.m.

25      (Appearances on Page 2)

---

**Page 332**

1    APPEARANCES:

2

3      EDWARD FOYE, Esquire

4      Todd & Weld LLP
     28 State Street, 31st Floor

4      Boston, Massachusetts 02109

5      On Behalf of the Plaintiffs

6

7      MICHAEL S. TAAFFE, Esquire
     Abel, Band, Russell, Collier,

8      Pitchford & Gordon, Chartered
     240 South Pineapple Avenue

8      Sarasota, Florida 34236

9      On Behalf of the Defendants

10

11    ALSO PRESENT:

12      Ronald W. Zolla

13

14

15      * * *

16

17

18      I N D E X

19

20    EXAMINATION OF KATHY LAMENSDORF

21                Page

22    Direct by Mr. Foye ................. 335

23

24

25      * * *

---

**Page 333**

1             E X H I B I T S

2

3    Description            Marked

4    94 - 1/19/05 cover letter from American Express
      with attached statements      344

5    95 - American Express statements      344

6    96 - RBC Centura bank statements for Bayou Jenkay    359

7    97 - Provident Bank bank statements for Bayou

8       Jenkay      359

9    98 - 2002 U.S. Income Tax Return for an S

10       Corporation      364

11    99 - Carol Hartle's Annual Evaluation Supplement
      dated 2/2/03      389

12    100 - Pages from Eye Specialists website      401

13    101 - 12/15/01 letter to James Lenhart from
      Michael Lamensdorf      404

14

15    102 - 1/11/02 letter to Michael Lamensdorf from
      Linda Schulze      406

16    103 - 4/30/02 letter to Corinne Harris from Kathy
      Lamensdorf and Dawn Satterlee      416

17    104 - Chart re "Averaged Eyes" and "Goals"      419

18

19    105 - 3/25/03 Eye Specialists Business Development
      Position      420

20    106 - 1/2/03 letter to Bonnie Evans and Kathy
      Lamensdorf from Carol      433

21    107 - 9/24/02 letter to Kim from KDL      439

22    108 - Daily time sheets for Dale Weber      443

23    109 - 2/22/02 handwritten letter to John Hirsch

24       from KDL re Lantz Fund to Pay TV Commercials,
      with handwritten response dated 2/26/02 to

25       Kathy and Michael Lamensdorf from John      483

---

**Page 334**

1    EXHIBIT INDEX (cont'd.)

2

3    Description            Marked

4    110 - 2/13/02 letter to Kathy from Ken      491

5    111 - 2/12/02 handwritten note to Kasia from
      Kathy L re YAG laser      493

6

7    112 - 2/20/02 memo to Amsia from Kathy w/
      handwritten response dated 2/25/02 to

8       Kathy from Amsia      496

9

10    113 - 2/26/02 letter to Amsia from KDL      500

11    114 - 2/28/02 letter to Kasia and Sue from Kathy      503
     115 - Letter to Michael Lamensdorf from John re
      response to 2/26 fax note to Amsia from

12       Kathy      507

13

14

15

16      (EXHIBITS ATTACHED)

17

18

19

20      * * *

---

Page 491

1   that exhibit?
2       A. I personally?
3       Q. Yes.
4       A. Not to my recollection.
5       Q. Did your husband ever make a different
6   offer?
7       A. I don't know.
8           MR. FOYE: Could you mark that as our next
9       exhibit, please?
10      (EXHIBIT 110 WAS MARKED FOR IDENTIFICATION)
11  BY MR. FOYE:
12      Q. Do you recognize that document?
13      A. I'm not sure. It's been a while. It's
14  three years. I'm not sure.
15      Q. Do you recognize your notations on the
16  right-hand margin?
17      A. I don't recognize -- I wouldn't say that
18  they were my notations.
19      Q. The great big stars and the asterisk, is
20  that typical of notations that you'd make at the side of
21  documents?
22      A. I often make notations. As I just stated,
23  I can't say that they are my notations.
24      Q. Looking at paragraph 8, it says "Finally,
25  should you wish to get together to discuss/work on ES

Page 492

1   issues, I will make myself available."
2       A. That's interesting, isn't it?
3       Q. Did you in fact ever take Mr. Cram up on
4   his offer?
5       A. Repeatedly.
6       Q. On February 13th, did you in fact speak
7   with Mr. Cram pursuant to his invitation?
8       A. I don't recall if on February 13th I did --
9   I don't recall what I did on February 13th so I wouldn't
10  be able to respond to that question.
11      Q. How often during the month of February were
12  you in verbal communication with Mr. Cram?
13      A. I don't recall.
14      Q. How often did you actually go to the Lantz
15  during February?
16      A. I don't believe I went to the Lantz from
17  early December to early February.
18      Q. Why not?
19      A. I felt that those who were being paid and
20  expected to manage the Lantz should be doing so.
21      Q. Did you believe that they were not doing so
22  at the time?
23      A. That's correct.
24      Q. But you still didn't actually go over to
25  talk to them about it, correct?

Page 493

1       A. That is incorrect.
2       Q. What did you do to talk to them about it?
3       A. We had a meeting at my home on December
4   11th, 2001, in which we discussed it quite aggressively
5   among ourselves.
6       Q. And between December 2001 and February
7   13th, 2002, how many times did you visit the Lantz?
8       A. As I've just said, I don't believe -- I
9   couldn't give you a specific number of times. I'm not
10  even sure I was on site until early February at the
11  Lantz, unless Kasia called to ask me to do something.
12      Q. After early February, how often did you
13  begin to show up at the Lantz?
14      A. That depended on the week and the need for
15  me to be there.
16      Q. Once a week? Twice a week? Every day?
17      A. I would have to check my records, my time
18  cards. I don't recall at this moment.
19      Q. Did you make a notation when you went to
20  the Lantz on your time cards as a matter of policy and
21  practice?
22      A. Yes.
23          MR. FOYE: Would you mark that as our next
24      exhibit, please?
25      (EXHIBIT 111 WAS MARKED FOR IDENTIFICATION)

Page 494

1   BY MR. FOYE:
2       Q. Why did you -- First of all, did you write
3   that document?
4       A. This appears to be my printing, yes.
5       Q. Why did you do that in writing rather than
6   picking up the phone and talking to Kasia?
7       A. It may have been late at night. I'm
8   looking. It doesn't say. Let's see. What does it say?
9   It may have been after hours. It appears that I faxed
10  this to her, I'm not sure, looking at this. I also
11  tried to have most of my communication with Kasia in
12  writing so that there would be a record of what I said
13  or didn't say.
14      Q. By the way, just so we have a clear record,
15  if you could go back to the 2/22/02 fax to John Hirsch?
16  You cc'd your lawyer on that, correct?
17      A. I wrote that. I can't say whether I
18  actually ever gave it to my attorney, looking at this.
19      Q. Why did you write that there?
20      A. Well, at that point, I believe we had been
21  in communication with Attorney Taaffe about the Lantz
22  situation and I probably wanted him to see anything that
23  I was sending to the Lantz.
24      Q. That wasn't about the Lantz, was it, that
25  document you have in front of you?

Page 495

1      A. I wanted him to see any correspondence we
2  had with Ophnet.
3      Q. When you saw Mr. Hirsch's response that's
4  in the upper right-hand corner, what was your reaction?
5      A. Well, we weren't surprised when we saw
6  that. I think we had already received something from
7  Mr. Zolla saying the same thing, so we weren't surprised
8  at that, that they were saying that Eye Specialists had
9  terminated Ophnet's contract. That's a little game they
10  played.
11      Q. Did you ever write back to them and say,
12  "No, we didn't terminate your contract," or words to
13  that effect?
14      A. I don't know.
15      Q. cc Michael Taaffe?
16      A. Mr. Hirsch is directing us not to send any
17  further communications. He's an attorney. He's
18  directing me not to send him any further communications.
19  I don't know why we weren't entitled to have an attorney
20  as well. Were we forbade to have an attorney when
21  working with Ophnet? Is one not allowed to have an
22  attorney if you work with Ophnet? Is that the deal?
23      Q. Do you expect me to answer those questions
24  after the many times that your attorney has told you
25  that I'm not here to answer questions?

Page 496

1      A. I don't have any expectations of you. I'm
2  just asking the question. You're asking me if I, if I,
3  ever contacted Mr. Hirsch again, and I'm saying he's an
4  attorney and he's directing me not to contact him again.
5  I believe Attorney Zolla had already previously directed
6  us not to.
7      Q. Did you in fact contact him or did you not
8  contact him?
9      A. As I've stated previously, I don't know.
10      MR. FOYE: Could we mark this as our next
11  exhibit, please?
12      (EXHIBIT 112 WAS MARKED FOR IDENTIFICATION)
13  BY MR. FOYE:
14      Q. Who wrote that document, Exhibit 112?
15      A. I can't tell from this document who wrote
16  that.
17      Q. At the top, it says to Anusia from Kathy,
18  correct?
19      A. That's correct.
20      Q. And at the bottom it's signed Michael
21  Lamensdorf, M.D. --
22      A. There is no signature on my copy.
23      Q. -- F.A.C.S.; is that correct?
24      A. There is no signature on my copy.
25      Q. Well, there's a printed signature, isn't

Page 497

1  there?
2      A. There's a printed name. It's not a
3  signature.
4      Q. Did you write it?
5      A. I don't recall. I may have written it with
6  my husband. I don't recall.
7      Q. Did, in the course of the Ophnet-Lamensdorf
8  correspondence, did you ever sign your husband's name to
9  a correspondence that you wrote?
10      A. No. No. I understand you've implied that
11  on a number of occasions, but no, I have not. My
12  husband is his own person; he writes his own letters.
13  I'm my own person; I write my own letters.
14      Q. Had you in fact gotten monthly copies of
15  the reconciled check registers since January 2000?
16      A. Say that -- For what?
17      Q. For Lantz payments?
18      A. We received I believe a copy of a
19  QuickBooks record from Anusia. We didn't have any
20  copies or any information on bills being paid and to
21  whom and for why. We didn't have any documentation as
22  to monies that were coming into the Lantz and how they
23  were being appropriated at this time.
24      We had asked repeatedly of Ken Cram, I know
25  I have it documented a number of times, and also Anusia,

Page 498

1  although here she says "the first time," which is
2  obviously not true.
3      Q. What were the -- Were the previous
4  occasions oral or in writing?
5      A. Both, I believe. I had e-mailed Ken Cram a
6  list of requests that we had probably two or three
7  times. We had had at least two phone conversations
8  about it. He stopped me in the parking lot of the Lantz
9  at one point, Lantz or -- some parking lot to say, "I'm
10  awfully sorry I haven't gotten you the information you
11  wanted about the staffing and the finances but I'm just
12  overwhelmed and we're going to work on it." I have that
13  recollection of that conversation.
14      So they were both in writing and orally.
15      Q. Have any of those writings been produced in
16  this litigation?
17      A. If I had them, they've been produced.
18      Q. What was the issue you had that prompted
19  you to request that information?
20      A. Well, we were very concerned about the
21  billing practices at Ophnet and we were concerned that
22  if monies were coming in as a result of my husband's
23  surgery, we felt at this point, since things were so
24  poorly managed, we needed and we had a right as
25  shareholders to know where that money was being

Page 499

1  deposited and how those bills were being paid and to
2  whom, what were the liabilities of the Lantz at that
3  point.
4      Q.  Did the QuickBooks reports that you
5  received not satisfy your curiosity on that point?
6      A.  Obviously not.
7      Q.  Did you also have physical copies of the
8  reconciled check register presented to you on or about
9  2/25/02?
10     A.  Say that again?
11     Q.  Did you also receive a physical copy of the
12  reconciled check register?
13     A.  Reconciled check register.  I don't think
14  I've ever seen a reconciled check register.  I've seen a
15  printout which I believe is QuickBooks of deposits made
16  and checks written, but usually to whom the check is
17  written is often cut off and there aren't any memos
18  alerting us as to why that check was written to that
19  entity.
20     Q.  What were you expecting to see?
21     A.  Exactly what we asked for.
22     Q.  At various times in February and March and
23  April and May of 2002, were there board of directors
24  meetings scheduled for ZHL?
25     A.  I believe Ron and John had a board of

Page 500

1  directors meeting it seemed like daily at that point.
2  That's my best recollection.
3      Q.  Did Dr. Lamensdorf ever attend any of those
4  meetings?
5      A.  Attorneys Hirsch and Zolla would not allow
6  my husband to have his attorney present during those
7  meetings, so he did not attend.
8      Q.  Did you ever discuss with him why he as a
9  member of the board of directors of a business
10  corporation needed to have a lawyer with him when making
11  business decisions for the corporation?
12     A.  Since the other two shareholders had sued
13  my husband and me, I think that it's quite obvious why.
14  There wasn't any need to question that.  And let's not
15  forget they're attorneys.
16         MR. FOYE:  Would you mark that as our next
17     exhibit, please.
18     (EXHIBIT 113 WAS MARKED FOR IDENTIFICATION)
19  BY MR. FOYE:
20     Q.  Did you write that letter?
21     A.  I believe so.
22     Q.  Did you later find out that in fact ZHL did
23  maintain a bank account at Colonial Bank?
24     A.  I'm not sure if I did determine that.
25     Q.  You don't know one way or the other?

Page 501

1      A.  I don't know with whom Ophnet had its or
2  the Lantz had its bank account.  It was always a little
3  bit confusing.
4      Q.  Who did you -- I'll read the second
5  sentence of that paragraph.  "Ken relayed thru email
6  that it is with Colonial Bank but we were told (when we
7  tried to do leg work for Lasik auto payments) that there
8  was no bank account for Lantz Eye Surgery Center."  Who
9  told you that?
10     A.  I believe Bonnie Evans, our office manager,
11  contacted Colonial Bank to see if we couldn't set up
12  with them an arrangement for potential LASIK patients to
13  make auto payments through them and was told that there
14  was no bank account for the Lantz Eye Surgery Center.
15     Q.  Did you ever say to Bonnie Evans, "Of
16  course there isn't, there's no such legal entity as
17  Lantz Eye Surgery Center, check ZHL," or words to that
18  effect?
19     A.  No.  I would have assumed that the Lantz
20  Eye Surgery Center would have had an account under its
21  name at that point as a separate entity from ZHL.
22     Q.  So it was your expectation that the d/b/a,
23  Lantz Eye Surgery Center, would have its own bank
24  account.
25     A.  Yeah, I believe so.

Page 502

1      Q.  Did you later learn that you were incorrect
2  about that?
3      A.  I don't know that I ever followed up on
4  that because there wasn't any need to follow up on that.
5      Q.  Why not?
6      A.  Because we had decided not to do LASIK at
7  the Lantz so there wasn't any need to follow through on
8  that.  And then, as it's stated here and elsewhere,
9  repeatedly we were asking for copies of the bank
10  accounts so I suppose I assumed I would be getting that
11  information.
12     Q.  And what you kept getting back was
13  information for ZHL, Inc., right?
14     A.  We got some information about ZHL, Inc.
15     Q.  What was the next to last paragraph
16  referring to?
17     A.  I believe Anusia told me that no one had
18  responded to my requests because they were on vacation,
19  incredibly enough.
20     Q.  Do you know where they went on vacation?
21     A.  I don't know.  The Hirsches own a lot of
22  homes.  It could have been at any one of their homes.
23  They could have gone skiing.  It was February.  They
24  take a lot of vacations.  I don't know.
25         MR. FOYE:  Next.

February 13, 2002

Kathy,

I received your faxes concerning the YAG, LASIK and Lantz A/R this morning, as well as Dawn's verbal request for Nicole and Tina's timecards and your note about staffing tomorrow. I can respond as follows:

1. I have been directed by John Hirsch, the President of ZHL, Inc, to continue to carry out my responsibilities here at the Lantz until the shareholders have resolved their issues.

2. John informed me he has communicated to you and Michael that he will be delivering a full financial report and accounting of Lantz financial activity at the next shareholders meeting on March 12. Accordingly, I have directed Sue to not prepare or send any financial information to anyone without my specific direction which I will receive from John. 

3. Until the shareholders resolve their differences, please do not make any further specific requests to Lantz staff members other than what is normal and routine for conducting surgery. Specifically, please do not ask Lantz staff for Lantz financial information or for Lantz staff or personnel information. Please do not have other ES personnel call Lantz staff for Lantz financial, staff or personnel information. All such requests should be directed to me in writing. 

4. Regarding Dawn's request to Sue for Nicole and Tina's timecards, I will direct Kasia to forward the hours worked by ES staff at Lantz to ES on a weekly basis. This will begin Monday, February 18, 2002 with hours worked for this week, February 11 – 15, 2002.

5. For Lantz liability reasons, Monday morning is not convenient for moving the YAG. I need to be here when it is moved out as I was here when it was moved in. I can make arrangements to have it moved on Wednesday morning, Feb 20 if that works for you. You are welcome to be here as well when it is moved.

6. I have noted the decision to cancel LASIK on February 19 and on into the future and have passed this information on to John and Ron.

7. With respect to ES staff coming to Lantz tomorrow, as always, we welcome any ES staff that Michael wishes to provide in the interests of patient care. Please be advised that ES staff, while in the Lantz Eye Surgery Center, are responsible, in general, to Kasia and me. We welcome you to observe as well. We expect that ES staff will conduct themselves as they have in past visits, in a friendly, supportive role to help Lantz staff to provide the highest quality experience for the patients. I've also been directed to let you know that Lantz will pay for Pam's

LAM 1029



services in post-op but will not pay for other ES staff members. There should be
a good supply of scrubs in the ladies locker room in various sizes.

8. Finally, should you wish to get together to discuss/work on ES issues, I will make
myself available.

Ken

02/12/2002  18:03    3498304              LAMENSDORF                        PAGE  01

FEBRUARY 12, 2002

TO: KASIL
FROM: KATHY L.
RE: YAG LASER
PER DR LAMENSDORF:

• The movers will be at CANTZ AT
9:00 a.m. on 2/18/02 TO
RETURN THE YAG TO EYE
SPECIALISTS. I will be meeting
the movers at 9:00 a.m.
Pls have all items related to
YAG in the same room

• LASIK is C.X AT CANTZ FOR
2/19/02 AND INTO THE FUTURE

thanks!

KDC

EXHIBIT
111
K. Lamensdorf 2/28/03

OPH 019466

February 20, 2002

To: Anusia
From: Kathy

This is to document that a direct request to you for documentation of all Lentz payments, deposits and monies allocated has been ignored as well as specific questioning of certain allocation of monies. Please refer to recent faxes and submit the information requested to me no later than 2/22/02. Let it be noted here that we have asked on six different occasions for this information. Continuing refusal to release this information will result in legal action.

Michael Lamensdorf, M.D., F.A.C.S.

cc: Michael Taaffe, Esquire

2/25/02

To: Kathy

1) The only requests I have ever received are the faxes received last week. As per Margot's note, I was with my kids for school vacation + back in the office today. I have sent monthly copies of the reconcilled check register to you since Jan. 2000 — you have never had any questions.

2) see attached answers

3) These faxes are the first time, not sixth, that you have asked me for info.

Anusia

EXHIBIT
112
K. Lamensdorf 2/28/0

February 26, 2002

Anusia,

I have before me the six requests for information on the LANTZ bank account. This will be our 7th request. Please read our correspondence more closely. I have never asked for the ZHL, Inc. bank statement. Both Michael (his name is not Mike) and I have asked in writing for the following:

. At what bank is the account for the Lantz Eye Surgery Center? Ken relayed thru email that it is with Colonial Bank but we were told (when we tried to do leg work for Lasik auto payments) that there was no bank account for Lantz Eye Surgery Center.

. What has been deposited and what has been withdrawn (from the first day of surgery at the Lantz Eye Surgery Center)? We have asked for the bank register for the Lantz Eye Surgery Center, not ZHL, Inc.

. You have always asked me to relay any concerns/questions about the register so I am not sure why you are so touchy about my questions. I am looking into things I never had to before, so there will be questions. Just let me know in writing if my questioning is going to bother you.

. Why would we ever think that anyone from ZHL, Inc. would take a vacation when the Lantz Eye Surgery Center is in need of so much management attention?

Once again, please provide us with the Lantz Eye Surgery Center bank register. You may fax it to our home fax – 1-941-349-0304 today.

KDL

EXHIBIT

_113_

K. Lamensdorf 2/28/05

EXHIBIT 15
TO
**MEMORANDUM IN SUPPORT OF MOTION TO REMAND**

—                —

IN THE CIRCUIT COURT FOR THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA

DR. MICHAEL LAMENSDORF, in his capacity
as shareholder of ZHL, INC., a Massachusetts
corporation, and KATHY LAMENSDORF,
in her capacity as shareholder of ZHL, INC.,

      Plaintiffs,

v.                                     CASE NO.: *2005 CA 2997 NC*

ZHL, INC., a Massachusetts corporation,
RONALD W. ZOLLA, in his capacity as
shareholder of ZHL, INC., JOHN A. HIRSCH,
in his capacity as shareholder of ZHL, INC.,
and GLOBAL SURGICAL PARTNERS, INC.,
a Florida corporation,

      Defendants.
_____/

## COMPLAINT

COME NOW, Plaintiffs, Dr. Michael Lamensdorf, in his capacity as shareholder of ZHL,

Inc., and Kathy Lamensdorf, in her capacity as shareholder of ZHL, Inc. (hereafter collectively

referred to as the "Lamensdorfs" or the "Plaintiffs"), by and through their undersigned counsel,

and hereby sue Defendants, ZHL, Inc., a Massachusetts corporation, Ronald W. Zolla, in his

capacity as shareholder of ZHL, Inc., John A. Hirsch, in his capacity as shareholder of ZHL, Inc.,

and Global Surgical Partners, Inc., a Florida corporation, and allege as follows:

## JURISDICTIONAL ALLEGATIONS

1.      This is an action in equity in which Plaintiffs seek relief from this Court for: (i)

injunctive relief; (ii) the appointment of a receiver to preserve the value of property located

within Sarasota County; and (iii) the imposition of a constructive trust.

2.     Plaintiff, Dr. Michael Lamensdorf, is a resident of Sarasota County, Florida and a practicing ophthalmologist whose professional address is 1428 South Tamiami Trail, Sarasota, Florida 34239.

3.     Plaintiff, Kathy Lamensdorf, is a resident of Sarasota County, Florida.

4.     Defendant, ZHL, Inc. ("ZHL"), is a Massachusetts corporation authorized to conduct business in the State of Florida. ZHL is registered with the Florida Department of State, Division of Corporations, and its registered agent authorized to accept service of process is William Hirsch, CPA.

5.     William Hirsch, CPA's professional address is listed with the Florida Department of State, Division of Corporations, as 608 West Horatio Street, Tampa, FL 33606

6.     Defendant, Ronald W. Zolla ("Zolla"), is a resident of the State of Massachusetts and resides at 20 Schooner Ridge, Marblehead, Essex County, Massachusetts 01945.

7.     Defendant, John A. Hirsch ("Hirsch"), is a resident of the State of Massachusetts and resides at 15 Brookside Road, Topsfield, Essex County, Massachusetts 01983.

8.     Defendant, Global Surgical Partners, Inc. ("GSP"), is a duly licensed Florida corporation authorized to conduct business in the State of Florida. GSP's principal address is listed with the Florida Department of State, Division of Corporations, as 3059 Grand Avenue, Suite 300, Miami, Florida 33133.

9.     GSP's registered agent is Ziskind & Arvin, P.A., located at 3059 Grand Avenue, Suite 300, Miami, Florida 33133.

10.    All conditions precedent to the maintenance of this action, if any, have been performed and/or waived.

11.    This Court has jurisdiction of this matter pursuant to Sections 26.012(2)(e) and 26.012(3), Florida Statutes.

12.    Venue is proper in Sarasota County since the property Plaintiffs are seeking to protect is located in Sarasota County, Florida.

## GENERAL ALLEGATIONS

13.    Dr. Lamensdorf is a board-certified, fellowship trained ophthalmologist.

14.    Dr. Lamensdorf has dedicated his professional life to helping people achieve their best possible vision by providing them with the latest in eyecare technology. As a practicing ophthalmologist, he specializes in cataract surgery and the eyecare needs unique to seniors. He developed Rapid Recovery Cataract Surgery, an advanced, no-stitch procedure that allows patients to resume life's normal activities almost immediately following surgery.

15.    In addition to his medical practice, Dr. Lamensdorf remains very active in the local Sarasota community and has founded several service and charitable organizations.

16.    As a board-certified ophthalmologist, Dr. Lamensdorf also maintains memberships and affiliations with: (i) Phi Beta Kappa; (ii) the American Academy of Ophthalmology; (iii) American College of Surgeons; (iv) American Society of Cataract and Retractive Surgery; (v) American Society of Ophthalmic Administrators; (vi) Sarasota County Medical Society; (vii) Sarasota Memorial Hospital; and (viii) the Doctor's Hospital.

17.    In addition, Dr. Lamensdorf maintains an affiliation with the Lantz Eye Surgery Center ("LESC").

18.    The Lantz Eye Surgery Center is an ambulatory eye surgery center located at 2821 Proctor Road, Sarasota, Florida 34231.

EXHIBIT 16
TO
**MEMORANDUM IN SUPPORT OF MOTION TO REMAND**

COMMONWEALTH OF MASSACHUSETTS

ESSEX, s.s.                                      SUPERIOR COURT
                                                CIVIL ACTION NO. B 2 0419

OPHNET, INC., et al.,                    )
                                         )
        Plaintiffs,                      )
                                         )
v.                                       )
                                         )
MICHAEL LAMENSDORF, et al.,              )
                                         )
        Defendants.                      )
                                         )

## DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM

Defendants, Michael Lamensdorf, Michael Lamensdorf, M.D., P.C. [sic], Bayou Jenkay, Inc., and Kathy Lamensdorf (collectively, "Defendants"), answer Plaintiffs' Second Amended Complaint as follows:

1.      Defendants deny the allegations contained in paragraph 1 of the Second Amended Complaint.

2.      Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in paragraph 2 of the Second Amended Complaint and, hence, deny same.

3.      Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in paragraph 3 of the Second Amended Complaint and, hence, deny same.

4       Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in paragraph 4 of the Second Amended Complaint and, hence, deny same.

1

68.    Defendants deny the allegations contained in paragraph 53 [sic] of the Second Amended Complaint.

69.    Defendants, in response to the allegations contained in paragraph 54 [sic] of the Second Amended Complaint, reallege their responses to paragraphs 1 through 64 and 50-53 [sic] of the Second Amended Complaint as if set forth verbatim here.

70.    Defendants admit that a copy of the Shareholders' Agreement is attached to the Second Amended Complaint as Exhibit "4", but deny the remaining allegations contained in paragraph 55 [sic] of the Second Amended Complaint to the extent that such allegations differ from the terms thereof.

71.    Defendants admit that a copy of the Shareholders' Agreement is attached to the Second Amended Complaint as Exhibit "4", but deny the remaining allegations contained in paragraph 56 [sic] of the Second Amended Complaint to the extent that such allegations differ from the terms thereof.

72.    Defendants deny the allegations contained in paragraph 57 [sic] of the Second Amended Complaint.

73.    Defendants deny the allegations contained in paragraph 58 [sic] of the Second Amended Complaint.

74.    Any allegation of the Second Amended Complaint not specifically admitted by Defendants herein is hereby denied.

### FIRST AFFIRMATIVE DEFENSE

75.    Plaintiffs first breached the parties' Management Agreement and such breach was material.  Plaintiffs breached their obligations under the Management Agreement by, without limitation: failing to provide acceptable management, staffing, and training services and failing

10

to provide acceptable billing and financial management services. Though Defendants Michael Lamensdorf, M.D., Kathy Lamensdorf, and Michael Lamensdorf, M.D., P.C. [sic], frequently requested Plaintiffs to remedy such deficiencies, Plaintiffs refused to do so.

### SECOND AFFIRMATIVE DEFENSE

76.    Plaintiffs first breached the parties' Management Agreement For ZHL, Incorporated Ambulatory Surgery Center Project and such breach was material. Plaintiffs breached their obligations under this agreement by, without limitation: failing to ensure that the Ambulatory Surgery Center ("ASC") was properly staffed; failing to monitor the day to day operation of the ASC; failing to ensure that the ASC had properly functioning equipment; failing to meet all regulatory requirements for the operation of the ASC; failing to operate the ASC in a cost-effective and efficient manner; and, failing to ensure that billing and collections services for the ASC were provided in a timely, efficient, and cost-effective manner. Though Defendants Michael Lamensdorf, M.D., and Kathy Lamensdorf, individually and as shareholders of ZHL, Inc., frequently requested Plaintiffs to remedy such deficiencies, Plaintiffs refused to do so.

### THIRD AFFIRMATIVE DEFENSE

77.    Plaintiffs claims for fraud are barred by the economic loss rule to the extent they seek damages resulting from any alleged contractual breach.

### COUNTERCLAIM

Defendants Michael Lamensdorf, Michael Lamensdorf, M.D., P.C. [sic], and Kathy Lamensdorf (collectively, "Defendants"), counterclaim against Plaintiffs Ophnet, Inc., John A. Hirsch, Ronald W. Zolla, and Kenneth Cram (collectively "Plaintiffs"), and allege:

### GENERAL ALLEGATIONS

1.    Michael Lamensdorf, M.D. ("Dr. Lamensdorf") is a licensed ophthalmologist

11

644714v 3

practicing in the Sarasota area.

2.      Michael Lamensdorf, M.D., P.A. (the "Practice"), improperly referred to in Plaintiffs' Second Amended Complaint as Michael Lamensdorf, M.D., P.C., is a Florida professional association, owned and operated by Dr. Lamensdorf, under which Dr. Lamensdorf practices medicine and performs ophthalmic surgery.

3.      Bayou Jenkay, Inc., is a Florida corporation owned and operated by Kathy Lamensdorf, Dr. Lamensdorf's wife, that performs management, staffing, and other services for Dr. Lamensdorf and Michael Lamensdorf, M.D., P.A.

4.      On information and belief, Plaintiff John A. Hirsch is a licensed attorney authorized to practice in state of Massachusetts

5.      On information and belief, Mr. Hirsch is not authorized to practice law in the state of Florida.

6.      On information and belief, Plaintiff Ronald W. Zolla is a licensed attorney authorized to practice in the state of Massachusetts.

7.      On information and belief, Mr. Zolla is not authorized to practice law in state of Florida

8.      On information and belief, Ophnet, Inc. ("Ophnet"), is a Massachusetts corporation, owned and operated by John A Hirsch, Ronald W. Zolla, and Kenneth Cram.

9.      Ophnet, Inc , is marketed as a management and marketing company whose principles, Mr. Hirsch and Mr. Zolla, allegedly have 20 years experience specializing in the management and marketing of ophthalmology practices.

10.     Encouraged by Ophnet's marketing scheme, Dr. Lamensdorf hired Ophnet in

12

1995 to provide marketing and management services to the Practice and entered the Management Agreement, Michael Lamensdorf, M.D. (the "Management Agreement"), a copy of which is attached hereto as Exhibit "A".

11.    Pursuant to the Management Agreement, Kenneth Cram was placed in charge of Ophnet's management and marketing responsibilities to the Practice.

12.    The Management Agreement was amended on March 19, 1997, by an Addendum To Management Agreement With Michael Lamensdorf, M.D., a copy of which is attached hereto as Exhibit "B", which memorialized the terms of the Practice's purchase of the ophthalmology practice operated by Dr. Richard Baise.

13.    Pursuant to this purchase, Dr. Lamensdorf, Kathy Lamensdorf, Kenneth Cram, John A. Hirsch, and Ronald W. Zolla formed the Lamenscram Partnership and entered the Lamenscram Partnership Agreement.

14.    Pursuant to the Lamenscram Partnership Agreement, a copy of which is attached hereto as Exhibit "C", the Lamenscram Partnership was to hold title to the tangible assets acquired as a result of the purchase of Dr. Baise's practice.

15.    In violation of the Management Agreement, Ophnet grossly mismanaged the Practice.

16.    In 1998, Dr. Lamensdorf, Kathy Lamensdorf, Mr. Hirsch, and Mr. Zolla, agreed to build an ambulatory surgery center in Sarasota, Florida, and formed ZHL, Inc. ("ZHL"), a Massachusetts closely-held corporation, to accomplish this purpose.

17.    To induce Dr. Lamensdorf and Kathy Lamensdorf to become investors in, and shareholders of, ZHL, Plaintiffs Hirsch and Zolla assured the Lamensdorfs that they were experienced with the construction and operation of ambulatory service centers, that they were

13

licensed attorneys who could handle the majority of legal issues faced by such a surgery center, and that Dr. Lamensdorf's involvement in the center would be limited to performing surgeries and providing other ophthalmic services for patients at the center.

18.    Based on these representations, Dr. Lamensdorf and Kathy Lamensdorf agreed to invest in and become shareholders of ZHL.

19.    Pursuant to this agreement, Dr. Lamensdorf, Kathy Lamensdorf, Mr. Hirsch, and Mr. Zolla executed a Shareholders' Agreement, attached hereto and made a part hereof as Exhibit "D", which memorialized the terms of ownership of ZHL's shares.

20.    On the basis of Ophnet's alleged experience in the construction and operation of ambulatory surgery centers, ZHL entered into the Management Agreement For ZHL, Incorporated Ambulatory Surgery Center Project (the "ZHL Management Agreement") with Ophnet.

21.    Pursuant to the ZHL Management Agreement, a copy of which is attached hereto as Exhibit "E", Ophnet was to perform management services for the Ambulatory Surgery Center throughout the construction process and thereafter.

22.    Ophnet placed Kenneth Cram in charge of Ophnet's management and marketing responsibilities to ZHL and the Ambulatory Surgery Center.

23.    During the construction of the Ambulatory Surgery Center, Ophnet provided insufficient management, inspection and licensing oversight, thereby delaying the opening of the center approximately six weeks and significantly increasing the construction costs thereof.

24.    The Ambulatory Surgery Center opened for business on November 27, 2001, as the Walter P. Lantz Outpatient Surgery Center (the "Lantz").

25.    In violation of the ZHL Agreement, Ophnet grossly mismanaged the Lantz.

14

26.    Due to Ophnet's failure to perform its management obligations under the ZHL

Management Agreement, Dr. Lamensdorf and Kathy Lamensdorf were forced to assume all

management responsibilities for the Lantz, and subsequently, terminated Ophnet, Inc., for cause

on February 15, 2002.

27.    In response to being terminated by Dr. Lamensdorf on behalf of ZHL, Ophnet

unilaterally terminated its agreement with the Practice on February 16, 2002.

### COUNT I: BREACH OF CONTRACT (ZHL MANAGEMENT AGREEMENT)

28.    Defendants Dr. Lamensdorf and Kathy Lamensdorf incorporate by reference the

allegations of Counterclaim paragraphs 1-27 as if fully set forth herein.

29.    Defendants Dr. Lamensdorf and Kathy Lamensdorf bring this action as

shareholders of ZHL, on behalf of ZHL.

30.    Defendants Dr. Lamensdorf and Kathy Lamensdorf have not demanded that ZHL

bring this claim, as such request would be futile; ZHL is controlled by its majority shareholders,

Plaintiffs Hirsch and Zolla.

31.    Pursuant to the ZHL Management Agreement (Exh. "E"), Plaintiffs were to

provide management and marketing services to the Lantz.

32.    Plaintiffs breached the ZHL Management agreement by, without exclusion:

(a) failing to provide proper oversight during the inspection process, thereby
delaying the opening of the Lantz approximately six weeks;

(b) failing to provide staff of suitable qualifications and abilities;

(c) failing to schedule staff in a cost effective and efficient manner, thereby
forcing Dr. Lamensdorf to schedule employees of his Practice to work at the
Lantz;

(d) failing to provide proper staff and equipment for sterilization and post-
operative care;

15

(e) failing to follow ACHA guidelines;

(f) failing to provide a functioning and efficient system for billing procedures;

(g) failing to provide pest control services for the center;

(h) failing to provide cleaning services for the center;

(i) failing to provide adequate anesthesia support for Dr. Lamensdorf;

(j) failing to collect accounts receivable in a timely fashion;

(k) failing to pay the accounts receivable in a timely fashion;

(l) failing to develop a marketing schedule or engage in suitably proactive marketing activities;

(m) failing to provide suitable surgical equipment;

(n) failing to qualify the Lantz to perform surgeries covered by Blue Cross/Blue Shield of Florida and other insurance providers; and,

(o) failing to appropriately manage billing procedures or provide for adequate training on billing software.

33.    Plaintiffs' breach of the ZHL Management Agreement caused Defendants Dr. Lamensdorf and Kathy Lamensdorf, as shareholders of ZHL, to suffer damages, including, but not limited to, lost revenues and the cost of acquiring replacement management services.

34.    Defendants have retained the undersigned attorneys to represent them in this action and are obligated to pay such attorneys for their services and such attorneys' fees are recoverable from Plaintiffs.

WHEREFORE, Defendants respectfully request that this Court enter judgment against Plaintiffs:

(a)    for damages;

(b)    for attorneys' fees, costs, and prejudgment interest; and,

16

644714v 3

(c)    for such further and additional relief as this cause and justice may require.

### COUNT II: BREACH OF CONTRACT (MANAGEMENT AGREEMENT, MICHAEL LAMENSDORF, M.D., P.A.)

35.    Defendants incorporate by reference the allegations of paragraphs Counterclaim

paragraphs 1-27 as if fully set forth herein.

36.    Pursuant to the Management Agreement (Exh. "A"), Plaintiffs were to

provide management and marketing services to the Michael Lamensdorf, M.D., P.A.

37.    Plaintiffs breached the Management Agreement by, without limitation:

(a) failing to follow through on clinical staff monitoring, staffing, and training;

(b) failing to manage the LASIK service and follow through on LASIK marketing
strategies;

(c) effectively abandoning management of the Practice by assigning Kenneth
Cram to manage the Lantz as early as August 2001;

(d) ignoring their management responsibilities to the Englewood office in order
to, on information and belief, protect Ophnet's competing interest in a Port
Charlotte ophthalmology office;

(e) failing to develop another satellite office, as promised;

(f) failing to obtain an insurance provider for all doctors at the practice, and
failing to provide staffing and scheduling oversight for all doctors at the practice;

(g) failing to manage doctors' patients services;

(h) failing to provide proper oversight over the purchase of a new computer
system, installation thereof, and software and hardware training thereon; and

(i) failing to successfully manage the Health On Site program.

38.    Plaintiffs' breach of the Management Agreement has caused Defendants to suffer

17

damages, including but not limited to, lost profits and revenues and the cost of acquiring replacement management services.

39.    Defendants have retained the undersigned attorneys to represent them in this action and are obligated to pay such attorneys for their services and such attorneys' fees are recoverable from Plaintiffs.

WHEREFORE, Defendants respectfully request that this Court enter judgment against Plaintiffs:

(a)    for damages;

(b)    for attorneys' fees, costs, and prejudgment interest; and,

(c)    for such further and additional relief as this cause and justice may require.

### COUNT III: BREACH OF FIDUCIARY DUTY

40.    Defendants incorporate by reference the allegations of Counterclaim paragraphs 1-27 as if fully set forth herein.

41.    As fellow shareholders of ZHL, a closely held corporation organized under the laws of Massachusetts, Plaintiffs Hirsch and Zolla owed a fiduciary duties of loyalty, care, and full disclosure to Dr. Lamensdorf and Mrs. Lamensdorf.

42.    Plaintiffs Hirsch and Zola have breached their fiduciary duties to the Lamensdorfs by, without limitation:

(a) grossly misrepresenting the amount of money that would be required to construct the Ambulatory Surgery Center;

(b) conspiring in bad faith to dilute, and, ultimately, diluting Dr. Lamensdorf's and Mrs. Lamensdorf's ownership interest in ZHL in order to improperly gain control over ZHL;

(c) refusing to disclose the financial records of ZHL and the Lantz to Dr. and Mrs. Lamensdorf despite numerous requests therefor;

18

644714v 3

(d) refusing in bad faith to pay Dr. Lamensdorf and Mrs. Lamensdorf the distributions due to them.

(e) engaging in self-dealing by, without limitation, failing to act in the best interests of ZHL and other shareholders by terminating Ophnet as soon as they became aware of Ophnet's inability to manage the Lantz in a profitable, efficient, and safe manner.

43.    Plaintiffs' breaches of their fiduciary duty to Defendants have caused Defendants to suffer damages.

44.    Defendants have retained the undersigned attorneys to represent them in this action and are obligated to pay such attorneys for their services and such attorneys' fees are recoverable from Plaintiffs.

WHEREFORE, Defendants respectfully request that this Court enter judgment against Plaintiffs:

(a)    for damages;

(b)    for attorneys' fees, costs, and prejudgment interest; and,

(c)    for such further and additional relief as this cause and justice may require.

### COUNT IV: FRAUDULENT INDUCEMENT

45.    Defendants Dr. Lamensdorf and Kathy Lamensdorf incorporate by reference the allegations of Counterclaim paragraphs 1-27 as if fully set forth herein.

46.    Plaintiffs Hirsch and Zolla fraudulently induced Dr. Lamensdorf and Kathy Lamensdorf to invest substantial funds into the formation and operation of ZHL, Inc., based on their representations, without exclusion, that they were experienced with the construction and operation of ambulatory service centers, that they were licensed attorneys who could handle the majority of legal issues faced by such a surgery center, and that Dr. Lamensdorf's involvement

19

644714v 3

in the center would be limited to performing surgeries and providing other ophthalmic services for patients at the center.

47.    Such representations were material and false, and Plaintiffs Hirsch and Zolla were aware of their falsity at the time they were made.

48.    Plaintiffs Hirsch and Zolla made these false representations for the purpose of inducing Defendants Dr. Lamensdorf and Kathy Lamensdorf to act thereon.

49.    Defendants Dr. Lamensdorf and Kathy Lamensdorf reasonably relied on the Defendants false representations as true and were damaged thereby.

WHEREFORE, Defendants respectfully request that this Court enter judgment against Plaintiffs:

    (a)    for damages;

    (b)    for attorneys' fees, costs, and prejudgment interest; and,

    (c)    for such further and additional relief as this cause and justice may require.

### COUNT V: NEGLIGENT MISREPRESENTATION

50.    Defendants Dr. Lamensdorf and Kathy Lamensdorf incorporate by reference the allegations of Counterclaim paragraphs 1-27 as if fully set forth herein.

51.    Plaintiffs Hirsch and Zolla, in order to induce Dr. Lamensdorf and Kathy Lamensdorf to invest substantial funds into the formation and operation of ZHL, Inc., negligently misrepresented a number of material facts, including, without exclusion, that they were experienced with the construction and operation of ambulatory service centers, that they were licensed attorneys who could handle the majority of legal issues faced by such a surgery center, and that Dr. Lamensdorf's involvement in the center would be limited to performing surgeries and providing other ophthalmic services for patients at the center.

20

644714v 3

52.    Plaintiffs Hirsch and Zolla knew, or, through a modicum of diligence should have known, that such representations were false.

53.    Defendants Dr. Lamensdorf and Kathy Lamensdorf relied on the Defendants false representations as true and were damaged thereby.

WHEREFORE, Defendants respectfully request that this Court enter judgment against Plaintiffs:

(a)    for damages;

(b)    for attorneys' fees, costs, and prejudgment interest; and,

(c)    for such further and additional relief as this cause and justice may require.

### COUNT VI: ACCOUNTING

54.    Defendants Dr. Lamensdorf and Kathy Lamensdorf incorporate by reference the allegations of Counterclaim paragraphs 1-27 as if fully set forth herein.

55.    Due to Plaintiffs Hirsch and Zolla's numerous breaches of their fiduciary obligations to Defendants Dr. Lamensdorf and Mrs. Lamensdorf as fellow shareholders of ZHL, Defendants Dr. Lamensdorf and Kathy Lamensdorf require an independent accounting of ZHL to accurately determine the true financial condition of ZHL and the value of the parties' ownership interests therein.

56.    This court should order and hold an accounting of ZHL's finances.


Dated:  June _6_, 2003                    Respectfully submitted,

                                          Michael S. Taaffe (Fla. Bar No. 490318)
                                          Jennifer B. Compton (Fla. Bar No. 0128041)
                                          ABEL, BAND, RUSSELL, COLLIER,
                                          PITCHFORD & GORDON, CHARTERED
                                          240 South Pineapple Avenue
                                          Sarasota, Florida  34230-6948
                                          (941)  366-6660
                                          (941)  366-3999 (fax)
                                          admitted *pro hac vice*

                                          Brandon F. White, BBO# 525020
                                          Elizabeth Heinrich, BBO # 649090
                                          FOLEY HOAG, LLP
                                          155 Seaport Boulevard
                                          Boston, MA 02210
                                          (617) 832-1000


                                          Attorneys for Defendants
                                          MICHAEL LAMENSDORF, Individually
                                          and as a Shareholder of ZHL, Inc.;
                                          MICHAEL LAMENSDORF, M.D., P.C., A
                                          Florida Professional Corporation, BAYOU
                                          JENNKAY, INC., a Florida Corporation;
                                          KATHY LAMENSDORF, Individually and
                                          as an officer of Bayou JennKay, Inc.

22

644714v 3

## CERTIFICATE OF SERVICE

I hereby certify that on this $\underline{6}$ day of June 2003, I have caused a copy of the foregoing Answer and Counterclaims to be forwarded by first-class mail, postage pre-paid, to Edward Foye, Esq., Todd & Weld LLP, 28 State Street, Boston, MA 02109.

_____
Elizabeth Heinrich

23